MONICA STONE vs ROBERT HENDRY
MONICA STONE

1              IN THE UNITED STATE DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
2

3        CASE NO: 2:17-CV-14177-ROSENBERG/MAYNARD

4
    MONICA STONE, as the
5   Personal Representative of the
    ESTATE OF CHRISTOPHER COX,
6
             Plaintiff,
7
        vs.
8
    ROBERT HENDRY, ROBERT FEIPEL, CHRISTOPHER
9   ROSE, DAVID BAILES, CAROLYN CONRAD, and
    THE STATE OF FLORIDA through JULIE L. JONES,
10  In her official capacity as Secretary of the
    Florida Department of Corrections,
11
             Defendants.
12  _____

13

14            DEPOSITION OF MONICA STONE

15
    Taken on Behalf of the Defendants Hendry, Feipel & DOC
16

17
        DATE TAKEN:        February 14, 2018
18      TIME:              11:15 A.M. - 1:11 P.M.
        PLACE:             Accurate Reporting Service, Inc.
19                         439 Rose Avenue
                           Sebring, Florida 33870
20

21

22

23            Reported By:

24        Susan Rankine, Court Reporter

25

                                        **EXHIBIT A**



                         **Orange Legal**
                         **800-275-7991**

MONICA STONE vs ROBERT HENDRY
MONICA STONE

2..5

Page 2

```
 1
    APPEARANCES FOR THE PLAINTIFF:
 2
 3  JAMES COOK, ESQUIRE
    Law Office of James Cook
 4  314 West Jefferson Street
    Tallahassee, Florida 32301
 5
 6
    APPEARANCES FOR THE DEFENDANTS HENDRY, FEIPEL AND DOC:
 7
 8  JAMES O. WILLIAMS, JR., ESQUIRE
    Williams, Leininger & Cosby, P.A.
 9  11300 U.S. Highway One, Suite 300
    North Palm Beach, Florida 33408
10  eService@wlclaw.com
11
12  APPEARANCES FOR THE DEFENDANTS ROSE AND BAILES:
13
    CHRISTOPHER J. WHITELOCK, ESQUIRE
14  Whitelock & Associates, P.A.
    300 S.E. Thirteenth Street
15  Fort Lauderdale, Florida 33316
    cjw@whitelocklegal.com
16
17
    APPEARANCES FOR DEFENDANT CONRAD:
18
19  CLAIRE R. HURLEY, ESQUIRE
    Cole, Scott & Kissane
20  222 Lakeview Avenue, Suite 120
    West Palm Beach, Florida 33401
21  claire.hurley@csklegal.com
22
23  ALSO PRESENT:
24  (N/A)
25
```

Page 3

```
 1            I N D E X
 2  Deposition of MONICA STONE          Page No.
 3  Direct Examination by Mr. Williams        4
    Cross-Examination by Ms. Hurley          44
 4  Cross-Examination by Mr. Whitelock       49
    Redirect Examination by Mr. Williams     76
 5  Recross-Examination by Mr. Whitelock     84
    Certificate of Oath                      86
 6  Certificate of Reporter                  87
    Errata Sheet                             88
 7  Read & Sign Letter to Witness            89
 8
 9
          PLAINTIFF'S EXHIBITS INDEX
10
11  No.   Description                   Page No.
12
13          *****N O N E*****
14
15
16          DEFENDANTS' EXHIBITS INDEX
17  No.   Description                   Page No.
     1       Insurance Card                 82
18
19
20
21
22
23
24
25
```

Deposition of MONICA STONE — Page No.
Direct Examination by Mr. Williams — 4
Cross-Examination by Ms. Hurley — 44
Cross-Examination by Mr. Whitelock — 49
Redirect Examination by Mr. Williams — 76
Recross-Examination by Mr. Whitelock — 84
Certificate of Oath — 86
Certificate of Reporter — 87
Errata Sheet — 88
Read & Sign Letter to Witness — 89
Insurance Card — 82

Page 4

1 WHEREUPON:
2        MONICA STONE,
3 called as a witness, was sworn/affirmed to tell the
4 truth, the whole truth, and nothing but the truth, and
5 was deposed and testified as follows:
6     THE WITNESS:  Yes.
7         DIRECT EXAMINATION
8 BY MR. WILLIAMS:
9   Q.  Would you state your full name for our record,
10 please, ma'am?
11   A.  Monica Lynn Stone.
12   Q.  Ms. Stone, I'm Jim Williams.  We introduced
13 ourselves briefly before we got started here today.  I
14 understand you have not had your deposition taken
15 before.  Is that right?
16   A.  Right.
17   Q.  I know your lawyer has talked to you and
18 explained something about it.  I'm just going to share
19 some of the rules with you from our perspective.  Most
20 of the rules are for the benefit of the court reporter.
21     First of all, if you and I were just standing
22 around outside talking, we would be nodding and shaking
23 our head.  We have to answer out loud so she can get it
24 down.
25     When we say things like uh-huh and uh-uh, when

Page 5

1 I read it on the typed page six months from now, I won't
2 know what was said, so try to say yes and no.
3   A.  Okay.
4   Q.  Also folks tend to talk on top of each other a
5 lot these days.  It's really tough for her to type two
6 people at one time, so if you let me finish my questions
7 I'll try to let you finish your answers.  Okay?
8   A.  Okay.
9   Q.  If you need a break at any time for any reason,
10 you let me know.  I know we're here on a sensitive
11 matter involving your son and if you get upset, we'll
12 take a break and you can settle down if you want to.
13 Okay?
14   A.  Okay.
15   Q.  Most important to me is that you understand and
16 answer all of my questions as best you can.  So if you
17 don't understand my question, I need you to let me know.
18 Is that fair?
19   A.  Yes.
20   Q.  If you answer it and you didn't understand it,
21 we're going to hold you to your answer.
22   A.  Okay.
23   Q.  Does that sound fair?
24   A.  Yes.
25   Q.  Okeydoke.  What is your current residence



Page 6

1 address, ma'am?
2    A.   3335 Oakland Road South, Lakeland, Florida
3 33801.
4    Q.   And how long have you lived there?
5    A.   16 years.
6    Q.   Who currently lives there with you?
7    A.   My husband.
8    Q.   And what's his name?
9    A.   Randall Stone.
10    Q.   And has it always been just the two of you
11 these 16 years or have there been other people who have
12 lived there over time?
13    A.   My daughter, she came down for a year and a
14 half from Tennessee.
15    Q.   When was that?
16    A.   2015.
17    Q.   And did she come down by herself?
18    A.   Yes.
19    Q.   And when she came down, did she -- when you
20 said she came in 2015, did she stay for a year and a
21 half after that?  So into 2017?
22    A.   Yeah.
23    Q.   Okay.  Are you currently employed outside the
24 home?
25    A.   Yes.

Page 7

1    Q.   Where do you work?
2    A.   At a grooming shop.
3    Q.   And are you working there full time?
4    A.   Yes.
5    Q.   What's the name of the grooming shop?
6    A.   Happy Paws Pet Salon.
7    Q.   What is the address?
8    A.   I don't know the physical address, but it's on
9 South Florida Avenue.
10    Q.   In Lakeland?
11    A.   Uh-huh.
12    Q.   Yes?
13    A.   Yes.
14    Q.   It's okay.  Everybody does it and we just
15 correct each other along the way.
16         How long have you been working at the Happy
17 Paws Grooming Salon?
18    A.   February will be two years.
19    Q.   And who is your supervisor there?
20    A.   Laura Schuloffer.
21         MR. COOK:  Do you need a spelling?
22         THE COURT REPORTER:  (Nods head.)
23         THE WITNESS:  S-C-H-U-L-O-F-F-E-R.
24    Q.   Is your husband employed?
25    A.   No, sir.

Page 8

1    Q.   When was the last time he was employed, if he
2 was?
3    A.   I'm going to say 2004.
4    Q.   Is there a particular reason why he hasn't
5 worked since that time?
6    A.   He's disabled.
7    Q.   Was there some specific incident that caused --
8    A.   He has multiple sclerosis.
9    Q.   How far did you go in school?
10    A.   I quit in the eleventh grade.
11    Q.   And where were you going to school at that
12 point?
13    A.   Tampa Bay Tech Vocational.
14    Q.   And did you receive some sort of certificate or
15 degree from there?
16    A.   No, sir.
17    Q.   After that time, did you take any additional
18 training to obtain any kind of certificate or degree?
19    A.   No, sir.
20    Q.   Do you have any specific training for the work
21 that you're doing now, the grooming?
22    A.   What do you mean?
23    Q.   Did you go to take some classes or --
24    A.   No.
25    Q.   All on-the-job training?

Page 9

1    A.   Yeah.
2    Q.   Okay.  And have you lived anywhere other than
3 Lakeland and Tampa?
4    A.   I used to live in Tampa.
5    Q.   Other than those two places, have you lived any
6 other place in your lifetime?
7    A.   No, sir.
8    Q.   Where were you born?
9    A.   In Tampa.
10    Q.   And what was your date of birth, please?
11    A.   September 10th, 1969.
12    Q.   You know that we're here about a lawsuit that
13 you have filed against our clients, is that right?
14    A.   Yes, sir.
15    Q.   Did you read the lawsuit when it was filed?
16    A.   I believe I did.
17    Q.   And did you agree with the things that you saw
18 there?
19         MR. COOK:  Form.
20    Q.   Did you agree with what they said in the
21 lawsuit?
22    A.   Yes.
23    Q.   During the deposition lawyers object and we do
24 that to put it on the record.  So unless your lawyer
25 tells you not to answer the question when he makes



MONICA STONE vs ROBERT HENDRY
MONICA STONE

10..13

Page 10

1 objections like that, you can answer.  Okay?
2    A.  Okay.
3    Q.  Where were you living when your son,
4 Christopher Cox, was born?
5    A.  In Tampa.
6    Q.  Do you remember the address?
7    A.  4014 East Miller Avenue, Tampa.  Do you need
8 the zip code?
9    Q.  No.
10   A.  Okay.
11   Q.  Who is Christopher Cox's father?
12   A.  Ronald Doyle.
13   Q.  Do you know where Mr. Doyle lives now?
14   A.  Somewhere in the Spring Hill/Brooksville area.
15   Q.  When was the last time you spoke with
16 Mr. Doyle?
17   A.  A year ago.
18   Q.  And have you discussed with him your lawsuit
19 that you filed?
20   A.  No, sir.
21   Q.  Is he, to your knowledge, is he aware that you
22 filed a lawsuit as a result of your son's passing?
23   A.  I don't know.  I'm sure he is.
24   Q.  You mentioned earlier that your daughter was
25 down for a year and a half, is that right?

Page 11

1    A.  Yes.
2    Q.  What is her name?
3    A.  Amanda.
4    Q.  Last name?
5    A.  Daniels.
6    Q.  Is she related by blood to Christopher Cox?
7    A.  No, sir.
8    Q.  Do she or did she and Mr. Cox know each other?
9    A.  Yes.
10   Q.  Were they raised together?
11   A.  Yes.
12   Q.  So they know each other as stepbrother and
13 stepsister, is that correct?
14   A.  Yeah.
15   Q.  Were there any other siblings in the family?
16   A.  Yeah.  I have an older daughter named
17 Stephanie.
18   Q.  Where does Stephanie live now?
19   A.  Town 'n' Country.
20   Q.  And what is Stephanie's last name?
21   A.  Daniels.
22   Q.  Is she related by blood to Christopher Cox?
23   A.  No, sir.
24   Q.  And I'm sorry if I already asked you.  What was
25 the daughter's name who came down to visit you?

Page 12

1    A.  Amanda.
2    Q.  And where is Amanda now?
3    A.  In Tampa.
4    Q.  Do you know the address?
5    A.  No, sir.
6    Q.  Do you know her phone number?
7    A.  She doesn't have a phone.
8    Q.  How about Stephanie, do you have an address or
9 phone number for her?
10   A.  I think I've got both of them here.
11      MR. WILLIAMS:  Do you mind if she gets the
12   phone number?
13      MR. COOK:  No.  That's fine.
14   A.  (931)952-3313.
15   Q.  Thank you.
16   A.  You're welcome.
17   Q.  When was the last time that you saw Christopher
18 Cox alive?
19   A.  I think it was in Tampa when he was in County.
20   Q.  And are you familiar with the charges that he
21 went to prison for?
22   A.  Yes, sir.
23   Q.  What is your understanding of what those
24 charges were?
25   A.  I don't understand.

Page 13

1    Q.  What is your understanding of the charges
2 against him that sent him to prison?
3      MR. COOK:  Form.
4    A.  How do I feel about it?
5    Q.  No, ma'am.  Do you know what those charges
6 were?
7    A.  Yes.
8    Q.  That's what I'm asking, what are the charges as
9 far as you know?
10   A.  Okay.  I'm sorry.
11   Q.  I just said it wrong, so no sweat.  What were
12 those charges?
13   A.  Second degree murder, I believe.
14   Q.  Are you aware of any other charges against him
15 at the time that he went to prison?
16   A.  No, sir.
17   Q.  And he was arrested in Tampa, is that right?
18   A.  Yes, sir.
19   Q.  Do you remember the year that he first went to
20 prison?
21   A.  I don't -- I can't remember what year it was.
22   Q.  Okay.  Since the time that he first went to
23 prison, have you been able to see him or visit him?
24   A.  No.  I didn't have a reliable car.
25   Q.  Did you communicate with him through either



MONICA STONE vs ROBERT HENDRY
MONICA STONE

14..17

Page 14

1 letters or e-mail or telephone calls?
2     A.  I wrote him some letters.
3     Q.  Have you -- did he write back to you?
4     A.  He did.
5     Q.  And have you saved those letters that he wrote
6 to you?
7     A.  My letter came with his sister's letter all in
8 one envelope and I'll have to find it.
9     Q.  I'm sorry.  I'm not sure I understand what you
10 were saying there.  Your sister?
11     A.  My daughter.  I'm sorry.  My daughter's and my
12 letter came in the same envelope, so I have to see if I
13 have it.
14     Q.  All right.  So if I -- and correct me if I'm
15 wrong.  Christopher sent you and your daughter each a
16 letter and they were in the same envelope, is that
17 right?
18     A.  Yes, sir.
19     Q.  Has he sent you-all more than one letter or was
20 it just the one each?
21     A.  No.  He sent several letters to my daughter
22 when she was living at my house.
23     Q.  And that's Amanda?
24     A.  Yes, sir.
25     Q.  Did Amanda's return to live with you in Tampa

Page 15

1 have anything to do with the charges against
2 Christopher?
3     A.  No, sir.
4     Q.  It was just coincidental that she was there
5 during the time that those charges were being pressed?
6     A.  Yes, sir.
7     Q.  And you seem to have been focused on two
8 letters that came together just now when I asked you
9 about letters from Christopher.  When did you-all
10 receive those two letters together?
11     A.  I can't remember when it was.
12     Q.  Was that the last communication that you had
13 from Christopher?
14     A.  Yes, sir, I believe.
15     Q.  Do you remember, even your best estimate, of
16 when those letters came to you?
17     A.  Probably around 2015.  I can't quite remember.
18     Q.  And did they come to the address where you live
19 now?
20     A.  Yes, sir.
21     Q.  And at the time that those letters came, was
22 Amanda still living there with you?
23     A.  Yes, sir.
24     Q.  Did you read Amanda's letter or have it read to
25 you?

Page 16

1     A.  No.  She had her own letters.  I didn't get
2 involved in that because that was her and her brother's
3 time.
4     Q.  What did the letter that you received, together
5 in this envelope with the letter to Amanda, say?
6     A.  How much he loved me and he was sorry about
7 what had happened and --
8     Q.  Do you need to take a break?
9     A.  (Witness shakes head.)
10         MR. COOK:  Are you okay?  Would you like to
11 take some time?
12         THE WITNESS:  I think I'm okay.
13     A.  He just wished things would have been different
14 and he wouldn't have been put in there.
15     Q.  When you say that he said he was sorry about
16 what had happened, you mean the charges against him?
17     A.  Yes, sir.
18     Q.  Did he say anything else in that letter that
19 you remember?
20     A.  No, sir.
21     Q.  Do you remember how many pages the letter was?
22     A.  I think it was one.
23     Q.  And you believe that you still have the letter
24 somewhere?
25     A.  Somewhere.  I would have to look for it.

Page 17

1     Q.  And would there be other letters with it?
2     A.  I don't know.  I can't remember.
3     Q.  Did Christopher keep you informed of what
4 facility he was in as he moved about in the Department
5 of Corrections?
6     A.  I didn't have a home phone so he couldn't call
7 me, but he had called my mom, my sister.
8     Q.  Did he write to you to tell you when he changed
9 facilities?
10     A.  I don't remember.
11     Q.  Okay.  Did you receive any sort of notice,
12 either verbally, someone else telling you, or through
13 some sort of correspondence when he would move from one
14 facility to another?
15     A.  My mom.
16     Q.  What is your mom's name?
17     A.  Brenda Truett.
18     Q.  Does she have a middle name?
19     A.  Gail.
20     Q.  How are you spelling Truett?
21     A.  T-R-U-E-T-T.
22     Q.  Where does Ms. Truett live?
23     A.  In Dover, Florida.
24     Q.  Do you know the address there?
25     A.  I want to say it's 4354 Lindsey Loop.



MONICA STONE vs ROBERT HENDRY
MONICA STONE

18..21

Page 18

1   Q.  How are you spelling Lindsey?
2   A.  L-I-N-D-S-E-Y.
3   Q.  And how long has Ms. Truett lived at that
4   address?
5   A.  I don't -- I don't know.
6   Q.  Years?
7   A.  Yeah.
8   Q.  Okay.  Does anybody live with your mom
9   currently to your knowledge?
10   A.  No, sir.
11   Q.  And why is it that your mom would be the one
12   that Christopher would correspond with as opposed to
13   you?
14   A.  Because she has a home phone.
15   Q.  And so when she would speak with you, she was
16   describing to you what Christopher had told her on the
17   telephone, is that right?
18   A.  Yes, sir.
19   Q.  Did you ever see any letters that went to your
20   mother from Christopher?
21   A.  No.
22   Q.  Do you know how many times Christopher has
23   written to you since he went into the prison system?
24   A.  I don't know.
25   Q.  Was there some sort of pattern?  Did he write

Page 19

1   once a year, once every six months?
2   A.  I can't remember, to be honest with you.
3   Q.  Other than the letter that we talked about a
4   few minutes ago that you thought you received in 2015,
5   do you remember the contents of any other letter that he
6   sent to you?
7   A.  No.
8   Q.  Do you remember him ever sending you a letter
9   where he described being in fear for his safety?
10   A.  I can't remember.  I really don't.
11   Q.  It doesn't stick out in your mind that he ever
12   complained that he was in fear for his safety though?
13   A.  No.  I've heard that he told his dad's dad and
14   I think there was a letter or two that he wrote to maybe
15   one of my daughters that said that.
16   Q.  Who told you that Christopher indicated to his
17   father's father that he was afraid?
18   A.  My mom would have been the one to tell me that.
19   Q.  When did she tell you that?
20   A.  I can't remember.
21   Q.  Was it after your lawsuit was filed?
22   A.  Yes.
23   Q.  And who told you that Christopher had written
24   to his sister complaining that he was afraid?
25   A.  I can't remember.

Page 20

1   Q.  Would that have been Amanda or could it have
2   been Stephanie?
3   A.  It could have been either one.  I don't
4   remember.
5   Q.  Do you know for sure that both of the sisters,
6   Amanda and Stephanie, had letters going back and forth
7   between them and Christopher?
8   A.  My oldest daughter, Stephanie, would have -- I
9   think is the one that wrote a lot to him.
10   Q.  Do you know whether or not Amanda or Stephanie
11   ever visited Christopher while he was in the prison
12   system?
13   A.  No, they haven't.
14   Q.  Do you know whether or not Mr. Doyle ever
15   visited him while he was in prison, the prison system?
16   A.  No.
17   Q.  You don't know or he did not?
18   A.  I don't think he has, no.
19   Q.  Did your mother ever visit him while he was in
20   the prison system?
21   A.  While he was in county jail.
22   Q.  So before he went off, before he was sentenced
23   --
24   A.  Yes, sir.
25   Q.  -- and went to the Department of Corrections?

Page 21

1   A.  Yes, sir.
2   Q.  And that would have been there in Tampa?
3   A.  Uh-huh.  Yes, sir.
4   Q.  Have you ever spoken with anyone who told you
5   that they were in prison with Christopher?
6   A.  Uh-uh.  No, sir.
7   Q.  Have you ever spoken to anyone who told you
8   that they were working within the Department of
9   Corrections during the time that Christopher was in
10   prison?
11   A.  No, sir.
12   Q.  How did you first learn that Christopher had
13   passed?
14   A.  I didn't find out until the next day.
15   Q.  And who told you?
16   A.  My sister.
17   Q.  What is your sister's name?
18   A.  Stephanie.
19   Q.  The same name as your daughter?
20   A.  Yes, sir.
21   Q.  How is it that Stephanie learned about
22   Christopher's passing?
23   A.  I think the chaplain called her.
24   Q.  And where were you when your sister Stephanie
25   told you about Christopher's passing?



**Orange Legal**
**800-275-7991**

MONICA STONE vs ROBERT HENDRY
MONICA STONE

22..25

Page 22

1    A.  I was headed -- I was headed home.
2    Q.  Meaning you were driving?
3    A.  Yes, but she didn't tell me.  She just told me
4 I had to come over to her house.  She wouldn't tell me
5 while I was driving.
6    Q.  Did you have a cell phone that she called you
7 on?
8    A.  Yes, sir.
9    Q.  Do you still have a cell phone?
10    A.  Yes, sir.
11    Q.  What is that phone number?
12    A.  (863)473-2343.
13    Q.  And who is the carrier?
14    A.  Metro.
15    Q.  How long have you had that number?
16    A.  I'm going to say four years.
17    Q.  Okay.  So I think you said you were on your way
18 home from work when Stephanie called?
19    A.  On the way back from the woods.
20    Q.  What were you doing in the woods?
21    A.  We were packing up everything we had down there
22 and bringing it back to Lakeland.
23    Q.  What do you mean when you say you were in the
24 woods?  Do you all have a cabin?  Do you camp?
25    A.  We did.

Page 23

1    Q.  Do you hunt?
2    A.  We were hunting down there.
3    Q.  And you say it was the day after Christopher
4 passed away?
5    A.  Yes, sir.
6    Q.  Was anyone in the car with you?
7    A.  My husband.
8    Q.  Anyone else?
9    A.  That's it.
10    Q.  So Stephanie called you, she says you need to
11 come over to my home immediately, is that right?
12    A.  She just said that she needed -- we were having
13 a family meeting or something and that I needed to come
14 over as soon as I got home.
15    Q.  Okay.  And did you do that?
16    A.  Yes, sir.
17    Q.  Did anyone go with you?
18    A.  No, sir.
19    Q.  When you arrived at Stephanie's home, who all
20 was there?
21    A.  My mom, my sister and my sister's husband.
22    Q.  And what is Stephanie's last name?
23    A.  My sister?
24    Q.  Yes, ma'am.
25    A.  Baker.

Page 24

1    Q.  And her husband's name?
2    A.  David.
3    Q.  And what's the address of their home?
4    A.  The same one as my mom, but my mom has her own
5 like apartment off the side of her house, so it would be
6 the 4354 Lindsey Loop.
7    Q.  So there would have been five of you, right?
8 Ms. Truett, Ms. Baker, Mr. Baker and yourself, so four
9 of you.  I'm sorry.
10    A.  Yes.
11    Q.  So tell me what happened when you arrived at
12 your sister's home.
13    A.  I walked through the garage door and she was
14 standing there and I said, "What's wrong?"  She gave me
15 a hug and she told me Christopher was gone.
16    Q.  Do you want to take a break or a couple of
17 minutes?
18    A.  (Witness nods head.)
19        (A break was taken from 11:40 a.m. until
20 11:49 a.m.)
21        MR. WILLIAMS:  Are we all set?
22        THE WITNESS:  Yes.
23 BY MR. WILLIAMS:
24    Q.  When we broke, ma'am, we were talking about
25 when your sister first let you know that Christopher had

Page 25

1 passed.  And you told me that you went to her home, she
2 gave you a big hug and explained that he was gone, is
3 that right?
4    A.  Yes, sir.
5    Q.  Do you remember anything else that she told you
6 about his passing at that time?
7    A.  No, sir.
8    Q.  Did she describe to you how he passed away
9 while you were there at her home?
10    A.  I don't remember.
11    Q.  Do you remember anything else that you all
12 talked about while you were there at your sister's home?
13    A.  No.
14    Q.  Did you recall when you first learned how
15 Christopher passed?
16    A.  Say that again?  I'm sorry.
17    Q.  Do you recall when you first learned how
18 Christopher died?
19    A.  Yes.
20    Q.  When was that?
21    A.  The 16th of March.
22    Q.  And who told you?
23    A.  I don't remember.  I was in a fog.
24    Q.  Do you remember who was with you when you
25 learned?

MONICA STONE vs ROBERT HENDRY
MONICA STONE

26..29

Page 26

1   A.  I think my mom and my sister.
2   Q.  And did you hear by telephone or was there some
3  written correspondence or did someone tell you?
4   A.  I don't -- I don't remember.  It might have
5  been my sister.  I don't remember.
6   Q.  After you learned that he died at the hands of
7  another inmate, when did you first learn the details of
8  how it happened as described in your lawsuit?
9   A.  I don't remember.  Honestly, I don't.
10   Q.  That's all right.  If you recall anything
11  during the time that we are talking today, you're
12  welcome to correct your testimony and tell us that you
13  have remembered.  Okay?
14   A.  Okay.
15   Q.  Have you ever spoken with anybody from the
16  Department of Corrections about Christopher's death?
17   A.  I did, but I don't remember the guy's name that
18  I spoke with.
19   Q.  Do you recall it was a man though?
20   A.  Yes, sir.
21   Q.  Did you speak with more than one person at the
22  Department of Corrections ever?
23   A.  I spoke to the chaplain about Christopher's
24  personal belongings.
25   Q.  Other than the chaplain -- well, let me back up

Page 27

1  first and ask you this:  When you say "the chaplain",
2  you mean the chaplain at Martin Correctional
3  Institution?
4   A.  Yes, sir.
5   Q.  And it was your understanding he was there in
6  Martin County, this chaplain?
7   A.  Yes, sir.
8   Q.  Other than the chaplain at Martin Correctional
9  Institution have you ever spoken with anyone else with
10  the Department of Corrections about Christopher's
11  passing?
12   A.  No, sir.
13   Q.  And you said you spoke to the chaplain in order
14  to collect Christopher's belongings?
15   A.  Yes.
16   Q.  Did he contact you or did you contact him?
17   A.  I called him.
18   Q.  And how did you get his contact information?
19   A.  I believe I got the number from my mom.
20   Q.  Did your mom indicate someone had been in touch
21  with her?
22   A.  No.
23   Q.  Okay.  What belongings did Christopher have
24  that you ultimately got back from the chaplain?
25   A.  I never received them.

Page 28

1   Q.  Did you ask that they be sent to you?
2   A.  Yes, sir.
3   Q.  Did you have some sort of description of what
4  belongings he owned?
5   A.  No, sir.  I just figured he had pictures.
6   Q.  When you spoke with the chaplain, did he
7  indicate whether or not he actually had belongings that
8  were Christopher's?
9   A.  He said he would get with whoever gathered them
10  or however the process works, I don't know.
11   Q.  After that first phone call with the chaplain
12  about Christopher's belongings, did you ever speak with
13  anyone else at the Department of Corrections about
14  Christopher's belongings?
15   A.  No, sir.
16   Q.  Did you ever try to contact anyone else at the
17  Department of Corrections about Christopher's
18  belongings?
19   A.  I don't remember -- I don't think I did.
20   Q.  Did you ever ask anybody else to do that for
21  you?
22   A.  I didn't know who to go to.
23   Q.  So, as far as you know, no one else has tried
24  to contact the Department of Corrections again about his
25  belongings, is that fair?

Page 29

1   A.  Yes.
2   Q.  Are you aware of anyone else in your family
3  having communications with anyone at the Department of
4  Corrections after Christopher passed other than the
5  phone call from the chaplain to your sister advising her
6  --
7   A.  Right.
8   Q.  -- of Christopher's death and this phone call
9  from you seeking Christopher's belongings?
10   A.  Correct.
11   Q.  Other than those two calls, are you aware of
12  anyone in your family ever speaking to anyone at the
13  Department of Corrections after Christopher passed?
14   A.  No, sir.
15   Q.  Were you in possession of any personal
16  belongings of Christopher's at the time that he passed?
17   A.  No, sir.
18   Q.  In your lawsuit and the letters of
19  administration it says that Christopher had personal
20  belongings.  Are you aware of any personal belongings
21  that he owned at the time that he passed?
22      MR. COOK:  Form.
23   A.  No, sir.
24   Q.  As we sit here today, you don't have anything
25  that belongs to him, is that right?



MONICA STONE vs ROBERT HENDRY
MONICA STONE

30..33

Page 30

1  A.  No, sir.
2  Q.  Do you have pictures of Christopher?
3  A.  Yes, sir.
4  Q.  How many pictures of him do you think you have?
5  A.  Probably 500.  That's just a number.
6  Q.  And those are all in your possession at your
7  home where you live now?
8  A.  Yes, sir.
9  Q.  Have you heard from anyone what it was that
10  Christopher was concerned about or afraid of during
11  those last days before he passed away?
12  A.  He told my mom and his grandfather on his dad's
13  side if he didn't pay somebody some money or something
14  they were going to kill him.
15  Q.  Who told you that?
16  A.  My mom, I believe.
17  Q.  Do you know when he told your mother and his
18  father's father that he needed to pay money to someone
19  or they would kill him?
20  A.  I don't remember the dates or anything.
21  Q.  Was it your understanding that that occurred
22  sometime close to the time that he passed, if you know?
23  A.  Yes, sir.
24  Q.  Do you know whether your mom and his father's
25  father sent money?

Page 31

1  A.  His father's father sent him money off and on,
2  but we didn't.
3  Q.  When you say "we didn't", you mean you and your
4  mother and sisters?
5  A.  Yes.
6  Q.  And no one that you know of on your side of the
7  family sent money?
8  A.  No, sir.
9  Q.  Was there a particular reason why you-all
10  wouldn't send him the money?
11  A.  Didn't have the funds.
12  Q.  You said his father's name was Doyle?
13  A.  Uh-huh.
14  Q.  What's the first name?
15  A.  Ronald.
16  Q.  And what is the grandfather's name?
17  A.  I want to say Roland.  I'm not sure what his
18  first name is.
19  Q.  Also Doyle?
20  A.  Uh-huh.
21  Q.  Yes?
22  A.  Yes.  Sorry.
23  Q.  And where does the grandfather live, if you
24  know?
25  A.  That, I don't know.

Page 32

1  Q.  Do you believe it to be in Florida?
2  A.  Yes, sir.
3  Q.  Other than Ronald Doyal's father and your
4  mother, have you heard from any source that Christopher
5  Cox ever complained that he was afraid while he was
6  incarcerated with the Department of Corrections?
7  A.  That, I don't know.
8  Q.  Are you aware of Christopher ever being charged
9  with any other crimes besides the ones that sent him to
10  prison this most recent time?
11  A.  I don't -- I don't know.
12  Q.  Do you know if he was ever arrested before the
13  date when he was arrested for the murder that sent him
14  to prison?
15  A.  I believe he was.  I just don't know what for.
16  Q.  Do you know -- do you have a sense for how many
17  times he might have been arrested before that?
18  A.  Three, four.  I don't -- I don't really know.
19  Q.  Do you know what any of the charges were?
20  A.  No.
21  Q.  At the time that he was arrested on the charges
22  that sent him to prison, where was he living, if you
23  know?
24  A.  I don't know.  I think he just bounced from
25  like a friend's house, my mom's old house and --

Page 33

1  Q.  Is it true that he was not living with you at
2  the time that he was arrested for the murder?
3  A.  Yes.
4  Q.  Do you know whether or not he was living with
5  your mother at that time?
6  A.  No, he wasn't.
7  Q.  And you don't know where he was living?
8  A.  Uh-uh.  No.  I'm sorry.
9  Q.  Have you ever spoken to Mr. McAndrews, the
10  expert who your lawyers have hired in this case?
11  A.  No, sir.
12  Q.  During the time before he went to prison, did
13  Christopher Cox complete high school?
14  A.  No, sir.
15  Q.  Had he quit or was he still attending school or
16  taking GED courses or anything like that?
17  A.  He quit.
18  Q.  Do you remember when he quit?
19  A.  No, sir.
20  Q.  Do you know what grade he was in?
21  A.  No, sir.
22  Q.  Did he get into high school before he stopped
23  attending school?
24  A.  I don't think so.
25  Q.  Do you remember the name of the last school



**Orange Legal**
**800-275-7991**

MONICA STONE vs ROBERT HENDRY
MONICA STONE

34..37

Page 34

1 that he attended?
2   A. No, sir.
3   Q. After he quit school did Christopher ever
4 attend any sort of special training, classes, obtain any
5 certificate or learn a skill or a technical trade?
6   A. No, sir, not that I'm aware of.
7   Q. Are you aware of Christopher ever having been
8 employed in a job?
9   A. No, sir.
10   Q. What was your understanding of how he was
11 spending his time after he quit school?
12   A. Say that again. I'm sorry.
13   Q. What was he doing after he quit school and
14 before the time he was arrested and went to prison, if
15 you know?
16   A. I don't.
17   Q. Did he have any hobbies?
18   A. No, sir, not that I'm aware of.
19   Q. Did you know his friends?
20   A. No, sir.
21   Q. Did Christopher complete junior high school, if
22 you know?
23   A. I think he did.
24   Q. And where did he go to junior high school?
25   A. That, I don't know.

Page 35

1   Q. Was it in Tampa?
2   A. Yes, sir.
3   Q. Was it in the public school system?
4   A. Yes, sir.
5   Q. I'm looking here at -- lawyers send written
6 questions around to each other, we call them
7 interrogatories but they are just written questions, and
8 we sent some over to your lawyer and he provided your
9 answers, so that's what I'm looking at here now. All
10 right?
11   A. Okay.
12   Q. It indicates here that your last name was Cox
13 during the period 1969 to 1990. Is that right?
14   A. Yes.
15   Q. And you were married to Mr. Cox at that time?
16   A. No, sir. That was my maiden name.
17   Q. Oh, I see. So you were first married to
18 Mr. Daniels?
19   A. Yes, sir.
20   Q. And how did you-all -- did he pass or did you
21 divorce?
22   A. Divorce.
23   Q. Did that divorce take place in Tampa?
24   A. Polk County.
25   Q. Polk County?

Page 36

1   A. Lakeland, yes.
2   Q. Do you know where Mr. Daniels is now?
3   A. I believe Tennessee.
4   Q. Do you know what town?
5   A. No, sir.
6     MR. WILLIAMS: Off the record.
7     (Discussion off the record.)
8   Q. And other than Timothy Daniels and Randall
9 Stone, had you ever been married to anyone else?
10   A. No, sir.
11   Q. Do you have any children other than Stephanie,
12 Amanda and Christopher?
13   A. No, sir, that's it.
14   Q. Have you ever been arrested?
15   A. No, sir.
16   Q. Have you ever been charged with a crime even if
17 you were not arrested, to your knowledge?
18   A. No, sir.
19   Q. You indicated here that I believe your sister
20 paid the funeral expenses for Christopher, is that
21 right?
22   A. Yes, sir.
23   Q. Do you know how much those were?
24   A. I want to say right at 1500.
25   Q. And have you agreed to pay her back out of the

Page 37

1 proceeds of this lawsuit if you're successful?
2   A. Yes, sir.
3   Q. And that was Stephanie?
4   A. Yes, sir.
5   Q. Do you know who the facility was that the
6 funeral expense was paid to?
7   A. That, I don't remember. All I know is it was
8 in Tampa.
9   Q. Is Christopher buried in Tampa?
10   A. No, sir.
11   Q. Where is he buried, if you know?
12   A. I've got his ashes in my bedroom.
13   Q. Was there a service after he passed?
14   A. A memorial.
15   Q. And where was the memorial service held?
16   A. At my sister's house.
17   Q. When did you all hold the memorial service?
18   A. I want to say in April.
19   Q. Of 2000 --
20   A. 15.
21   Q. '15? Are you aware of Christopher having any
22 kind of illnesses or sickness during the time he was in
23 the Department of Corrections?
24   A. No, sir.
25   Q. During the time before he went into prison were



Page 38

1 you aware of Christopher having been involved in doing
2 illegal drugs?
3    A.  No, sir.
4    Q.  Did you ever send any gifts or packages to
5 Christopher while he was in prison?
6    A.  No, sir.
7    Q.  Are you aware of your family ever doing that?
8    A.  No, sir.
9    Q.  Aside from the funeral expense your sister
10 paid, have you had any expenses that you have had to pay
11 out of your pocket because of Christopher's passing?
12    A.  No, sir.
13    Q.  Are you aware of anyone else in your family
14 having to pay expenses out of their pocket because of
15 his passing?
16    A.  No, sir.
17    Q.  And was Christopher providing you any sort of
18 income or support?
19    A.  No, sir.
20    Q.  Did you ever speak with any of the
21 investigators who looked into Christopher's death?
22    A.  I think his name was Eric.  I'm not sure.
23    Q.  You think he was one of the investigators?
24    A.  He was somebody with the FDLE, so I don't know.
25    Q.  What was the occasion for you to speak with

Page 39

1 Eric with the FDLE?
2    A.  I think I was trying to get information of what
3 was going on or what happened or -- I don't remember.
4    Q.  So did you contact the FDLE investigator or did
5 he contact you?
6    A.  I contacted him.
7    Q.  And what is it that made you know that you
8 should contact someone with FDLE?
9    A.  I don't know.
10    Q.  Is it something you read in the paper?  Did
11 someone suggest to you that you should contact FDLE?
12 Were you made aware of a report?
13    A.  Maybe my -- I really don't remember.  It was
14 all a big fog.  Maybe my mom said something.
15    Q.  Did you actually meet with this investigator?
16    A.  No, sir.
17    Q.  Did you talk to them on the phone?
18    A.  To Eric I did.
19    Q.  How many times?
20    A.  Maybe a couple of times.
21    Q.  And tell me about those conversations.  What
22 did you say to this investigator and what did they say
23 to you?
24    A.  I really can't remember all that.
25    Q.  Can you remember anything that you all talked

Page 40

1 about?
2    A.  Just I was just trying to find out information,
3 you know, of what happened and I think he told me that
4 he was beaten to death and that's all I can remember.
5    Q.  You don't remember any other details of that
6 conversation?
7    A.  No, sir.
8    Q.  Did you ever speak with anybody with the State
9 Attorney's Office that prosecuted Mr. Hurley (phonetic)?
10    A.  There was one lady that I spoke to, I don't
11 remember her name, trying to get information out of her,
12 but I don't remember or don't recall her name.
13    Q.  Do you remember anything about your
14 conversation with her?
15    A.  I believe I asked her if he was going to be
16 convicted and I think she said, no, that he was claiming
17 self-defense.
18    Q.  Do you remember anything else about that
19 conversation?
20    A.  No, sir.  That's it.
21    Q.  And did you only speak with her the one time?
22    A.  I believe so.
23    Q.  All right.  Did you speak with any investigator
24 from the Department of Corrections --
25    A.  No, sir.

Page 41

1    Q.  -- or from the Inspector General's Office?
2    A.  No, sir.
3    Q.  Did you speak with anyone from the Martin
4 County Sheriff's Office?
5    A.  No, sir.
6    Q.  Did you ever talk with any of the paramedics
7 that responded?
8    A.  No, sir.
9    Q.  Did you ever talk with any of the nurses?
10    A.  No, sir.
11    Q.  Did you ever hear from anyone who said that
12 they knew Christopher during the time that he was in
13 prison?
14    A.  No, sir.
15    Q.  Have you ever heard from any of his friends
16 since the time that he passed?
17    A.  No, sir.
18    Q.  And those might be friends from before he went
19 to prison or people he knew in prison.
20    A.  No, sir.
21    Q.  I'm sorry if I asked you before, did you ever
22 go to see Christopher at any of the facilities where he
23 was housed while he was in the prison system?
24    A.  Not while he was in prison, but I did see him a
25 couple of times in county jail.



Page 42

1  Q.  So before he went to prison?
2  A.  Yes, sir.
3  Q.  And that was in Hillsborough County?
4  A.  Yes, sir.
5  Q.  Do you remember how old Christopher was when he
6  passed?
7  A.  28.
8  Q.  And at that point he had been in the Department
9  of Corrections for a number of years, is that right?
10  A.  Yes, sir.
11  Q.  Did you send birthday cards or Christmas cards?
12  A.  No, sir.
13  Q.  Have you ever known anyone else who was in the
14  prison system here in Florida?
15  A.  No, sir.
16  Q.  Do you know anyone, either family or friends or
17  acquaintances, who have worked in the Department of
18  Corrections?
19  A.  No, sir.
20  Q.  How did Christopher do when he was in school
21  with his grades?
22  A.  He did pretty good.
23  Q.  Which is what?  B's, C's, D's, A's?
24  A.  C's.
25  Q.  Did he have a particular interest in school?

Page 43

1  Shop?
2  A.  He never really said.
3  Q.  Before the incident where Christopher passed
4  away, were you aware of him ever being involved in any
5  other fights while he was in prison?
6  A.  No, sir.
7  Q.  Was he ever suspended from school that you
8  recall?
9  A.  No, sir.
10  Q.  Did he ever get into trouble for fighting while
11  he was in school?
12  A.  No, sir.
13  Q.  Have you ever heard anything specifically about
14  my client, Robert Hendry?
15  A.  No, sir.
16  Q.  Have you ever heard anything specifically about
17  Robert Feipel, another one of my clients?
18  A.  No, sir.
19  Q.  Do you know who Julie Jones is?
20  A.  No, sir.
21  Q.  Have you ever heard anything specifically about
22  Carolyn Conrad, the nurse that you-all sued?
23  A.  No, sir.
24  Q.  Christopher Rose?
25  A.  No, sir.

Page 44

1  Q.  Do you know who he is?
2  A.  No, sir.
3  Q.  Do you know who David Bailes is?
4  A.  No, sir.
5  Q.  Have you ever heard anything about him?
6  A.  No, sir.
7     MR. WILLIAMS:  I think that's all I have for
8  now, ma'am.  The way this works is every party that
9  you've sued has lawyers representing them and they
10  each get a turn to ask you questions.
11     THE WITNESS:  Okay.
12     MR. WILLIAMS:  So that's all I have for now.
13     THE WITNESS:  Okay.
14     MS. HURLEY:  Hi.  My name is Claire Hurley.  I
15  introduced myself to you off the record.  I
16  represent Carolyn Conrad, one of the nurses working
17  at the time.  I just have a couple of follow-up
18  questions and I'll try not to be repetitive.
19        CROSS-EXAMINATION
20  BY MS. HURLEY:
21  Q.  Is your sister or mother, anyone in your
22  immediate family, in the health care profession?
23  A.  No.  Like what?  What do you mean?
24  Q.  Is your sister or mother a nurse, for example?
25  A.  No.

Page 45

1  Q.  Anyone in your immediate family in the health
2  care profession?  Nurses or --
3  A.  No.
4  Q.  Okay.  You said your son stopped going to
5  school.  You believe it was sometime before high school?
6  A.  Yes, ma'am.
7  Q.  All right.  That was in the -- I'm sorry.  This
8  is the part where it may be a little repetitive, but
9  which county or city was that in?
10  A.  Hillsborough, Tampa.
11  Q.  All right.  Thank you.  Prior to his stopping
12  going to school, was he living with you?
13  A.  No, ma'am.
14  Q.  Where was he living?
15  A.  I believe he was with his father.  He was.
16  Q.  When is the last time that Christopher lived
17  with you at your residence?
18  A.  It's going to take me a minute to think.  2000,
19  around there.
20  Q.  At the time that -- had he been residing with
21  you since his birth in 1987 up until 2000?
22  A.  He lived with his dad maybe a year in between
23  that.
24  Q.  Okay.  Thank you.  But the large bulk of the
25  time from '87 to 2000 he was residing with you?



MONICA STONE vs ROBERT HENDRY
MONICA STONE

46..49

Page 46

1    A.  Yes, ma'am.
2    Q.  Okay.  Thank you.  In 2000 he went to live with
3  his father, is that correct?
4    A.  Yes.
5    Q.  To the best that you can recall?
6    A.  Yeah.
7    Q.  I understand that.  So that would take us
8  forward a couple of years then.  He was then living with
9  his father at least a couple of years until him dropping
10  out of school.  Does that sound accurate?
11    A.  Yeah.
12    Q.  All right.  Did you know what his father was
13  doing at the time for a living?
14    A.  No, ma'am.
15    Q.  Does Christopher have any other siblings,
16  whether they be by blood or half or step?
17    A.  My two daughters, Stephanie and Amanda, and
18  then I think his dad has two daughters also.
19    Q.  Do you know if Christopher was close to any of
20  his siblings or closer to some versus others?
21    A.  I think he was a lot closer to my two girls
22  than -- than his father's.
23    Q.  If you need to take a break at any time, please
24  let me know.  I hope you know it's not my intention to
25  upset you.

Page 47

1    A.  I know.
2    Q.  I just have to get through the questions and
3  get my job done.  Is there a reason that you know or
4  believe that Christopher went to live with his father in
5  2000?
6    A.  Say that again.  I'm sorry.
7    Q.  If you know, why did Christopher go to live
8  with his father in the year 2000?
9    A.  I don't know.
10    Q.  All right.  And then, if you can describe to me
11  how often you would see Christopher prior to his going
12  into County and the correctional system?  That was kind
13  of a bad question.  Let me rephrase.  I'm sorry.  I'll
14  start over.  Do you know about what year Christopher
15  went into the County and correctional system?
16    A.  I can't really remember.  I want to say '15,
17  '14.
18    Q.  All right.  Thank you.
19    A.  It might have even been '13.
20    Q.  Okay.  How often would you see Christopher
21  after he stopped residing with you in 2000 up until
22  whatever date that was that he went into County or
23  correctional?
24    A.  It was hard because he was just, you know, at
25  friends' houses, you know, so it was kind of hard.  He

Page 48

1  would try and get over like Christmas and, you know,
2  stuff like that.
3    Q.  And did you talk to Christopher somewhat
4  regularly or was there any kind of can you say I would
5  talk to him every Sunday night or every couple of
6  months, do you have any --
7    A.  It was probably every couple of months when,
8  you know, he would get a phone for a month and then --
9    Q.  He didn't have a cell phone to your knowledge?
10    A.  Right.
11    Q.  Okay.  Thank you.  What was Christopher's
12  middle name?
13    A.  James.
14    Q.  Did you ever speak with the medical examiner or
15  any individuals with the Medical Examiner's Office?
16    A.  No, ma'am.
17    Q.  All right.  Did you request that the autopsy be
18  performed?
19    A.  No.  I had no clue of what was going on.
20    Q.  And you haven't -- have you spoken to anyone,
21  outside of your lawyer, about the results of the
22  autopsy?
23    A.  No.
24    Q.  Outside of your lawyer, have you spoken to
25  anyone that has provided you with any information at all

Page 49

1  about my client, Nurse Carolyn Conrad?
2    A.  No, ma'am.
3      MS. HURLEY:  Thank you.  Those are all the
4  questions I have for you.
5      THE WITNESS:  Okay.
6      MR. WHITELOCK:  Good afternoon.
7      THE WITNESS:  Hi.
8      MR. WHITELOCK:  How are you doing?
9      THE WITNESS:  Trying to hold it up.
10      MR. WHITELOCK:  Are you ready to continue or do
11  you want to take a break?
12      THE WITNESS:  No.  We can keep going.
13      MR. WHITELOCK:  Okay.  Great.
14        CROSS-EXAMINATION
15  BY MR. WHITELOCK:
16    Q.  My name is Christopher Whitelock.  I represent
17  the defendants, David Bailes and Christopher Rose, who
18  the Estate has sued in this matter.  I'm going to try
19  and ask you some questions and not repeat what's already
20  been asked, but I would ask if you don't know the answer
21  to any of my questions, just tell me, Mr. Whitelock, or
22  you can call me Chris, I don't know.  Fair enough?
23    A.  Yes.
24    Q.  To begin with and before you were asked
25  questions in this case did you prepare at all for this



MONICA STONE vs ROBERT HENDRY
MONICA STONE

50..53

Page 50

1 deposition other than speaking with counsel?
2    A.  No, sir.
3    Q.  You didn't read any documents or anything like
4 that?
5    A.  No, sir, just what was in the e-mails.
6    Q.  Okay.  And that would be e-mails with your
7 counsel, I'm assuming?
8    A.  Yes, sir.  Just the papers that were e-mailed
9 to everybody.
10   Q.  Anything other than e-mails in terms of --
11   A.  No, sir.
12   Q.  Any papers you can identify to me that you
13 reviewed?
14   A.  I can't remember.
15   Q.  All right.  And again, I told you before I was
16 going to start asking specific questions.  If you don't
17 know any of the answers to these questions, tell me you
18 don't know.  But you're involved in this case as what is
19 described as a personal representative of the Estate of
20 Christopher Cox.  You realize that, correct?
21   A.  Yes, sir.
22   Q.  What is your understanding of why the estate
23 was opened?
24   A.  I don't know.
25   Q.  There was an attorney that represented the

Page 51

1 estate in terms of petitioning that process.  Are you
2 aware of that?
3    A.  Yes, sir.
4    Q.  And who was that?
5    A.  I can't remember their name.
6    Q.  And it was a female?  You said theirs or hers?
7    A.  Their.
8    Q.  Okay.  What, if anything, was your
9 understanding of why the estate was open?
10       MR. COOK:  Form.  Give your understanding
11    without reference to what your attorneys have told
12    you, if you have an understanding.
13   A.  I don't.  I don't even know why.
14   Q.  You don't know why it was opened?
15   A.  Correct.
16   Q.  Okay.  You're identified as the personal
17 representative.  Do you know what duties, if any, you
18 have in terms of the estate?
19   A.  No, sir.
20   Q.  Do you know if the estate is still open?
21   A.  As of my knowledge right now it is.  I don't
22 know though.
23   Q.  Okay.  How about in terms of anybody filing any
24 type of claims against the estate, has anybody done
25 that?

Page 52

1    A.  Not to my knowledge.
2    Q.  Do you know what a creditor is, like somebody
3 or an entity asking for money against the estate?
4    A.  None that I know of.
5    Q.  Counsel asked you about the expenses for the
6 funeral.  Do you recall those questions?
7    A.  Yes, sir.
8    Q.  And I just want to make sure I'm clear.  It was
9 your sister who paid for the funeral, is that right?
10   A.  Yes, sir.
11   Q.  And that sister, what is her name again?
12   A.  Stephanie.
13   Q.  Did Stephanie, your sister, ever file any claim
14 against the estate to your knowledge?
15   A.  No.
16   Q.  Did the estate ever sign any type of agreement
17 to pay Stephanie back?
18   A.  I believe so.
19   Q.  Okay.  And when you say you believe so, you're
20 basing that on what?  Something that you did as the
21 representative?
22   A.  No.  My ex-lawyer.
23       MR. COOK:  Don't comment on anything you
24    discussed with him, as well as myself.
25       THE WITNESS:  Okay.

Page 53

1    Q.  Well, I'm not asking you specifically what you
2 discussed with this ex-lawyer.  First of all for the
3 record, when you say the ex-lawyer, this is the lawyer
4 that assisted in opening the estate?
5    A.  Yes, sir.
6    Q.  Was there some type of document or agreement
7 that you're aware of that obligated the estate to pay
8 back these funeral expenses?
9    A.  Say that one more time.
10   Q.  Sure.  Was there some document or writing or
11 anything obligating or requiring the estate to pay back
12 your sister?
13   A.  No, sir.
14   Q.  Was this kind of like a handshake,
15 word-of-mouth kind of deal?
16   A.  Yes.
17   Q.  Other than the funeral expenses, are you aware
18 of any other expenses that the estate has?
19   A.  No, sir.
20   Q.  You were asked about your prior knowledge of
21 what, if anything, your son did in terms of his
22 employment before he went into the prison system.  Do
23 you recall that question?
24   A.  Yes, sir.
25   Q.  And your answer was "I don't know," right?



MONICA STONE vs ROBERT HENDRY
MONICA STONE

54..57

Page 54

1    A.  Yes, sir.
2    Q.  Do you recall at any point in time what your
3 son did at all for employment?
4    A.  No, sir.
5    Q.  From a paper route to until he was an adult?
6 No?
7    A.  No, sir.
8    Q.  And just so I'm clear and I'm trying not to
9 repeat what went on, but I'm going to try and make a
10 chart here so my understanding of when Christopher --
11 how do you refer to him, as Christopher or Chris?
12   A.  Christopher.
13   Q.  Okay.  Because I'm a Christopher and I don't
14 like Christopher, so I go by Chris.  And you're
15 laughing.  But it appears he was born in 1987, right?
16   A.  Yes, sir.
17   Q.  All right.  And you said before he was born in
18 Tampa, is that right?
19   A.  Yes, sir.
20   Q.  So if I'm doing a chart here, he lived with you
21 starting in 1987 in Tampa, correct?
22   A.  Yes, sir.
23   Q.  And then, as Defendant Conrad's counsel asked
24 you, he stopped living with you around the year 2000,
25 correct?

Page 55

1    A.  Yes, sir.
2    Q.  So Christopher would have been 13, around,
3 correct?
4    A.  Somewhere in there.
5    Q.  Now, from 1987 until 2000, when he no longer
6 lived with you, did Christopher live with you
7 continuously during that time period?
8    A.  Yes, sir.
9    Q.  There wasn't any time period during that where
10 he was taken out of the house or residence for any
11 reason?
12   A.  No, sir.
13   Q.  And then you said he went to go live with his
14 father in 2000, correct?
15   A.  Yes, sir.
16   Q.  And you were asked why he went to go live with
17 his father when Christopher was 13 years old and your
18 answer was you don't know?
19   A.  I don't remember.
20   Q.  Okay.  Was there any type of court proceeding
21 going on at that point in time in terms of custody of
22 Christopher?
23   A.  No, sir.
24   Q.  Were there any type of lawyer letters or any
25 threats or stuff like that?

Page 56

1    A.  No, sir.
2    Q.  And just so I'm clear, Christopher's father,
3 you were married at one point in time, yes?
4    A.  No, sir.
5    Q.  Okay.  So was there any type of court
6 proceeding between you and the father with respect to
7 custody?
8    A.  No.  No, sir.
9    Q.  Did Christopher going to live with his father
10 in 2000 have to do in any part with you?
11   A.  No, sir.
12   Q.  Okay.  Was this a choice made by Christopher in
13 2000?
14   A.  Yes, sir.
15   Q.  So then he started living with his father in
16 the year 2000.  And I'm discerning or getting from your
17 testimony that he then never lived with you again.  Is
18 that correct?
19   A.  He would stay with me, but he didn't actually
20 live with me.
21   Q.  When is the first time that you recall since
22 leaving in 2000 that he came back and stayed with you
23 for any period of time the first time?
24   A.  I don't remember.
25   Q.  How old approximately was he the first time he

Page 57

1 came back?  So he was 13 when he left.  When did he come
2 back?  Was he driving at that point?
3    A.  No.  Probably around 15.
4    Q.  What were the circumstances of him coming back
5 to stay with you?
6    A.  Can you say that again?  I'm sorry.
7    Q.  Sure.  You said he came back and you wouldn't
8 describe it as residing or living with you, he would
9 come back and stay with you, right?
10   A.  Yes, sir.
11   Q.  Okay.  What were the circumstances of why he
12 was coming back to stay with you, do you know?
13   A.  To see us.  Spend time.
14   Q.  Any other reason other than that?
15   A.  No, sir.
16   Q.  And just so I have a time reference, from 2000
17 and going forward, when is the first time you recall him
18 going into the prison system?
19   A.  It was 2013, I think, somewhere in there.  I
20 can't really remember the date.
21   Q.  Let's use 2013.  How many times did he stay
22 with you, Christopher, between 2000 and 2013,
23 approximately?
24   A.  I can't remember.
25   Q.  Was it more or less than ten?  Can you do that?



MONICA STONE vs ROBERT HENDRY
MONICA STONE

58..61

Page 58

1   A.   More.
2   Q.   I'm sorry?
3   A.   It was more than ten times.
4   Q.   More than 20 times?
5   A.   I would say probably around 20 times.
6   Q.   Okay.  And during the time period between at
7   least 2000-2013, how would you characterize your
8   relationship with Christopher?  Was it a good
9   relationship?
10   A.   Uh-huh.  Yes, sir.
11   Q.   Was there any point in time from 2000 until he
12   went into the prison system that it wasn't a good
13   relationship?
14   A.   No, sir.
15   Q.   So from 2000 all the way until 2015, you always
16   had a good relationship with Christopher?
17   A.   Yes, sir.
18   Q.   What was the name of the high school he went
19   to?  You didn't recall?
20   A.   I don't recall.  He quit school.
21   Q.   What about the name of his middle school, do
22   you remember that?
23   A.   No, sir, I don't.
24   Q.   What about the name of his elementary school,
25   do you remember that?

Page 59

1   A.   No.  No, sir.
2   Q.   He at least lived with you up until middle
3   school, correct?
4   A.   Yes, sir.
5   Q.   Do you remember any of his teachers' names?
6   A.   No, sir.
7   Q.   Did he have like a best friend during that time
8   period?
9   A.   No, sir.
10   Q.   Was there a particular sport that he played?
11   A.   He played baseball.
12   Q.   Did he play in a league?
13   A.   Little League, yeah.
14   Q.   Which league was that?
15   A.   It was in Lakeland.  I don't recall.
16   Q.   And before March of 2015, how would you
17   characterize Christopher's relationship with his father?
18   A.   He really didn't have one.
19   Q.   Okay.  What do you mean by that?  And the
20   reason I'm asking that is I'm looking from the outside
21   in, so I'm not trying to be overly personal or make you
22   feel bad in any way.  I'm just trying to understand
23   because I wasn't there that this young boy or young man,
24   however you want to look at it, at 13 years old went to
25   live with his father, so I'm trying to find out what

Page 60

1   that relationship was like between Christopher and his
2   father.
3   A.   They had one, but it wasn't like a father-son
4   relationship.
5   Q.   How would you describe it?
6   A.   I don't know.  I wouldn't know how to describe
7   it or put it into words.
8   Q.   Was there any -- and I don't want you to take
9   this the wrong way, but was there any abuse allegations
10   from 1987 through 2015 against either you or the father?
11   A.   No, sir.
12   Q.   You've heard of the Department of Children &
13   Families?
14   A.   Yes, sir.
15   Q.   Any issues like that with DCF?
16   A.   There was one I believe against his stepfather
17   or my first husband.
18   Q.   Mr. Cox?
19   A.   No.  Daniels.
20   Q.   I'm sorry.  Timothy Daniels?
21   A.   Yes.
22   Q.   How old was Christopher at that point in time,
23   approximately?
24   A.   Eight, nine.
25   Q.   What were the allegations?

Page 61

1   A.   Spanking.
2   Q.   Anything else other than that?
3   A.   No, sir.
4   Q.   What was the result, if any, from the
5   investigation?
6   A.   They closed it, dropped it.
7   Q.   Other than that, has there been any allegations
8   of abuse regarding Christopher?
9   A.   No, sir.
10   Q.   Okay.  Christopher was never married, correct?
11   A.   No, sir, he wasn't.
12   Q.   And he has no children, correct?
13   A.   Correct.
14   Q.   And as the personal representative, he did not
15   have any support obligations of any kind that you're
16   aware of, correct?
17   A.   No, sir.  None.
18   Q.   I'm going to go through some questions that
19   were asked of you.  I'm going to bounce around a little
20   bit, so bear with me.  If you don't understand, again,
21   just tell me you don't understand.  You said you visited
22   Christopher when he was in County in Hillsborough,
23   correct?
24   A.   Yes, sir.
25   Q.   But you did not visit him at any point in time



MONICA STONE vs ROBERT HENDRY
MONICA STONE

62..65

Page 62

1 when he was in the state system, correct?
2    A.  Correct.
3    Q.  Why was that?
4    A.  I didn't have a reliable vehicle.
5    Q.  Any reason other than that?
6    A.  That and gas money.
7    Q.  Other than gas money and not having a reliable
8 vehicle, any other reasons other than that?
9    A.  No, sir.
10   Q.  You said you didn't call him because you didn't
11 have a house phone, is that correct?
12   A.  Correct.
13   Q.  Did you have a cell phone during that time
14 period?
15   A.  Yes, sir.
16   Q.  Did you ever use your cell phone to try and
17 call him?
18   A.  While he was incarcerated?
19   Q.  Yes, ma'am.
20   A.  It wouldn't go through.
21   Q.  How about in terms of scheduling calls from the
22 facility to you, collect or otherwise, through other
23 phones?
24   A.  No, sir.
25   Q.  So I'm clear, you never spoke to Christopher on

Page 63

1 the phone once he was out of Hillsborough, correct?
2    A.  Correct.
3    Q.  In terms of -- I just want to make this clear.
4 In terms of the funeral, was there a funeral and a
5 memorial, two separate things?
6    A.  No, sir.
7    Q.  Okay.
8    A.  Just a memorial.
9    Q.  Just a memorial.  And you attended that
10 memorial?
11   A.  Yes, sir.
12   Q.  Who else attended the memorial that you recall?
13   A.  There was a lot of people.
14   Q.  How about direct family members?
15   A.  Me, my mom, my sister, her husband, her kids,
16 my daughters.
17   Q.  Anyone else that you recall?
18   A.  Friends.
19   Q.  You went through a series of questions about
20 who you spoke to ranging from the Department of
21 Corrections to FDLE.  Do you recall those questions?
22   A.  Yes, sir.
23   Q.  Did you take any notes of those conversations?
24   A.  No, sir.
25   Q.  Record them in any way?

Page 64

1    A.  No, sir.
2    Q.  Your conversations with either the department
3 or FDLE, in part you identified this person Eric.  Did
4 these individuals act professional on the phone?
5    A.  Yes, they did.
6    Q.  Did they in any way act unprofessional at any
7 point in time?
8    A.  No, sir.
9    Q.  You testified in the initial part of your
10 deposition that there was some communication about your
11 son saying he had to pay some money to someone who was
12 going to kill him.  Do you recall that?
13   A.  Yes, sir.
14   Q.  That was a conversation that you testified
15 initially was presented to Ronald Doyle, is that
16 correct?
17   A.  His grandfather, Roland.
18   Q.  Roland Doyle.  Okay.  Was it just one
19 conversation to your knowledge?
20   A.  I think it was -- he called a couple of times
21 saying that.
22   Q.  A couple of times to his grandfather?
23   A.  Yes, sir.
24   Q.  Do you know if he told anybody else that?
25 That's a bad question.  Do you know if Christopher told

Page 65

1 anybody else that?
2    A.  I don't know.  I can't remember if he told my
3 mom that or if my mom talked to his grandfather and he
4 told her, told my mom.
5    Q.  I'm just trying to figure out when is it that
6 you found out that there was this alleged threat?  Was
7 this before or after his passing?
8    A.  Before.
9    Q.  Okay.  In relation to his death, how soon
10 before his death did you find that out?
11   A.  I don't remember.  Maybe five, six months.  I
12 just don't remember.
13   Q.  Did you go to the Department of Corrections or
14 anyone and report this threat?
15   A.  No, sir.  He said that he had told people
16 there.
17   Q.  And who told you that?
18   A.  That he had -- well, he told his grandfather
19 and his grandfather told my mom.
20   Q.  But my question is whether or not you went to
21 anybody in the Department or the prison system?
22   A.  No, sir.
23   Q.  And why is that?
24   A.  I don't know.
25   Q.  Do you know if Roland went to anyone in the



Page 66
1 prison system, Department of Corrections, and complained
2 about this alleged threat?
3    A.  I don't know if he did or not.  I don't talk to
4 them.
5    Q.  Why is it you don't talk to them?
6    A.  I just don't.
7    Q.  But somehow Roland -- was it Roland that
8 explained to you about this threat?
9    A.  No.  He told my mom, I believe.
10   Q.  And so it was your mom that told you that
11 Christopher told Roland about this alleged threat?
12   A.  Yes, sir.
13   Q.  Did your mom go to the Department of
14 Corrections or anybody at the prison facility?
15   A.  I don't know if she did or not.
16   Q.  Can you think of any reason why your mom or
17 yourself wouldn't go to the prison facility or
18 communicate to the prison facility and say, hey, there's
19 this purported threat about somebody trying to kill my
20 son unless they get money?
21       MR. COOK:  Form.
22   A.  I don't know.
23   Q.  Okay.  You also stated that the sisters or I
24 guess your daughters didn't visit Christopher in the
25 state facility either, is that correct?

Page 67
1    A.  Right.  They don't have a car.
2    Q.  Any other reason other than that?
3    A.  No, sir.
4    Q.  The letters that you were discussing with
5 counsel that were written by Christopher that you may
6 have, where would you most likely keep those letters?
7 At your residence?
8    A.  Yes, sir.
9    Q.  Can you do me a favor and if you do find those,
10 don't destroy those, hold onto those?
11   A.  Okay.
12   Q.  And would there have been any reason for you to
13 discard or destroy those letters from Christopher?
14   A.  No.
15   Q.  Because you said you kept 500 -- there's about
16 500 pictures you have of him, correct?
17   A.  Yeah.
18   Q.  How old is Amanda, approximately?
19   A.  23.
20   Q.  And forgive me, I'm losing track of the names.
21 The two sisters, it's Amanda and Stephanie, is that
22 right?
23   A.  Yes.
24   Q.  Okay.  Do they work?
25   A.  Amanda doesn't because she's pregnant.

Page 68
1    Q.  Okay.
2    A.  And Stephanie does.
3    Q.  How about in 2015, did Amanda work?
4    A.  No.
5    Q.  And what does Stephanie do for employment?
6    A.  She works at Walmart, I believe.
7    Q.  Did you ever come to realize that as the
8 personal representative that the purpose in part for
9 opening up the estate was to file the lawsuit that we're
10 all here about?  Does that sound familiar?
11   A.  Say that one more time?
12   Q.  Sure.  Was part of the purpose of opening up
13 the estate to file the lawsuit that we're all sitting
14 here today for?
15       MR. COOK:  Form.
16   A.  I believe so.
17   Q.  There was only one estate case that was open to
18 your knowledge regarding your son, correct?
19   A.  Right.
20       THE WITNESS:  Can I run to the restroom real
21 quick?
22       MR. WHITELOCK:  Absolutely.  I'm almost done.
23 I've got like really three more questions, but if
24 you have to go to the bathroom --
25       THE WITNESS:  That's fine.

Page 69
1        MR. WHITELOCK:  It's fine to keep going?
2        THE WITNESS:  Yes.  I'm sorry.
3        MR. WHITELOCK:  Sure.  And if you have to take
4 a break, just tell me.
5 BY MR. WHITELOCK:
6    Q.  I'm just curious because I'm looking at the
7 filing dates and it appears that the estate case was
8 filed on March 17, 2017.  Does that ring a bell?
9    A.  Yes, sir.
10   Q.  Okay.  But this lawsuit was filed on March 14th
11 of 2017, three days before the estate case was filed.
12 Are you aware of that?
13   A.  No.
14   Q.  Are you aware of any court order for petition
15 of administration that was issued by a court or
16 otherwise authorized the filing of this lawsuit prior to
17 March 14th of 2017?
18   A.  Did I receive papers?
19   Q.  Yes, prior to March 14th of 2017, authorizing
20 the filing of the lawsuit in the name of the personal
21 representative against the State of Florida?
22       MR. COOK:  Form.
23   Q.  Are you aware of that?
24   A.  I can't recall the date, but yes.
25   Q.  Other than potentially funeral expenses, what

MONICA STONE vs ROBERT HENDRY
MONICA STONE

70..73

Page 70

1 expenses, if any, did the estate have prior to
2 March 14th, 2017, that you're aware of as the personal
3 representative?
4    A.  That's all that I know of.
5    Q.  Okay.  This attorney that you can't remember
6 the name -- again, I'm almost done.  To help you out,
7 Alvarez, does that ring a bell?
8    A.  Yes.
9    Q.  To your knowledge, did the estate pay Alvarez
10 any attorney's fees?
11    A.  He said that would come out.
12    Q.  I don't want to know what he said.  That's not
13 my intent.  My intent is just do you know whether or not
14 the estate, as we sit here today, has paid Alvarez --
15    A.  No.
16    Q.  Hold on. -- or that firm any attorney's fees?
17    A.  Not that I'm aware of.
18    Q.  Have they been billed for attorney's fees?
19    A.  Not that I'm aware of.
20    Q.  Have they billed for any expenses or costs of
21 any kind?
22    A.  Not that I'm aware of.
23    Q.  Have you or any of your family members ever
24 filed a claim against any government agency?
25    A.  No, sir, not that I'm aware of.

Page 71

1    Q.  Any lawsuits that you're aware of against like
2 the State of Florida or any of their employees?
3    A.  No, sir.
4    Q.  And just as we sit here today, you wouldn't
5 have any firsthand knowledge to tell me whether or not
6 either David Bailes and/or Christopher Rose were
7 responsible for the death of your son?
8        MR. COOK:  Form.
9    A.  Say that one more time.
10    Q.  Sure.  Do you have any personal knowledge in
11 terms of whether or not Christopher Rose or David Bailes
12 are responsible for the death of your son?
13        MR. COOK:  Form.
14    A.  I don't know.
15        MR. WHITELOCK:  Thank you, ma'am.  That's all I
16 have.
17        THE WITNESS:  Okay.
18        (A break was had from 12:51 p.m. to 12:53 p.m.)
19        MR. COOK:  I'm going to follow up with just a
20 couple of questions.
21            CROSS-EXAMINATION
22 BY MR. COOK:
23    Q.  Can you give me a description of how your son's
24 death has affected you?
25        MR. WHITELOCK:  Object to the form.

Page 72

1    A.  I have fibromyalgia and it has severely
2 declined.
3    Q.  Can you explain what that is?
4    A.  It affects your muscles and your joints and
5 your bones and it also can affect your central nervous
6 system.
7    Q.  And how does it affect those things?
8    A.  It puts me down to where I can't hardly do
9 anything.
10    Q.  Can you be more descriptive?
11    A.  My joints, they hurt so bad that you don't want
12 to move because you're in severe pain.  The pain that I
13 feel is like hitting your funny bone really hard and goes
14 into all my joints; my neck, my shoulders, my back, my
15 elbows, my knees, my hips, my feet.  Sometimes it feels
16 like I'm walking on pins and needles.  They burn.
17    Q.  Is that a physical condition?  I mean, does it
18 start out as a physical condition?
19        MR. WILLIAMS:  Form and predicate.
20    A.  Yeah.
21    Q.  Okay.  And I apologize.  I don't know much
22 about fibromyalgia.  I think I've just heard the word,
23 so...
24    A.  Yeah.
25    Q.  Maybe you can educate me a little bit about,

Page 73

1 you know, what causes it to begin with?
2    A.  They don't know.
3        MR. WILLIAMS:  Form.  Predicate.
4    A.  They don't know why it causes or how it forms,
5 but it does affect your muscles and all your joints and
6 your bones, everything.
7    Q.  How long have you had that?
8    A.  I was diagnosed in '04.  And also borderline
9 lupus.
10    Q.  What is lupus?
11    A.  It is an immune deficiency -- immune -- it eats
12 all your -- it's hard to explain.  Your good -- your
13 immune system.  It affects your immune system.  That's
14 the word.
15    Q.  And was that also diagnosed in '04?
16    A.  I've just been diagnosed with that.
17    Q.  Just when?
18    A.  Probably a year ago.
19    Q.  Can you tell me what it is about the death of
20 your son that has changed your fibromyalgia condition?
21        MR. WILLIAMS:  Form and predicate.
22        MR. WHITELOCK:  Object to form.
23    A.  When I try to talk I stutter and it -- it's
24 hard to describe.
25    Q.  Well, if you could describe it before and after



Page 74

1 learning of your son's death?
2    A.   Before, it didn't bother me as much because I
3 was always up, moving, outgoing, and since his death
4 I've gained 50 pounds, I hurt, I --
5    Q.   Do you need to take some time?
6    A.   No. I'm fine.  It's just hard to get around now
7 because I've put on weight and I hurt more.
8    Q.   Prior to learning of your son's death was your
9 medical condition fairly stable?
10    A.   Yes, sir.
11    Q.   How would you describe the change in your
12 condition from the time of learning of your son's death?
13       MR. WHITELOCK:  Object to the form.
14       MR. WILLIAMS:  Join.
15    A.   Can you say it one more time?  It also affects
16 my memory, too, so...
17    Q.   Okay.  Yeah.  I asked you if it was, if your
18 condition was fairly stable prior to learning of your
19 son's death and my follow-up question was how did the
20 change occur?  Describe how it changed since you learned
21 of your son's death.
22    A.   I have more flare-ups with it where you can't
23 do anything.  I don't know.  I can't explain it.
24    Q.   Does it affect your work?
25    A.   Yes, sir.

Page 75

1    Q.   How?
2    A.   I wake up with migraines and I can't go to work
3 or I have to leave work early because I'm in so much
4 pain I can't stand it.
5    Q.   Do you feel your ability to work has threatened
6 your job?
7       MR. WILLIAMS:  Form.
8       MR. WHITELOCK:  Object to form.
9    A.   It's probably heading there.
10    Q.   What kind of insurance do you have?
11       MR. WHITELOCK:  Object to form.
12    A.   I pay out of pocket for my insurance.  I have
13 Blue Cross Blue Shield.
14    Q.   I think you said your husband also has a
15 disabling condition?
16    A.   Yes.  He has multiple sclerosis.
17    Q.   Is there any other way that you can describe to
18 me the effect that your son's death has had on you?
19       MR. WHITELOCK:  Object to the form.
20    A.   Just that it -- I don't know.  It's hard -- I
21 can't put things into -- what I'm trying to say into
22 words.  I don't know.  I just can't put it into words.
23 I don't know how to get it out to explain it.
24       My anxiety has gotten worse.  My depression has
25 really gotten worse.  I'm on anxiety medicine.  I'm on

Page 76

1 depression medicine.  My depression has definitely
2 gotten worse and my anxiety since then.
3       MR. COOK:  I don't have any other questions.
4       REDIRECT EXAMINATION
5 BY MR. WILLIAMS:
6    Q.   Ma'am, who diagnosed your fibromyalgia
7 condition?
8    A.   I've had several doctors diagnose me with that.
9    Q.   Who was the first one that diagnosed you?
10    A.   Dr. Miles in Plant City.
11    Q.   What is his first name?
12    A.   Robert.
13       MS. HURLEY:  Did you say Miles?
14       THE WITNESS:  Yes, ma'am.  M-I-L-E-S.
15    Q.   And who else has diagnosed you with
16 fibromyalgia?
17    A.   I can't remember the other two doctors, but
18 they were in like a clinic type thing.
19    Q.   Is Dr. Miles a medical doctor?
20    A.   Yes, sir.
21    Q.   And was that first diagnosed in 2004, you said?
22    A.   Yes.  2004, I believe.
23    Q.   And was this fibromyalgia condition diagnosed
24 by Dr. Miles the result of some incident?
25    A.   No, sir.

Page 77

1    Q.   Have you ever filed a lawsuit before this one?
2    A.   Not that I can remember.
3    Q.   Have you ever made a claim for money for any
4 reason before this lawsuit?
5    A.   Not that I can remember.
6    Q.   When was the last time you saw a doctor about
7 your fibromyalgia, looking back from today?
8    A.   Two weeks ago.
9    Q.   And who was that?
10    A.   Dr. Ghaly, I believe is how they pronounce it.
11    Q.   What is that doctor's first name?
12    A.   Y-O-U-S-K-E.
13    Q.   And how are you spelling the last name?
14    A.   G-H-A-L-Y I believe is how you spell it.
15    Q.   That's a medical doctor?
16    A.   Yes, sir.
17    Q.   Where is his practice?
18    A.   In south Lakeland.
19    Q.   What kind of doctor is Dr. Ghaly?
20    A.   I think he's just a regular medical doctor.
21    Q.   Is Dr. Ghaly the person who is prescribing
22 these medications to you?
23    A.   Yes, sir.
24    Q.   And what sort of medication has he prescribed
25 for your anxiety?



MONICA STONE vs ROBERT HENDRY
MONICA STONE

78..81

Page 78

1   A.  Buspar.  Buspirone or --
2   Q.  What has he prescribed for your depression?
3   A.  I'm on Cymbalta.
4   Q.  Also prescribed by Dr. Ghaly?
5   A.  Yes, sir.
6   Q.  And are you taking any medications related to
7 your fibromyalgia diagnosis?
8   A.  Yes, sir.
9   Q.  What medicines do you take for --
10   A.  Gabapentin.
11   Q.  Let me finish so she can take it down.
12   A.  Sorry.
13   Q.  How long have you been taking Gabapentin?
14   A.  Three years.
15   Q.  Before that were you taking any different
16 medication for the fibromyalgia condition?
17   A.  Yes, sir.  I was on Lyrica.
18   Q.  Are you taking any medications related to your
19 lupus?
20   A.  No, not yet.  They are watching it right now
21 because it is borderline.
22   Q.  Who diagnosed you as having borderline lupus?
23   A.  Dr. Ghaly.
24   Q.  Anyone before Dr. Ghaly ever diagnose you as
25 having lupus?

Page 79

1   A.  Dr. Miles said I probably have the skin form of
2 lupus.
3   Q.  Did he prescribe any medications for you?
4   A.  No, sir.
5   Q.  Can you remember the name of any other doctor
6 who has prescribed you medications for either
7 fibromyalgia, lupus, anxiety or depression?
8   A.  No, sir.
9   Q.  When were you first diagnosed with depression?
10   A.  '91, '92.
11   Q.  And who made that diagnosis?
12   A.  A psychologist or whatever they're called,
13 psychiatric or --
14       MS. HURLEY:  Psychiatrist?
15       THE WITNESS:  There you go.  Thank you.
16       MS. HURLEY:  Sure.
17   Q.  Where was this psychiatrist or psychologist?
18   A.  In Tampa.
19   Q.  Do you remember the person's name?
20   A.  No, I don't.
21   Q.  Do you remember the name of the facility where
22 they work?
23   A.  No, I don't.
24   Q.  Have you ever been hospitalized for
25 fibromyalgia?

Page 80

1   A.  No, sir.
2   Q.  Have you ever been hospitalized for lupus?
3   A.  No, sir.
4   Q.  Ever been hospitalized for depression?
5   A.  No, sir.
6   Q.  Ever been hospitalized for anxiety?
7   A.  No, sir.
8   Q.  Other than Dr. Miles and Dr. Ghaly, do you
9 remember the name of any physician who has treated you
10 for any of those conditions?
11   A.  No, sir.
12   Q.  Do you remember any medications other than
13 Buspar, Cymbalta, Gabapentin and Lyrica that you have
14 taken over the years?
15   A.  I've taken Zoloft.
16   Q.  What else?
17   A.  I'm trying to think of the other name.  It's
18 like Lexapro but it's the generic Lexapro.  That's about
19 it.
20   Q.  And where do you have your prescriptions
21 filled, please?
22   A.  At Walgreen's.
23   Q.  Where?
24   A.  Combee and 92.
25   Q.  Do you know an address there?

Page 81

1   A.  No, I don't.
2   Q.  What and 92?
3   A.  Combee, C-O-M-B-E-E.
4   Q.  And Highway 92?
5   A.  Yes, sir.
6   Q.  What town is that in?
7   A.  Lakeland.
8   Q.  That's always where you've had your
9 prescriptions filled?
10   A.  Yes, sir.
11   Q.  And all those medicines that you have described
12 for us here today have been filled in your name at these
13 locations?
14   A.  Yes, sir.
15   Q.  Who pays for the medications, please?
16   A.  My insurance.
17   Q.  The Blue Cross Blue Shield policy?
18   A.  Yes, sir.
19   Q.  Do you happen to have your insurance card, if
20 your lawyer would permit, with you?
21   A.  Yeah.
22   Q.  Can you provide us with that card and the
23 number of that insurance policy?
24   A.  (Witness complies.)
25   Q.  Thank you.



MONICA STONE vs ROBERT HENDRY
MONICA STONE

82..85

Page 82

1    A.  You're welcome.
2       MR. WILLIAMS:  We'll make a copy, but I'm
3    looking at a Florida Blue insurance card with
4    Ms. Stone's name on it and it has Member Number VM,
5    A as in apple, H17217579, Group Number 99999, Plan
6    Number 1443C.  It has an address for sending claims
7    to, Health, P.O. Box 1798, Jacksonville, Florida
8    32231.  And a customer service phone number
9    (800)352-2583.
10      I'll make that Defendants' 1 to the deposition.
11   We'll make a copy of both sides, please, ma'am.
12      (Defendants' Exhibit Number 1 was later marked
13   for identification.)
14   BY MR. WILLIAMS:
15   Q.  Has any doctor advised or told you that any
16   medical condition that you have was made worse as a
17   result of your son's passing?
18   A.  I don't know because I just started going to
19   Dr. Ghaly.
20   Q.  Whether it was Dr. Ghaly or anyone else, has
21   any doctor ever told you that your medical condition is
22   worse because of your son's passing or is this something
23   that you have surmised yourself?
24   A.  It's something that I've seen by myself.
25   Q.  So is it fair for me to say that no doctor has

Page 83

1    ever told you that your condition was made worse as a
2    result of your son's passing?
3    A.  I guess, yeah.
4    Q.  Have you ever made a disability claim, ma'am?
5    A.  No, sir.  Well, I did.  I take that back.  In
6    maybe '11.
7    Q.  Based on what?
8    A.  My fibromyalgia and depression.
9    Q.  And where was that disability claim filled out?
10   A.  In Lakeland.
11   Q.  At the Social Security Administration?
12   A.  Yes, sir.
13   Q.  Have you filed a disability claim anywhere
14   else?
15   A.  No, sir.
16   Q.  Do you have any other kind of health insurance
17   or disability insurance other than this Blue Cross
18   Insurance shown on the card that you handed me before?
19   A.  No, sir.
20   Q.  Were you represented by a lawyer when you made
21   this disability claim in 2011 or thereabouts?
22   A.  No, sir.
23   Q.  You did it yourself?
24   A.  Yes, sir.
25      MR. WILLIAMS:  All right, ma'am.  Those are all

Page 84

1    of the questions I have.  The other lawyers may have
2    some follow-up.
3       MS. HURLEY:  I don't anything.
4          RECROSS-EXAMINATION
5    BY MR. WHITELOCK:
6    Q.  The doctors you mentioned for all this
7    treatment, do any of them have any claims against the
8    estate?
9    A.  No, sir.
10   Q.  And I forgot to ask you this before, but to
11   your knowledge is there any property in the estate?
12   A.  No, sir.  None.
13      MR. WHITELOCK:  Thank you.  That's all I have.
14      MR. WILLIAMS:  Anything else?
15      MR. COOK:  No.
16      MR. WILLIAMS:  Read or waive?
17      MR. COOK:  We'll read.
18      MR. WILLIAMS:  And I'm ordering.
19      MR. COOK:  We'll take a copy.
20      MR. WILLIAMS:  What's your normal delivery
21   time?
22      (Discussion off the record.)
23      THE COURT REPORTER:  Copy?
24      MR. WHITELOCK:  Yes.
25      THE COURT REPORTER:  Ms. Hurley?

Page 85

1       MS. HURLEY:  Yes.  I'm sorry.
2          (THEREUPON, the deposition of MONICA STONE
3    was concluded at 1:11 p.m.)



Orange Legal
800-275-7991

MONICA STONE vs ROBERT HENDRY
MONICA STONE

86..89

Page 86

```
 1              CERTIFICATE OF OATH
 2   STATE OF FLORIDA
 3   COUNTY OF HIGHLANDS
 4
 5         I, Susan Rankine, the undersigned authority,
 6   certify that the witness, MONICA STONE, personally
 7   appeared before me on February 14, 2018, and was duly
 8   sworn.
 9
10         WITNESS my hand and official seal this 25th
11   day of February, 2018.
12
13
14
15              SUSAN RANKINE, COURT REPORTER
                Notary Public - State of Florida
16              Commission No: GG189925
                Expires:  February 26, 2022
17
18
19
20
21
22
23
24
25
```

Page 87

```
 1              CERTIFICATE OF REPORTER
 2   STATE OF FLORIDA
 3   COUNTY OF HIGHLANDS
 4
 5         I, SUSAN RANKINE, Professional Court
 6   Reporter, do hereby certify that I was authorized to and
 7   did stenographically report the deposition of MONICA
 8   STONE; that a review of the transcript was requested;
 9   and the foregoing transcript is a true record of my
10   stenographic notes.
11         I FURTHER CERTIFY that I am not a relative,
12   employee, or attorney, or counsel of any of the parties,
13   nor am I a relative or employee of any of the parties'
14   attorney or counsel connected with the action, nor am I
15   financially interested in the action.
16
17         DATED this 25th day of February, 2018 at
18   Sebring, Highlands County, Florida.
19
20
21
22              SUSAN RANKINE, COURT
23
24
25
```

Page 88

```
 1                  ERRATA SHEET
               DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES
 2
     IN RE:  (Monica Stone vs. Robert Hendry, et al.
 3   Deposition of MONICA STONE taken on 2/14/18.)
 4   PAGE   LINE  CORRECTION            REASON
 5   ____   ____  _____     _____
 6   ____   ____  _____     _____
 7   ____   ____  _____     _____
 8   ____   ____  _____     _____
 9   ____   ____  _____     _____
10   ____   ____  _____     _____
11   ____   ____  _____     _____
12   ____   ____  _____     _____
13   ____   ____  _____     _____
14   ____   ____  _____     _____
15   ____   ____  _____     _____
16   Under penalties of perjury, I declare that I have read
17   the foregoing document and that the facts stated in it
18   are true.
19
20   _____          _____
         DATE                     MONICA STONE
21
22   cc:  James O. Williams, Esq.
23        Christopher J. Whitelock, Esq.
24        Claire R. Hurley, Esq.
25        James V. Cook, Esq.
```

Page 89

```
 1   February 26, 2018
 2
     Ms. Monica Stone
 3   3338 Oakland Road South
     Lakeland, Florida 33801
 4
     In Re:  Deposition of MONICA STONE taken on 2/14/18.
 5
     Dear Madam,
 6
     This letter is to advise that the transcript for the
 7   above-referenced deposition has been completed and is
     available for review.  Please contact our office at
 8   (800)275-7991 to either make arrangements to read and
     sign the transcript or sign below to waive review of
 9   this transcript.
10   It is suggested that the review of this transcript be
     completed within 30 days of your receipt of this letter,
11   as considered reasonable under Federal Rules*; however,
     there is no Florida Statute to this regard.
12
     The original of this transcript has been forwarded to
13   the ordering party and your errata, once received, will
     be forwarded to all ordering parties for inclusion in
14   the transcript.
     Sincerely,
15
16
     Susan Rankine
17   Orange Legal, Inc.
     cc:  James O. Williams, Esq.
18        Christopher J. Whitelock, Esq.
19        Claire R. Hurley, Esq.
          James V. Cook, Esq.
20
     Waiver:
21
     I, _____, hereby waive the reading & signing
22   of my deposition transcript.
23
24   _____    _____
     Deponent Signature          Date
25
```

