UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| MONICA STONE, as the Personal Representative of the ESTATE OF CHRISTOPHER COX, on behalf of the Estate and Survivors, Monica Stone, Mother, and Ronald Doyle, Father,<br><br>    Plaintiff,<br><br>v.<br><br>ROBERT HENDRY, ROBERT FEIPEL, CHRISTOPHER ROSE, DAVID BAILES, CAROLYN CONRAD, and JULIE JONES in her Official Capacity as Secretary of the Florida Department of Corrections,<br><br>    Defendants. | CASE NO. 2:17-CV-14177-ROSENBERG/LYNCH |

PLAINTIFF'S STATEMENT OF
DISPUTED AND ADDITIONAL FACTS

COMES NOW the Plaintiff, MONICA STONE, and files this Statement of Disputed and Additional Facts, and would show that the Defendants' Material Facts are highly disputed and that additional facts are material to this action.

1. Christopher Cox was in the care and custody of the Department of Corrections and Defendant Warden Hendry. Cox was transferred to Martin Correctional Institution (MCI) on January 14, 2015 due to a request for protective management on December 18, 2014 approved by the State Classification Office (SCO) (DE 146-2).

1

2. Prior to coming to Martin C.I., Inmate Cox had been targeted and abused by various inmates on multiple occasions and his requests for protection were repeatedly denied by the SCO (DE 146-2).

3. Christopher Cox was placed in cell D2214 on February 3, 2015, along with an inmate named Denis McAuliffe, DC#933726. McAuliffe was replaced by Willie Davis, DC#B11942 on March 1, 2015. Cox was taken out of the cell on March 13, 2015, and replaced by Victor Antunez, DC#Y45888, and Jahdel Morales, DC#527188. On February 6, 2015, Hurley Brown was placed in cell D2210 which he had shared with Shernard Richardson, DC#962778 up until the time Richardson left on March 9, 2015. (Exhibit A, Inmate Locations Jan-Mar 2015, p. 6).

4. On or about March 15, 2015, Inmate Cox was moved to cell D2210, housed with Inmate Hurley Brown. Inmate Brown and Cox were the only two in this cell and the cell was locked down. The first night Cox was moved into cell D2210 with Brown, Brown strangled and murdered Cox. (Exhibit B, FDLE Investigative Summary, p. 22)

5. Prison staff had reason to know Brown was a danger to Cox. Officers, including Defendant Rose who escorted inmates to the showers would have been able to see Brown staring at young inmates in the showers. (Exhibit M, Declaration of Ernest Powell III; DE 185-5, Deposition of

Christopher Rose, 16:13-23). Brown went by the nickname, "Bug." (Id.).

6. Brown had repeated disciplinary reports for fighting, disorderly conduct, assaults, threats, disrespect, and lewd and lascivious behavior. (Exhibit D, DC-14 Brown, p. 9-11). He admitted belonging to the John Doe Boys Gang. He once told an officer, "I'd cut your fucking throat and anybody else who fucked with me." In another case he said, I'll break your jaw, you fucking cracker." In an intercepted letter he told a former girlfriend he'd shoot her in the head. (Exhibit D, Composite Brown Threats).

7. Warden Hendry stated that prison officials relied on a computer program to check inmate compatibility. (Exhibit E, Deposition of Robert Hendry, 26:19-27:14). In a memo, Department of Corrections Official Timothy Cannon emphasized that in cases strikingly similar to the characteristics of Cox and Brown, additional oversight by the Warden may be required. The memo states "database reports do not replace the sound correctional judgment of our staff." Physically or temperamentally mis-matched cellmates should be avoided. Some inmates should be housed alone, and "Wardens should make this determination on a case by case basis and in the best interest of inmate and staff safety." (Exhibit F, Potential Predator Identification List Memo). Brown was one such inmate.

8. In his deposition, Defendant Hendry said he did not know the officers who

placed the Cox and Brown together, and that is not something that would be of concern to him as the Warden of MCI (Exhibit E, Deposition of Robert Hendry, 13:12-17). However, later in the deposition Hendry was asked if there was anything questionable about the placement of Cox and Brown in the same cell with regards to compatibility standards. Hendry admits to reviewing the placement and says that he did not find it questionable (Id., 26: 9-18). The decision to place Cox and Brown together was made after the distribution of this agency-wide memo that demanded greater oversight and warden approval on certain cases.

9. Inmates like Brown, with a known propensity for violence and demonstrated threats. Inmate Cox was white, skinny, weighing 134 pounds with a very slight build. Inmate Brown was black and weighed over 190 pounds with a muscular build. (Exhibit G, Face Sheet Cox; Exhibit H, Face Sheet Brown).

10. Prior to the murder, Inmate Brown had himself requested help with his mental condition feeling he was a threat to himself or others. Inmate Derek Cedri stated in an interview the FDLE that Brown was mentally unstable and that Brown once threatened him by saying that the only thing he does with "crackers" is rape them. In fact, Inmate Cedri stated that Brown indicated before the murder of Cox that he was going to rape Cox

4

(Exhibit B, FDLE Investigative Summary Pg. 8).

11. Prison officials ignored Browns' admitted affiliation with the John Doe Boys Drug Gang. Brown has said things like that officials "don't care if I live or died as long as its blacks stabbing and killing blacks but let the tables turn and black starts stabbing and killing white boys, I know the ICT Team won't be all smiles then. (Exhibit I, Composite, Brown Threats). This is particularly troubling considering that Cox had been subject to threats from gang members in the past (DE146-2, p. 2, 5-7).

12. Cox had complained to prison officials that he feared for his life, including a request for protection dated February 26, 2015, just two weeks before he was murdered (DE 146-2, p. 2). He further complained that he had been previously raped and stabbed. Id.

13. On March 15, 2015, just two days after Inmate Cox was locked up with Inmate Brown in D2210, Inmate Brown attacked inmate Cox, beat him, possibly sexually assaulted him, strangled him and ultimately killed him. Defendants Feipel, Rose, Bailes, and Conrad failed or refused to come to the aide of Inmate Cox before, during, and after the attack. (Exhibit B, FDLE Investigative Summary).

14. Martin C.I. prisoner Derek Wells testified under oath that he yelled to Officer Bailes that a man was getting killed and Bailes does not deny he

5

failed to take action; (Exhibit B, FDLE Investigation Report, p. 8). There is evidence that officers in Dorm D knew that Brown was dangerous and that he had serious mental health issues. Brown's nickname was "bug," Id., and Wells told correctional officers not to place Cox in the cell with Brown because he was a "small, young, good-looking white boy." Cedri is quoted as saying, "The only thing I do to crackers is fuck 'em." Id. at 9.

15. Wells, also testified that he told Officer Bailes a man was being killed. (Exhibit B, FDLE Investigative Summary, p. 8). Several witnesses state that inmates loudly yelled "man down" for a half-hour after Officer Rose arrived in the housing area. (Id., p. 6).

16. Officer Christopher Rose was in a cell with Christopher Cox when he was unresponsive on the floor but made no effort to use his lifesaving skills. (DE 185-5, Deposition of Christopher Rose, 14:11-24). Although a first responder he said he was taught at Martin C.I. to leave it to medical.

17. A video of Cox's cell block, which Defendant Hendry reviewed, showed an officer make quick rounds, failing to look into many of the cells, including Cox's, although cell checks require exactly that. (Exhibit E, Hendry Deposition, 11:9-14). The video also revealed that no count was done at 7:00 p.m. although the housing log showed count at 7:00 p.m. (Exhibit B, FDLE Investigative Summary, p. 23-24). Defendant Hendry

said it was fine if cell checks are done a half hour before the 7 p.m. shift change and a half-hour afterwards, leaving a full one-hour gap between cell checks. (Exhibit E, Hendry Deposition, 63:20-64:3)

18. According to American Correctional Association Standard #4-4257, cell checks must be performed twice an hour, and no longer than 40 minutes apart. (Exhibit J, ACA Audit, p. 3). However, Defendant Hendry, in clear violation of the ACA standard, implemented his own rule which allowed for approximately one hour to pass without a cell check around the 7:00 pm shift change. Defendant Hendry stated in deposition that "way that they change shifts, it does not give them the ability to go in and immediately," and that it "usually takes a little bit of time" during the briefing process. (Exhibit E, Deposition of Robert Hendry, 63:13-25, 64:1-3). When asked if it concerned him that the Dormitory goes from 6:30 to 7:25 without a cell check, Defendant Hendry added:

    The off-going shift made their last check, and then the oncoming shift is required, by policy, to do theirs within 30 minutes of being assigned to the institution -- or being assigned to their posts. So, they had begun their rounds within the 30-minute time frame.

    (Id., 21:5-13)

19. Thus, each day around the shift change at MCI Defendant Hendry was aware of a predictable gap in which if an attack of another inmate will occur, it may occur in this time frame. Inmate Peter Larangera stated that

the checks are usually completed at the top of the hour and inmates can "easily time the checks if they wanted to do something." Likewise, Inmate Gallagher stated that the attack on Cox occurred right around the 7:00pm shift change, and every day is the same routine. (Exhibit B, FDLE Investigative Summary, p.7).

20. The evening of March 15, 2015, Inmate Derek Cedri heard fighting coming from cell D2210. Cedri began to yell "man down." Inmate Michael Gallagher stated that he saw Brown suffocating Cox through the window of cell D2210. He could see Brown's arm around Cox's neck. Inmate Peter Larangera stated that he heard a "couple of good solid thumps." Inmates screamed and banged on their doors attempting to summons help for Inmate Cox. Inmates Ernest Powell III and Peter Larangera stated that inmates continued these calls for help for approximately 25-30 minutes before any officer opened the door to check on Cox. The inmates were screaming "man down" which is a term used to alert guards that an inmate is being attacked or is hurt. (Exhibit B, FDLE Investigative Summary, p. 6-9).

21. When Nurse Conrad and Feipel entered the Dormitory around 7:22 pm, the inmates in the wing were already yelling for help, screaming "man down." (Id., p. 8-10, 25).  Nurse Conrad began to pass out medications.

8

Conrad stated in an interview with Jester that she heard inmates yelling and banging on cells, but the officer that escorted her (Feipel) forgot his radio and they both exited the dormitory to retrieve it (Id., p. 20).

22. Inmate Derek Cedri and Inmate Michael Gallagher reiterated that Feipel and Conrad entered the Dormitory, but ignored the inmates' calls for help and left a minute later. (Id., p. 8-10)

23. Feipel and Conrad re-entered the dormitory and Feipel looked into cell D2210 around 7:25pm. Feipel handcuffed Brown. Even though Cox was face down on the floor, Feipel waited two minutes before opening the door. Defendant Rose entered the cell with Feipel at 7:27 pm. (Id., p. 24). Feipel told Conrad to wait outside the door, and Feipel handcuffed Christopher Cox. (Exhibit K, Deposition of Robert Feipel, 17:12-15).

24. Nurse Conrad then finally entered the cell at 7: 28. (Exhibit B FDLE Investigative Summary, p. 24). Rose and Conrad found Christopher Cox face down, with his head in a pillow and a white cloth around his neck, and observed blood under his pillow. In an interview with Special Agent Jester, on April 9, 2015, Conrad claimed that she performed chest compressions and a chest rub (Id., p. 20). However, in her Incident Report, Nurse Conrad stated simply that she rubbed Cox's chest vigorously and received no response. Conrad did not say that she attempted CPR at any

point. She also noted that Cox was warm and pale. (Id., p. 21).

25. In fact, in an Incident Report, Feipel stated that he asked Conrad if she would like to perform CPR, and she responded, "He's dead and needs a stethoscope." Feipel then called for additional medical staff. In an interview with SA Jester, Feipel stated that Conrad checked Cox's wrist for a pulse and stated that he was dead. When directly asked if Conrad performed CPR, Feipel responded that she did not. (Id., p. 11-12).

26. Despite finding Cox unresponsive, Conrad chose not to perform CPR, declaring Christopher Cox dead. Defendants Feipel and Rose also chose not to initiate CPR. Rose removed Inmate Brown and then re-entered the cell one minute later. At around 7:35, approximately six minutes after entering, Conrad exited the cell to continue passing out medications to the rest of the inmates in the dormitory. The cell was declared a crime scene, and Feipel locked the cell door before any medical team arrived to administer aid. (Exhibit E, Deposition of Robert Hendry, 68:14-20). Less than a minute later, Feipel left the area and walked downstairs. (Exhibit B, FDLE Investigative Summary, p. 24).

27. The former director of nursing at MCI, Robert Silvis, stated that he had warned Hendry that nurses like Conrad, who as an LPN could not pronounce anyone dead, were outside the scope of their practice. Silvis

said Defendant Conrad should have immediately begun CPR. He stated Conrad was not qualified to pronounce an inmate deceased. Silvis added he wanted to report Defendant Conrad to the Board of Nursing for failure to render aid (Exhibit L, IG Inquiry Summary Report June 11, 2015).

28. Defendants Rose and Feipel were in the cell with Defendant Conrad and knew the obvious risk to Cox. Defendant Hendry noted in deposition that all correctional officers are first responders, trained in CPR techniques. (Exhibit E, Deposition of Robert Hendry, 61:11-17). Thus, Defendants Rose and Feipel were required to perform CPR but chose not to do so.

29. Hendry said officers can make a judgment whether to perform CPR or not, even if the nurse who made the call was only an LPN. Hendry added, "there is no standard policy or procedure for that specific thing. If a nurse makes the call, the correctional officer doesn't have to act." (Id., 69:17-25, 70:1-18). Thus, Hendry trained his officers to follow the lead of a nurse with only an LPN certification who declared that an unresponsive inmate was dead and not in need of CPR.

30. An additional several minutes passed where Defendants Conrad, Rose, and Feipel left Christopher Cox unattended, handcuffed in a secured cell. Nurses Rashena Williams and Leah Darlington arrived at 7:41 pm to find that the cell door was secured and they were unable to immediately enter.

(Exhibit B, FDLE Investigative Report, p. 24; Exhibit E, Deposition of Robert Hendry, 68:7-10).

31. When Darlington and Williams entered the cell, Cox has handcuffed behind his back and shackled at the legs. (Exhibit B, FDLE Investigative Summary, p. 16-20). Thus, neither Defendant Feipel nor Defendant Rose had removed Cox's handcuffs after calling for additional medical staff. Nurse Jenell Jones arrived at 7:48 with an AED. At that point, the AED did not advise the nurses to attempt to use shock. (Id., p. 17-18).

32. Hendry noted in deposition that it stood out to him that Defendants Conrad and Feipel exited the cell, "secured the cell, door, and continued to make their medication rounds. And then the emergency medical-response unit responded later." (Exhibit E, Deposition of Robert Hendry, 11:1-5).

33. Nurses Darlington, Williams, and Jones were instructed to not transport Christopher Cox to medical, because the cell was a "crime scene." Officers asked Williams what the nurses intended to do for Cox because he appeared to be dead. Williams responded that they were required to do everything they could, because no one present could pronounce him deceased. Williams stated the person who told her this was most likely a captain, because he was wearing a white shirt (Exhibit B, FDLE Investigative Summary, p. 17).

Respectfully Submitted,  *s/James V. Cook*_____
JAMES V. COOK
Florida Bar Number 966843
Law Office of James Cook
314 West Jefferson Street
Tallahassee, FL 32301
Fax: 850 561-0836
cookjv@gmail.com

ATTORNEYS FOR PLAINTIFF

I CERTIFY a true copy hereof was served 3/24/18 on all counsel of record registered with the CM/ECF electronic filing system.

*/s/James V. Cook*