UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. PIERCE DIVISION

| | |
|---|---|
| MONICA STONE, as the Personal Representative of the ESTATE OF CHRISTOPHER COX, on behalf of the Estate and Survivors, Monica Stone, Mother, and Ronald Doyle, Father,<br><br>        Plaintiff,<br><br>v.<br><br>ROBERT HENDRY, ROBERT FEIPEL, CHRISTOPHER ROSE, DAVID BAILES, CAROLYN CONRAD, and JULIE JONES in her Official Capacity as Secretary of the Florida Department of Corrections,<br><br>        Defendants. | CASE NO. 2:17-CV-14177-ROSENBERG/LYNCH |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO
DISMISS OR STRIKE ON CLAIMS FOR DAMAGES**

COMES NOW the Plaintiff, MONICA STONE, and files this Response to Motion to Dismiss/Strike on Claims for Damages and would show Defendants' conduct involved callous indifference to the rights of Christopher Cox and meets standards for punitive damages in cases under 42 USC 1983, and would show:

1. Inmate Christopher Cox was placed in cell D2214 on February 3, 2015, along with an inmate named Denis McAuliffe, DC#933726. (Exhibit A, Inmate Locations Jan-Mar 2015, p. 6).

2. On March 13, 2015, Inmate Cox was moved to cell D2210, with Inmate

Hurley Brown. Brown was well-known as a violent inmate with mental health problems. Just about two weeks prior to killing Cox, he wrote,

As long as its Blacks stabbing and killing one another here at Martin C.I., the ICT Team is all for it, but let the tables turn and Blacks starts stabbing and killing white boys, I know the ICT Team won't be all smiles then.

Exhibit B, Brown Threats, p. 2.

Wing 2 could hold up to 80 inmates, possibly more. (Exhibit C, Housing Logs, p. 1). On the date Cox was moved, there were five other bunks free in Wing 2 (Id., p. 2). But Cox and Brown were locked down together.

3. Officers knew Brown was dangerous. He was mentally ill and known as "bug." He had a history of fights, assaults, threats, disrespect, and lewd behavior. (Exhibit D, DC-14 Brown, p. 9-11). He admitted belonging to the John Doe Boys Gang. (Exhibit B, Brown Threats, p. 1). He told an officer, "I'd cut your fucking throat and anybody else who fucked with me." (Id., p. 3). In another case he said, I'll break your jaw, you fucking cracker." (Id., p. 4). In an intercepted letter he told a girlfriend he'd shoot her in the head. (Id., p. 7).

4. On March 15, 2015, just two days after Cox was locked up with Brown in D2210, Brown attacked Cox, beat him, strangled him and ultimately killed him. (Exhibit E, FDLE Report).

5. The evening of March 15, 2015, Inmate Derek "Cedri" Wells heard Cox

call for help. Wells and other inmates yelled "man down" for 25-30 minutes before officers responded. (Exhibit E, FDLE Report, p. 6-9).

   A. **Warden Robert Hendry**

6. Warden Hendry was callously indifferent. He made his own rules for security checks. While Post Orders required a security check of the entire confinement dorm at the beginning and end of each shift and no more than 30 minutes apart, Hendry approved leaving a full hour between security checks at shift changes. (Exhibit F, Post Order 10, p. 2; Exhibit G, Hendry Deposition, 63:20-64:3).

7. Inmate Gallagher said the attack on Cox occurred around shift change and every day is the same. Inmate Peter Larangera said checks were an hour apart and that inmates could easily time their actions to the routine if they wanted to get away with something. (Exhibit E, FDLE Report, p.7).

8. Warden Hendry stated that he relied on a computer program to check inmate compatibility. (Exhibit G, Deposition of Robert Hendry, 26:19-27:14). But an FDOC memo, responding to a case strikingly similar to this one, said, "database reports do not replace the sound correctional judgment." Physically or temperamentally mis-matched cellmates should be avoided. Some inmates should be housed alone, and "Wardens should make this determination on a case by case basis and in the best interest of

3

inmate and staff safety." (Exhibit H, Potential Predator Identification).

9. The errors in placement were compounded by a failure to use life-saving techniques when Cox was found. A nurse, LPN Carolyn Conrad told officers she thought Cox was dead and so no one tried CPR. Robert Silvis, the director of nursing at Martin C.I. at the time, stated that he had warned Hendry that nurses like Conrad, who as an LPN could not pronounce anyone dead, were acting outside the scope of their practice. But nothing changed. (Exhibit I, IG Inquiry Summary Report June 11, 2015). Hendry said "there is no standard policy or procedure for that specific thing. If a nurse makes the call, the correctional officer doesn't have to act." (Exhibit G, Hendry Deposition, 69:17-25, 70:1-18).

### B. Sgt. Robert Feipel

10. Sgt. Feipel was callously indifferent. As the Dorm Sergeant, he was governed by Post Order 10, that said he had to do a complete security check at the beginning of his shift. But a video of Wing Two showed no security check was done at 7:00 p.m. although the housing log showed an inmate count at 7:00 p.m. (Exhibit E, FDLE Report, p. 23-24).

11. Thus, each day around the shift change at Martin C.I., Warden Hendry, Sgt. Feipel, and all the inmates in Dorm D, were aware of a predictable one-hour gap in security checks right at shift change. This was an open

invitation to an inmate like Hurley Brown.

12. When Sgt. Feipel entered the Dormitory with Nurse Conrad around 7:22 pm the inmates in Wing Two had been screaming "man down" for some time. (Id., p.8-10, 25). Conrad stated in an interview with Jester that she heard inmates yelling and banging on doors, but Feipel had forgotten his radio and they both exited the dormitory to retrieve it (Id., p.20).

13. Sgt. Feipel re-entered the dormitory with Conrad and looked into cell D2210 around 7:25 pm. After taking Brown out of the cell, Feipel handcuffed Cox. (Exhibit J, Deposition of Robert Feipel, 17:12-15). As Warden Hendry noted in deposition that all correctional officers are first responders, trained in CPR techniques. (Exhibit G, Deposition of Robert Hendry, 61:11-17). But neither Conrad or Feipel started CPR. Defendant Feipel did not remove Cox's handcuffs after calling for additional medical staff. (Exhibit E, FDLE Investigative Summary, p. 16-20).

14. The cell was declared a crime scene, and Feipel locked the cell door before a medical team arrived to administer aid. (Exhibit G, Deposition of Robert Hendry, 68:14-20). Less than a minute later, Feipel left the area and walked downstairs. (Exhibit E, FDLE Investigative Summary, p. 24).

15. Despite the fact that Wing Two video showed that no one had come onto Wing 2 since 6:28 p.m., the housing log showed that an inmate count had

been done at 7:00 p.m. (Exhibit E, FDLE Report, p. 23-24). That means the log entry, made by Christopher Rose and signed off on by Feipel, was entirely fictitious and amounted to a false report.

### C. Officer Christopher Rose

16. Christopher Rose was callously indifferent. Inmate Derek Wells told officers not to place Cox in the cell with Brown because he was a "small, young, good-looking white boy." Brown is quoted saying, "The only thing I do to crackers is fuck 'em." Id. at 9. Rose escorted Brown for showers and would have witnessed Brown staring at the naked young inmates. (Exhibit K, Powell Declaration; Exhibit L, Rose Deposition, 16:13-23).

17. Rose was also present as Cox lay on the floor, his body still warm, without anyone starting CPR. (Id., 14:13-19). Although Rose was a First Responder, he failed to act.

18. An additional several minutes passed where Defendant Rose left Christopher Cox unattended, handcuffed in a secured cell. Defendant Rose did not remove Cox's handcuffs after calling for additional medical staff. (Exhibit E, FDLE Report, p. 16-20).

### D. Officer David Bailes

19. David Bailes was callously indifferent. Martin C.I. prisoner Derek Wells testified under oath that he yelled to Officer Bailes that a man was getting

6

killed and Bailes does not deny he failed to take action. Bailes did say that the person Wells saw could not have been him but Wells did identify him as the officer. (Exhibit E, FDLE Investigation Report, p. 8).

### E. Nurse Carolyn Conrad, LPN

20. Nurse Carolyn Conrad was callously indifferent. When Nurse Conrad and Feipel entered the Dormitory around 7:22 pm, the inmates in the wing were already yelling for help, screaming "man down." (Id., p. 8-10, 25). Nurse Conrad admitted she heard inmates yelling and banging on cells, but the officer that escorted her (Feipel) forgot his radio and they both exited the dormitory to retrieve it (Id., p. 20).

21. Inmate Derek Wells and Inmate Michael Gallagher reiterated that Feipel and Conrad entered the Dormitory, but ignored the inmates' calls for help and left a minute later. (Id., p. 8-10)

22. Conrad and Feipel re-entered the dormitory and Feipel looked into cell D2210 around 7:25 pm. (Id., p. 24). Conrad claimed that around 7:29, she performed chest compressions (Id., p. 20). However, in her Incident Report, Nurse Conrad did not state that she did chest compressions or CPR. (Exhibit M Conrad Incident Report).

23. In fact, in his Incident Report, Feipel stated that he asked Conrad if she would like to perform CPR, and she responded, "He's dead and needs a

7

stethoscope." Feipel then called for additional medical staff. In an interview with SA Jester, Feipel stated that Conrad checked Cox's wrist for a pulse and stated that he was dead. When directly asked if Conrad performed CPR, Feipel responded that she did not. (Id., p. 11-12). Rose also did not observe Conrad perform chest compressions. (Exhibit L, Deposition of Christopher Rose, 15:9-11).

24. Nurses Rashena Williams and Leah Darlington responded to the call for medical assistance. Williams found Nurse Conrad in the stairs leading to the cell D2210, and Conrad stated, "He looks dead to me." (Exhibit N, Williams Incident Report). Williams and Darlington arrived at 7:41 pm to find that the cell door was secured and they were unable to enter immediately. (Exhibit E, FDLE Investigative Report, p. 24; Exhibit G, Deposition of Robert Hendry, 68:7-10).

25. Williams and Darlington asked the officers to open the door where they found Christopher Cox handcuffed behind his back and shackled at the legs. (Exhibit E, FDLE Investigative Summary, p. 16-20). Nurse Jenell Jones arrived at 7:48 with an AED, (Id., p. 17-18). When Jones entered the cell, found Darlington and Williams performing CPR while Cox was still handcuffed. Jones asked officers to remove the restraints. (Exhibit O, Jones Incident Report). At that point, the AED did not advise the nurses to

attempt to use shock. Nurses Darlington, Williams, and Jones continued CPR until the Emergency Medical Services (EMS) arrived. (Id.).

26. Hendry noted in deposition that it stood out to him that Defendants Conrad and Feipel exited the cell, "secured the cell, door, and continued to make their medication rounds. And then the emergency medical-response unit responded later." (Exhibit G, Hendry Deposition, 11:1-5).

## MEMORANDUM OF LAW

As an initial matter, Plaintiff agrees that Julie Jones, in her official capacity, standing in, as she does, for the Florida Department of Corrections in this lawsuit, cannot be assessed punitive damages and Plaintiff does not intend to seek such damages as to the entity she represents.

Punitive damages against individual defendants, however, are "a particular remedial mechanism normally available in the federal courts," *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, 397 (1971), and are especially appropriate to redress violation of constitutional rights by a Government official. Moreover, punitive damages are authorized under the federal common law and actions pursuant to 42 USC 1983. *McCulloch v. Glasgow*, 620 F.2d 47, 51 (5th Cir. 1980); *Carey v. Piphus*, 435 U. S. 247, 257, n. 11 (1978).

In this case, Defendants quote *Stallworth* to say the standard for punitive damages is as follows: "Punitive damages are available under 42 U.S.C.A. §§ 1981

and 1983 when defendant's conduct is shown to be motivated by evil motive or intent, *or when it involves reckless or callous indifference* to federally protected rights of others." *Stallworth v. Shuler*, 777 F. 2d 1431, 1435 (11th Cir. 1985) (*emphasis added*); *quoting Smith v. Wade*, 461 US 30, 56 (1983). *See also Block v. R.H. Macy & Co.*, 712 F.2d 1241, 1246 (8th Cir. 1983).[1]

The *U.S. Supreme Court in Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032 (1991), provides that juries can also take into consideration "the necessity of preventing similar wrong," which in the case of a violent and painful death, such has here, adds an additional relevant factor.

Martin Correctional Institution Warden Robert Hendry was callously indifferent to the rights of Christopher Cox. Mr. Hendry came to Martin C.I. just after Thanksgiving, 2014, just a few months before the death of Christopher Cox and just two months after a previous murder of a prisoner at Martin C.I.[2]

Having previously held the position of Assistant Bureau Chief of Professional Development and Training,[3] Hendry was peculiarly well-versed in the importance of following procedure. And yet, against all written policy, Hendry

---

[1] Defendants question whether Plaintiff has alleged any facts showing that any defendant was motivated by reckless or callous indifference. (Doc. 177, p. 2). Whether a defendant is "motivated" by "indifference" appears to be an oxymoron but facts set out in the pleadings certainly justify an inference that defendants were recklessly or callously indifferent.
[2] Exhibit G, Deposition of Robert Hendry, 23:12-24:6
[3] Exhibit G, Deposition of Robert Hendry, 5:23-6:3.

allowed Dorm Sergeants to go an hour without cell checks at each shift change.

Post Order 10, Housing Sergeant/Officer Confinement, states:

> Conduct a security check of the inside of the building at the beginning of each shift, and at the end of each shift. The entire housing unit will be inspected for safety, sanitation, security, and maintenance discrepancies. This security check will be documented on the DC6-209, Housing Unit Log.

Exhibit F, Post Order 10.

The Post Order also says that security checks will be "at least every 30 minutes." (Id.).  Hendry was also callously indifferent in letting nurses, including LPNs like Conrad, go beyond their qualifications despite warning. This had fatal implications for Cox as he lay unresponsive on the floor without first aid.

Rose, Bailes, and Feipel were reckless/callously indifferent to Cox's safety when they failed to follow department policy on the frequency of cell checks, when they ignored pleas for help, when they ignored the potential danger of placing Cox in with Brown, when they failed as first responders. Conrad was reckless/callously indifferent when she failed to administer CPR/do everything she could to save Cox's life.

> The Pattern Jury Instructions for the Eleventh Circuit read as follows:
>
> [Name of plaintiff] also claims that [name of individual defendant]'s acts were done with malice or reckless indifference to [name of plaintiff]'s federally protected rights, which would entitle [name of plaintiff] to an award of punitive damages in addition to compensatory damages. [Name of plaintiff] must prove by a preponderance of the evidence that [he/she] is entitled to punitive damages.

11

> If you find for [name of plaintiff] and find that [name of defendant] acted with malice or reckless indifference to [name of plaintiff]'s federally protected rights, the law allows you, in your discretion, to award [name of plaintiff] punitive damages as a punishment for [name of defendant] and as a deterrent to others.
>
> [Name of defendant] acts with malice if [his/her] conduct is motivated by evil intent or motive. [Name of defendant] acts with reckless indifference to the protected federal rights of [name of plaintiff] when [name of defendant] engages in conduct with a callous disregard for whether the conduct violates [name of plaintiff]'s protected federal rights.

Eleventh Circuit Pattern Jury Instruction 5.5, p. 383.

Plaintiff would simply ask that the Court determine the issue of whether a punitive damages instruction will be submitted to the Jury at the same time other instructions are worked out, nearer to the trial of the damages phase of this case.

WHEREFORE, Plaintiff asks that the Court DENY the Motion to Strike Plaintiff's claims for punitive damages as to individual defendants.

| Respectfully Submitted, | *s/James V. Cook*_____ |
| --- | --- |
| | JAMES V. COOK |
| | Florida Bar Number 966843 |
| | Law Office of James Cook |
| | 314 West Jefferson Street |
| | Tallahassee, FL 32301 |
| | Fax: 850 561-0836 |
| | cookjv@gmail.com |
| | |
| | ATTORNEYS FOR PLAINTIFF |

I CERTIFY a true copy hereof was served 3/29/18 on all counsel of record registered with the CM/ECF electronic filing system.