MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018

1
2                        UNITED STATES DISTRICT COURT
                         SOUTHERN DISTRICT OF FLORIDA
3             CASE NO.: 2:17-CV-14177-ROSENBERG/LYNCH

4
    MONICA STONE, as the
5   Personal Representative of the
    ESTATE OF CHRISTOPHER COX,
6
7        Plaintiff,

8   vs.

9   ROBERT HENDRY, ROBERT FEIPEL,
    CHRISTOPHER ROSE, DAVID BAILES,
10  CAROLYN CONRAD, and THE STATE OF
    FLORIDA through JULIE L. JONES,
11  in her official capacity as Secretary
    of the Florida Department of Corrections,
12
         Defendants.
13
    _____/
14

15  DEPOSITION OF:   ROBERT FEIPEL

16  DATE TAKEN:      FEBRUARY 21, 2018

17  TIME:            11:00 A.M. - 11:45 A.M.

18  PLACE:           WILLIAMS, LENINGER, COSBY, P.A.
                     301 SE Ocean Blvd, Suite 205
19                   Stuart, Florida  34994

20  TAKEN BEFORE:    PAMELA L. KIESER, PROFESSIONAL COURT
                     REPORTER AND NOTARY PUBLIC
21

22

23

24

25

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                              Page 2

```
 1
     APPEARANCES:
 2        JAMES V. COOK, ESQUIRE
          LAW OFFICE OF JAMES COOK
 3        314 West Jefferson Street
          Tallahassee, Florida 32301
 4        cookjv@gmail.com
               APPEARING ON BEHALF OF THE PLAINTIFF
 5
          JAMES O. WILLIAMS, JR., ESQUIRE
 6        WILLIAMS, LEININGER & COSBY, P.A.
          11300 US Highway One, Suite 300
 7        North Palm Beach, Florida 33408
               APPEARING ON BEHALF OF THE DEFENDANT
 8             HENDRY, FEIPEL & STATE OF FLORIDA
 9        SHERI-LYNN COREY-FORTE, ESQUIRE
          WHITELOCK & ASSOCIATES, P.A.
10        300 Southeast Thirteenth Street
          Ft. Lauderdale, FL 33316
11             APPEARING ON BEHALF OF DEFENDANTS
               ROSE & BAILES
12
          CLAIRE R. HURLEY, ESQUIRE
13        COLE SCOTT & KISSANE, P.A.
          222 Lakeview Avenue, Suite 120
14        West Palm Beach, FL 33401
               APPEARING ON BEHALF OF DEFENDANT
15             CAROLYN CONRAD
16
17
18
19
20
21
22
23
24
25
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                          Page 3

```
 1                          I-N-D-E-X
 2   February 21, 2018                                    PAGE
 3   ROBERT FEIPEL
 4          Direct Examination by Mr. Cook               4
            Cross-Examination by Ms. Furman              25
 5          Redirect Examination by Mr. Cook             28
 6
 7
                            EXHIBITS
 8   No.  Description
 9   (No exhibits)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                                Page 4

```
 1   THEREUPON,

 2                        ROBERT FEIPEL,

 3               after being first duly sworn,

 4               testified on his oath as follows:

 5                     DIRECT EXAMINATION

 6   BY MR. COOK:

 7      Q    Could you state your name for the record, sir?

 8      A    Robert Anthony Feipel.

 9      Q    I'm sorry.  Robert, what was the second name?

10      A    Middle name Anthony Feipel.

11      Q    Okay.  How are you employed, sir?

12      A    I'm retired.

13      Q    When did you retire?

14      A    September 2016.

15      Q    '16?

16      A    Yeah.

17      Q    And prior to your retirement what was your

18   occupation?

19      A    I was a state correctional officer, Sergeant.

20      Q    Where did you work?

21      A    Martin Correctional Institution.

22      Q    Martin, did you say?

23      A    Yeah.  Martin Correctional Institution.

24      Q    When did you first go to work for Martin?

25      A    2000.  Year 2000.
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                    Page 5

1      Q      And were you a correctional officer prior to

2  that?

3      A      Yes.

4      Q      Where did you work prior to that?

5      A      Different institutions, State of Florida.

6      Q      Can you give me the institutions you worked at

7  just prior to Martin?

8      A      Indian River Institution.

9      Q      What were your dates of employment there,

10 years?

11     A      I don't know the dates, but it was

12 approximately two years.  I worked for five different

13 institutions in the consistence of 25 years.

14     Q      You had been working for the Department of

15 Corrections for 25 years?

16     A      Yes.

17     Q      And the last, looks like about the last 16

18 years were at Martin CI?

19     A      Yes.

20     Q      About two years at Indian River?

21     A      Yeah, I believe so.

22     Q      Where did you work prior to Indian River?

23     A      Prior to that was Polk CI.

24     Q      How long did you work at Polk?

25     A      I think it was about maybe four years.

1     Q      Okay, and prior to Polk?

2     A      I believe I was at Indian River again.

3     Q      What was the first institution that you worked

4  at when you became a corrections officer?

5     A      Hendry Correctional Institution.

6     Q      Hendry?

7     A      Yes.

8     Q      When did you make Sergeant?

9     A      2004 at Martin CI.

10    Q      And were you always a housing sergeant?

11    A      No.  I bounced back between Control Room

12  Sergeant and Housing Sergeant.

13    Q      Between what sergeant and the Housing Sergeant?

14    A      Yes, that's correct.

15           MR. WILLIAMS:  He said between -- James, he

16  said between control room or housing.

17    Q      Thank you.  During year 2015 when the incident

18  happened that we're here on, what was your job?

19    A      I was the Sergeant of Confinement.

20    Q      What is the confinement dorm?

21    A      Delta Dorm.  There is two confinements.  I was

22  in the intake confinement.

23    Q      Intake?

24    A      Yes.

25    Q      Is that administrative confinement?

1      A     Yes.

2      Q     And is Delta Dorm or D Dorm, is that a -- how

3  many wings does that have?

4      A     Three wings.  One open pop, two confinement.

5      Q     Is that what they call a T-dorm?

6      A     Yes.

7      Q     And T-dorm describes the shape of the dorm; is

8  that right?

9      A     Yes.

10      Q     From the control room can you see all of the

11  common areas of all the wings?

12      A     Yes.  You can see all the way through the

13  wings.

14      Q     Is it fair to say that you can see into some

15  cells and not others?

16      A     No.  You have no visualization in any of the

17  cells from the officer's station.

18      Q     If the doors were open could you see into any

19  of the cells?

20      A     Only if you're in the wing standing in front of

21  the door.

22      Q     But not from the officer's station?

23      A     No.

24      Q     So in order to see into any of the cells you

25  have to go and do a cell by cell check, right?

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                         Page 8

```
 1      A    Correct.

 2      Q    How often are cell checks done?

 3      A    Every 30 minutes.

 4      Q    Can you tell me when the various counts are

 5  done?

 6      A    They're done on a time frame.  I don't remember

 7  what the time frame was.

 8      Q    How many counts are there in the course of one

 9  shift?

10      A    I believe we had -- I believe we did seven, I

11  believe.

12      Q    Seven counts?

13      A    I believe so.

14      Q    Is one of them called master count?

15      A    Yes.

16      Q    When you do a count you put your eyes on every

17  prisoner, correct?

18           MR. WILLIAMS:  Form.  Go ahead.

19           THE WITNESS:  Yes.

20      Q    You how about cell checks, do you put your eyes

21  on every prisoner at cell checks?

22           MR. WILLIAMS:  Form.  Go ahead.

23           THE WITNESS:  Yes.

24      Q    And do you maintain logs of this activity?

25      A    Excuse me?
```

1      Q      Do you maintain logs of this activity?

2      A      Yes.   There are logs.   Yes, there are logs

3    that are kept on everything that we do.

4      Q      So if we wanted to figure out what happened

5    when on a particular shift we could just look at the

6    log?

7              MR. WILLIAMS:   Form.

8              THE WITNESS:   Yes.   Log would indicate who

9    did what and when.

10     Q      And for D-dorm, you sign off on all the logs,

11   correct?

12     A      Yes.   I sign at the bottom indicating I read

13   and understood what's on the form.

14     Q      Sign on the bottom indicating what?

15     A      That I read it and understand what's on the

16   form.

17     Q      The incident that we are here on, the death of

18   Christopher Cox on March 15, 2015, do you remember what

19   happened that night?

20     A      Some of it.

21     Q      What shift did you work at that time?

22     A      7:00 p.m. to 7:00 a.m.   I believe it was C

23   shift.

24     Q      C shift?

25     A      Yes.

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                    Page 10

```
 1      Q      And do you -- when you come on your shift do
 2  you normally come a few minutes early?
 3      A      I normally try to get there about 15 minutes
 4  early.  Ten minutes early.
 5      Q      And during that ten to 15 minute period, is
 6  that when you get briefed by the prior shift?
 7      A      Yes.
 8      Q      Do you remember who was the -- would that
 9  normally be the dorm sergeant who would brief you?
10      A      Yes.
11      Q      Do you remember who that was?
12      A      No, I don't.
13      Q      I think that the report that we got from FDLE
14  quoted from some of the logs and I understand that --
15  well, let me ask you about these logs.  I see the FDLE
16  investigator referring to Log D.  Is there something
17  called Log D?
18      A      I have no idea what that would be.
19      Q      Let me just tell you what he's got as the name
20  of the log and you tell me if you think that these are
21  accurate?
22             MR. WILLIAM:   Form.
23  BY MR. COOK:
24      Q      He's got Log D and then he's, also, got wing
25  enter exit log and then it says delta.  Are these two
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                           Page 11

```
 1   separate logs to your recollection?

 2            MR. WILLIAMS:  Form.

 3            THE WITNESS:  Yes, they are.

 4      Q    So if I wanted to know who came and went from

 5   the dorm I would have to look at the enter-exit log,

 6   correct?

 7      A    You would have to look at the dorm log.

 8      Q    Well, but there is more than one dorm log,

 9   right?

10      A    No.  There is only one dorm log.  The second

11   log you're referring to is the incident log that the

12   officer was stationed at the door of the wing to write

13   down who came in and out.

14      Q    Okay.  And that is called what?

15      A    I don't know what they call it.

16      Q    So I'm looking at the first log that he called

17   Log D and it says 7:00 p.m., Sergeant Robert Feipel and

18   CO Christopher Rose assumed duties and responsibilities

19   of housing Unit D and subsequently conducted an inmate

20   count.  Is that accurate to your recollection?

21      A    It's the housing log and we didn't count, but

22   that part of the log is basically a reference to how

23   many the shift had counted on last count.

24      Q    You mean that you didn't actually do a separate

25   count, right?
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                              Page 12

```
1       A     No, because it wasn't a time frame in which we
2   were called to count.
3       Q     So when it says on this log if we quoted it
4   correctly, subsequently conducted an inmate count, that
5   would be inaccurate, correct?
6               MR. WILLIAMS:  Form and predicate.
7               THE WITNESS:  It's not a count.  It's what
8   the count was at the last shift.  Unless it's a recount,
9   it would say recount and we would put our count down.
10      Q     You didn't conduct any actual eyes on count at
11  7:00 p.m., did you?
12      A     Not to my knowledge.
13      Q     Now, I see that it has just you and Officer
14  Christopher Rose.  Is that all the staff you had in D
15  Dorm at that time?
16      A     It should be two officers and a sergeant in
17  every confinement unit.
18      Q     Two officers and a sergeant.  Do you remember
19  who the other officer was?
20      A     I don't remember his name.
21      Q     And you believe that there was one other
22  person?
23      A     Yes.  Otherwise somebody would have been held
24  over by the previous shift because you can't allow to be
25  understaffed.
```

1   Q    Okay.  So there would necessarily have been two

2   officers.  Was one of the officers David Bailes?

3   A    I don't remember.

4   Q    I guess the duty rosters would show that,

5   wouldn't they?

6   A    Yes, they would.

7   Q    Now, you've got three wings, but you can

8   operate it with just a sergeant and two officers?

9   A    Yes.

10   Q    Is optimal staffing more than two officers?

11        MR. WILLIAMS:  Form.  Go ahead.

12        THE WITNESS:  It's supposed to be, but it's

13   up to the captain.

14   Q    That would have been at the time Captain Martin

15   at Martin, right?

16   A    Yes.

17   Q    Did you frequently operate with just two

18   housing officers?

19   A    Yes.

20        MR. WILLIAMS:  Form.

21   Q    And one person of the three of you has to stay

22   in the officer's station pretty much all the time,

23   right?

24   A    Correct.

25   Q    So that's when count or cell check happens.

```
 1   That means that there are only two people available to

 2   do that, right?

 3       A    Yes.

 4       Q    Now, I have it on this log that you first --

 5   and we've got a description of the video.  You first

 6   come on the wing at, I think, it's 7:25.  Does that

 7   sound right?

 8                MR. WILLIAMS:  Form.

 9                MS. HURLEY:  Join.

10                MR. COOK:  7:24?

11                MR. WILLIAMS:  Same objection.

12       Q    Tell me if you know.

13                MR. WILLIAMS:  Same objection.

14                MS. HURLEY:  Join.

15       Q    Tell me if you know.

16                MR. WILLIAMS:  Same objection.

17   BY MR. COOK:

18       Q    Tell me if you know.

19                MR. WILLIAMS:  Same objection.

20                THE WITNESS:  I think it was approximately

21   that time.  When the nurse gets there she has to verify

22   where the inmates are in the cell so that way she knows

23   where to go.

24       Q    She has to verify what?

25       A    When the nurse gets there she verifies where
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                            Page 15

1    the inmates are because they get moved during the day.

2    She has to verify where the inmates are so she has to do

3    that when she gets there.

4        **Q    She is distributing medication, right?**

5        A    Yes.

6        **Q    So the inmates whose cell she goes to are on**

7    **her medication list, right?**

8        A    Yes.  The psyche inmates.

9        **Q    But you, also, do a cell check at 7:25, right?**

10           MR. WILLIAMS:  Form.

11       A    Yes.  They go around and look at all the

12   cells.  I go around and look at all the cells.

13       **Q    When somebody does cell checks, they go and**

14   **look in every cell, right?**

15       A    Correct.

16       **Q    And do you remember whether the lights in the**

17   **cells at that time were on or off?**

18       A    They're on at that time.

19       **Q    How do you first -- how are you first lead to**

20   **go to cell 2210, D-2210?**

21       A    Those inmates were banging on the doors in

22   Wing-2.  When I went in there I went to one cell to find

23   out where the problem was.

24       **Q    Okay.  What were the inmates saying?**

25       A    I couldn't understand them.  They were all

```
 1  yelling at one time.
 2      Q    But how did you become aware of what cell to go
 3  to?
 4      A    Because I went to a cell and stood in front of
 5  the cell door and talked to another inmate who informed
 6  me where the problem was.
 7      Q    Who was that?
 8      A    I don't remember.
 9      Q    So you asked an inmate what the problem was and
10  you were directed to cell 2210?
11      A    Yes.
12      Q    Is 2210 on the upper tier?
13      A    Yes.
14      Q    When you went to 2210, what did you observe?
15      A    I looked in the cell window and I saw an inmate
16  laying on the floor with his arms straight down to his
17  side and his face in a pillow with a noose around his
18  neck.
19      Q    And he was face down; is that right?
20      A    Yes.
21      Q    Now, can you tell me what the noose was made
22  out of?
23      A    It looked like it was a bed sheet torn.
24      Q    Where was it tied?  Was it tied in front or
25  behind?
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                    Page 17

```
 1      A     I don't remember.

 2      Q     But you took it off?

 3      A     Yes.

 4      Q     Was it tight?

 5      A     I don't remember.

 6      Q     Before you went in the cell, did you cuff and

 7  take the cell mate, Mr. Brown, out of the cell?

 8      A     I called for assistance and Officer Rose came

 9  down with additional shackles and handcuffs.  Then we

10  opened up the food flap and Brown was told to come to

11  the door backwards so he could be handcuffed.  Once he

12  was handcuffed we rolled the door.  The nurse stayed

13  outside the door, and Brown was told to sit on the lower

14  bunk.  I then took the shackles and handcuffs, went in

15  and handcuffed the inmate laying on the floor.  Put

16  shackles on and handcuffs on him and then rolled him

17  over and then asked Officer Rose to put the other inmate

18  in the shower and stay with him.  Then the nurse came in

19  and checked the inmate that I secured on the floor.  So

20  he was dead.  Then shortly after that, two or three

21  minutes after that captain came in.  I told him what the

22  nurse said.  He then declared a crime scene and told

23  everybody to get out and the door was then secured.

24      Q     Told who to get out?

25      A     Told everyone to get out.  Myself and the
```

```
 1  nurse.

 2      Q    So did Martin stay in there?

 3      A    No.  It was a crime scene.  He also exited.

 4      Q    Everybody left?

 5      A    Yes.

 6      Q    Now, Conrad is an LPN, right?

 7      A    I don't know.

 8           MR. WILLIAMS:  Form.

 9      Q    You don't know what kind of nurse she is?

10      A    No, I don't.  I didn't get into the

11  stipulation.

12      Q    Do you have any reason to believe that she has

13  the medical authority to declare someone dead?

14           MR. WILLIAMS:  Form and predicate.

15           THE WITNESS:  As security we were not to

16  question medical.  That was their area and we were to

17  follow their direction.

18      Q    Who told you that security can't question

19  medical?

20           MR. WILLIAMS:  Form.

21           THE WITNESS:  In our training.  We are to

22  assist them and they are to direct us in medical needs

23  issues.

24      Q    So you're saying you don't have any independent

25  duty to render aid?
```

```
 1              MR. WILLIAMS:  Form.

 2              THE WITNESS:  We are there to protect the

 3   staff.

 4      Q    But I need to go back to my original question.

 5   Do you not have any independent duty to render aid?

 6              MR. WILLIAMS:  Form and predicate.

 7              THE WITNESS:  If they're not there we are

 8   responsible to render aid and.  I'm, also, responsible

 9   to my Captain.  If they say leave, you leave.

10      Q    You are a first responder, right?

11      A    No, we were not trained.  That year we were

12   taken out of that scope.

13      Q    Well, you had been with the department for

14   quite a few years, right?  More than 20 years?

15      A    Yes.

16      Q    So you had received CPR training, right?

17      A    Prior to that, year of training, yes.

18      Q    You didn't forget everything, did you?

19              MR. WILLIAMS:  Form.

20              THE WITNESS:  No.  Again, the nurse was the

21   one who was in control of that medical situation.

22      Q    I'm sorry, speak up, please.

23      A    The nurse had the authority in the medical at

24   that time.

25      Q    The nurse has the authority and -- let me ask
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                          Page 20

```
 1  you more about this CPR thing.  You said that you were

 2  no longer required to provide CPR at that time?

 3              MR. WILLIAMS:  Form.

 4     A    If I was by myself then, yes, I was required to

 5  do something.

 6     Q    I'm sorry, you were or not?

 7     A    I was if I was by myself.

 8     Q    Okay.  I got you.  And you understand that CPR,

 9  you don't do CPR with somebody in cuffs, right?

10              MR. WILLIAMS:  Form.

11              THE WITNESS:  That was a confinement inmate.

12  He was required to be cuffed when the door was open

13  period.

14     Q    So even if someone had come in to do CPR, the

15  inmate would not be uncuffed; is that your testimony?

16              MR. WILLIAMS:  Form.

17              THE WITNESS:  Our policy was that any

18  confinement inmate who would be cuffed if that door was

19  open or he was outside that cell.  If anybody were to

20  take the cuffs off, that would be the captain that gave

21  that order.

22     Q    So Cox is a protective management inmate, isn't

23  he?

24              MR. WILLIAMS:  Form.

25              THE WITNESS:  Yes, but he was a confinement
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                    Page 21

```
 1   status.

 2       Q     So Captain Martin said everybody needed to

 3   leave the cell and you all walked out and left Mr. Cox

 4   alone on the floor; is that correct?

 5       A     That's correct.

 6       Q     And you continued to do medication rounds?

 7             MR. WILLIAMS:  Form.

 8             THE WITNESS:  I sent the nurse around with

 9   another officer and I was told to watch the inmate in

10   the shower.

11       Q     You were told to watch the cell?

12       A     No.  I was told to watch the inmate in the

13   shower.

14       Q     Okay.  I'm sorry, I'm still having a little

15   trouble hearing.  So you were watching Brown in the

16   shower after you left the cell?

17       A     Yes.

18       Q     How long did you stay at the shower watching

19   Brown?

20       A     Prior to that I was at the door of the entrance

21   wing.  When the other nurses came in and the captain

22   approved them to go into the cell to check on the inmate

23   to work on him.  Captain approved that so he went up

24   there with them.  I then remained at the shower

25   relieving the officer who was at the shower.
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                    Page 22

```
 1      Q     Looking back at this dorm log, D-dorm log, and
 2   it says, corrections officer, it looks like Wisley
 3   (phonetic) Matthews.  Do you know who that is?
 4      A     No.
 5      Q     Says that he maintained the log and you signed
 6   off on it?
 7      A     He may have.  I don't know who it is.
 8      Q     You don't remember an officer Matthews or
 9   Mathias?
10      A     No, I don't.
11      Q     Do you happen to know why Mr. Cox and Mr. Brown
12   were put in the same cell together?
13      A     They were both A-5.
14      Q     Both what?
15      A     They were both A-5 status.
16      Q     What does A-5 mean?
17      A     It means they were seeking protection.
18      Q     Okay.  And if two people are seeking protection
19   they can be celled together?
20      A     Yes.  As long as there is nothing in the 229
21   that stipulates otherwise.
22      Q     As long as there is nothing on the T what?
23      A     On the 229 that stipulates otherwise.
24      Q     What kind of entries on the 229 would indicate
25   that two people shouldn't be celled together?
```

 1     A     It would have to say in the notes area.  It

 2  would have to say house alone or do not house with a

 3  specific inmate.

 4     **Q     Now, did Martin CI have what they call**

 5  **compatibility standards?**

 6     A     Not at that time.

 7     **Q     Did they get some subsequently?**

 8     A     It was, like, a year later that they decided to

 9  revamp the system.

10     **Q     When you say, revamp, does that mean that there**

11  **had previously been compatibility standards?**

12     A     No.  It was the scale of A-4 to A-8.

13     **Q     Those are compatibility standard terms?**

14     A     No.  The status was according to the DR

15  written.

16     **Q     Status was according to what?**

17     A     According to the DR that was written.

18     **Q     When you say DR, you mean disciplinary report?**

19     A     Yes.

20     **Q     So a disciplinary report which I guess is**

21  **something that oftentimes results in somebody going to**

22  **confinement, would say what their status was?**

23     A     Yes.  For instance, if you have someone that

24  was disorderly, he would be in A-7.  If you had someone

25  that was disobeying a verbal order, they would be A-7.

 1   Those would be housed together because they're A-7.

 2       Q     You say they could or they couldn't?

 3       A     They would be.

 4       Q     They would be.  Okay.  Is that the nature of

 5   the compatibility standards?

 6       A     That was the system they had set up.  There was

 7   nothing to -- they didn't go by size or crime at that

 8   time.

 9       Q     How about mental health status?

10       A     That did not take a part in that system at that

11   time either.

12       Q     Okay.  Did you independently check Mr. Cox?

13             MR. WILLIAMS:  Form.

14             THE WITNESS:  I don't understand the

15   question.

16   BY MR. COOK:

17       Q     Did you look for a pulse or did you check the

18   body for warmth?

19       A     No, I didn't because medical was there.

20       Q     In your experience how long does a round of

21   cell checks in a single wing usually take?

22       A     Usually between -- usually about five minutes.

23       Q     Does that allow an officer to physically look

24   into every cell?

25       A     Yes.

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                    Page 25

```
 1      Q      That's what they're required to do, right?

 2      A      Yes.

 3      Q      Did you have any conversations with inmate

 4  Brown?

 5      A      I'm sure I did, but there was nothing

 6  indicating they were having problems.  Neither one of

 7  them said anything to me or the captain.  We're required

 8  to come around once a shift and talk to all the inmates.

 9      Q      You wrote a report on this, right?

10      A      Are you referring to the death?

11      Q      Yes.  Incident report.

12      A      Yes, I did.

13      Q      Do you have that with you?

14      A      No, I do not have any of the paperwork

15  concerning this incident.

16      Q      Now, I asked you whether you checked the body

17  and you said no because medical was there.  Is that --

18  am I remembering that correctly?

19      A      Yes.

20      Q      But did you not also roll Mr. Cox over?

21      A      Yes, I did.

22      Q      So you would have had an opportunity to feel

23  whether his body was warm?

24      A      Yes.

25      Q      And was it?
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                    Page 26

```
 1      A    He was stiff and cold and his eyes were glazed

 2  over.

 3      Q    Stiff and cold and his eyes were glazed over?

 4      A    Yes.

 5      Q    You subsequently did an interview with

 6  Inspector Ryan Nicholas; is that correct?

 7      A    I believe so.

 8      Q    Was that a sworn interview?

 9      A    I don't remember if they swore me in or not.  I

10  talked to two or three of them since then.

11      Q    Was that a audio-recorded interview?

12      A    I believe that's what they did.  A taped video.

13      Q    Did they do audio or video?

14      A    They tape-recorded it.

15      Q    Do you remember anything that inmate Brown told

16  you about what happened?

17      A    He never said they weren't getting along.  Not

18  to me.

19      Q    Did he say anything about what happened to

20  you?

21           MR. WILLIAMS:  Form as to time.

22           THE WITNESS:  He's never --

23      Q    At any time?

24      A    No.  He never ever said they weren't getting

25  along at any time.
```

```
 1              MR. WILLIAMS:  James, you guys are talking
 2   about two different times so you need to clarify.
 3       Q    Yeah.  I'm not talking about anything prior to
 4   the incident.  I'm talking about the time -- from the
 5   time that you first went to the cell to the time that
 6   you last saw him.
 7              MR. WILLIAMS:  Meaning Brown?
 8       Q    After the incident.
 9       A    Are you talking about Brown that was in the
10   shower?
11       Q    Or as you were handcuffing him or as he was
12   leaving the cell or at any time after the incident?
13   Anytime?
14       A    The only statements he made to me was after.
15   In the shower he said that he strangled the inmate and
16   wants another killing.  He had death already.  Death
17   sentence.  He said he waited until the other shift left
18   the wing and then he did it.
19       Q    Then he strangled him?
20       A    Yes.  He planned it.
21       Q    Did you share that with agent Jester?
22       A    I don't remember if I did or not.  I believe I
23   told one of the investigators that it was premeditated.
24       Q    So the two investigators were Jester and
25   Nicholas, right?
```

```
 1      A    I believe so.  I don't remember their names.

 2      Q    We are close to being finished with my part of

 3 this.  Let me just look over my notes and pretty soon I

 4 should be able to pass you along to the next

 5 questioner.

 6      I understand that Captain Martin has since died; is

 7 that correct?

 8      A    Yes.

 9           MR. COOK:  Okay.  I have no other questions.

10 Tender the witness.

11           MS. HURLEY:  I don't have very many

12 questions.  This is Claire Hurley.  I represent Carolyn

13 Conrad.

14                    CROSS-EXAMINATION

15 BY MS. HURLEY:

16      Q    Earlier you said that there were two

17 confinements at Martin Correctional, Delta Dorm which

18 was administrative confinement and what was the other

19 confinement?

20      A    The other one was disciplinary confinement.

21 That's the one once they're found guilty they go from AC

22 to DC.  It's another housing unit.

23           MR. COOK:  So it's a whole different dorm?

24           THE WITNESS:  Yes.

25 BY MS. HURLEY:
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                          Page 29

```
 1      Q      Thank you.  When you rolled Mr. Cox over did

 2   you believe he was dead?

 3      A      Yes.  He was stiff.  His arms were down by his

 4   side and his eyes were glazed.

 5             MS. HURLEY:  Those are all my questions for

 6   you.  Thank you.

 7             MR. WILLIAMS:  I'm sorry, who else is on the

 8   phone?  Sheri, are you there?

 9             MS. COREY-FORTE:  Yes.  I'm reviewing my

10   notes to see if I have any questions.  No, we don't have

11   any questions.

12             MR. WILLIAMS:  I have nothing.

13             MR. COOK:  Okay, so is it read or waive?

14             MR. WILLIAMS:  Read.  If it's ordered I will

15   take a copy.

16             MR. COOK:   I guess we will get together

17   again at 3:00 p.m. at Atlantic and everybody calls in.

18             MR. WILLIAMS:  Do you need us to call in?

19             MR. COOK:  Yes, I think that's the best way

20   to do it.  We'll order.

21             MR. WILLIAMS:  Anybody else copies?

22             MS. COREY-FORTE:  I don't think so right

23   now.  We'll let you know.

24             MS. HURLEY:  We'll take a copy.

25             MR. WILLIAMS:  Copy for me, same.
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018

1    (Deposition concluded at 11:48 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                                    Page 31

```
 1   STATE OF FLORIDA         )
                              )
 2   COUNTY OF INDIAN RIVER   )

 3

 4          I, PAMELA L. KIESER, Professional Reporter, do

 5   hereby certify that I was authorized to and did

 6   stenographically report the foregoing deposition of

 7   ROBERT FEIPEL, that a review of the transcript was

 8   requested; and that the foregoing transcript pages 1

 9   through 30 is a true record of my stenographic notes.

10       I FURTHER CERTIFY that I am not a relative,

11   employee, attorney or counsel of any of the parties'

12   attorneys or counsel connected with the action, nor am I

13   financially interested in the action.

14       Dated this 2nd day of March 2018 at Vero Beach,

15   Indian River County, Florida.

16

17

18                      PAMELA L. KIESER
                        _____
19                      Court Reporter
                        Notary Public
20                      My Commission FF 984037
                        Expires 6/26/2020

21

22

23

24

25
                        CERTIFICATE OF OATH
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018

```
 1
     STATE OF FLORIDA          )
 2   COUNTY OF INDIAN RIVER    )

 3

 4

 5       I, Pamela L. Kieser, Professional Reporter, Notary

 6   Public, State of Florida, certify that the witness,

 7   ROBERT FEIPEL, personally appeared before me on the 21st

 8   day of February 2018 and was duly sworn.

 9       WITNESS my hand and official seal this 2nd day of

10   March 2018.

11

12

13

14                   Pamela L. Kieser, Notary Public
                     State of Florida at Large
15                   My Commission:  FF 984037
                     My Commission Expires:  6/25/2020
16

17

18

19

20

21

22

23

24

25

                   E R R A T A   S H E E T
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                                    Page 33

```
 1
        IN RE:  Monica Stone vs Robert Henry, et al.
 2
        DEPOSITION OF:  ROBERT FEIPEL   TAKEN:  2/21/2018
 3
        DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE
 4
        Please sign, date, and return this sheet to our office.
 5      If additional lines are required for corrections, attach
        additional sheets.
 6
        At the time of the reading and signing of the
 7      deposition, the following changes were noted:
        PAGE   LINE      CHANGE          REASON
 8
 9      _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      Under penalty of perjury, I declare that I have read my
        deposition and that it is true and correct subject to
20      any changes in form or substance entered here.

21
        SIGNATURE OF DEPONENT: _____
22      DATE:_____

23

24

25
```

MONICA STONE vs ROBERT HENDRY, et al.
ROBERT FEIPEL on 02/21/2018                                    Page 34

```
 1

 2   March 2, 2018

 3   JAMES O. WILLIAMS, JR., Esquire
     WILLIAMS, LEININGER & CROSBY, P.A.
 4   11300 US Highway One, Suite 300
     North Palm Beach, FL 33408

 5

 6   IN RE:  Monica Stone vs Robert Hendry

 7

     Dear Mr. Williams:
 8
     Enclosed please find the original errata page with your
 9   copy of the transcript so ROBERT FEIPEL may read and
     sign his transcript.  Please have him make whatever
10   changes are necessary on the errata page and sign it.
     Please then forward the original errata page back to our
11   office at 1080 Woodcock Road, Suite 100, Orlando, FL
     32803.
12
     If the Errata page is not signed by the witness within
13   30 days after this letter has been furnished, we will
     notify all counsel that received the transcript, that
14   the read and sign has not been completed.

15   If your client wishes to waive their right to read and
     sign, please have him sign their name at the bottom of
16   this letter and send it back to our office.

17   Your prompt attention to this matter is appreciated.

18   Sincerely,
     Pamela Kieser
19
     I do hereby waive my right to read and sign.
20
     _____
21   Robert Feipel

22   cc:  James V. Cook, Esq.
          Claire R. Hurley, Esq.
23

24

25
```