UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-14177-CIV-ROSENBERG/MAYNARD

MONICA STONE, as the Personal Representative
of the Estate of Christopher Cox, and on
behalf of Survivors Monica Stone and Ronald Doyle,

    Plaintiff,

v.

ROBERT HENDRY,
ROBERT FEIPEL,
CHRISTOPHER ROSE,
DAVID BAILES,
CAROLYN CONRAD, AND
STATE OF FLORIDA through
JULIE JONES, in her official capacity as
Secretary of the Florida Department of Corrections,

    Defendants.
_____/

## REPORT AND RECOMMENDATION ON PENDING MOTIONS
### (DE 130, 136, 142, 144, 150, 177, 192 & 213)

**THIS CAUSE** comes before this Court upon Orders of Reference
(DE 162 & 179) and the above Motions. Having reviewed the
Motions, their respective Responses and Replies, the respective
evidentiary proffers, and the relevant portions of the
underlying record, this Court recommends as follows:

### BACKGROUND

1.  On March 15, 2015, inmate Christopher Cox was moved
into a cell with Hurley Brown. Other inmates in the wing were
concerned about Cox's safety in Brown's cell. Their concern
proved well-founded. Cox did not survive the day. Around 7:30 PM

he was found in his cell unresponsive, and by 8:00 PM paramedics pronounced him dead. Monica Stone---who is Mr. Cox's mother and the personal representative of his estate---sues the Florida Department of Corrections ("FDOC"), the then Warden of the Martin Correctional Institution ("MCI"), various MCI Correctional Officers, and an MCI nurse for his death. The Plaintiff argues that Cox should not have been paired with Brown; that the Defendants were deliberately indifferent to the substantial risk of harm that Brown posed to Cox; that that risk of harm bore out when Brown killed Cox; and that the Defendants were then deliberate indifferent to Cox's need for resuscitative medical care. The Plaintiff seeks to hold the Defendants liable under 42 U.S.C. § 1983 for Cox's death. The operative pleading is the Plaintiff's Third Amended Complaint (DE 173).

<u>Procedural Posture</u>

2.   The primary subject of this ruling are the summary judgment motions. Moving for summary judgment are the two Correctional Officers Christopher Rose and David Bailes (found at DE 130); Robert Hendry, MCI's then Warden (found at DE 142); Sergeant Robert Feipel (found at DE 144); and Carolyn Conrad, a nurse at MCI at the time (found at DE 150). They claim qualified immunity, and they argue that the Plaintiff's deliberate indifference claims fail as a matter of law.

3.    There are two additional dispositive motions. Together
Defendants Warden Hendry, Sgt. Feipel, and FDOC move at DE 177
to strike the Plaintiff's claim for punitive damages. At DE 136
FDOC moves for judgment on the pleadings on the basis of its
Eleventh Amendment sovereign immunity as a State of Florida
entity. FDOC asserts Eleventh Amendment sovereign immunity late
in the proceeding, after participating in discovery and while
its timely compliance with this Court's Orders to Compel and its
full compliance with the general good faith discovery obligation
remain uncertain.

4.    All of the above Motions are fully ripe. Some
Defendants raise a variety of procedural objections to the
Omnibus Response that the Plaintiff files at DE 190 to respond
to the three summary judgment motions. They complain that the
Omnibus Response was filed late---two minutes too late, that is.
The Plaintiff explains at footnote 1 to DE 212 that she began
the process of uploading her Omnibus Response before midnight,
but an unexpected technical glitch delayed the upload's
completion until 12:02 AM the next day. This Court accepts the
Omnibus Response as timely filed. (This Court likewise accepts
the Reply (DE 209) that Nurse Conrad filed four hours after the
noon deadline.) Nor does this Court see any reason to reject the
Plaintiff's use of a single "Omnibus" Response to respond to all

three summary judgment motions. To a large extent the fact
background and the legal issues inter-relate, and where they
differ, the differences are readily apparent. This Court sees no
practical or substantive need for separate Responses. The
Defendants themselves share arguments across their respective
pleadings.

5.    The Defendants' objection also ignores how the
Plaintiff's Omnibus Response is the product of the incomplete
record. This Court's prior Orders document the difficult course
of discovery in this case. There is the HIPAA Qualified
Protective Order that this Court entered at DE 96. "Given the
nature of this lawsuit and the issues it raises, the Plaintiff
seeks the physical and mental health medical records of both Mr.
Cox and Hurley Brown," this Court observed. Finding those
"requested medical records [to be] relevant and informative",
this Court permitted their disclosure. In a later Order (DE 172)
this Court re-affirmed the legal authority to produce them. It
does not appear that any such records were produced (until
perhaps very recently, contemporaneous with this ruling).

6.    The discovery in this case has required close judicial
supervision. When Plaintiff's newly substituted counsel asked to
re-schedule one deposition because of a time conflict, the
Defendants refused. In its Order at DE 107, this Court overruled

the Defendants' objection to re-scheduling the deposition. This Court held a Discovery Conference on February 12th. As its Order Memorializing Discovery Conference (DE 112) shows, the Defendants had greater time flexibility in scheduling depositions than they initially had indicated. In their Replies (DE 205 & 206) Defendants Sgt. Feipel and Warden Hendry seek to limit the scope of the summary judgment record to those depositions. While those depositions do consist of sworn testimony, their respective testimonies largely lack detail about or insight into the substantive issues. The Defendants do not remember or were not aware of the matters underlying this lawsuit. When the deposition schedule left no room to depose Dr. Sperry, the Defendants moved to strike his expert witness opinion. At DE 124 this Court denied that extreme form of relief and ordered the parties instead to explore alternative times to conduct his deposition such as after business hours or on the weekend. The parties did so, deposing Dr. Sperry on a Friday evening.

7.    The parties were unable to agree to the terms of a confidentiality order. This Court resolved that dispute in the Plaintiff's favor when at DE 126 & 127, it adopted her proposed version. Despite that ruling, Defendant FDOC (and third party Florida Department of Law Enforcement "FDLE") have continued to

withhold and/or redact documents they consider confidential
(until very recently). This Court has addressed that ongoing
dispute in several Orders.

8.    While the Defendants did cooperate in fashioning a
last minute deposition schedule (the testimony from which they
proffer to support summary judgment in their favor), the
production of documents moved much slower (some of which may
remain outstanding to-date). This Court initially addressed that
issue in its Order at DE 140. Despite the thoroughness of that
ruling, the dispute lingered well afterwards. These are
documents and other materials that originated with FDOC and
which FDLE also now has. In its discovery Orders this Court
consistently stressed the need to produce responsive discovery
and to do so expeditiously in light of the dispositive motions
briefing deadline. The most recent discovery motion---
Plaintiff's Motion to Compel Production from FDLE (DE 210)---
shows how responsive, material, and directly relevant
information was disclosed after the deadlines for doing so;
improperly redacted; and/or too late to be useful.

9.    The Plaintiff since withdrew that Motion to Compel
after recently fashioning an agreement with FDLE. That agreement
and that exchange of discovery are happening well after the
dispositive motions became ripe for review and after this Court

undertook this legal analysis. Therefore this Court does not include in this consideration any discovery from this very recent exchange (unless the parties discussed those materials' contents in the summary judgment motions' briefing). This Court limits its analysis to the case's procedural posture at that point in time when the motions became ripe. Nor does this Court see need to grant the Plaintiff's Motion to File under Seal (DE 213) or review the documents that the Defendants agree to proffer under seal at DE 214 & 222. This Court considers documents subject of those filings only to the extent the parties discussed their contents in the summary judgment motions' briefing. To the extent the proffer of documents subject of FDLE's recent production or subject of the sealing-related pleadings do substantively affect the legal analysis, a party may raise it in an Objection to this Report and Recommendation.

## Scope of the Evidentiary Record

10. The problems that the Plaintiff has experienced in discovery brings the discussion around to the question of what constitutes the scope of the evidentiary record that this Court may consider in ruling on the summary judgment motions. In their Replies (DE 205 & 206) Defendants Sgt. Feipel and Warden Hendry argue for a very restricted record, one limited to just those

statements that are sworn---namely fully executed affidavits and depositions. The Defendants argue that anything else is either hearsay, contains hearsay, or is unauthenticated. The Defendants cite legal authority that limits the scope of a summary judgment ruling to evidence that is in trial-admissible form. That general rule does not apply here, however, because the Plaintiff (and this Court) are left with the record that the Defendants' produced. The evidence that those two Defendants reject as inadmissible is evidence that originated with Defendant FDOC and which third party FDLE (who has been under a Rule 45 subpoena[1]) now has. This Court's discovery Orders to-date document the Plaintiff's diligence in pursuing discovery. The Defendants' application of that general rule fails here because the Defendants deprived the Plaintiff of evidence in its direct and admissible form despite her best efforts to obtain it. The Defendants' argument concerns FDOC's <u>own</u> documents and records. It would be unfair to preclude the Plaintiff from relying on documents that Defendant FDOC, itself, generated and for which none of the Defendants apparently have made an effort to confer about stipulating to their authenticity.

---

[1] FDOC referred the Plaintiff to FDLE for those records (even though they are records that originated from MCI and FDOC). FDLE in turn treated the Plaintiff's Rule 45 subpoena as a public records request.

11. This includes the video recordings by two fixed cameras overlooking Dormitory D during the relevant time period. Special Agent Jester ("SA Jester") reviewed the videos for his investigation and discussed it in his Summary Report to FDLE. Defendant Warden Hendry discussed the videos at his deposition. The record does not contain the videos, however, despite the fact that they bear directly on key fact questions. The Defendants then object to the Plaintiff's reliance on their discussions of it as second-hand information. They do so despite FDOC's non-compliance with an Order compelling it to produce the videos. For her part, the Plaintiff complains about how the lack of access to the videos hinders her ability to respond to the summary judgment motions. For purposes of this ruling this Court relies on SA Jester's and Warden Hendry's discussions of the videos because that is the only record of what the videos show. This Court construes in the Plaintiff's favor any disputes between what the videos (are reported to) show and witness statements, and this Court construes any inferences that might be gleaned from the videos in the Plaintiff's favor.

12. For the same reason this Court overrules the Defendants' objection to the recitation of witness interviews that SA Jester gives in his FDLE Summary Report. As the Motion to Compel at DE 210 shows, the Plaintiff still was waiting on

the production of the full report and its underlying records
until very recently. Because the Defendants did not produce the
underlying interviews, the Plaintiff (and this Court) is left
with SA Jester's reporting. Moreover this Court assumes for
present purposes that the declarants whose statements SA Jester
gathered for his report would testify the same at trial. Cf.
Rule 56(c)(2) and (4), Fed.R.Civ.P. This Court overrules the
hearsay objection and considers the FDLE Summary Report for
present purposes (keeping in mind the hearsay objection). Cf.
McCaskill v. Ray, 279 Fed.Appx. 913 (11th Cir. 2008) (allowing a
court to consider evidence in inadmissible form if it otherwise
would be admissible). This Court also overrules the Defendants'
objection to SA Jester's FDLE Summary Report as an unsworn item
of evidence. For one, the Defendants do not challenge the
report's authenticity. For another, SA Jester was deposed about
his report and his investigation of Cox's death. (His deposition
is found at DE 158—5). Thirdly the Defendants may not rely on
FDLE's Summary Report to support their summary judgment
arguments but then object to the Plaintiff's use of it.

13.   This brings the discussion around to the Plaintiff's
Rule 56(d) Motion (DE 192). Rule 56(d)(1), Fed.R.Civ.P., permits
a court to deny a summary judgment motion if the non-movant has
been left unable to present facts essential to justify its

opposition. See also, Smith v. Fla. Dep't of Corrs., 713 F.3d
1059 (11th Cir. 2013). This Court notes that Defendant FDOC did
not respond to that Motion. It is true that FDOC filed no
summary judgment motion. However it is FDOC (and FDLE) who are
responsible for the current state of the record, and in its
Order at DE 193 this Court opened briefing to any Defendant who
wished to respond "to demonstrate full compliance with this
Court's discovery orders and the timely production of discovery
relevant and material to the summary judgment analysis".
Defendant FDOC thereby leaves this matter unaddressed.

14.  In its prior Order (DE 193) this Court denied the Rule
56(d) Motion to the extent the Plaintiff sought to delay
consideration of the summary judgment motions or to allow extra
time for discovery. Only the District Court can provide that
relief. Now, in considering the second part of that Motion, this
Court finds the relief of denying the summary judgment motions
outright likewise inconsistent with the current procedural
posture of this case. The pre-trial development stage and its
deadlines now are over. There is no time left to resume
discovery or briefing. Instead this Court invokes Rule 56(d)(3)
and fashions another form of relief, one that recognizes the
limitations that the undeveloped record creates but also keeps
the case moving forward and on track as currently set.

15.   For that alternative form of relief under Rule 56(d)(3), this Court does not restrict the scope of the record relevant to the summary judgment analysis as strictly as Defendants Warden Hendry and Sgt. Feipel seek. This Court will work with the record such as it is---albeit mindful to give each item of evidence its due weight in light of any admissibility objections. Where the record has been left undeveloped, this Court will construe inferences in the Plaintiff's favor. This approach is consistent with this Court's discovery Orders to-date which gave the Plaintiff leave to include in her opposition to summary judgment any arguments based on discovery non-compliance. See also, Rule 37(b)(2)(A), Fed.R.Civ.P. (discussing consequences of discovery non-compliance). See also, Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292 (11th Cir. 2011) (allowing adverse inferences to be drawn against a summary judgment movant when the movant was the primary source of relevant evidence).

16.   Making full use of the existing record and construing inferences in the Plaintiff's favor ameliorate the prejudice to the Plaintiff from the discovery shortcomings. It furthers the Court's policy of litigating on the merits and on a full evidentiary record. It lessens the reward to the Defendants from allowing the discovery clock to run out. Lastly it accounts for

the fact that Cox, who was killed, is unable tell his version of
the story.

## Fact Background

17.  This Court considers the entire available record, such
as it is. This includes the Third Amended Complaint (to the
extent the Plaintiff pleads specific facts), the other
pleadings, discovery, and proffered evidence. See Castleberry v.
Goldome Credit Corp., 408 F.3d 773, 785—86 (11th Cir. 2005).
(For ease of reference this Court provides a pinpoint docket
citation for each item of record evidence.) This Court limits
only the proffer's time frame, limiting consideration to that
record that existed when the Motions subject of this Report and
Recommendation became ripe for review. That time frame ends with
the Reply filed at DE 212. This Court therefore does not take
into consideration what evidence might be subject of the Motion
to Compel (DE 210), the documents subject of the Motion to Seal
(DE 213), or the more recent filings---although this Court does
consider the parties' discussion of those same documents'
contents in the briefing.

18.  This Court consolidates below the parties' respective
proffers into one general recitation of the facts. This Court
stresses that the present recitation is drawn from the existing
record and with inferences drawn in the Plaintiff's favor under

the Rule 56 standard of review. This Court does not offer this recitation of the fact background as the ultimate findings of fact. That would be the role of the jury.

19.   This Court begins with inmate Hurley Brown. The information on the FDOC's website (DE 191—8) shows that Brown has a criminal history that goes back to 1983. His current incarceration began in January 1998 for a robbery conviction. He was sentenced to 35 years, and at the time of Cox's death in 2015, he had a 2029 release date. FDOC records at DE 191—4 & 191—9 show during his incarceration a history of threats, violence, racist comments, and lewd and lascivious acts. On February 6, 2015 FDOC transferred Brown to MCI. The reason for the transfer is unknown.

20.   The records contained in DE 191—4 & 191—5 show that in addition to threatening others, Brown has sought protection for himself. At various times he has sought protection claiming to be a gang member in fear of reprisal. He made his most recent such request soon after his arrival at MCI. He complained that upon his arrival, he "was chased by two Blood members with knives." MCI's Institutional Classification Team ("ICT") denied his Protective Management ("PM") request, and on February 25, 2015 Brown administratively appealed that denial. He complained that the ICT laughed at his story. He accused the ICT of being

unprofessional, unsympathetic, and racist. He accused the panel of being indifferent to violence between black inmates. He speculated that the team would care more if blacks started killing "white boys".

21. The Plaintiff pleads at Paragraph 83 of his Third Amended Complaint that "Brown had told MCI he was not right and needed help." The existing record contains no information about Brown's mental health (despite the HIPAA Qualified Protective Order authorizing its disclosure). At DE 212 the Plaintiff references mental health call-outs that the housing records note. They thereby show that Brown was receiving mental health care of some sort. The Plaintiff also points to other inmates' description of Brown's reputation as crazy and dangerous. His prison nickname was "Bug", which is prison lingo for a crazy person. This Court construes the inference in the Plaintiff's favor and assumes for present purposes that there were mental health and violence concerns about Brown.

22. As with Brown, the only source of Cox's criminal background is the FDOC website (DE 191—7). It shows that in February 2012 Cox was sentenced to 25 years for second degree murder. This Court notes that at DE 174 the two Correctional Officer Defendants----CO Rose and CO Bailes---say that Cox "was a reputed gang member or associated with gangs, who was in

prison for ordering the execution murder of a gang member." Both
the nature of the conviction and his gang affiliation reasonably
could be construed to lessen the characterization of Cox as
"prey" in the inmate-against-inmate violence sense. However the
Defendants leave the nature of Cox's conviction and criminal
history undeveloped both factually (they proffer no supporting
evidence) and in terms of their legal arguments.

23.  Records at DE 146—2 show that on several occasions
before his transfer to MCI, Cox had sought PM status. For
example, while incarcerated at the Tomoka Correctional
Institution, Cox sought PM status fearing reprisal from an
incarcerated relative of his co-defendant. That request was
denied. Another request mentions being stabbed while at the
Charlotte Correctional Institution. Page 6 of DE 146—2 is the
second page from a PM request. It begins, "of 6-13-14 I would
have been locked-up the state could have done a rape kit". This
half sentence may suggest that Cox was a rape victim.

24.  Cox was transferred to MCI on January 14, 2015. (The
reason for the transfer is unknown.) His previous place of
incarceration had granted him PM status. His fears for his
safety continued at MCI. He reported that a gang was threatening
his life and requested to be transferred away from MCI. His
family members had not visited him at MCI due to the travel

costs, his mother explained at her deposition (DE 146—1), but she says that Cox had written two letters expressing concern for his personal safety. The inmates who provided statements in conjunction with the investigation of Cox's death describe MCI as unusually violent and permissive toward (and even encouraging of) inmate-against-inmate violence and "hits". At his deposition Defendant Warden Hendry denied knowing about two inmate murders that had happened there in the two years before he started at MCI in November 2014.

25.  Both Brown and Cox now were housed at MCI, and both were being held in administrative confinement. Both were classified as administrative confinement pending review of their PM requests (or for Brown pending review of his appeal, presumably).

26.  Those with an administrative confinement status are kept in their cells in "lock-down" close confinement. At first they are not allowed to leave their cells at all. Then after some period of time they are permitted very short recreational breaks only. They may not leave their cells without restraints. MCI houses those with a special confinement status in its D Dormitory. Dormitory D is not limited to such inmates, however; general population inmates are housed there, too. Standard policy is for guards to check on PM inmates every half hour.

27.  This Court notes that PM status does not necessarily mean an inmate is in need of protection. Defendant Warden Hendry explained at this deposition that both those seeking protection and those who pose a danger to others may seek PM status. The Plaintiff notes this distinction at Paragraph 23 of his Third Amended Complaint in which he pleads that Brown was "in PM for his own safety or the safety of other inmates."

28.  This Court presumes that inmates who have PM status or who are awaiting the PM status determination receive the same administrative confinement classification. Defendant Warden Hendry furthers that MCI tries to house administrative confinement status inmates together. Whether MCI separates those inmates who need protection from those inmates who are a risk to others (rather than put both types in the same cell under lock-down together), he did not address.

29.  As to who at MCI decides how to house inmates in administrative confinement pending the PM determination, Defendant Warden Hendry pointed to the Institutional Classification Team ("ICT"). The ICT consists of the classification supervisor, the assistant warden of programs, and the chief of security. The dormitory's housing officers and the sergeant also participate in the decision, he added. Alternatively, when there is need for a quicker decision, the

housing sergeant makes that decision alone with the aid of the "iBAS" computer program. Who specifically was deciding Brown and Cox's PM requests, the record leaves unidentified. All of the named Defendants deny participation in that decision. This includes Warden Hendry. In his affidavit (DE 142—1) Defendant Warden Hendry denies any involvement. At his deposition (DE 191—5) Defendant Warden Hendry also denied knowing who decided to move Cox in with Brown. Defendant Warden Hendry furthered that the decision-making process generates a paper trail (a paper trail which the record before this Court lacks).

30.  Lastly there is the question of how the classification and cell assignment decisions are made. Defendant Warden Hendry explained at his deposition that during the relevant time period, FDOC did have compatibility standards in place. Defendant Warden Hendry explained that the "iBAS" computer software program aided the determination of whether two inmates should be placed in the same cell together. The iBAS program compared such factors as physicality (height and weight), gang affiliation, sentence length, and disciplinary history for violence or murder. He furthered that the assistant warden of programs and the grievance coordinator brought grievance-related concerns to the decision, too. He does not know whether it accounted for mental health, however. The reason for checking

compatibility is to avoid creating a "predator and prey" situation inside a cell.

31.  That same policy is expressed in the FDOC's memorandum entitled "Potential Predator Identification List" (DE 191—6) that discusses "iBAS/SRI" or "Inmate Behavioral Assessment Scale/Sexual Risk Indicator". That memo is undated, but the Plaintiff says that it predates Cox's assignment to Brown's cell. "Any [potential] inmate on inmate violence occurring in the cell", it stresses, "will be closely scrutinized as to the appropriateness of their housing in conjunction with this memo". "It may be appropriate, to the extent possible," the memo adds reflecting the seriousness of the matter, "for some inmates to be housed alone."

32.  The memo does not leave it to the computer software program alone. "Security staff should be mindful of these issues when making cell assignments", the memo advises, and "[w]ardens should make this determination on a case-by-case basis and in the best interest of inmate and staff safety." "As always, database reports do not replace the sound correctional judgment of our staff." At his deposition Defendant Warden Hendry echoed the need to bring the "human element" to the decision to supplement the computer's calculation. He denied any personal

involvement in creating or implementing classification and
assignment policies or procedures.

33.   At DE 191—10 is MCI's Accreditation Report. Because it
is dated March 2017---two years after the incident---it is not
directly relevant. However it repeats the same emphasis on close
supervision of special management inmates that the earlier
documents do. The Accreditation Report stresses how, pursuant to
Standard #4—4257, all special management inmates should be
observed personally twice an hour and no more than 40 minutes
apart, on an irregular schedule. It stresses the need for more
frequent observation of inmates who are violent, mentally
disordered, or who demonstrate unusual or bizarre behavior.

34.   At the time of the incident, Defendant Warden Hendry
recalled at his deposition, MCI used an ad hoc approach for
deciding how to house inmates. MCI lacked a specific written
procedure or process. As noted above, the record does not
identify who specifically participated in the decision to house
Cox with Brown, and all of the named Defendants deny personal
involvement. Nor does the record contain any documents generated
from the classification or cell assignment process. However
Defendant Warden Hendry does argue that the compatibility
standards in place at the time were followed and that there were
no factors or criteria against putting them in the same cell

together. He denies personally knowing at the time of any reason why the two should have been kept separate.

35.  Defendant Sgt. Feipel is another source of information about the classification and assignment of Cox and Brown. At his deposition (DE 145—3) he explained that Cox and Brown both had an A—5 status, which means seeking protection. He said that inmates who are seeking protection may be housed together--- unless something in the "229" says otherwise[2]. (Brown's administrative appeal suggests that MCI had <u>denied</u> Brown PM status before Cox was moved into his cell, this Court notes.) Defendant Sgt. Feipel said that at the time of the incident, MCI lacked formal compatibility standards.

36.  On February 3, 2015 Cox was placed in cell no. D2214 in Dormitory D. He shared that cell with an inmate by name of McAuliffe. On March 1st inmate Davis became his new cellmate. (Evidently SA Jester took no statements from either McAuliffe or Davis, this Court notes.) Cox's prison records contain reference to "psych-evals" and to an incident of taking a handful of pills in front of a nurse from early March. The only other evidence that implies mental health treatment is the autopsy which found a low level of a medication in his blood that is commonly prescribed for seizure disorders or bipolar disorder.

---

[2] At his deposition (DE 158—11) Defendant CO Rose explains that the "DC-229" is a housing record in which guards sometimes make entries.

37.   Brown had been assigned to cell no. D2210 since his arrival at MCI on February 6th. Unlike with Cox, SA Jester did interview Brown's prior cellmate, Shernerd Richardson. Richardson had attempted suicide several times (and again after he was moved to a new cell) motivated by the desire to leave MCI. Richardson was moved to another cell on March 9, 2015. Richardson reported no problems with Brown. This Court emphasizes a few points from Richardson's statement (which starts at page 11 of DE 148—5). First is Richardson's complaint about the guards' response when he cut himself. (This is similar to Brown's own perception of an unsympathetic ICT.) Second, when the guards did intervene, they sprayed a chemical agent into the cell before entering it, after which both Richardson and Brown had to be treated for the exposure. (Brown told SA Jester that he told Cox to commit suicide elsewhere to avoid being pepper-sprayed.) Third is the fact that Richardson's last suicide attempt while in Brown's cell involved making a noose from a bed sheet and hanging himself from the top bunk. (Brown said that Cox attempted suicide in the same way.)

38.   It is unknown why Richardson was moved out of Brown's cell. It also is unknown why Cox was moved out of his cell and into Brown's cell. Cox was fearful of the move into Brown's cell. Neighboring inmates were concerned for his safety, too, as

they later recalled when SA Jester interviewed them. Inmate
Ernest Powell recalls those concerns in his Declaration (DE 191-
13)[3]. The neighboring inmates were concerned that the pairing
would create a "predator/prey" situation. Cox was lighter and
younger. FDOC's website states Cox's weight as 134 lbs. (which
is the same weight that SA Jester gave in his report)[4]. He was 28
years old at the time. Powell describes Cox's personality as
friendly and even-tempered. Brown was heavier. (FDOC's website
states his weight as 198 lbs., and SA Jester estimated his
weight to be 165 lbs.) Powell describes Brown's reputation as
being dangerous and sexually predatory. The Plaintiff pleads at
Paragraph 85 of his Third Amended Complaint that "Brown had
indicated . . . that he was going to rape Cox." The Plaintiff
pleads that the neighboring inmates voiced their concern to MCI.

   39.  Records suggest that Cox was moved out of cell no.
D2214 on March 13, 2015 and moved into Brown's cell (cell no.
D2210) on March 15, 2015. The record contains no paperwork for
this transfer, and it is unclear where Cox was on March 14th.

---

[3] This Court notes Defendants' Hendry and Feipel's objection to Powell's
Declaration. They say this Court may not consider it because it is unsigned.
This Court notes their objection, but this Court does not exclude it from
consideration. The Plaintiff affixes to the Declaration the notation that she
will substitute it with a verified version. This Court gives the Plaintiff
the benefit of the doubt on the assumption that Powell's incarceration adds
some difficulty to executing documents.

[4] The coroner reported Cox's weight as 174 lbs. Dr. Sperry said that it is
common for coroners to report an incorrect weight. Because the Defendants did
not produce the coroners' photographs, he is unable to confirm the weight
that the coroner reported.

Assuming that Cox entered Brown's cell on March 15th, he did not survive the evening.

40.   The Plaintiff seeks to submit under seal Post Order No. 10, and at DE 204 the Plaintiff states the relevant instructions from it. This Court avoids discussing the details here. Having considered the full proffer on the matter and all of the parties' arguments, it suffices to say for present purposes that cell no. D2210 went unchecked at 6:30 PM and at 7:00 PM and that those two lapses may have been contrary to official FDOC procedure. There is evidence that reasonably could support the finding that Brown anticipated the 7:00 PM lapse. This Court also notes how the Housing Log that Sgt. Feipel and CO Rose had signed off on states that an inmate count was done at 7:00 PM. However SA Jester found the video to contradict that report. The videos of the wing from that time show no guards in the wing. (They explain that the check was planned but ended up being delayed.) For present purposes this Court construes this discrepancy in the Plaintiff's favor and assumes that the 6:30 PM check did not include a visual check into Cox's cell; that no inmate check at all was done at 7:00 PM; and that Defendants Sgt. Feipel and CO Rose inaccurately reported conducting a check at 7:00 PM.

41.   The record contains statements from the neighboring inmates. Warden Hendry said at his deposition that he had instructed them to cooperate with SA Jester and to report what they knew. Their statements enter the record through the FDLE Summary Report (DE 148—5) authored by SA Jester who interviewed them. The details differ between their respective recollections, and only one inmate had some sort of view into the cell. The rest recall what they heard. The common thread running through their respective reports is that starting between 6:50 and 7:00 PM, they began to sense a struggle happening inside the cell. Inmate Cedri says he heard Cox cry out for help, Brown's answer that everything was alright, and the sound of strangling. Inmate Gallagher says that he had a view into the cell and saw Brown choking Cox. Several inmates heard the struggle end with a thud sound. Inmate Cedri then heard the sound of running water and cleaning up. Around 7:15 PM (some inmates place the time a few minutes before and some place it a few minutes after) the neighboring inmates began yelling "Man Down!" which is prison lingo for an inmate in distress and began making other commotion to attract the guards' attention.

42.   No guard responded to their alert. In his Declaration Powell concedes that such commotion is frequent. An estimated 25 to 30 minutes passed before a guard became involved.

43.   At around 7:25 PM Defendant Sgt. Feipel[5] entered Dormitory D to conduct a security, safety, and sanitation check. The videos show this to be the first entry of a guard into the wing since 6:25 PM. Defendant Nurse Conrad accompanied Sgt. Feipel to pass out medication. They both recall hearing the yelling and the commotion, but they did not know what it concerned. Sgt. Feipel briefly left the dormitory to get his radio which he had forgotten. Soon after being in the wing, Sgt. Feipel got a better sense of what the inmates were trying to communicate, and he went directly to cell D2210 to check on Cox and Brown. He then summoned Nurse Conrad to assist him.

44.   Through the cell door flap, Sgt. Feipel and Nurse Conrad saw Cox unresponsive with a noose-like ligature around his neck. Cox was lying face down into a pillow with his arms along his side. Sgt. Feipel handcuffed Brown through the flap before opening the cell. After entering the cell he placed restraints on Cox (who remained unresponsive). That was in accordance with lock-down close confinement procedure. Defendant CO Rose responded to Sgt. Feipel's call for assistance and escorted Brown out of the cell.

---

[5] Sgt. Feipel's statements of record consist of his interview as summarized by SA Jester (DE 148–5), affidavit (DE 144-1), and deposition (DE 145–3). Sgt. Feipel had worked at MCI since 2000 and for FDOC for 25 years. At the time of the incident he was the Sergeant of Confinement in Dormitory D handling intake. His shift had started at 7:00 PM.

45.   That was when Nurse Conrad entered the cell and examined Cox. Sgt. Feipel flipped him over. She observed blood that had drained from his mouth and nose as well as from an abrasion on his forehead. Cox was warm but pale with some discoloration in his nose and ears. There is a dispute in the record[6] over the degree to which Nurse Conrad rendered medical care to Cox. Construing the record in the light most favorable to the Plaintiff, Nurse Conrad's actions were limited to checking his wrist pulse. She found no pulse, and she observed no chest movement. Nurse Conrad quickly formed the opinion that Cox already was dead. She undertook no resuscitative measures and resumed her medication round. Based on her opinion that Cox already was dead, neither Sgt. Feipel nor CO Rose undertook resuscitative measures.

46.   Captain Martens[7] declared the cell a crime scene. This meant that the cell (including Cox) could not be disturbed, and the cell was locked to secure it. CO Rose was ordered to log all traffic in and out of the cell.

---

[6] Nurse Conrad wrote an Incident Report on March 15, 2015. It is found at DE 204—13. SA Jester interviewed her, and the Plaintiff deposed her. Her deposition is found at DE 158—6.

[7] Captain Martens was Sgt. Feipel's superior. The Plaintiff originally named him as a Defendant, but he passed away in February 2017. That was the subject of DE 51. Captain Martens' story of what happened is recorded in the Incident Report that he had written and which SA Jester summarizes in his FDLE Report at DE 148—5.

47.    Although Captain Martens declared a crime scene, it
was not initially treated that way. When the guards first
entered the cell, Brown said that Cox had had a seizure. This
affected the medical staff's response to the situation. Although
Nurse Conrad had requested medical staff, the responding medical
staff did not know that the situation was of an unresponsive
inmate. Had they known of the full situation, they would have
responded differently. Another factor that affected the medical
response was the fact that the cell door was locked. That caused
a delay while the responding medical staff waited for the cell
to be re-opened.

48.    FDLE SA Jester recalls in his report coming to the
scene on March 15th upon the report of Cox's death. SA Jester
initially had been told it was a suicide. Upon his arrival
Warden Hendry told SA Jester that Brown had spontaneously told a
guard that he had "taken Cox out" in self-defense after Cox had
attacked him first. (The guard who had heard that spontaneous
utterance and who relayed it to Warden Hendry is unidentified.)
After Brown admitted to killing Cox, the investigation shifted
from one about suicide to one about a possible crime.

49.    Also on that same day, March 15th, SA Jester
interviewed Brown post-Miranda in the presence of the Chief
State Attorney for Martin County and an Assistant State

Attorney[8]. Brown told them that he awoke to the sound of Cox
trying to hang himself. Brown told Cox not to try that in the
cell because he did not want to be pepper-sprayed when the
guards responded. Brown assumed that the matter was over and
fell back asleep. He awoke to Cox attacking him. He fought back,
punching and kicking Cox including stomping on his head. He
fought back hard not knowing if Cox had a weapon. Cox was lying
on the floor on his stomach. Cox became unresponsive and then
began making a gagging noise and was having a seizure. Thereupon
it was he who called out to the neighboring inmates to get the
guards' attention. Brown said he placed the pillow under Cox's
head but with Cox's face to the side. He denied trying to kill
Cox.

50. The two nurses who responded to Sgt. Feipel's and/or
Nurse Conrad's call for medical assistance were Nurse Williams
and Nurse Darlington[9]. They thought they were responding to a
seizure event and had assumed that they would be bringing the
inmate back to the infirmary for care. Because they did not know
he already was in an unresponsive state, they did not bring all

---

[8] The Plaintiff's attorney reports being given the transcript of Brown's
interview, but it is not of record. The record contains only SA Jester's
recitation of the interview.

[9] Both Nurse Williams and Nurse Darlington wrote Incident Reports. Nurse
Williams' is found at DE 204-14. In addition to reviewing their Incident
Reports, SA Jester interviewed them. He includes their statements in his
Summary Report at DE 148-5.

of their first aid medical equipment with them to the cell. En route they passed guards who said the inmate was dead. They also passed Nurse Conrad who said, "He looks dead to me".

51.   They arrived at the cell at 7:41 PM. When they arrived, no one was administering CPR. It took three to four minutes for the cell door to be unlocked and opened for them. The other prison officials were acting on the belief that Cox already was dead and beyond help. His cell already was being treated as a crime scene.

52.   Inside they found Cox in restraints and lying on his back. They saw blood coming from his nose and mouth and from a forehead bruise. They observed signs of strangulation and trauma. His ears and nail beds were cyanotic. They found no pulse or blood pressure. They found him still very warm to the touch. They began CPR, requested an AED, and requested an EMS 9-1-1 call. Nurse Jones[10] arrived with the AED. She hooked it up to him, but the machine advised against administering an electric shock after detecting no sign of heart activity. EMS arrived at 8:05 PM, took over CPR, and then pronounced Cox dead.

53.   Dr. O'Neil performed the autopsy. Her Coroner's Report is dated May 19, 2015 and is found at DE 158—9. Dr. O'Neil observed brain contusion and hemorrhage, cerebral swelling,

---

[10] Nurse Jones wrote an Incident Report on March 16, 2015. It is found at DE 204—15. SA Jester interviewed her for his Summary Report, as well.

muscular hemorrhages around the neck, larynx fracture, tongue contusion, muscular hemorrhages in the right side of the back, and pulmonary edema and congestion. She declared the cause of death to be blunt trauma injuries to the head and neck, and she declared the manner of death to be homicide[11]. (It does not appear that Dr. O'Neil estimates the time of death.)

54.    The Plaintiff engaged Dr. Sperry, M.D., as her expert forensic pathologist expert. His deposition is found at DE 158—10. Dr. Sperry was the chief medical examiner for the State of Georgia for 18½ years, retiring in November 2015 (thus seven months after Cox's death). His career in public health service began in 1979. The Defendants argue that Dr. Sperry and his medical opinion in this case do not meet the Daubert standard. This Court finds his professional experience, the breadth of the records that he reviewed, and the detail of his deposition testimony to be sufficiently compelling to take it into consideration for present purposes. He did not have the benefit of Dr. O'Neil's autopsy photographs, but that was because the Defendants had not produced them.

---

[11] Dr. O'Neil's autopsy report clarifies that suicide was not the cause of Cox's death. It is therefore accurate to say that Brown "killed" Cox. The determination of whether Brown unlawfully murdered Cox has not been made. Defendants CO Rose and CO Bailes highlight that difference at DE 175 where they refer to "the alleged 'killing' by inmate Brown" and at DE 207 where they refer to the alleged murder of Cox by Brown.

55.   Moreover Dr. Sperry largely agreed with Dr. O'Neil's opinion. Dr. Sperry's opinion differed from her report in that he reached some <u>additional</u> findings based on what Dr. O'Neil had reported. From the degree of brain injuries and the amount of brain swelling that Dr. O'Neil reported, Dr. Sperry opines that some degree of slow suffocation contributed to his death. In other words the blunt force injuries to his head were the primary---but not sole---cause of death. Dr. Sperry attributes the partial and slow suffocating effect to lying face down in the pillow (and not to Brown's initial choke-hold on Cox). The fact that Cox was unable to turn his head out of the pillow to breathe implies that he already was unconcious.

56.   Moreover the degree of brain swelling that Dr. O'Neil reports suggests that Cox lived 15 to 30 minutes after Brown physically had attacked him (with it more likely 30 minutes than 15 minutes). This raises the possibility that Nurse Conrad might have been able to revive him, although Dr. Sperry cannot make that assertion with medical certainty. Dr. Sperry cannot opine with a medical degree of certainty one way or the other whether Cox could have been revived when Nurse Conrad and Sgt. Feipel first encountered him.

57.   Secondly Dr. Sperry doubted that the noose-like ligature that was found around Cox's neck played any role at

all, whether as the cause of death or even the cause of the neck
injuries. Because the ligature could not have caused the
injuries observed or been a contributing cause of death, Dr.
Sperry deduces that it was placed around his neck after the
attack. Otherwise Dr. Sperry regarded the observed injuries and
trauma to be consistent with Brown's description of how he had
attacked Cox. Dr. Sperry furthered that the brain swelling could
have caused seizure-like manifestations.

58.  Dr. Sperry is not the only one to think Nurse Conrad
should have begun CPR as soon as she arrived. Several others who
responded to the scene, including the other nurses, were
critical. The Director of Nursing at MCI at the time, Nurse
Robert Silvis, complained. He was fired afterward on May 26,
2015. The medical services contractor at MCI, Wexford, said it
fired him because "he was doing poor care". Nurse Silvis said
Wexford fired him in retaliation for raising "several issues
concerning the nurses at [MCI]" with various administrative
staff including Warden Hendry regarding documented incidents of
concern. The foregoing is subject of a report by the Office of
the Inspector General (DE 191—12).

59.  Nurse Conrad no longer works at MCI or for Wexford. At
her deposition she said that she retired from nursing after the
incident. The OIG Report suggests that she was fired and is no

longer permitted to work at a FDOC facility. At the time of his deposition (in February 2018) CO Rose was still working for FDOC but at a different facility. Captain Martens passed away. Warden Hendry left MCI in March 2016 to work as an FDOC trainer. He did not follow the Cox investigation and does not know what became of it. Warden Hendry denies administering any discipline as a consequence of this incident. He sees nothing about the incident that could have been done differently---other than the inaccurate initial report of a suicide and of the need for training materials on how to house inmates together.

60.  As for the consequences to Brown from the homicide, SA Jester testified at his deposition that he left the question of whether Brown had committed any crime to the State Attorney's Office to answer. SA Jester furthered that the State Attorney's Office decided not to pursue any criminal charges against Brown. Presumably the State Attorney's Office did not believe it could overcome his claim of self-defense. FDOC transferred him from MCI the day after the incident. His disciplinary record (at page 11 of DE 191—4) shows only that he received a penalty of 90 days' lost gain-time for the administrative offense of lewd or

lascivious exhibition on March 15, 2015 (the day of the incident)[12].

## SUMMARY JUDGMENT STANDARD OF REVIEW

61. This Court applies the well-established standard for deciding a claim of relief summarily under Rule 56, Fed.R.Civ.P. See Essex Ins. Co. v. Barrett Moving & Storage, Inc., 2018 WL 1407067 (11th Cir. 2018) (providing a recent application of the Rule 56 standard of review). See also, Caldwell, supra (applying the summary judgment standard in the deliberate indifference context). That standard requires the moving Defendants to show the absence of a genuine issue of material fact and the ability of this Court to rule on the merits of the claim on the existing evidentiary record as a matter of law. That standard requires the Plaintiff as the opposing party to proffer sufficiently probative evidence by which a reasonable jury could find in her favor and the existence of a dispute over a material fact that warrants sending the claim to the jury to resolve. This standard of review requires this Court to draw all reasonable factual inferences in the Plaintiff's favor. For the reasons explained above, this Court also keeps in mind the case's discovery history and the Plaintiff's Rule 56(d) Motion when considering

---

[12] The record contains no direct evidence of an act of a sexual nature by Brown on the day of the incident. The only possible evidence of such is Inmate Cedri's statement to SA Jester, found at page 9 of DE 148—5, of his belief that Brown had attacked Cox to rape him.

what the scope of the useable evidentiary record is and what
inferences may be drawn in the Plaintiff's favor.

## DISCUSSION & ANALYSIS

62.  The Eighth Amendment of the U.S. Constitution protects
inmates from cruel and unusual punishment. It sets the standard
for the treatment of inmates and the conditions of their
confinement. Prison officials are obligated to care for inmates'
basic life necessities, and there are several different
manifestations of that right. One such manifestation is inmate
safety. A prison official must take reasonable measures to
ensure an inmate's safety and to protect inmates from harm.
Gratuitous violence against an inmate serves no penological
purpose. A prison official therefore violates an inmate's Eighth
Amendment right if s/he is deliberately indifferent to a
substantial risk of serious harm to the inmate. See Farmer v.
Brennan, 511 U.S. 825 (1994). Another such manifestation is
inmate health. A prison official violates an inmate's Eighth
Amendment right if s/he is deliberately indifferent to the
inmate's serious medical need. See Estelle v. Gamble, 429 U.S.
97 (1976). A third manifestation is when a prison official
violates an inmate's Eighth Amendment right in a supervisory
capacity. See Harper v. Lawrence County, 592 F.3d 1227 (11th
Cir. 2010). Title 42 U.S.C. § 1983 provides an aggrieved inmate

the cause of action to seek redress for an Eighth Amendment violation.

63.  The Plaintiff alleges three different kinds of deliberate indifference. Generally speaking, they all share the same basic elements. Therefore this Court's review of the elements in the failure to protect from risk of harm context applies generally to the other two contexts, too. This Court notes any material differences between them in the respective discussions below.

## Deliberate Indifference (Risk of Harm)

64.  This Court discusses first the theory of deliberate indifference to risk of harm. At Count I of her Third Amended Complaint the Plaintiff contends that several of the Defendants failed to protect Cox from the substantial risk that inmate Brown would seriously harm him. First, the Plaintiff argues that Defendants Warden Hendry, CO Rose, and CO Bailes were deliberately indifferent to the harm that would result from placing Cox in the same cell with Brown. Second, the Plaintiff argues that those same Defendants were deliberately indifferent by "failing to check on him under the circumstances" and by "failing to come to Cox's aid" in sufficient time after Brown had attacked him.

65.  As for the elements that the Plaintiff must prove to
prevail on a deliberate indifference theory of relief, this
Court reviews the case law of: Williams v. Bennett, 689 F.2d
1370 (11th Cir. 1982), Farmer v. Brennan, 511 U.S. 825 (1994),
Carter v. Galloway, 352 F.3d 1346 (11th Cir. 2003), McBride v.
Rivers, 170 Fed.Appx. 648 (11th Cir. 2006), Rodriguez v. Sec'y,
Dep't of Corrs., 508 F.3d 611 (11th Cir. 2007), Goodman v.
Kimbrough, 718 F.3d 1325 (11th Cir. 2013), Caldwell v. Warden,
748 F.3d 1090 (11th Cir. 2014), Brooks v. Warden, 800 F.3d 1295
(11th Cir. 2015), Bowen v. Warden, 826 F.3d 1312 (11th Cir.
2016), Scott v. Miami Dade County, 657 Fed.Appx. 877 (11th Cir.
2016), and Woodyard v. Ala. Dep't of Corrs., 700 Fed.Appx. 927
(11th Cir. 2017). This Court adds that Reid v. Polk, 2018 WL
1426428 (M.D.Fla. 2018) provides a recent discussion of that
case law.

66.  The required elements are as follows: First, the
inmate must have faced a harm that is serious in nature. This
Court notes that the above case law recognizes inmate-against-
inmate violence as a serious harm. There also must be a
substantial risk of that serious harm. That is, a strong
likelihood of occurring (as opposed to a mere possibility), and
the risk of harm must be specific, not general. Whether the
inmate demonstrates this first "substantial risk of serious

harm" element is determined objectively. The next element is the defendant's "deliberate indifference", which has three sub-parts. It entails showing (1) the defendant's subjective (actual) awareness of that risk of harm and (2) the defendant's failure to respond in an objectively reasonable manner despite that knowledge. It also entails showing (3) that the defendant committed that wrongdoing with a heightened degree of culpability. That is, the inmate must prove that the defendant's wrongdoing is more blameworthy than mere negligence and possibly more than gross negligence[13]. The last element is causation. Pursuant to it an inmate must link the defendant's wrongdoing causally to the harm suffered.

67.   This Court begins by accepting as true for present purposes that the situation presented a "substantial risk" of harm. This Court accepts as true that both Cox, himself, and the neighboring inmates were concerned about Cox's safety should he be placed inside Brown's cell. This Court accepts as true that certain criteria (Brown's disciplinary history and reputation, the physical and sentence differences between the two, etc.) were factors that may have weighed against assigning Cox to

---

[13] This Court notes some discussion in the case law over whether the standard requires culpability greater than "gross negligence" or greater than just simple negligence. For the precise culpability standard this Court applies the holding from the seminal case of <u>Farmer</u>, <u>supra</u>, which requires a showing of culpability equivalent to conscious disregard. In any event the standard does not require the inmate to prove blameworthiness at the level of a purposeful or intentional act to inflict harm.

Brown's cell. Importantly the cell assignment decision involved more than a standard review of generally applicable compatibility criteria: just a few days before killing Cox, Brown expressed in his administrative appeal to MCI what reasonably could be construed as motivation to kill someone like Cox. This Court therefore accepts as true that Cox was facing a risk of harm that was potentially both violent and specific in nature.

68.   This Court notes how the deliberate indifference theory of relief (whether it be in the failure to protect, medical need, or supervisory contexts) turns on what the defendant subjectively (actually) knew. A prison official cannot deliberately fail to protect an inmate from a risk of harm of which the prison official personally knew nothing about. Through sworn affidavits and deposition testimony the Defendants deny any subjective knowledge of any reason why Cox should not be assigned to Brown's cell.

69.   Although the Defendants deny subjective knowledge, this Court focuses instead on the causation element: whether there is any causal link between the Defendants' inaction and Cox's death. As the Fourth Circuit noted in the analogous supervisory liability context, "liability ultimately is determined by pinpointing the persons in the decision-making

chain whose deliberate indifference permitted the constitutional [violation to occur]." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal citation omitted). This Court focuses on the causation element because the Defendants also deny any involvement with the cell assignment decision. Someone or some group made the decision to move Cox into Brown's cell. That cell assignment decision was made either through some formal proceeding or on some informal ad hoc basis. As far as this Court can tell from the existing record, this Court assumes that there was some sort of administrative-type decision related to both inmates' respective protective management requests. This Court assumes that their PM requests were at least one reason, or the precipitating reason, for placing them in the same cell together. It is that administrative-type cell-assignment decision[14] that is the act that underlies the Plaintiff's failure to protect theory of relief. The Plaintiff must prove that the decision-maker made that cell assignment decision with deliberate indifference to the substantial risk that Brown would seriously harm Cox. If none of the named Defendants participated in the cell assignment decision, then they cannot be found liable. Until the responsible decision-maker(s) are named, this

---

[14] The record does not suggest that Cox ended up in Brown's cell because of some unilateral action by a guard, by comparison.

Court cannot judge the merit of the Plaintiff's failure-to-protect theory of relief.

70.   The Defendants deny any involvement in the decision through sworn affidavits and sworn deposition testimony[15]. There is nothing in the record that might contradict their denials of involvement or otherwise bring their denials into dispute. If the Defendants named in Count I did not participate in the cell assignment decision, then it does not matter what they subjectively knew. The Plaintiff's failure-to-protect theory of relief is moot as to them. What the Plaintiff must do now is to "pinpoint" the decision-maker(s) and raise her failure to protect-based theory of relief against them.

71.   Frustratingly the Defendants deny any personal involvement in the cell assignment decision without identifying who the decision-maker(s) are (and without disclosing the actual decision-making process). This includes Defendant Hendry who despite being the warden and conceding in his Motion (DE 142) general responsibility for inmate housing, went to his deposition entirely unprepared to explain who exactly made the cell assignment decision. (The primary portion of this area of

---

[15] At the time of the incident Sgt. Feipel was Sergeant of Confinement in charge of intake in Dormitory D. In his affidavit (DE 144—1) he denies any "involvement in the decision for these two inmates to be housed together." In his affidavit (DE 148—2) CO Rose expressly denies any responsibility for cell assignments either generally or with respect to Cox specifically. CO Bailes expressly denies the same in his affidavit (DE 148—3).

inquiry is found at pages 48—52 of DE 191—5). Defendant Warden
Hendry only goes so far as to describe the different ways in
which a cell assignment decision can be made and the different
ranks and titles of officers who may participate in that
decision. Defendant Warden Hendry offers nothing more specific
than that, especially in regard to Cox's cell assignment.
Earlier at page 13 of his deposition when he was asked, "Did you
ever become aware of the name of the officer or officers who
placed Mr. Cox into that cell?", he answered "No".

72. All that the existing record shows is that the named
Defendants were not involved. Obviously the Plaintiff was
dependent on Defendant Warden Hendry for this information of who
the decision-maker(s) are. By not revealing that information,
the Defendants place the Plaintiff in the impractical situation
of having to go and ask every MCI prison official individually
about each's role in the decision to assign Cox to Brown's cell.
Leaving the record undeveloped as to this dispositive fact issue
wastes time and resources.

73. Therefore this Court finds Defendants Warden Hendry,
CO Rose, and CO Bailes entitled to summary judgment on Count I
to the extent that the Plaintiff alleges that they assigned Cox
to Brown's cell with deliberate indifference to the serious harm
that assignment posed. This Court finds them entitled to summary

judgment on the basis of their sworn denials of any involvement in that assignment decision. That does not mean that the theory of relief that the Plaintiff expresses at Count I is entirely foreclosed. The Plaintiff should have the opportunity for additional discovery to learn who the decision-maker(s) are and to amend her complaint to name them as party-Defendants. That re-pleading should be construed as relating back in a way that avoids any statute of limitations prejudice. Because this Court recommends below that Count IV be remanded, this Court recommends that Count I be "remanded" along with it. In other words this summary judgment ruling should be without prejudice to the Plaintiff being able to raise her deliberate indifference to risk of harm cause of action against the proper party-defendants after she learns in state court who the proper defendants are.

74.   Count I alleges another instance of failure to protect against Defendants Warden Hendry, CO Rose, and CO Bailes. That is, for "failing to come to Cox's aid before it was too late to protect him." This Court construes this theory of relief to concern the span of time that starts when Brown attacked Cox and during which the neighboring inmates were trying to get the guards' attention. This is not the focus of Count I (which

mainly concerns the cell assignment). Nevertheless this Court
will consider it here as its own free-standing theory of relief.

75.    The element of the deliberate indifference to risk of
harm standard that is dispositive to this particular inquiry is
the "subjective awareness" element. As the above cited case law
stresses, "deliberate indifference" means the failure to take
remedial action despite actual awareness of the harm or the risk
of harm. This Court discerns nothing in the record that suggests
or raises the possibility that Defendant Warden Hendry or
Defendant CO Rose actually knew that Cox had been attacked and
was in distress. Neither of them was physically present to know
Cox was in distress. Warden Hendry was not in the dormitory at
the time of the incident. At page 32 of his deposition he
recalls being at his residence when Captain Martens called him
to report the situation. While CO Rose was assigned to Dormitory
D, his shift had just started. CO Rose explained at his
deposition (DE 158—11) that he still was completing preliminary
tasks such as attending a briefing, storing his lunch, and
conducting an equipment inventory. These tasks took place
outside of the dormitory space. He first entered the dormitory
when he responded to Sgt. Feipel's call for help. Moreover the
video recordings reportedly confirm that no prison guard or
official entered the dormitory after the 6:30 PM check. On this

record evidence neither Warden Hendry nor CO Rose can be held liable for not responding to Cox's need for help.

76.   However there is some record evidence that could tie Defendant CO Bailes to the situation. This comes from SA Jester who recorded inmate Cedri's statement that he had seen CO Bailes checking the perimeter of Dormitory C and yelled to "him that a man was getting killed in the cell next to [his]." Inmate Cedri said that he had heard sounds of fighting through a vent and asked them what was going on. Brown answered first, saying that everything was alright. Cox answered next, yelling "Help, Ced, everything is not alright!" (This is found at page 9 of DE 148—5.) Inmate Cedri also believes that CO Bailes wrote a report of the incident. After yelling to CO Bailes, Cedri then prompted the other inmates to call out for help for Cox, he recalled.

77.   Although Cedri's statement does constitute some evidence of subjective awareness by a prison officer (CO Bailes), this Court finds it to be insufficient evidence by which to create a genuine dispute. CO Bailes explains in his affidavit (DE 148—3) that his shift started at 7:00 PM and that he was finishing pre-shift tasks too far away from either Dormitory C or D to have known what was going on. He first learned of the situation when Captain Martens, whom he was with at the time, received the radio call. SA Jester's report

suggests that it was CO Huertas-Rodriguez---not CO Bailes---who was doing that perimeter check of Dormitory C. However CO Huertas-Rodriguez denied hearing anything like that coming from Dormitory D. (In any event CO Huertas-Rodriguez is not a defendant to this lawsuit.) Therefore, on the record evidence, this Court finds that Defendant CO Bailes had no subjective knowledge of Cox's distress, and for that reason cannot be found liable under a deliberate indifference cause of action.

78.   To be clear, this Court sees no genuine dispute of fact as to whether inmate Cedri had alerted CO Bailes of the attack. The relevant point here is that Plaintiff proffers insufficient evidence to overcome the fact that CO Bailes could not have been checking the Dormitory C parameter at the time when Cedri says he yelled at him (or someone whom he believed to be CO Bailes). The record evidence shows that CO Bailes still had not yet finished his pre-shift duties and was with Captain Martens when word began to spread.

<u>Deliberate Indifference (Supervisory Context)</u>

79.   Next this Court considers the Plaintiff's claim that Defendants Warden Hendry and Sgt. Feipel were deliberately indifferent in their supervisory capacity. The Plaintiff raises this cause of action at Count II. There the Plaintiff argues that those two named "supervisory Defendants failed to implement

or follow a lawful inmate classification system that identified predator and non-predator inmates, and those suffering from mental health problems, which directly resulted in Brown and Cox being housed together in a single cell."

80.  This Court draws the legal standard for what constitutes liable supervisory conduct from Cottone v. Jenne, 326 F.3d 1352 (11th Cir. 2003), McDowell v. Brown, 392 F.3d 1283 (11th Cir. 2004), and Harper v. Lawrence County, Ala., 592 F.3d 1227 (11th Cir. 2010). The deliberate indifference standard in the supervisory context places the same emphasis on subjective knowledge and causation. It asks whether the supervisor knowingly disregarded, condoned, promoted, or tacitly permitted conduct that created a known or obvious risk of harm to an inmate. In other words a supervisor is not vicariously liable simply by virtue of being the supervisor. The supervisor must have played some role in or had some direct responsibility for the constitutional deprivation that the inmate suffered. The denials of involvement in the cell assignment decision by Defendants Warden Hendry and Sgt. Feipel therefore mean neither can be found liable for taking some affirmative supervisory action in relation to Cox's cell assignment. The record evidence does not call their denials of any direct conduct into genuine doubt. Given the case law's strict requirements in the

deliberate indifference context, this Court finds an insufficient basis to send the supervisory-based theory of relief to the jury.

81. This Court notes that Warden Hendry's broad denial of knowledge of and involvement in the cell assignment decision-making process may leave open the question of whether through <u>inaction</u> he was deliberately indifferent to the risk that the cell assignment process would pair a "predatory" inmate with a "prey" inmate. As warden he had influence over the cell assignment protocol and decision-making process (unlike Sgt. Feipel). The same holds true for the shift-related delay in checking cells which Warden Hendry permitted. However this is not the focus of the Plaintiff's theory of relief. What institution-level concerns and allegations that the Plaintiff does raise about MCI are too conclusory to proceed on. Thus this Court need not resolve them here. This Court mentions this simply to clarify that the present summary judgment ruling does not extend so far as to reach the question of whether Warden Hendry was deliberately different in some passive way.

<u>Deliberate Indifference (Medical Need)</u>

82. Count III raises the third version of the Plaintiff's deliberate indifference theory of relief. The Eighth Amendment right at issue here concerns an inmate's serious medical need.

The failure to respond to an inmate's serious medical need violates the Eighth Amendment right against cruel and unusual punishment. Serious medical suffering serves no penological purpose. The deliberate indifference standard in the medical need context remains fundamentally the same as the two contexts discussed above. Ways in which a prison official can be deliberately indifference in this context is by not responding or refusing to respond to an inmate's need for medical care or by delaying treatment unreasonably, without explanation, or for a non-medical reasons. A violation also can be shown through grossly inadequate medical care, the administration of easier but less efficacious treatment, or the administration of medical care that is so cursory that it amounts to no treatment at all. See generally, Melton v. Abston, 841 F.3d 1207 (11th Cir. 2016) and Truschke v. Chaney, 2018 WL 814579 (S.D.Ga. 2018) (providing recent statements of the governing case law).

83.  The Plaintiff brings Count III against Defendants CO Rose, CO Bailes, and Nurse Conrad for their alleged failure to render aid after Brown had attacked Cox. The first aspect of the Plaintiff's theory of relief concerns the lack of response to the neighboring inmates' cries for help. However, as this Court explains above, there is no record evidence that either of these three named Defendants actually knew that Cox was in distress

and in need of medical care. Therefore this Court finds them entitled to summary judgment on this particular point.

84.   The other aspects of the Plaintiff's theory of relief concerns their response when Cox was found. The first responders at the scene were Sgt. Feipel and Nurse Conrad, next joined by CO Rose (who answered Sgt. Feipel's call for assistance), and thirdly Captain Martens and CO Bailes (who also answered a radio call for assistance). None of them began resuscitative measures. As for the guards, Defendants CO Rose and CO Bailes, the medical need-based deliberate indifference standard applies to them differently because they are not medical personnel. See Truschke, 2018 WL 814579 at *5. Even if the standard were the same, Count III still fails against them. This is because neither of them were the first at the scene, and they were acting on instructions from their superiors to handle other needed matters related to the situation. Defendants CO Rose and CO Bailes therefore are entitled to summary judgment on the failure-to-resuscitate aspect of Count III.

85.   The proper focus of this aspect of the Plaintiff's theory of relief is Nurse Conrad. Not only was she the first on the scene (along with Sgt. Feipel), but she was medical personnel. For present purposes this Court construes the record evidence to show that Nurse Conrad's response was limited to a

cursory check for life signs. She was quick to form the opinion that Cox already was dead and beyond the need for first aid or resuscitative measures. That opinion in turn caused other prison guards and officials at the scene not to render first aid or attempt resuscitation.

86.   The failure to render first aid and resuscitation aspect of Count III against Nurse Conrad fails for several reasons. First if Cox indeed was dead and beyond resuscitation when Nurse Conrad first found him, then there was no serious medical need in a purely technical sense. Next is the question of whether Nurse Conrad acted with the required degree of culpability when she decided not to respond with medical care (in the form of first aid and resuscitative measures). As to this point this Court construes the other responding nurses' statements and the supervising nurse's formal complaint to establish that Nurse Conrad was negligent---and even grossly negligent---in her conduct. Even if a matter of standard procedure or even a matter of simple conscientiousness, it reasonably could be said that Nurse Conrad should have evaluated Cox more thoroughly, should have attempted resuscitation, and should have solicited appropriate medical help. The dispositive point is that those "should haves" do not rise to the level of deliberate indifference. If Nurse Conrad genuinely perceived Cox

to be dead and perceived no medical need, then she did not withhold medical care with deliberate indifference. Even if Nurse Conrad's negligence constitutes medical malpractice, it is a degree of culpability insufficient to prove deliberate indifference.

87.   Next, this Court addresses causation. If Cox already was dead and beyond resuscitation, then it stands to reason that Nurse Conrad's failure to respond did not cause or contribute to his death. This Court gives careful consideration to Dr. Sperry's opinion. It may have been within the realm of possibilities that immediate first aid and resuscitative measures might have brought Cox back, Dr. Sperry opines. This Court assumes for present purposes that Dr. Sperry's opinion is sound.[16] However it is a moot point whether it suffices to create a genuine dispute of fact regarding causation because the Plaintiff still fails to prove all of the other required elements.

## Qualified Immunity

88.   All of the individual Defendants claim the defense of qualified immunity. This Court assumes for present purposes that all of the individual Defendants, including Nurse Conrad, are

---

[16] Currently pending are the Defendants' Motions to Strike Dr. Sperry's opinion on Daubert and other trial admissibility grounds at DE 147, 149 & 153. Those Motions were not referred to the undersigned to decide. For purposes of this Report and Recommendation this Court takes Dr. Sperry's opinion into consideration.

the kind of government actors who may seek qualified immunity protection and that they all acted within the scope of their discretionary authority with respect to the incident involving Cox.

89.  Resolving those points in the Defendants' favor shifts the burden to the Plaintiff to refute their claims of qualified immunity. A Defendant is not entitled to qualified immunity if (1) the Defendant violated Cox's constitutional rights and (2) that constitutional right was clearly established at the time. The case law that this Court cites above discusses the qualified immunity standard in the deliberate indifference context. See also, Dang v. Sheriff, 871 F.3d 1272 (11th Cir. 2017).

90.  In a practical sense the qualified immunity claims are moot. The individual Defendants (with the exception of Nurse Conrad) were not the relevant actors who were involved in the cell assignment decision and none of them personally knew that Cox lay dying during the period of time between Brown's attack and Sgt. Feipel's check. The individual Defendants have no practical need for qualified immunity because they are not the proper defendant-parties to the causes of action. To the extent a legal ruling is required here, this Court finds the individual Defendants entitled to qualified immunity for the same reason the Plaintiff fails to show a violation of Cox's Eighth

Amendment constitutional right on the merits. Because the Plaintiff fails to overcome qualified immunity's first element, this Court need not consider the second element of whether Cox's Eighth Amendment right was clearly established.

91.   The qualified immunity issue is not moot with respect to Nurse Conrad. In comparison to the other named Defendants, she was a participant. Nevertheless the Plaintiff still fails to overcome qualified immunity's first element. She proffers insufficient evidence to warrant sending the question of whether Nurse Conrad was deliberately indifferent to Cox's medical need to the jury. Because the Plaintiff fails to contradict Nurse Conrad's qualified immunity claim on the first element, there is no need for this Court to consider whether Cox's constitutional right was clearly established to put Nurse Conrad on fair notice.

## Sovereign Immunity

92.   This brings this discussion around to the last count of the Plaintiff's Third Amended Complaint: Count IV. Count IV is brought against the Florida Department of Corrections ("FDOC"). It is a negligence-based theory of relief in which the Plaintiff alleges that FDOC breached its duty of care to Cox by placing him in a harmful situation (by assigning him to Brown's cell despite the several reasons against doing so) and by

failing to come to his aid "before, during and after" Brown had attacked Cox.

93.   Despite actively participating in this case, FDOC now moves to dismiss Count IV on sovereign immunity grounds. At issue here is the Eleventh Amendment to the U.S. Constitution. Case law interprets it as protecting states from being sued in federal court for damages. At § 768.28, Fla. Stat., the State of Florida waives its Eleventh Amendment sovereign immunity in tort lawsuits that apply Florida tort law. However at § 768.28(18), Fla. Stat., the State of Florida does not extend that waiver to being sued in federal court. Section 768.28(18), Fla. Stat., even bars the exercise of supplemental jurisdiction over the Plaintiff's Florida tort law cause of action.

94.   The case law is clear about the general applicability of § 768.28(18), Fla. Stat., and the bar to suing the State of Florida (or here, its FDOC agency) in this federal court. See Gamble v. Florida, 779 F.2d 1509 (11th Cir. 1986), Williams v. Robbins, 153 Fed.Appx. 574 (11th Cir. 2005), Yawn v. Sec'y, Fla. Dep't of Corr., 2017 WL 2730671 (N.D.Fla. 2017). What the parties dispute is whether FDOC raises its Eleventh Amendment sovereign immunity too late.

95.   FDOC has had notice of the Plaintiff's negligence claim against it since receiving her § 786.26(6)(a) letter in

September 2016. As of May 2017 the Plaintiff sued Warden Hendry for negligence both in his individual capacity and in his official capacity. Count IV of the then operative complaint was entitled "Negligence Against the State of Florida Department of Corrections and Warden Hendry in his Official Capacity". There the Plaintiff framed the text of Count IV in terms of the State of Florida. It was Defendant Warden Hendry who removed this lawsuit to federal court. In his Notice of Removal Defendant Warden Hendry noted that the Plaintiff's complaint "also contains a count of negligence under the law of the State of Florida against this Defendant" meaning himself, Warden Hendry, but without distinguishing between his individual and official capacities.

96.   At DE 25 Defendant Hendry moved to dismiss Count IV arguing that FDOC was the proper party defendant instead of himself in his official capacity. In her Second Amended Complaint (filed on September 7, 2016 and found at DE 62) the Plaintiff therefore named Julie L. Jones in her official capacity as the head of FDOC and brought Count IV for negligence and wrongful death against FDOC. The only mention of sovereign immunity that FDOC raised in its Answer (DE 73) was at Paragraph 150 where it claimed limited damages liability. It was not until its Answer (DE 194) to the Plaintiff's Third Amended Complaint

when it pleaded Eleventh Amendment sovereign immunity, too. FDOC has actively participated in this case since its appearance. It was the principle participant in discovery. It continues to actively litigate this case: FDOC joins other Defendants at DE 177 in moving to strike the Plaintiff's claim for punitive damages.

97.   The question is whether FDOC waived its ability to invoke sovereign immunity now at this stage after allowing itself to be an active party to this case despite ample notice of the negligence claim against it. The two cases that FDOC cites suggest that sovereign immunity is not waivable in this way. In Shedrick v. District Bd. of Trustees of Miami-Dade College, 941 F.Supp.2d 1348, 1358—60 (S.D.Fla. 2013) no such waiver was found from the state agency's failure to raise it as a defense in its answer. Indeed, as the court noted in Moultrie v. Smith, 2015 WL 12552095, *3 (N.D.Ga. 2015), a state may raise it as late as an appeal. Therefore FDOC still may assert it as a defense to continued litigation in this federal case

98.   That does not mean FDOC also prevails on the merits of Count IV. Presumably the Plaintiff still may continue with her negligence claim---just in state court. This Court finds that Count IV of the Plaintiff's Third Amended Complaint relates back to her state court lawsuit, and this Court therefore recommends

that Count IV be remanded back to state court (where it originated before Defendant Warden Hendry removed it). This ameliorates any prejudice to the Plaintiff from FDOC's late assertion of sovereign immunity.

<u>**CONCLUSION**</u>

99.   The Plaintiff's allegation that deliberate indifference may have caused the death of her son, Christopher Cox, is reasonably made. The Plaintiff proffers evidence that reasonably could suggest a likely harm to Cox from improper cell assignments and/or of predictable gaps in inmate checks. The neighboring inmates regarded Cox's assignment to Brown's cell as too risky. Moreover Brown raised in an administrative appeal grievance what reasonably could be construed as a threat to kill someone like Cox. That grievance also reasonably could be construed as notice to MCI of the existence of a specific risk that Brown would harm someone like Cox. At page 28 of his deposition (DE 191—5), Defendant Warden Hendry said that he is in the loop for inmate grievances and that inmate grievances factor into a cell assignment decision. That suggests that the grievance did or should have played a role in Cox's assignment decision.

100. The record suggests that MCI had some sort of decision-making system or protocol for making cell assignments

whose purpose was meant to minimize the risk of harm by inmate "predators". That system may have failed Cox. Brown killed him very soon after being moved into his cell. If that system did fail him, then it failed without any negative consequences or repercussions. That is where the record stops. The record does not identify who made the decision to assign Cox to Brown's cell---other than to exclude the named Defendants. On the basis of their sworn testimony and the lack of any evidence to refute their sworn testimony, this Court finds them entitled to summary judgment in their favor. However this Court recommends that it be without prejudice to the Plaintiff's ability to learn who the decision-maker(s) are and to learn how that decision was made.

101. As for Nurse Conrad, she was the first medical personnel to find Cox after Brown had attacked him. Therefore, unlike the other named MCI officials, she properly stands as a Defendant against the Plaintiff's medical need-based deliberate indifference claim for relief. However she still is entitled to summary judgment. The record evidence fails to show that Nurse Conrad deliberately failed to provide first aid or to initiate resuscitative measures. This is because the record does not suggest that she subjectively perceived him still to be alive. In addition, if Dr. Sperry's opinion that Cox still could have been revived when Nurse Conrad first found him is rejected, then

neither can the Plaintiff prove the existence of a serious medical need or causation.

102. As for FDOC, this Court finds that it may invoke sovereign immunity to avoid being sued for negligence in this federal court. However, rather than be dismissed, this Court finds that Count IV should be remanded back to state court where presumably the Plaintiff may sue it for damages for negligence.

**ACCORDINGLY**, this Court recommends to the District Court that the Motions for Summary Judgment (DE 130, 142, 144 & 150) be **GRANTED**. This Court recommends that summary judgment be entered in the favor of Defendants Warden Hendry, Sgt. Feipel, CO Rose, CO Bailes, and Nurse Conrad. However this Court does not recommend that the summary judgment ruling prejudice the Plaintiff's ability to continue to litigate Count I, after she has had an opportunity to learn who the proper party-defendant(s) are. To that extent (and to the extent this Court construes any inferences from the undeveloped record in the Plaintiff's favor where possible for purposes of the above analysis), this Court recommends that the Plaintiff's Rule 56(d) Motion (DE 192) be **GRANTED**.

This Court recommends that Defendant FDOC's Motion for Judgment on the Pleadings (DE 136) be **DENIED**. Rather than dismiss FDOC, this Court recommends that Count IV be **REMANDED**

back to state court. This Court recommends that Count I be "remanded" back to state court, too. That is, without prejudice to the continued pursuit in state court of relevant discovery and without prejudice to amending Count I to name the proper parties as defendants after she learns who they are.

Lastly this Court recommends that the Defendant's Motion to Dismiss/Strike Claims for Damages (DE 177) be **DENIED** as moot. This Court recommends that the Plaintiff's Motion to Seal (DE 213) be **DENIED** for the reasons this Court explains above at Paragraph 9.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Robin L. Rosenberg, the United States District Judge assigned to this case. Failure to file timely objections shall bar the parties from a de novo determination by the District Court of the issues covered in this Report and Recommendation and bar the parties from attacking on appeal the factual findings contained herein. LoConte v. Dugger, 847 F.2d 745, 749–50 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988).

**DONE AND SUBMITTED** in Chambers at Fort Pierce, Florida, this __24th__ day of April, 2018.

SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE