## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:17-CV-14177-ROSENBERG/LYNCH

MONICA STONE, *as the*
*Personal Representative of the*
ESTATE OF CHRISTOPHER COX,

       Plaintiff,

v.

ROBERT HENDRY, ROBERT FEIPEL,
CHRISTOPHER ROSE, DAVID BAILES,
CAROLYN CONRAD, and THE STATE OF
FLORIDA through JULIE L. JONES,
in her official capacity as Secretary of the Florida
Department of Corrections,

       Defendants,

_____/

### SECOND AMENDED COMPLAINT

COMES NOW the  Plaintiff,  Monica Stone,  *as the  Personal Representative of*

*the Estate of* Christopher Cox, by and through her undersigned  legal counsel, James A.

Wardell, Esq. of WARDELL LAW FIRM, P.A., and hereby files her Second Amended

Complaint as follows:

1.     This is an action for wrongful death by an 8th Amendment violation of the United

States Constitution brought pursuant to Title 42 U.S.C. § 1983.

2.     Plaintiff also alleges wrongful death by negligence.

### PARTIES

3.     Plaintiff, Monica Stone, *as the Personal Representative of the Estate of*

Christopher Cox, ("Estate").  Mrs. Stone is an adult, who, currently  resides in Plant City,

Florida.  She was the natural mother of deceased Christopher Cox.

4.      Defendant, Robert Hendry, is an adult individual, who, during all relevant times, was employed by the Florida Department of Corrections as the Warden of the Martin Correctional Institute (MCI).  All of Defendant Hendry's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

5.      Defendant, Robert Feipel, is an adult individual, who, during all relevant times, was employed by the Florida Department of Corrections, as a corrections officer, with the rank of Sergeant. All of Defendant Feipel's actions or inactions were taken under color of state law.  He is sued in his individual capacity.

6.      Defendant, Christopher Rose, is an adult individual, who, during all relevant times, was employed by the Florida Department of Corrections, as a corrections officer. All of Defendant Rose's actions or inactions were taken under color of state law. He is sued in his individual capacity.

7.      Defendant, David Bailes, is an adult individual, who, during all relevant times, was employed by the Florida Department of Corrections, as a corrections officer.  All of Defendant Bailes' actions or inactions were taken under color of state law. He is sued in his individual capacity.

8.      Defendant, Carolyn Conrad, is an adult individual, who, during all relevant times, was employed by Medical Staffing Network and assigned to work at the Martin County Correctional Institute,  as  a nurse. All of Defendant Conrad's actions or inactions were taken under color of state law.  She is sued in her individual capacity.

9.      Defendant, Julie L. Jones, who during all relevant times, was and is the current Secretary and chief executive officer of the Florida Department of Corrections ("FDOC"). FDOC is the agency of the State of Florida that operates state prisons. She is sued in her official capacity.

## FACTUAL BACKGROUND

**A. Appointment of Personal Representative of Probate Estate and Issuance of Letters of Administration**

10.     On March 15, 2015, Christopher Cox, a resident of Martin County, Florida, died, owning assets in the State of Florida.

11.     On March 27, 2017, the Circuit Court for the Thirteenth Judicial Circuit in and for Hillsborough County, Florida, appointed Monica Lynn Stone, Personal Representative, of Mr. Cox's probate estate.

12.     On that same date, the Probate Division issued Letters of Administration to Mrs. Stone. A copy of the Letter of Administration is attached to this Second Amended Complaint as **Exhibit A**.

**B. Florida Department of Corrections**

13.     During the relevant period of time, the State of Florida ran the Department of Corrections (FDOC) as the prison system for the State.

14.     As one of its prisons FDOC ran the Martin Correctional Institute (MCI).

15.     The FDOC has come under scrutiny for the acts of its employee's regarding the treatment and supervision of inmates within the system.

16.     The FDOC has also been scrutinized for failing to have or implement policies designed to protect the life and safety of inmates, as well as for intentionally showing a callous disregard for the life and safety of inmates under its supervision.

17.     The FDOC had a policy of not accurately reporting inmate deaths or sabotaging investigations to hide the true extent of the problems within Florida's DOC.

18.     In 2015, Florida had the highest prison death rate (354 per 100,000 inmates)

than any of the other 10 largest states.

19.     The environment within the Florida Department of Corrections, generally, and within MCI, specifically, was that corrections officers knew  that they could engage in conduct that violated prisoners' civil rights, with  impunity.

20.     This environment directly caused  or  permitted Defendants Hendry, Feipel, Rose, Bailes and Conrad to  engage in the acts or inaction described herein.

## **FACTS OF ATTACK AND MURDER**

21.     On March 15, 2015, it was reported to the Fort Pierce Field Office of the Florida Department of Law Enforcement ("FDLE") that inmate Christopher Cox allegedly committed suicide at Martin Correctional Institution ("MCI").

22.     MCI Warden Robert Hendry told the FDLE investigator that inmate Hurley Brown stated to one of his corrections officers that inmate Cox attacked him and he "took him out".

23.     Inmate Christopher Cox was transferred to MCI on January 14, 2015 and placed in protective management (PM) on February 3, 2015.   Inmate Hurley Brown was also in PM for his own safety or the safety of other inmates.

24.      Inmate Cox was later moved to D Dormitory, wing 2, cell 2214 where he resided by himself.  On or about March 15, 2015 Inmate Cox  was moved to cell D2210. Inmate Hurley Brown was housed in D2210.  Inmate Brown and Cox were the only two in this cell.  The cell was locked down.

25.     Both Inmate Cox and Inmate Brown should have been kept separate and should not have been housed in the same cell and locked down.

26.     MCI Warden Hendry, as well as other classification and correction officers at

MCI knew inmates designated with PM should not be housed with other inmates. They further knew Inmate Brown presented a threat to Inmate Cox and these two inmates should not have housed together.

27.     Inmate Cox advised MCI that his life was in danger.  He further complained that he had been previously abused and warned his life was in danger.

28.     Other Inmates cautioned MCI that they cannot put Inmate Cox in a cell with Inmate Brown.

29.     Inmate Cox was white and weighed 123 pounds with a very slight build.

30.     Inmate Brown was black and weighed 190 pounds with a muscular build.

31.     Prior to the murder, Inmate Brown had himself requested help with his mental condition feeling he was a threat to himself or others.

32.     Inmates Brown and Cox, despite both being designated as "PM", were not only designated to the same cell but were put on lock down in the cell.

33.     On March 15, 2015, the first and only day Inmate Cox was locked up with Inmate Brown, Inmate Brown attacked inmate Cox, beat him, possibly sexually assaulted him, strangled him and ultimately killed him.

34.     Inmate Brown first claimed Inmate Cox was attempting to kill himself and Inmate Brown stopped him because he did not want to get pepper sprayed.

35.     Inmate Brown claims that when an Inmate attempts suicide in a cell the guards have a policy to pepper spray the inside of the cell to secure the inmates before going in. Since Brown did not want to get pepper sprayed he stopped Inmate Cox from killing himself. According to Inmate Brown, this caused Inmate Cox to come after Inmate Brown and Inmate Brown responded by fighting him and killing him.

36.    It is well known that violent inmates often try to claim a murder victim committed suicide.  They also claim a murder was done in self-defense, especially where there are only two individuals within a cell.

37.    Deliberate indifference to the obvious danger presented to Inmate Cox at MCI is a direct result of Defendants Hendry and Sgt. Feipel's intentional indifference to the treatment of inmates and culture created within the Department of Corrections and MCI.

### ***Deliberate Indifference***

38.    The Florida Department of Corrections is the third largest state prison system in the country, with a current budget of $2.4 billion, consisting of 143 facilities housing over 100,873 inmates, and  142,000 offenders on active community supervision.

39.    Inmate housing decisions are supposed to be made by the Department's  security and classification officers.

40.    However, it is  believed that  discovery will reveal that during  the  relevant period of time, all Defendants knew that the Department did not have a sufficient inmate classification policy including one that identified predator or non-predator inmates to protect inmates from other inmates.

41.    The most serious offenders, with the longest sentences, and those least  likely to adjust to institutional life, are placed in the more secure facilities.

42.    Correctional institutions are divided into seven levels of security, ranging from minimum custody facilities to maximum custody facilities.

43.    During the relevant period of time, the Martin Correctional Institution was a level six facility, and was a close-management housing facility.

44.    Close  management  is  disciplinary  custody,  not  protective  custody,  where an inmate is housed separate from the general inmate population.

45.     This status is designed to house inmates who commit acts that threaten the safety of others, threaten the security of the institution, or demonstrate an inability to live in the general population without abusing the rights and privileges of others.

46.     Close management is very restrictive housing, where inmates are confined to their cells up to 24 hours a day.

47.     There are three levels of close management: I, II, and III, with I being the most restrictive, and III being the least restrictive.

48.     Close management is the most restrictive level of housing below death row and max management.

49.     The D Wing of the Martin Correctional Institution is such that inmates cannot be properly monitored from the nearest station.

50.     The physical set up makes it more important to properly categorize inmates and prevent dangerous inmates who are designated as PM or CM to be kept separate from other inmates.

51.     Everyone knew that Inmate Brown should have been kept separate from Inmate Cox.

52.     The other inmates even advised the staff at Martin Correctional that they cannot put Inmate Brown with Inmate Cox prior to Inmate Brown murdering Inmate Cox.

53.     MCI did not take into consideration the mental health condition of Inmate Brown.

54.     In addition to MCI's failure to properly designate and keep these inmates separate, they also failed or refused to come to the aide of Inmate Cox before, during, and after the attack.

55.     Other inmates screamed and were banging on their doors attempting to summons help for Inmate Cox.  They were screaming "man down" which is a term used to alert guards that

an inmate is being attacked or is hurt.

56.     Despite the banging and screaming no guard or employee came to the assistance of Inmate Cox for what is believed to be 30 minutes.

57.     When someone finally arrived, nurse Conrad was with the guard that opened the door to cell D2210.  Nurse Conrad and the guard failed or refused to provide any emergency medical assistance to Inmate Cox despite finding him on the floor unresponsive with obvious distress.

58.     Inmate Cox was left in obvious distress for more than 20 additional minutes before a second group of nurses arrived and began CPR.

59.     It was obvious Inmate Cox was in immediate need of emergency care and Nurse Conrad, Sgt. Feipel and CO Rose failed or refused to provide any emergency medical treatment to Inmate Cox.

60.  Nurse Conrad was later fired for her failure or refusal to render care to Inmate Cox.

## C. **The Duties of a Correctional Officer**

61.     Florida corrections officers are responsible for the supervision, care, custody, and control of all inmates in Florida correctional institutions and facilities.

62.     Correctional officers' duties and responsibilities include, but are not limited to, supervising inmates in housing units and those segregated for administrative or punitive measures, maintaining a periodic patrol either inside or outside the institution to ensure the security and integrity of the institution, maintaining control and discipline, initiating and participating in search of inmate recreation areas, work areas, and housing units to prevent the introduction of contraband items, and preventing the introduction of contraband into the institution.  They are also responsible for carrying out Inmate designations to

prevent placing inmates in obvious dangers.

63.     On March 15, 2015, Defendant Corrections Officers Rose, Bailes, and Sgt. Feipel, were assigned to supervise, the D wing at the Martin MCI where inmate Cox was being housed.

## D. Defendants Hendry, Feipel, Rose, and Bailes Knew Inmate Cox Should Not Have Been Locked in a Cell with Inmate Brown

64.     Defendants Hendry, Feipel, Rose, and Bailes knew that inmates are classified based upon danger to others, among other things.

65.     They further knew that once classified as a "PM" they had to take precautions to protect other inmates from dangers presented by the inmate with such a designation.

66.     Defendants further should have used common sense in locking Inmates Cox and Brown in the same cell knowing Brown's propensity, the difference in size and strength between Cox and Brown and Brown's mental state.  They further were aware of their different races.

67.     Failing to respect and follow the designations given to Brown, or failing to designate him properly, was deliberately indifferent to the health and safety of Cox and resulted in his needless beating, strangulation and death at the hands of Brown.

## E. Defendants Hendry, and Feipel, supervised Defendants Rose, Bailes and Conrad, and were responsible for ensuring Cox's physical safety.

68.     Defendants Hendry, and Feipel, knew that Defendants Rose, Bailes and Conrad, failed to adopt, implement or enforce an inmate classification policy or procedure that identified inmates as predator or non-predator or sufficiently identified dangerous inmates that were risk to house with other inmates.

69.     Defendants Rose, Bailes and Conrad, knew that they were not permitted to follow unlawful orders or directions.

70.     Moreover, Defendants Hendry, and Feipel, knew that they were responsible to ensure Cox's safety, since Cox  was in their custody and they were the supervisors at the time of his placement in the cell with Brown.

71.     Defendants Rose, Bailes and Conrad approved  and/or permitted Brown and Cox to be placed in, or to remain in, the same cell.

72.     Defendants Hendry, Feipel, Rose, and Bailes, were not  permitted to be deliberately indifferent to Cox's safety by arbitrarily assigning, or  leaving Cox in a cell with Brown.

73.     Likewise, Rose, Bailes and Conrad were not permitted to ignore orders to house Cox and Brown in D2210 despite classifications that should have kept them separate.

74.     Rather, at the very least, Defendants Hendry, Feipel, Rose, and Bailes were required to use common sense, and to consider the inmates' age, size, strength, disciplinary history, criminal history, known biases or  conflicts, propensity for violence, and mental health condition before placing inmates in, or leaving inmates in, a cell together.

75.     This is especially true, since Defendants Hendry, Feipel, Rose, and Bailes, were on notice that being a level 6 facility, they  were generally encountering inmates who commit acts that threaten the safety of others, threaten the security of the institution, or demonstrate an inability to live in the general population without abusing the rights and privileges of others.

76.     Defendants Hendry, Feipel, Rose, and Bailes, despite knowing of the obvious danger, failed or refused to protect Cox from the obvious danger.

77.     It was deliberately indifferent to place Cox in cell D2210 all alone with Brown.

78.     Defendants Hendry, Feipel, Rose, and Bailes could have kept Cox and Brown separated but chose not to do so.

79.     Defendants Hendry, Feipel, despite having access to video monitoring, audio monitoring, written reports, and the inmates, failed to utilize their authority and access to properly supervise Defendants Rose, Bailes and Conrad to ensure Cox's safety.

80.     Following Cox's murder, Florida Department of Corrections spokesman Lewis admitted that the Department of Corrections did not have a system in place to identify inmates as predator or non-predator.

## F. Hurly Brown beats and murders Christopher Cox

81.     Prior to moving Inmate Cox into the cell with Inmate Brown, both inmates were designated as PM and were not to housed in a cell with other inmates.

82.     On March 15, 2015, the first night Cox was moved into cell D2210 with Brown, Brown strangled and murdered Cox.

83.     Prior to the murder, Brown had told MCI he was not right and needed help.

84.     Other inmates advised MCI that Cox should not be placed in a cell with Brown.

85.     Brown had indicated before the murder of Cox that he was going to rape Cox.

86.     Cox had complained to MCI that he was in danger and feared for his life.

87.     At the beginning of the attack on Cox, inmates began screaming and banging on their doors to get the attention of the guards to come to Cox's rescue.  It took 30 minutes of screaming and banging before anyone reported to D2210 only to find Cox already unconscious.

88.     Even after arriving with a medical nurse, no care was rendered to Cox.

89.     After an additional 20-30 minutes, two different nurses appeared and began CPR on Cox to try to save his life.  Paramedics were then called to the scene.

90.     Cox did not survive.

91.     Inmates testified under oath that they specifically told correction officers at MCI not to put Cox in the cell with Brown.

## COUNT I

### Plaintiff v. All Defendants Eighth Amendment – Cruel and Unusual Punishment – Failure to Protect  (pursuant to 42 U.S.C. § 1983)

92.     Paragraphs 1-91 are stated herein by reference.

93.     The Eighth Amendment protects inmates against infliction of "cruel and unusual punishment."

94.     The U.S. Supreme Court, in Farmer v. Brennan, 511 U.S. 825 (1994), established the current legal standard for federal civil rights liability against correctional officials and employees, in the context of the failure to prevent prisoner on prisoner assault.

95.     While previous court cases had established that it takes "deliberate indifference" to a substantial risk of serious harm to an inmate to violate the Eighth Amendment's prohibition on cruel and unusual punishment, see Helling v. McKinney, 509 U.S. 25 (1993), Wilson v. Seiter, 501 U.S. 294 (1991), and Estelle v. Gamble, 429 U.S. 97 (1976), Farmer makes it clear that "deliberate indifference" is based on subjective awareness, i.e., that the prison official knows that an inmate or inmates face a substantial risk of serious harm, and disregards that risk, by failing to take reasonable measures to abate it, or to prevent it.

96.     Both Cox and Brown were in the care, custody, and supervision of the Defendants.

97.     While the Courts generally defer to prison officials to determine the classification and placement of prisoners, prison officials are not permitted to violate prisoners' constitutional rights when doing so.

98.     The reckless or intentional subjecting of Cox to physical assault, rape, and

death, is a sufficiently serious deprivation within the zone of Eighth Amendment protection.

99.     The Defendants, Hendry, Rose and Bailes, were deliberately indifferent to Cox's health and safety as they had subjective knowledge of the danger of putting them together.

100.     The Defendants, Hendry, Rose and Bailes' had subjective knowledge of, appreciated, and ignored, the risks and dangers to Cox's health and safety.

101.     Despite having an appreciable opportunity to do so, the Defendants, Hendry, Rose and Bailes took no action to abate the risk and danger to Cox's health and safety.

102.     Defendants Hendry, Rose and Bailes observed Cox and Brown in a cell together, appreciated the danger that Cox was in, but failed to keep Cox separate from Brown.

103.     Defendants Hendry, Rose and Bailes either placed, ordered, or permitted Cox to remain, with a particularly violent inmate designated to be by himself. Brown had complained that he didn't feel right. These Defendants knew, and were in a position to observe, Cox was at risk due to his much smaller size and weight, with a slight build, and who had expressed fear for his safety. Both Cox and Brown, for different reasons, had been designated as PM. The inmates were also of different races.

104.     By leaving these inmates together and **locking them down in a single cell**, without checking on them, these Defendants afforded Brown the opportunity to slowly murder Cox and make up an illogical story that Cox first attempted suicide and then initiated a fight with Brown to justify his attack.

105.     Defendants Hendry, Rose and Bailes were subjectively deliberately indifferent to the substantial risks to Cox by locking them down together, failing to check on them under the circumstances, failing to head warnings from Cox, Brown and other inmates, and failing to come

to Cox's add before it was too late to protect him.

106.     The Defendants' actions and inactions were the direct and proximate cause of Cox's death.

107.     As a direct and proximate cause of the Defendants' actions, Cox suffered emotional and physical torture, injury, and trauma; immense pain and suffering; humiliation; terror; and ultimately, death (hedonic damages).

### COUNT II –
**Plaintiff v. Defendants' Hendry and Feipel Eighth Amendment
– Supervisory Liability
(pursuant to 42 U.S.C. § 1983)**

108.     Paragraphs 1-91 are stated herein by reference.

109.     The Eighth Amendment protects inmates against infliction of "cruel and unusual punishment."

110.     A supervisor may be held liable for his/her actions that cause a constitutional injury.

111.     The supervisory Defendants failed to properly train the subordinate Defendants regarding the responsibilities associated with their respective employment positions.

112.     The supervisory Defendants failed to properly supervise the subordinate Defendants to ensure that the subordinate Defendants were properly performing their employment duties.

113.     The supervisory Defendants were responsible for the health and safety of inmates, like Cox, who were in their custody.

114.     The supervisory Defendants may not delegate the constitutional duties that they owed to Cox to subordinate employees.

115.    The supervisory Defendants failed to implement or follow a lawful inmate classification system that identified predator and non-predator inmates, and those suffering from mental health problems, which directly resulted in Brown and Cox being housed together in a single cell.

116.    The supervisory Defendants placed, or permitted to remain, a particularly aggressive and violent inmate, complaining of mental health problems, Brown, in a cell with a much smaller inmate, Cox.

117.    Defendants Hendry and Feipel had direct knowledge that officers were engaging in unlawful conduct.

118.    Defendants Hendry and Feipel, as policymakers and/or by virtue of the authority of their offices, had the opportunity to stop the criminal conduct from occurring but neglected to do so.

119.    Instead, they refused to investigate or retaliated against investigators who investigated criminal wrongdoing.

120.    Importantly, Defendants Hendry and Feipel knew that their conduct would cause officers to either act, or continue to act, unlawfully, but failed to stop them from doing so.

121.    As a result, the supervisory Defendants' actions and inactions were the direct cause of Cox's death.

122.    As a direct and proximate cause of the Defendants' actions, Cox suffered emotional and physical torture, injury, and trauma; immense pain and suffering; humiliation; terror; and ultimately, death (hedonic damages).

## COUNT III

**Plaintiff v. Defendants Rose, Bailes and Conrad Eighth Amendment
– Failure to Render Aide
(pursuant to 42 U.S.C. § 1983)**

123.  Paragraphs 1-91 are restated here by reference.

124.  Defendants Rose, Bailes and Conrad were physically on the floor around cell D2210 when Cox was attacked and murdered by Brown.

125.  They had subjective knowledge that Brown and Cox were not permitted to be housed together but were actually locked down within cell D2210 together.

126.  As soon as the attack began, other inmates began screaming and banging and kicking on their cell doors hollering "man down" in order to summons help for Cox.

127.  Rose, Bailes, and Conrad were alerted and knew the attack was taking place and knew Cox was locked down with Brown in cell D2210.

128.  Inmates claim it was 30 minutes before anyone came to cell D2210 despite being in a position to do so and hearing the screams and alerts from other inmates.

129.  By the time Rose and Conrad arrived, Cox had already been attacked and was in need of medical assistance.

130.  Conrad was a nurse and should have immediately recognized Cox was unconscious with obvious injuries and in need of emergency care.  Rose and Bailes knew Cox was in need of emergent care.

131.  No care was started, nor was an evaluation of his condition performed.

132.  Approximately another 30 minutes later a second group of nurses arrived and began CPR and paramedics were called.

133.  A full hour went by before any attempts to save Cox's life were undertaken.

134.  As a result of their failure to take action to aide Cox, Conrad's employment was

terminated.

135.  As a result of the actions or inactions of Defendants Bailes, Rose and Conrad, Cox died from the injuries he suffered in the attack.

136.  As a direct and proximate cause of the Defendants' actions, Cox suffered emotional and physical torture, injury, and trauma; immense pain and suffering; humiliation; terror; and ultimately, death (hedonic damages).

## COUNT IV

**Negligence Against The State of Florida Department of Corrections through
Julie Jones in her Official Capacity as Secretary of the Florida Department of Corrections**

137.  Paragraphs 1-91 are restated herein by reference.

138.  Plaintiff has met all conditions precedent to filing this action including filing a notice under Florida Statute 768.28.  The Notice is attached to this Complaint as **Exhibit B**.

139.  At all times material, Christopher Cox and Hurley Brown were inmates at MCI and under the custody and care of the Florida Department of Corrections.

140.  The State of Florida owes the inmates a duty of care to protect them from obvious dangers within the Florida prison system presented by other inmates and provide for their wellbeing while in custody.

141.  The State breached its duty of care to Inmate Cox by negligently placing him in a locked cell with a dangerous and predatory inmate who was of a different race, physically bigger and stronger and who had expressed mental health problems and was designated to be kept separate.  The State further failed to check on Inmate Cox even after being alerted to the attack.

142.  The State further breached its duty by failing to come to the aide of Inmate Cox before, during and after the attack.

143.  As a direct and proximate result of the State's breach of its duty, Inmate Cox

suffered emotional and physical torture, injury, and trauma; immense pain and suffering; humiliation; terror; and ultimately, death (hedonic damages).

**WHEREFORE**, Plaintiff respectfully requests that judgment be entered in her favor as follows:

A.      That this Court issue a declaratory judgment, declaring that the Defendants' actions violated the decedent's constitutional rights;

B.      Compensatory damages including but not limited to the monetary value associated with the following: loss of enjoyment of life, torture, immense pain and suffering, humiliation, terror, and death (hedonic damages);

C.      Punitive damages;

D.      Reasonable attorney's fees and costs;

E.      A jury trial; and,

F.      Such other financial or equitable relief as is reasonable and just.

## JURY TRIAL DEMAND

Plaintiff respectfully requests a trial by jury on all claims/issues in this matter that may be tried by a jury.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th of September, 2017, the above document was electronically filed with the Clerk of Court by using the Court's Electronic Case Filing System, and relied upon the system's automatic service of this document to all counsel of record.

/s/ James A. Wardell
JAMES A. WARDELL, ESQUIRE
Florida Bar No.:  0868061
WARDELL LAW FIRM, P.A.
805 W. Azeele Street
Tampa, FL  33606

Telephone:  (813) 387-3333
Facsimile:  (813) 387-3050
jwardell@jawlaw.net
kdaley@jawlaw.net