Monica Stone in RE: the Estate of Christopher
Cox v. Robert Hendry, et al.

2:17-CV-14177/ROSENBERG

Transcript of the Testimony of:

# Kris Sperry, M.D.

March 2, 2018



800.899.7222 • www.GramannReporting.com

MILWAUKEE   414.272.7878 • FAX: 414.272.1806 • 740 North Plankinton Ave, Suite 400, Milwaukee, WI 53203
MADISON   608.268.0435 • FAX: 608.268.0437 • 14 West Mifflin Street, Suite 311, Madison, WI 53703

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

--------------------------------------------------------

Case No. 2:17-CV-14177

MONICA STONE, as the Executor De Son Tort
on behalf of ESTATE OF CHRISTOPHER COX,

     Plaintiffs,

     vs.

ROBERT HENDRY, ROBERT FEIPEL,
CHRISTOPHER ROSE, CHARLES MARTEEN,
DAVID BAILES, CAROLYN CONRAD, and
THE STATE OF FLORIDA through JULIE L. JONES,
in her official capacity as Secretary of the
Florida Department of Corrections,

     Defendants.

--------------------------------------------------------

Deposition of KRIS SPERRY, M.D.

Friday, March 2, 2018

7:44 p.m.

at

GRAMANN REPORTING
740 North Plankinton Avenue
Suite 400
Milwaukee, Wisconsin 53203

Reported by Alexandria Klier

```
 1              Deposition of KRIS SPERRY, M.D., a witness in

 2    the above-entitled action, was taken at the instance of the

 3    Defendants, pursuant to Chapter 804 of the Wisconsin

 4    Statutes, pursuant to notice, before Alexandria M. Klier,

 5    Notary Public, State of Wisconsin, at Gramann Reporting, 740

 6    North Plankinton Avenue, Suite 400, Milwaukee, Wisconsin, on

 7    the 2nd day of March, 2018, commencing at 7:44 p.m. and

 8    concluding at 9:09 p.m.

 9

10                    A P P E A R A N C E S

11            (Telephonic Appearance)
              LAW OFFICE OF JAMES V. COOK, by
12            Mr. James V. Cook
              314 West Jefferson Street
13            Tallahassee, Florida 32301
              Appeared on behalf of the Plaintiffs,
14
              (Telephonic Appearance)
15            COLE, SCOTT & KISSANE, P.A., by
              Ms. Claire R. Hurley
16            Esperante Building
              222 Lakeview Avenue, Suite 120
17            West Palm Beach, Florida 33401
              Appeared on behalf of Carolyn Conrad,
18
              (Telephonic Appearance)
19            WHITELOCK & ASSOCIATES, P.A., by
              Ms. Sheri-Lynn Corey-Forte
20            300 Southeast Thirteenth Street
              Ft. Lauderdale, Florida 33316
21            Appeared on behalf of Christopher Rose and
              David Bailes,
22
              (Telephonic Appearance)
23            WILLIAMS, LEININGER & CROSBY, P.A., by
              Mr. Philip Wiseberg
24            11300 US Highway One, Suite 300
              North Palm Beach, Florida 33408
25            Appeared on behalf of Robert Hendry, Robert Feipel
              and Department of Corrections.
```

```
 1                         I N D E X

 2    EXAMINATION BY:                              PAGE:

 3    Ms. Hurley                                       4

 4    Mr. Wiseberg                                     38

 5    Mr. Cook                                         60

 6

 7                      E X H I B I T S

 8              (No exhibits were marked.)

 9

10                    R E Q U E S T S

11              (No requests were made.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              T R A N S C R I P T   O F   P R O C E E D I N G S

 2                   KRIS SPERRY, M.D., called as a witness

 3         herein, after having been first duly sworn, was

 4         examined and testified as follows:

 5                   E X A M I N A T I O N

 6    BY MS. HURLEY:

 7    Q    Good evening, Dr. Sperry.

 8    A    Good evening.

 9    Q    My name is Claire Hurley and I represent Carolyn Conrad

10         in this matter.  Thank you for making yourself

11         available here tonight, and I appreciate you handling

12         this over telephone.  I know you've been deposed

13         before, just given the fact we're all over the phone,

14         if we can all just try to wait a little bit after we're

15         done with our questions or our answers, you know, to

16         take into account for any kind of interference or allow

17         people to object, if need be.  Dr. Sperry, what is your

18         specialty?

19    A    I'm a forensic pathologist.

20    Q    How did you get involved with this case?

21    A    Mr. Cook contacted me, I believe, in January of this

22         year and asked me to review the case.

23    Q    In January of 2018, that is?

24    A    Yes.

25    Q    And what were you asked to do?
```

```
 1   A   Well, to review the records and materials that he

 2       provided me, and give an opinion as far as the cause of

 3       death of Mr. Cox, and also look at issues regarding

 4       potential survivability or whether or not he actually

 5       -- Mr. Cox -- was dead at the time when Nurse -- excuse

 6       me, Nurse Conrad examined him or subsequent to that

 7       time, and really to -- also, to just essentially

 8       clarify as much as I could: the injuries, the nature of

 9       the injuries that Mr. Cox sustained, and what they

10       would have -- you know, how they would have affected

11       him.

12   Q   Okay.  All right.  And doctor, can you tell us how is

13       it that you spend your professional time: meaning can

14       you break it up in terms of legal forensic work and

15       professional work?

16   A   Sure.  Well, I was the chief medical examiner for the

17       State of Georgia for almost 18 and a half years, and I

18       retired from service with the State of Georgia on

19       November 1st of 2015.  And since that time, besides

20       being retired, I've been engaged in general consulting

21       in forensic medicine and pathology in a wide array of

22       civil and criminal kinds of cases.

23   Q   Okay.  So since 2015, has 100 percent of your

24       professional time been devoted to legal forensic

25       work?
```

```
 1   A   Yes.

 2   Q   Well, let's just go back then to -- for the past three

 3       years, are you able to tell me -- well, I guess would

 4       100 percent of your income then be derived from legal

 5       forensic work?

 6   A   Well, consulting work, yes, in forensic medicine and

 7       forensic pathology, and then, of course, I have my

 8       pension from the State of Georgia.

 9   Q   Okay.  Thank you.  Over the last three years, can you

10       tell me the percentage of cases that you are reviewing

11       on behalf of the plaintiff versus the defendant?

12   A   Well, I have to split it up.  You know, prior to my

13       retirement, I was not engaged in looking at any

14       criminal cases where I was reviewing -- reviewing the

15       case on behalf of -- of a defendant, but since I

16       retired, I -- well, my time is split now between

17       criminal and civil work, and probably easily --

18       probably 50 percent or so, I'm estimating, of the cases

19       I look at are criminal, and the other 50 percent are

20       civil.  And of the civil matters, I'd say they're split

21       probably -- right now, probably about 50/50 for

22       plaintiff versus defense.

23   Q   Thank you.  I saw on your curriculum vitae that we've

24       been provided, it looks like you've provided your

25       testimony list for trial and deposition since January
```

```
 1            of 2015?

 2    A     Yes.

 3    Q     And I noticed that -- all right, thank you.  I noticed

 4            that I saw Mr. James Cook's name on that just one time

 5            in the past three years; have you worked with Mr. Cook

 6            on any other cases outside of this one and --

 7    A     Well, yes.  I mean, I -- yeah, I've -- I think I've

 8            looked at maybe a couple of others that he's, you know,

 9            asked me to review for him, but I -- you know, I told

10            him -- well, at least I didn't have any opinions that I

11            could -- that after reviewing the cases, that I could

12            assist him with.

13                    And actually, the first time I met him was,

14            oh, three or four years ago maybe; I was actually

15            testifying on behalf of the defense in a matter that

16            he -- that Mr. Cook was the plaintiff's attorney on,

17            and this ended up going to court in federal court --

18            where was that -- I'm thinking in Panama City perhaps,

19            so that was where, you know, I first met Mr. Cook.

20            And then since that time, he asked me to look at a

21            few things that he's -- where he's representing

22            individuals.

23    Q     Okay.  And -- so just to clarify, on your testimony

24            list it identified an attorney named James Cook from

25            Tallahassee, and that you were -- if I'm reading this
```

```
 1          right -- the testimony type was that you were providing
 2          a deposition on behalf of the plaintiff --
 3    A     Yes.
 4    Q     -- and that was in the Panama City case in December of
 5          2015, so in that case you were testifying -- or in that
 6          case you'd been retained by Mr. Cook; is that
 7          correct?
 8    A     Yes, ma'am.
 9    Q     Okay.  And then you're talking about -- you must have
10          met him prior to that time?
11    A     Yes, when I was -- I was the expert for the defense in
12          a matter where he, Mr. Cook, was representing the
13          plaintiff.
14    Q     All right.  Thank you.  Have you testified at
15          deposition or trial in any cases that are similar to
16          the one that you have provided opinions on in -- in
17          this Christopher Cox matter?
18    A     Similar -- similar in what way?
19    Q     Similar in the -- well, let's start with have you
20          provided testimony with respect to the cause of death
21          and survivability in prison inmate death cases outside
22          of this one?
23    A     Oh, yes.  I mean, I can't really tell you how many,
24          but it's, I mean, really going back two decades, maybe
25          even farther than that.  I mean, cases where inmates,
```

```
 1        you know, died in state or federal penitentiaries or

 2        even local, you know, county or city incarceration

 3        facilities are -- are not rare, and I have been -- you

 4        know, I've testified on behalf of plaintiffs, on behalf

 5        of defendants, on -- you know, quite a number of times.

 6        I mean, like I said, I really can't tell you, but it's

 7        -- it's not something that's particularly rare for

 8        me.

 9   Q    Okay.  And then taking that a step further with respect

10        to those cases where prison inmates have died, have you

11        testified in any cases where there's similar alleged

12        facts of death regarding the types of injuries that the

13        inmate sustained, the head and neck-type injuries?

14   A    Yes, yes.

15   Q    Okay.  Are you able to tell me the name or provide me

16        any information about those cases that you have

17        testified in?

18   A    No, I can't do that sitting here.  You know, if I had

19        my case list I might be able to point out occasional

20        ones here and there, but like I said, this -- you know,

21        the basic scenario or the fact set of inmates injured

22        or dying from injuries that they sustained while

23        incarcerated is -- like I said, it's -- well, fairly

24        common for a forensic pathologist, and, you know,

25        because those -- the people that died come to our
```

```
 1        attention by us performing autopsies on them, and -- I

 2        mean, I -- I know I've looked at cases like this going

 3        back 25, 30 years, as in mostly as part of my job as a

 4        forensic pathologist, but also occasionally as a

 5        retained consultant for one side or the other.

 6   Q    Okay.  But -- and just so that I can make sure that I'm

 7        understanding what you're -- what you're saying, are

 8        you -- have you provided testimony in a case involving

 9        the same or similar type of injury to a prison inmate

10        such as those that Mr. Christopher Cox sustained?

11   A    Yes.  I mean, head injuries, neck injuries, those are,

12        quite frankly, usually the most common types of

13        injuries that end up being lethal or potentially lethal

14        that are sustained during the course primarily being --

15        there's occasional stab wounds from shanks and some

16        other, you know, a little more unusual types of things

17        and --

18   Q    Okay.

19   A    -- occasional strangulations to homicidal

20        strangulations that I've looked at.

21   Q    Okay, thank you.  And just so I'm clear, you just can't

22        tell me, as you sit here today, the name or -- or

23        direct me to any case --

24   A    No, ma'am.

25   Q    Okay.
```

```
 1   A    I mean, that's -- that's one reason why at least I keep
 2        the case list, but quite honestly, there's just, you
 3        know, so many.  I've done over 6,600 autopsies myself,
 4        and seen and witnessed somewhere about another -- or
 5        supervised another maybe 88- to 90,000 others, so
 6        that's the -- they get kind of lost in the sands of
 7        time.
 8   Q    What -- how much do you charge for your time in these
 9        cases?
10   A    I charge $500 an hour for reviewing materials and
11        discussing cases, and if a report is necessary, then
12        for the generation of a report.
13   Q    And then what about for deposition testimony?
14   A    For depositions I charge $750 an hour with a two-hour
15        minimum, and then if -- for live courtroom testimony,
16        it's $7,500 a day, plus any applicable travel and
17        lodging expenses.
18   Q    Okay.  Do you -- have you been told that this case is
19        on a -- the court's trial calendar down in south
20        Florida?
21   A    No, I have not.
22   Q    Okay.  And now as I'm asking you the question I can't
23        remember the exact date, but I believe that it's in
24        May; are you -- are you able to present live at trial
25        in south Florida if it's called in May of 2018?
```

```
 1    A    Well, barring the unforeseen or an act of God, I should

 2         be there.

 3    Q    Okay.  All right.  Now let's ask you -- I -- we have

 4         your report that's dated January 31st of 2018, and

 5         doctor, did you bring that with you today?

 6    A    Yes, I do.  I have it.

 7    Q    Okay, perfect.  That report identified, at least in

 8         the first paragraph, things that you reviewed; it lists

 9         the autopsy report, second amended complaint, Florida

10         Medical Examiner Department -- I'm sorry, that's the

11         autopsy report -- the FDLE investigative report,

12         e-mails, the Martin County Sheriff's Office incident

13         report, and a transcript of a recorded interview with

14         Inmate Hurley Brown?

15    A    Yes.

16    Q    Have you reviewed any other materials in formulating

17         your opinions in this case?

18    A    Well, the only other thing that I've received was --

19         actually, I think it was earlier today -- yesterday,

20         actually; Mr. Cook sent me a document that I think is

21         62 pages, something like that, but it's -- I think it's

22         the complete medical examiner file from the District 19

23         Medical Examiner's Office regarding the autopsy and

24         investigation of Christopher Cox's death, and that's

25         the only other thing that I've received since I
```

```
 1        authored the report.

 2   Q    Okay.  Have you taken any notes?

 3   A    No, ma'am.

 4   Q    All right.  And this is the only report that you've

 5        generated in this case?

 6   A    Yes.

 7   Q    All right.  Have you spoken with Special Agent Jester

 8        who authored that FDLE investigative summary?

 9   A    No, ma'am.

10   Q    Have you spoken with any of the -- any of the inmates

11        referenced in that report?

12   A    Oh, no.  No.

13   Q    All right.  And then what about the medical examiner

14        Dr. O'Neil, have you spoken with her?

15   A    No.

16   Q    All right.  Have you spoken with anyone from her

17        office?

18   A    No.

19   Q    All right.  Obviously you didn't perform the autopsy in

20        this case, correct?

21   A    Correct.

22   Q    All right.  Did you review the autopsy photographs?

23   A    No, I've not -- I've not been provided those yet, and I

24        -- actually, I discussed that or I talked with Mr. Cook

25        about that a little earlier this afternoon, and he told
```

 1     me he has not yet been provided those photographs

 2     either, so he's not been able to get them to me.  So I

 3     don't know why he doesn't have those, but that's -- you

 4     know, that's not my issue.

 5 Q   Okay.  And those photographs are something that you

 6     would want to review --

 7 A   Yes, I --

 8 Q   -- to have a chance to review?

 9 A   Yes, they're part of the autopsy examination, and, you

10     know, so -- and as such, I would like to see those.

11 Q   Is it your understanding that there's no video of

12     actually what took place within Mr. Cox's cell on

13     March 15th, 2015, at the time of his assault?

14 A   Well, I would say that's accurate; at least in reading

15     through the FDLE report, there's no -- no reference

16     made at any point to any video recording that documents

17     what happened inside the cell, so at least my

18     conclusion is that no such video exists.

19 Q   Okay.  And in formulating your opinion, you say, in

20     part then, that they rely upon the -- the summaries of

21     the interviews of SA Jester, that he -- I'm sorry, of

22     Special Agent Jester, that he had with the various

23     inmates and nurses and corrections officers in this

24     case, right?

25 A   Yes.  Yes, they do.  And he certainly -- in his

```
 1              interviews, he establishes various time lines as

 2              well.

 3    Q    All right.  And then your opinions also rely upon the

 4              time line of his review of the video footage that's

 5              contained within his report; is that correct?

 6    A    Yes.

 7    Q    All right.  So I wanted to talk to you a little bit

 8              about your understanding of the time line of events

 9              here and your basis for that.  SA Jester has documented

10              that the video footage shows that at 1825 there was a

11              cell check or cell checks were performed of the

12              inmates; is that also your understanding?

13    A    Yes.

14    Q    All right.  And then you understand from review of the

15              evidence -- a review of the materials that you've

16              reviewed in this case that there was a shift change of

17              the officers at about 7 o'clock?

18    A    Yes.

19    Q    All right.  What is your understanding of the time that

20              the assault happened?

21    A    The best understanding that I was able to glean is

22              really from Agent Jester's report.  And there is one

23              interview that he conducted with an inmate -- I think

24              his name is Gallagher -- Gallagher believed that the

25              assault happened somewhere around 1850 and 1900 hours,
```

```
1         or 6:50 to 7:00 p.m., that was his estimation, and that

2         was, as I recall, the only actual specific times that

3         Agent Jester was able to get or at least documented

4         from any of his interviews.  Other interviews were --

5         well, just didn't really have actual times; it was

6         more, kind of, general approximations, but it didn't

7         really pin down a specific time frame that I could

8         see.

9    Q    Sure.  And the general approximation or so shows

10        about 30 minutes prior -- or 30 minutes from the time

11        of the -- the alleged assault until the time that

12        the responders arrived at the cell; is that what you

13        saw?

14   A    Yes, that -- yeah, that's basically what I recall, that

15        -- that it was the estimations that were given.

16   Q    Okay.  So for purposes of formulating your opinion, you

17        utilized Gallagher's statement that it was between 6:50

18        and 7:00 p.m. at the time of the assault?

19   A    Well, I did only -- I mean, only -- well, for two

20        reasons: one is -- we just -- I just talked about; the

21        -- that's the only interview that I recall that

22        actually set down actual times; and secondly, it was

23        actually just exactly what you said.  The other

24        interviews, although not specific, put the assault

25        somewhere, you know, a half hour or thereabouts -- I
```

```
 1        mean, I'm paraphrasing, obviously -- prior to the time

 2        that the officer and Nurse Conrad entered the cell.

 3   Q    Okay.  And is your understanding of when the officer

 4        and Nurse Conrad entered the cell at 19- -- I have

 5        1928, so 7:28 p.m.?

 6   A    Yes.

 7   Q    All right.  So that's about a half hour -- well, I

 8        guess 40 -- half hour to 40 minutes from the time that

 9        Gallagher says the assault occurred --

10   A    Yes.

11   Q    -- is that correct?  Okay.  And then just following up

12        on the time line, you understand that according to

13        SA Jester, he saw Conrad leave the cell at 1935

14        followed by Officer Feipel shortly thereafter?

15   A    Yes.

16   Q    Okay.  And then additional nursing arrived at about

17        1941?

18   A    Yes.  Yeah, two other nurses --

19   Q    All right.

20   A    -- arrived, yes.

21   Q    Okay.  What's your understanding of what -- of what

22        happened to Christopher Cox within the cell?

23   A    Okay.  What's -- you mean -- well, the only source for

24        that is Inmate Brown -- yeah, Hurley Brown, so -- I

25        mean, there's what Brown says that happened, although
```

```
 1        his story changed somewhat, versus, you know, what -- I

 2        mean, what the injuries show, so how do you want me to

 3        address that?

 4   Q    Sure.  You've agreed there isn't a video that you were

 5        able to look at to say this is what happened during the

 6        assault?

 7   A    Yes.

 8   Q    So just what is your understanding of -- of what

 9        happened during the assault, so of what Hurley Brown

10        did?

11   A    Okay.  Well, it's -- and I think the best summary, at

12        least, is Agent Jester's interview with Hurley Brown

13        from the FDLE report.  I mean, Brown says that he -- I

14        think Cox was -- that Brown was asleep, he thought Cox

15        was trying to tie a sheet around the end of the bunk in

16        order to attach it to -- well, he said the item on

17        Cox's neck; Brown did not want Cox to do that.  Then

18        Brown says that Cox became angry, and that Brown tried

19        to go back to sleep, but then according to Brown, Cox

20        jumped on Brown and began -- began hitting Brown in the

21        back of the head, so Brown began to fight.

22              He said he was able to get Cox to the floor

23        where he then punched him and kicked Cox several times;

24        he stomped Cox's head with his bare feet, and Cox's

25        head bounced off the concrete floor a few times.  He
```

```
 1        said Brown described Cox as being on his stomach during

 2        this; Brown stated he fought Cox until the fight was

 3        over, and then Brown stopped fighting.  He thought that

 4        Cox was making a gagging noise and was, quote, "having

 5        a seizure"; he -- Brown asked inmates to bang on the

 6        doors to get attention of corrections officers, and

 7        they put -- then he put a pillow under Cox's head, and

 8        I think that was basically --

 9    Q   All right.

10    A   -- basically the -- the sequence of events, as Brown

11        describes then.

12    Q   Okay.  Do you also have an understanding that one of

13        the inmates saw Hurley Brown actually choking

14        Mr. Cox?

15    A   Yeah.  As I recall, he -- he could see through the --

16        the window into the cell, he could see Brown's arm

17        around Cox's neck, and I think he recalled Cox as

18        having his eyes bugged out, but then shortly thereafter

19        there was --

20    Q   Okay.

21    A   -- I think, a shirt hung over the window, so he

22        couldn't see anything else.

23    Q   All right.  So in formulating your opinion, you have --

24        or you -- you have the basis from these -- from what

25        the inmates have said, that Mr. Cox was -- was choked,
```

```
 1        his neck and head were stomped on, his head was

 2        bouncing off of the floor, and then his -- he was

 3        placed face down on a pillow --

 4   A    Basically --

 5   Q    -- is that all?

 6   A    -- yeah, basically.  Yes.

 7   Q    Okay.  All right.  And this all happened sometime

 8        between 30 to 40 minutes prior to anybody arriving at

 9        the cell?

10   A    Yes, that seems to be, at least, the -- the general

11        reasonable time frame.

12   Q    Okay.  Are you able to say -- well, I guess is your

13        opinion -- is your opinion based on a belief or an

14        understanding that he -- Mr. Cox's face was down on

15        this pillow for 30 to 40 minutes prior to anybody

16        coming to the cell?

17   A    Well, it certainly could have been.  I mean, if Brown

18        is at least telling the truth about that particular

19        aspect of -- of the sequence of the assault, then Cox

20        very well had his -- could have had his face down on

21        the pillow.  Now Brown himself said that Cox's head was

22        turned to the side, that's in his statement, but I

23        believe when Cox was found, it was, I believe, the

24        corrections officer who was -- who accompanied the

25        nurse, Conrad, into the cell.
```

1        They described his face as being on -- you

2        know, in the pillow, although, I think the other --

3        see, the other corrections officer, is that name Rose;

4        is that the right name?  He -- he described Cox as

5        laying on his side, you know, with his head on the

6        pillow, so there's -- clearly there's some differences

7        in -- in different individuals as far as what -- how

8        they're describing the exact position of Mr. Cox's head

9        on the pillow, whether -- it seems to be pretty

10       uniformly that he was face down, although possibly on

11       his side, but also, it's, you know -- well, Brown says

12       that when he put Cox onto the pillow, that Cox's head

13       was turned to the side, so that's -- that's the best --

14   Q   All right.

15   A   -- I can say.

16   Q   Okay.  But in formulating your opinions -- then does it

17       not matter to you, at least in formulating your

18       opinions, that Mr. Cox's -- if Mr. Cox is face down on

19       the pillow for a half hour versus if his head was

20       turned to the side on the pillow for a half hour?

21   A   Well, it matters some in the sense that I think Mr. Cox

22       was unconscious, you know, at -- by the time that Brown

23       at least finished the physical part of the assault.

24       And being unconscious, he would not be able to protect

25       his airway.  If -- if he was -- if Cox was face down in

```
 1        the pillow, this could have created a situation of

 2        suffocation that would have, you know, essentially been

 3        the last thing that culminated in his death, but if his

 4        nose or mouth or both were exposed, as if his head was

 5        turned, then he would not have suffocated.  But this,

 6        you know, then -- well, his brain would have continued

 7        to swell, but -- so if his face -- if he was face down

 8        in the pillow, this would have created, like I said, an

 9        environment of -- that would have at least probably

10        initiated some element of suffocation that contributed

11        to the death.

12   Q    All right.  And are you able to say within a reasonable

13        degree of medical certainty whether or not he was

14        suffocated because his face was face down in the

15        pillow?

16   A    Well -- okay.  If he was face down in the pillow -- I

17        mean, I think some element of suffocation, you know,

18        can't -- I -- can't be ignored.  The problem comes in

19        though, is how much, you know, if his -- if his nose

20        and mouth were completely occluded which, frankly, I

21        don't think so because his brain is tremendously

22        swollen.

23             The swelling of the brain is something that

24        takes quite a while.  I mean, many minutes to develop

25        and progress, and if -- if Cox was placed face down on
```

```
 1        the pillow such that he was suffocating, then I don't
 2        think there would have been enough time for the brain
 3        to really swell before -- before he died; then, of
 4        course, he would have been dead by the time that the
 5        corrections officer and Nurse Conrad got to the cell,
 6        but then, at the same time, I would not have expected
 7        his brain to be as swollen as it was, so -- you know,
 8        partial suffocation --
 9   Q    Well, let's just --
10   A    Okay.  So it's -- you know, suffocation is not all or
11        nothing, I guess is the best way I can say it.
12   Q    Sure.  And I just want to make sure I'm getting that
13        correctly --
14   A    Sure.
15   Q    -- you're saying that because of how his brain was, the
16        state of his brain during the autopsy, how it was
17        found, you're saying within a resonable degree of
18        medical probability that he could not have had his face
19        down on the pillow, is that correct?
20   A    Okay.  He could not have had his face down on the
21        pillow blocking his nose and mouth to such an extent
22        that -- that he died rapidly; that is, his nose and
23        mouth were not completely blocked.  If they -- if they
24        had been completed blocked, he would have died very
25        rapidly, but if --
```

```
 1   Q    Okay.

 2   A    -- there was at least -- you know, if they were

 3        incompletely blocked, he would be able to breathe to

 4        some extent.

 5   Q    And as you sit here today, you don't know whether or

 6        not they were completely blocked or whether they were

 7        not completely blocked?

 8   A    Not -- not as far as, you know, being -- you know,

 9        seeing exactly how he was positioned in the cell;

10        there's, you know, there's no one that knows that

11        specifically.  I can just -- you know, all I can do --

12        work with are the descriptions as they are provided;

13        and then as I said, the swelling of the brain is an

14        element that is very significant because that weighs

15        against a rapid suffocation.

16   Q    All right.  So meaning that because it was so swollen,

17        you don't believe that he could have been rapidly

18        suffocated; the suffocation wouldn't have happened

19        immediately prior to his death, is that what you're

20        saying?

21   A    Oh, well, the -- the suffocation would not have

22        progressed rapidly; once he was positioned with his

23        face down in the pillow, he did not rapidly suffocate

24        because otherwise, his brain would not have been so

25        severely swollen.  Is that making sense?
```

```
 1   Q    Yep, it does.

 2   A    Okay.

 3   Q    Let me ask you about your opinions that you have in

 4        your report.  Okay.  The first one you have is that you

 5        believe Christopher Cox died of the complications of

 6        blunt force injuries to the head and neck?

 7   A    Yes.

 8   Q    Which included a closed head injury.  You reviewed the

 9        autopsy report of Dr. O'Niel?

10   A    Yes, ma'am.

11   Q    All right.  So then you agreed with her cause of death

12        as -- was blunt trauma injuries to the head and the

13        neck?

14   A    Yes.

15   Q    All right.  So the second sentence I just need some

16        help understanding; you have in parenthesis, "which

17        would not, in and of itself, have been fatal or

18        significantly life-threatening"; what are you talking

19        about there?

20   A    I'm talking about the -- specifically the cerebral

21        contusions, or colloquially, the bruises on the brain,

22        but they're actually, you know, small hemorrhages

23        within the brain substance itself that were found in, I

24        believe, the frontal and occipital regions of the -- of

25        the brain.  And then the subarachnoid hemorrhage which
```

```
 1        was, again, relatively localized; it's the hemorrhage

 2        on the surface of the brain in the front and the back

 3        areas, but it was relatively small.  And those -- those

 4        injuries, some small localized contusions and a small

 5        amount of subarachnoid hemorrhage, in and of itself,

 6        would not be lethal, that's --

 7   Q    Okay.

 8   A    -- that's readily survivable, so that those -- those

 9        specific injuries would not have killed him.

10   Q    Okay.  What did kill him was the blunt force injuries

11        to the head and the neck?

12   A    Well, ultimately -- I mean, the totality of everything

13        that -- that he had.  I think, you know, the blunt

14        force injuries of the neck were certainly -- well, I

15        think were much more significant, but then I think the

16        -- the element of asphyxia or suffocation was -- was

17        really the -- well, the final -- the final element that

18        caused his death.

19   Q    All right.  You also indicated the neck injuries were

20        most consistent with the kicking and stomping of the

21        neck?

22   A    Yes.

23   Q    So you agree with -- or do you agree with Dr. O'Neil

24        then in the manner of his death being a homicide?

25   A    Oh, yes.  Yes.  All these injuries were inflicted by
```

```
 1        someone else, yes, and that's for -- for forensic

 2        pathologists, that's the definition of a homicide.

 3   Q    All right.  You have in your third opinion on your

 4        report that the ligature was probably placed around his

 5        neck after he was rendered unconscious; what do you

 6        base that on?

 7   A    Well, there was -- I don't think the ligature really

 8        had anything to do with his death.  And if it was

 9        something that he himself put on his neck, I don't

10        think it was -- I mean, it had no efficacy at all; it

11        didn't really do anything.  You really can't strangle

12        yourself by putting something around your neck and, you

13        know -- and with a single overhand knot and just

14        pulling it, and I think that may well have been done in

15        an effort to conceal the -- you know, the fact that

16        Mr. Cox really had been beaten severely.

17   Q    Sure.  So you're saying then that -- that the shirt

18        around the neck, you don't believe could have caused

19        his death --

20   A    Correct.

21   Q    -- the injuries to his brain and neck that you saw,

22        okay --

23   A    Correct.

24   Q    -- but what about if Mr. Hurley -- what about if

25        Mr. Hurley Brown had choked him, would that have caused
```

```
 1        the injuries?

 2   A    You mean by -- you lost me there.  If -- if

 3        Mr. Hurley Brown had tied the ligature on him?

 4   Q    Well, you said -- no.  He says that he choked him --

 5   A    Oh, oh, put him in a choke-hold, okay.  Okay.  You're

 6        talking about the -- the other inmate who -- who saw

 7        Hurley Brown, you know, have -- having Cox in a

 8        choke-hold?

 9   Q    Correct.  When -- you just said that you didn't believe

10        that this ligature tied around his neck could have

11        caused his death --

12   A    Yes.

13   Q    -- and my question is whether or not a choke- -- the

14        choke-hold, if Hurley Brown had put him in a

15        choke-hold, that that could have caused the injuries to

16        his head and neck that were seen?

17   A    Okay, okay.  Yes.  So at least some of the neck

18        injuries, yes.  A choke-hold, depending on how it's

19        applied, could have resulted in the -- some of the

20        internal areas of bleeding and the muscles on the front

21        and back of the neck, and even the fracture of the

22        larynx itself, so yes, the -- a choke-hold, as the

23        other inmate described seeing through the open window,

24        could have caused those -- the internal evidence of

25        injury, yes.
```

```
 1   Q   All right.  What do you believe -- or what's the basis

 2       of your opinion that the cerebral edema would not have

 3       resulted from the blunt head trauma?

 4   A   Oh, well, it's because the -- the severity of the -- of

 5       the trauma was -- was not very great.  I mean, that --

 6       some small cerebral contusions and a small amount of

 7       subarachnoid hemorrhage will not result in severe

 8       swelling of the brain like this; it takes much greater

 9       trauma, much greater injury, the primary impact injury

10       of the head to result in severe generalized swelling of

11       the brain.

12                 Whereas hypoxia, that is, you know, the

13       absence or inadequate oxygen getting to the brain will

14       cause what's called global; that is, it affects the

15       entire brain and the brain starts to swell because the

16       lack of oxygen affects all of the brain cells.

17   Q   All right.  Have you made any supplements or do you

18       have any additions to this report before I continue?

19   A   No, ma'am.

20   Q   I forgot to ask you that question.

21   A   Yeah, no --

22   Q   All right.

23   A   -- no, there's -- there hasn't been anything I, at

24       least, have seen, that needed -- that caused me to make

25       a supplement.
```

```
 1   Q   All right, thank you.  You've indicated -- actually, up
 2       above the point where you said -- where your opinions
 3       are that the cerebral edema found in the brain clearly
 4       indicates that he was alive for at least some minutes
 5       after the assault --
 6   A   Yeah.
 7   Q   -- how long is at least some minutes?
 8   A   Well, that's a wonderful question.  Looking at the
 9       totality --
10   Q   Thank you.
11   A   -- of things, in general -- well, first of all, I said
12       several times, but just to underscore it, you know,
13       the brain does not swell really rapidly, it takes --
14       if, say, if -- say the blood flow to the brain is cut
15       off or oxygen is diminished, it takes time for the
16       brain to swell; in the majority of, say, strangulation
17       injuries that we see that -- where there's one -- a
18       strangulation event from start to finish, that usually
19       takes, oh, about three to four minutes or so of
20       continuous neck pressure.
21              When the person dies, there is no swelling of
22       the brain; there's just not enough time for that to
23       develop.  In general, it would -- it takes somewhere on
24       the order of about -- of a person being alive somewhere
25       perhaps about -- at least 15 to 30 minutes for the
```

1      brain to start swelling appreciatively so that, you

2      know, somebody like me can see it in an autopsy, so

3      that's why there's not a precise way to -- to give that

4      to -- to make such a determination just because it all

5      -- it depends on how much lack of oxygen the brain has

6      been subjected to, and then, you know -- and how long

7      it takes for the nerve cells to, you know, to start

8      dying; in other words, the more severe the hypoxic

9      insult, the more severe and progressive the cerebral

10     edema or the swelling of the brain is going to be, but

11     as I said a bit ago, it takes --

12  Q  Okay.

13  A  -- somewhere between maybe 15 to 30 minutes for the

14     brain to be noticeably swollen; 15 to 30 minutes of

15     survival after a hypoxic incident for a pathologist to

16     see swelling of the brain.

17  Q  Okay.  And in this circumstance, if there was a

18     choke-hold on -- on Mr. Cox, and that was followed by

19     this placement of his head on the pillow, I think you

20     said that that would have had some kind of -- I think

21     you wrote it would have further complicated this?

22  A  Well, yes.  And of course the --

23  Q  So what -- what --

24  A  -- the stomping and kicking injuries had to have come

25     into play, you know, at some time during, you know,

```
 1            either -- either before the choke-hold or frankly, I

 2            think most probably, afterwards.

 3   Q   So you said if there was one strangulation event, it

 4            would take a certain amount of -- of minutes of

 5            continued neck pressure?

 6   A   Yes.

 7   Q   Would you consider a choke-hold followed by the

 8            placement of this person's neck on the pillow for, you

 9            know, over ten minutes of time to be two strangulation

10            events?

11   A   Well, yeah, they'd be two.  Yes, and I understand --

12            that's -- that's very good --

13   Q   Okay.

14   A   -- the first episode really would be, well, a

15            strangulation or a choke-hold with -- with

16            circumferential pressure on the neck --

17            "circumferential," for the court reporter -- and the

18            second, the -- his face in the pillow, that would be

19            actually suffocation or an asphyxial event caused by

20            blockage of the nose and the mouth, at least --

21   Q   Okay.

22   A   -- to whatever extent was necessary to decrease the

23            amount -- his ability -- decrease his involuntary

24            ability to breathe adequately, so yes, that would be

25            two --
```

```
 1   Q    Would that --

 2   A    -- two asphyxial episodes; very good.

 3   Q    And would that be -- would that be more severe of a

 4        hypoxic insult, having those two asphyxiate -- asphyxia

 5        conditions occurring?

 6   A    It -- well, it -- I would say it depends upon the

 7        duration of the choke-hold; as I -- as I mentioned --

 8   Q    All right.

 9   A    -- in order to cause irreversible brain damage with a

10        choke-hold or a strangulation -- actually pressure on

11        the neck -- it takes at least three to four minutes of

12        constant pressure to -- you know, to achieve a brain

13        injury.  And at any point in time, if the pressure is

14        released, then, if you will, it sort of resets the

15        clock, so -- you know, at -- it takes about two to

16        three minutes of unremitting pressure on the neck for

17        irreversible damage to the brain to begin; before that

18        time, people will -- if the pressure is released,

19        they'll wake up, and -- you know, they won't be happy,

20        but they'll be all right.

21   Q    All right, sure.  And in this case, this is -- what

22        happens to Mr. Cox could have resulted in a more severe

23        hypoxic insult because it wasn't just a choke-hold, but

24        it was also followed by the kicking of the neck, the

25        kicking of the head, the banging of the head on the
```

```
 1         floor, and then the placement of the face directly into

 2         a pillow --

 3    A    Yes.

 4    Q    -- is that correct?

 5    A    Yes --

 6    Q    All right.

 7    A    -- and I think that's an accurate reflection of my

 8         thoughts in this.  And once -- you know, as I noted

 9         also in my report, that the head injuries -- that is,

10         the ones to the brain we were talking about earlier --

11         although they would not have been sufficient enough to

12         kill him, I think they, you know, more probably than

13         not would have rendered him unconscious.  And when that

14         happened, you know, if he was in a choke-hold and then

15         kicked and stomped and beaten and then rendered

16         unconscious, then once he was placed onto the pillow,

17         he would not be able to protect his airway, and that's

18         where the suffocation element comes into play.

19    Q    Okay.  And -- again, I think I already asked you this

20         question, so I apologize -- I believe you told me that,

21         in so many words, it's possible, based on what you

22         know, that he was placed face down on that pillow for

23         at least 30 minutes?

24    A    Yes, it certainly could be.

25    Q    Is that right?
```

1  A    Yeah, face down, and --

2  Q    Okay.

3  A    -- how his head was positioned is -- well, like I said,

4       the only one who -- that witnessed that during the

5       event was Mr. Brown who said his head was turned --

6       Cox's head was turned; that's all I can tell you.

7  Q    All right.  So when you wrote that Mr. Cox was alive

8       for at least some minutes after the assault due to the

9       cerebral edema found in the brain, you're not able to

10      tell me how many minutes he was alive after the assault

11      within any resonable degree of medical certainty,

12      correct?

13 A    The -- only to the extent -- as I told you earlier, the

14      time element would be, you know, at least 15 to 30

15      minutes because that's -- that's the variability in how

16      long it will take the brain to start swelling to the

17      extent to achieve the extent of swelling that was found

18      at the autopsy, but that's -- that's --

19 Q    Okay.

20 A    -- you know, I can't get any more precise than that.

21 Q    All right.  And that's kind of why I went through the

22      time line with you earlier.  So understanding that your

23      opinions are being based off of a time line that

24      considers that this assault occurred 30 to 40 minutes

25      prior to the officer and nurse arriving, you cannot

```
 1          tell me within a resonable degree of medical

 2          probability that at the time the officer and the nurse

 3          arrived at the cell, Christopher Cox could have

 4          survived, whether he was alive or dead --

 5    A     Yeah --

 6    Q     -- is that correct?

 7    A     -- no, I -- yes, I understand; and no, you know, I

 8          can't tell you that, only that the -- you know, at

 9          least based upon, as I've talked about for the last few

10          minutes, the injuries and the swelling of the brain,

11          that -- that, you know, he -- he could have been alive

12          and -- and survivable -- or have been in -- well, he

13          could have survived -- I'm phrasing that poorly, I'm

14          sorry -- but -- I mean, I can't be any more precise

15          than that just because -- well, for the obvious reasons

16          that there's -- there's no other way to be more

17          precise.

18    Q     Okay.  And couple of things that -- just to try to wrap

19          up here, Dr. Sperry, you don't have any law enforcement

20          training, is that correct?

21    A     Well, yeah, I'm not a trained law enforcement officer.

22          I guess it depends on what it is you're asking me; I

23          mean, I worked for a law enforcement agency for 18 and

24          a half years, and I've been involved in law enforcement

25          issues, you know, constantly for 30-some years just
```

```
 1           because of -- of what I'm -- you know, because I'm a
 2           forensic pathologist, but I'm not a -- you know, a
 3           certified trained law enforcement officer, no.
 4    Q      Right.  Okay.  And you're not a -- like a prison and a
 5           jail consultant?
 6    A      No, ma'am, I'm not an expert in prisons and jails and
 7           those things.
 8    Q      Are you offering any opinion on whether or not any of
 9           the defendants in this case acted with deliberate
10           indifference?
11    A      No, that's -- that's interesting.  That's -- to me,
12           that's a legal conclusion, and I'm not -- I'm not sure
13           -- I'm -- well, in my role as a forensic pathologist,
14           I'm not sure how to define it.  I mean, I think there's
15           elements of, sort of, stupidity involved and -- well,
16           things that really should have been done differently
17           because that -- that's really how people are -- are
18           trained -- should be trained, but as far as deliberate
19           indifference, I don't know that I can give you an
20           opinion about that one way or the other.
21    Q      All right.  Okay.  Have I covered all of your opinions
22           for today, Dr. Sperry?
23    A      Well, I -- you know, I think so.  You've asked good
24           questions, and, you know, I feel like I've expressed
25           everything that -- that I feel are my opinions, so I
```

```
 1              can't think of anything else.

 2  Q    Okay.  All right.

 3              MS. HURLEY:  Well, I thank you for your time.

 4       And I'll pass the witness.  Thank you.

 5              THE WITNESS:  Thank you, ma'am.  I've enjoyed

 6       it.

 7              MS. HURLEY:  Anybody else?

 8              THE WITNESS:  They're all taking naps.

 9              MR. WISEBERG:  Hello.  No, I'm here.

10                    E X A M I N A T I O N

11  BY MR. WISEBERG:

12  Q    This is Attorney Phil Wiseberg, Dr. Sperry.  How are

13       you?

14  A    I'm great.  How about yourself?

15  Q    Good.  I just want to cover some additional things and

16       follow up on some things Ms. Hurley said, and my goal

17       is not to repeat things she said, opinions that you've

18       had, but I want to find out prior to the deposition

19       today, how many times have you spoken to Mr. Cook in

20       regards to this case and your opinions?

21  A    Probably -- maybe two or three.

22  Q    And have all those contacts been by phone with him?

23  A    Yes.

24  Q    Have you had any in-person contacts or discussions with

25       Mr. Cook regarding this case and your work on it?
```

```
 1   A   Oh, no.

 2   Q   Okay.  On your report, it lists the company Sperry

 3       Forensic Pathology Consultants; that's your company,

 4       correct?

 5   A   Yes, I incorporated myself about 20 -- actually, 20

 6       years ago last year, so I'm in my 21st year, woo-hoo.

 7   Q   Other than yourself, is there anyone that is associated

 8       with that company?

 9   A   My wife, she plays the vitally important role as

10       bookkeeper, so she's superior to me in that.  I just do

11       the work, she keeps track of everything else.

12   Q   There's no other pathologists --

13   A   No, sir.

14   Q   -- you employ or have on an independent contractor

15       basis, you are the sole person that determines opinions

16       when they're retained on these types of cases,

17       correct?

18   A   Correct.

19   Q   You said that you were the medical examiner for the

20       State of Georgia, is that correct?

21   A   Yes.

22   Q   And you resigned from that -- or retired from that

23       position on November 1st of 2015, correct?

24   A   Yes.

25   Q   Prior to the time that you retired from being a medical
```

```
 1           examiner for the State of Georgia, were you doing some
 2           of the work you're currently doing now which is, you
 3           know, what I would like to call it, sort of,
 4           private-party forensic legal work?
 5    A      Oh, yes.  Yes, for many years.
 6    Q      How -- how long have you been doing this private-party
 7           forensic legal work?
 8    A      I've been acting as a consultant -- actually, the first
 9           time I was contacted was in 1983.
10    Q      And do you -- okay.  Have you ever had, to the best of
11           your knowledge, any court limit your opinions as to
12           what you can testify to?
13    A      Not -- not that I recall.  I mean, it's -- that's an
14           odd question in the sense that sometimes there are
15           things that -- I mean, that the attorneys and the court
16           decide that, you know, I'm not going to express before
17           I testify; well, for instance, once many years ago I
18           caused a mistrial by using the words "child abuse" when
19           I was testifying, and -- so, you know, the defense
20           attorney objected, and then the judge decided to call a
21           mistrial, so I don't use those words anymore unless --
22           unless I'm told that it's okay.
23                  That's -- I mean, I -- all I can tell you is
24           on occasion, you know, like I said earlier, a court
25           will decide -- or the attorneys may decide that, say, a
```

```
 1          certain thing that I may have an opinion about, even

 2          like the manner of death, for instance, that -- that

 3          they're not -- that they don't want me to say that a

 4          death is a homicide, so -- which is fine, so -- you

 5          know, I'm -- that's clarified to me, and then I go

 6          on.

 7     Q    Sure --

 8     A    Does --

 9                    [Simultaneous speaking.]

10     A    -- does that make sense, what I'm telling you?  Okay --

11     Q    Has a court of law ever fully barred you from

12          testifying and prevented you from testifying at all

13          regarding opinions that you've had in one of these

14          cases you've done work for?

15     A    No.

16     Q    Okay.  Do you currently have licenses -- do you

17          currently have active licenses to practice medicine?

18     A    Oh, absolutely, yes.

19     Q    How many states have you had your license to practice

20          medicine in your career?

21     A    Well, I had -- the first license I ever had was in

22          Minnesota, but I let that lapse; I was in the public

23          health service from 1979 to 1981, and I swore I'd never

24          go back there; it was too cold.  And -- so then after

25          that I've had licenses -- I have active licenses in
```

```
1            New Mexico, Kansas, Georgia and Wisconsin.

2    Q    Have you ever had any discipline on any of those

3         medical licenses?

4    A    No.

5    Q    You had said other than what is listed in your report,

6         the only additional materials you've been provided was,

7         I guess, a more-complete medical examiner report; is

8         that correct?

9    A    Yes, I think it's their file, you know, there's -- I

10        think, like 62 pages.  There was other information

11        there -- other documents in there that was -- were not

12        part of the autopsy.

13   Q    And your -- you've reviewed the full medical examiner

14        report including the autopsy, is that correct?

15   A    Yes.

16   Q    Do you have any disagreement with any of the findings

17        by the medical examiner as to Mr. Cox's cause of

18        death?

19   A    No.  Just looking in the way that she -- no, I don't --

20        I don't have any disagreements, really.  I mean, she

21        ascribed virtually everything to really -- to blunt

22        trauma, and I think so; you know, I agree with that.

23        She didn't really discuss, one way or the other,

24        elements of asphyxia, either strangulation or

25        suffocation.
```

```
 1   Q   The ME -- so from what you're saying, the ME report

 2       said -- gave as much detail as you have as to whether

 3       asphyxiation contributed at all to the death of

 4       Mr. Cox?

 5   A   Yes, that's -- I agree, that's a good way to put it,

 6       yes.

 7   Q   Okay.  Do you have any disagreement with the medical

 8       examiner's physical findings related to the injury that

 9       she saw to Mr. Cox?

10   A   Well, no.  I mean, I've not seen the photographs myself

11       which, as I indicated earlier, I would like to see

12       those, but I found her descriptions to be very thorough

13       and quite precise which allowed me to -- you know, to

14       -- to develop, to -- to understand what it was that she

15       was seeing, which is the way a good autopsy report

16       should be.  So I certainly don't have any disagreement

17       with her findings, but also, I think she was very

18       thorough in doing the documentation.

19   Q   Your time line in your report is based solely on the

20       FDLE report and the interviews that the special agent

21       did in this case, is that correct?

22   A   Yes, there's no other source material for that, that

23       I'm aware of.

24   Q   Now in your report on the second paragraph, you note

25       that Hurley Brown was substantially larger than Mr. Cox
```

```
 1        outweighing him by more than 60 pounds; was that

 2        information that you obtained from the FDLE report?

 3   A    Yes.  And, you know, I think also from the -- the

 4        incarceration documentation for both Cox and Brown.

 5   Q    And the medical examiner, one of the things they do --

 6        and obviously you know this -- is they weigh the body,

 7        correct?

 8   A    Yes.

 9   Q    And in the medical examiner report, you would agree

10        that Mr. Cox's weight, I believe, was 174 pounds [as

11        spoken], is that correct?

12   A    Yes, that's what they have written, yes.

13   Q    And do you know based on Mr. Cox's weight at the time

14        of autopsy whether Mr. Brown outweighed him, and if he

15        did, the amount that he outweighed him by --

16   A    Okay.

17   Q    -- on the date of the incident?

18   A    -- I understand, and that's assuming -- I mean, sadly a

19        very common mistake that's made in medical examiner

20        offices, is that the body weight is wrong.  I mean,

21        I've had to deal with that for three decades myself,

22        just having to reweigh bodies and get -- get it done

23        properly, and I don't know -- I can't tell you whether

24        their scales are accurate or not, but -- so -- and

25        really, the second part of your question -- I mean, I
```

```
 1        don't know what Mr. Brown's weight was at the time that

 2        the incident occurred, you know, all I know is from his

 3        incarceration records that -- and I don't know when

 4        actually that weight was -- was measured; however, I

 5        can tell you at least -- once I see the photographs of

 6        Cox, I can give you a better idea as to whether or not

 7        the, you know, which of the weights is more accurate.

 8        You know, I can't tell you an exact weight by looking

 9        at somebody -- otherwise, I'd be working for a carnival

10        -- but I can -- a difference of between 134 and 174

11        pounds should be fairly clear.

12   Q    And the 134 pounds you're referring to in the --

13        there's the record in regards to -- shows the inmate

14        record of Mr. Cox; you don't know when that weight was

15        taken of Mr. Cox, is that correct?

16   A    I -- you know, yeah, I don't know when the weight was

17        taken.  The form, I'm looking at it right now, it says,

18        quote, "This information was current as of 3/7/2015,"

19        but as far as when that weight was taken, I -- you

20        know, there's nothing independently that -- that

21        confirms or that states when that weight was

22        recorded.

23   Q    Sure.  On the date of the death of Mr. Cox on

24        March 15th of 2015, you can't say one way or the other

25        what the difference in weight between him and Brown is,
```

```
 1              is that correct?

 2    A    Not with exactitude, no.

 3    Q    Okay.

 4    A    Not at this point.

 5    Q    Your -- you talked about this blunt force trauma.  You

 6         read the -- the recorded statement of Mr. Brown, is

 7         that correct?

 8    A    Yes.

 9    Q    And in there Mr. Brown describes kicking with his foot

10         or pushing with his foot the head of Mr. Cox against

11         the concrete floor of his cell, is that correct?

12    A    Yes.

13    Q    He indicates he did that several times, right?

14    A    Yes.

15    Q    And that the altercation or the -- the physical

16         injuries to Mr. Cox, Mr. Brown says he stopped when he

17         no longer was responding, correct?

18    A    Yes.

19    Q    And that would be consistent, not responding, that

20         somebody is unconscious; you would agree?

21    A    Oh, yes.  You know, oddly, I think Brown was probably

22         telling the truth about those parts of the assault

23         because, frankly, what he described he did as compared

24         with the injuries really makes perfect sense.

25    Q    And the blunt force trauma, in and of itself, one time,
```

```
 1        a blow to the head, could have rendered Mr. Cox

 2        unconscious, right?

 3    A   Oh, potentially.  I mean, that's depending on --

 4    Q   Depends on the force --

 5    A   Yeah --

 6    Q   -- obviously, right?

 7    A   Oh, absolutely yes.  The force, the location, you know,

 8        the -- you know, a variety of variables, but yes, one

 9        -- one blow potentially could render him unconscious,

10        yes.

11    Q   And we note in your report, I think, your opinion is is

12        that the force to the head was severe; is that

13        correct?

14    A   Yes.

15    Q   Okay.  Talk about the ligature a little bit; there are

16        -- there were marks around Mr. Cox's neck consistent

17        with some type of force being applied there, is that

18        correct?

19    A   Yes, I agree with how you're putting your question,

20        yes.

21    Q   And your belief is that the ligature that was found was

22        not the contributing cause to that physical injury, is

23        that right?

24    A   Yes.

25    Q   Now Mr. Brown had said in his statement that Mr. Cox
```

```
 1           initially was trying to commit suicide by putting this

 2           cloth around his -- his neck; you don't believe,

 3           though, that that cloth contributed at all to Mr. Cox's

 4           cause of death?

 5      A    Correct, I don't believe that.

 6                    MR. COOK:   Form.

 7      BY MR. WISEBERG:

 8      Q    And that based on the fact that there were those marks

 9           which were not caused by the ligature is consistent

10           that those marks would have only been caused by

11           Mr. Brown?

12      A    Yes.

13      Q    Okay.  We talked about the cerebral edema; you would

14           agree that that'd be the technical term for a swollen

15           or swelled brain, right?

16      A    Yes.

17      Q    And that can be caused from trauma and nontraumatic

18           events, is that correct?

19      A    In -- in the broadest way that you're asking.  I mean,

20           yes --

21      Q    There's nothing at all in the report that you've seen

22           from the medical examiner that this brain swelling was

23           caused by nontraumatic events, is that correct?

24      A    Correct, I agree.

25      Q    Did you do anything to classify the cerebral edema at
```

```
 1        all?

 2   A    No.  I mean, there's nothing more than -- other than

 3        what's in the report.  I mean, it's -- I mean, there's

 4        different gradations, you know, one, two, three and

 5        four, as I recall; they're really more assessments

 6        based upon CAT scan findings, but four is the most

 7        severe with the brain tremendously -- well, very

 8        swollen, such that the surfaces are flat and -- and

 9        that is, you know, what I gleaned from Dr. O'Neil's

10        description of the brain, that this was, you know, very

11        severely swollen.

12   Q    And in your report, you say that the fact that there is

13        this cerebral edema means that he was alive for an

14        indeterminate amount of time following this assault; is

15        that correct?

16   A    Yes, yes.

17                  MR. COOK:  Form.

18   BY MR. WISEBERG:

19   Q    Were you able to tell in anything that you reviewed how

20        long this assault itself lasted?

21   A    No.

22   Q    All we can look at is the words of Mr. Gallagher, a

23        fellow inmate, that the time that he believed the

24        assault started before contact was made by corrections

25        staff in the cell?
```

```
 1   A   Yes.  Yeah, as far as objective information, then of

 2       course, obvious -- obviously, Mr. Brown's statements

 3       that, you know, once -- and he did not -- I -- I don't

 4       think he was even asked how long he thought the assault

 5       took place, but once Brown put Cox face down onto the

 6       pillow, he basically then just waited for someone to

 7       come.

 8   Q   In Mr. Brown's statement, he talked about his belief

 9       that Mr. Cox was suffering some type of seizure at some

10       point either during or right after the assault; do you

11       recall reading that?

12   A   Yes.

13   Q   What does the fact that Mr. Cox may have been suffering

14       a seizure do as it relates to the cerebral edema?

15   A   Probably not much, in and of itself.  I think it's --

16       eerily, it's kind of a chicken-and-egg issue in the

17       sense that the -- the progressive cerebral edema would

18       readily cause the development of seizures, but the

19       seizures don't result in cerebral edema; I think the

20       trauma precipitated -- you know, if Cox had a seizure,

21       that Brown -- that's what Brown saw, that that came --

22       the seizure arose from the swelling of the brain.

23   Q   With the knowledge that we don't know how long this

24       assault lasted, you can't say how long from the time

25       the assault ended that the prison staff arrived at the
```

```
 1              cell, is that correct?
 2   A    Correct.
 3   Q    Okay.  Let's talk about the -- sort of, the
 4        asphyxiation and suffocation.  You would agree that
 5        there's nothing in the medical examiner's report or
 6        findings that speaks of suffocation or asphyxiation
 7        being or contributing to the death at all?
 8   A    Correct.
 9   Q    And there's conflicting reports from the several
10        different witnesses as to when contact was made with
11        Mr. Cox, whether he was face down in the pillow or his
12        face to the side?
13   A    Yes.
14   Q    Your belief that there is some asphyxiation involved is
15        due to the amount of swelling of the brain that was
16        seen?
17   A    Yes, and also the -- and I'm not sure how clear that
18        was in the report, but I thought I tried to make it
19        clear: the blunt force injuries that -- that Mr. Cox
20        sustained alone would not -- I would not have expected
21        them to result in his death; either -- either involving
22        the brain or the neck.
23   Q    And that's just based on the severity of those injuries
24        that you saw, you wouldn't expect that those would have
25        caused the death on their own?
```

```
 1   A   Yes, that's fair.

 2   Q   You would agree, though, a person can be killed by a

 3       severe blunt force trauma?

 4   A   Well, of course.

 5   Q   And a person can be killed by strangulation as well?

 6   A   Absolutely.

 7   Q   The -- going back to the swelling, are you able to tell

 8       me how swollen the brain was beyond what it normally

 9       would have been prior to this incident?

10   A   Well, normally you shouldn't have any swelling of your

11       brain, so --

12   Q   You said that there was significant swelling, so I'm

13       trying to figure out how you've come to the

14       determination that there was significant or severe

15       swelling, I believe you call it.

16   A   Okay.  Well, let me get to -- to the brain.  This is --

17       this is on Page 5 of the autopsy report where

18       Dr. O'Neil, what she says is, "The brain weighs 1,490

19       grams," which is at the upper ends -- the normal range

20       is -- for brain weight are all over the place, so brain

21       weight alone is not a reliable indicator of swelling,

22       but then the next sentence, "The sulci are narrow and

23       the gyri are flat with cerebral edema present"; and for

24       the gyri to be flat, that is -- that's the most severe

25       swelling that a brain could swell because there's --
```

```
 1        there's no -- there's no spaces in between the -- the

 2        convolutions of the brain that are left to be seen, so

 3        I would -- I would consider that to be severe cerebral

 4        edema.

 5   Q    Did you review any prior medical records of Mr. Cox to

 6        determine whether he had any type of brain disorder

 7        prior to this incident?

 8   A    No, I've not seen any other medical records.  I know

 9        they found -- the toxicology studies found a low level

10        of carbamazepine in his blood which is an

11        anticonvulsive used to treat seizure disorders; it's

12        also used to treat bipolar disorder too which does not

13        have seizures, so beyond that, I don't know what his

14        specific medical history was.

15   Q    So the fact that -- and just going back to the ME's

16        report -- you said the brain weight in and of itself

17        doesn't tell you that there had been severe swelling,

18        is that correct?

19   A    Correct.

20   Q    It's the fact that the gyri are flat that gives you the

21        belief that there was severe swelling of the brain?

22   A    Yes, that's the typical finding.

23   Q    What other causes are there other than swelling of the

24        brain that can cause the gyri to be flat?

25   A    Well, in a situation involving the entire brain,
```

1       swelling of the brain is the only thing that does that.

2       I mean, there is nothing else.  Now there's other

3       things -- something called normal pressure

4       hydrocephalus or -- or even obstructive hydrocephalus

5       that will cause the brain to swell, but it's also --

6       that's not something that develops over the course of,

7       you know, of minutes or hours, that's something, you

8       know, that takes years to develop.

9                And a swollen -- well, and that would be

10      seen, say, by sectioning through the brain, seeing

11      widely dilated ventricles and compressive atrophy of

12      the -- of the white matter, things like that, so in an

13      acute setting -- well, normally none of us have swollen

14      brains at all, and in an acute development of brain --

15      of swelling of the brain -- I mean, cerebral edema,

16      that's -- well, that's the only cause; there's no other

17      underlying pathology that results in global cerebral

18      edema.

19  Q   And because you have not been provided the photographs

20      of the autopsy, you can't take a look at the slices of

21      the brain to make a determination on your own whether

22      the gyri are flat in this -- sort of, the significance

23      of it?

24  A   Well, if they're, you know -- and that's correct; if

25      there are photographs of the brain taken at the

```
 1          autopsy, then that is one of the things that I would

 2          like to look at and I can make my own independent

 3          assessment.

 4    Q     All right.  And I think that Ms. Hurley touched on this

 5          a little bit, but you can't say one way or another that

 6          when Nurse Conrad and Sergeant Feipel arrived at the

 7          cell that Mr. Cox was alive, is that correct?

 8    A     Correct, I cannot state that to a resonable degree of

 9          medical certainty.

10    Q     And you can't state within a resonable degree of

11          medical certainty that there were any resuscitative

12          measures that could have been done to Mr. Cox at that

13          time that could have saved his life?

14    A     Correct, without having more information, there's not

15          -- I cannot reach out that far.

16    Q     All right.  In your report in your -- I believe it's in

17          your conclusion section at the end, you note -- sorry,

18          it's actually the -- the third page in the paragraph

19          there.  It says, "Due to the gross negligence that

20          delayed any resuscitative procedures, any chance at

21          surviving was lost"; so based on what you've just told

22          me, I'm trying to figure out what you're speaking of

23          there of delaying any resuscitative procedures that you

24          just told me that you can't say within a resonable

25          degree of medical certainty that any resuscitative
```

```
 1              procedures could have saved Mr. Cox's life.

 2    A    Oh, well, I think -- frankly, I think you answered your

 3         own question.  I told you --

 4    Q    What --

 5    A    -- can I tell you to a resonable degree of medical

 6         certainty that he was alive at the time that

 7         Nurse Conrad examined him, I can't do that, but that's

 8         not -- you know, it's not outside of a realm of

 9         possibility at all.  And if there was -- you know, and

10         he very well could have been; see, that's the thing, is

11         that frankly, the fact that she checked his radial

12         pulse and then did nothing else, that -- I think that

13         was -- that was the gross negligence as far as I'm

14         concerned, and as a consequence, if he was alive and in

15         a situation or position where he could have been

16         resuscitated, that chance was lost at that point, but I

17         can't tell you --

18    Q    Right, you know --

19    A    -- more probably than not that he --

20              THE REPORTER:  Sorry, I can't --

21              THE WITNESS:  I'm sorry.  We're talking over

22         each other.  I can't tell you more probably or not --

23         more probably than not that if he was resuscitatable at

24         that point, but I can't --

25    Q    But the words "gross negligence" -- all right, go
```

```
 1        ahead.

 2   A    Oh, yeah, but I also can't tell you to a resonable

 3        degree of medical certainty that he was dead at that

 4        point; you see, that -- that is the crux of the issue

 5        to me, and I think, you know, not -- well, not

 6        initiating any type of resuscitative maneuvers at that

 7        point where he was first found for someone who has, you

 8        know, medical training, I would consider that to be

 9        gross negligence.

10   Q    Now you said the words "gross negligence"; you'd agree

11        that's a legal term that you're using, is that

12        correct?

13   A    I don't know.  I -- sorry, I don't know whether it's a

14        legal term or not.

15   Q    So you spoke earlier when Ms. Hurley spoke to you about

16        legal terms and not using legal terminology, that you

17        don't have a -- a legal background and you can't make

18        legal conclusions; is that correct?

19   A    Well, yes.  And I'm not -- you know, if you're telling

20        me that gross negligence is solely a legal conclusion,

21        then that's above and beyond my training, experience

22        and pay grade; that was also, I think, why I used the

23        term "stupidity" with -- you know, when I was

24        responding to Ms. Hurley's questions because if -- if

25        this is not -- if you're going to tell me that
```

 1          gross negligence is a legal conclusion that I can't

 2          make, that's fine; as a physician, I would say the

 3          decision not to attempt resuscitation of Mr. Cox was

 4          stupid.

 5     Q    I just want to make sure that when you use the phrase

 6          "gross negligence," you're using it not in a legal

 7          context, you're using it more into your opinion in your

 8          review as a -- as a medical expert; is that correct?

 9     A    Yes, as a --

10                    MR. COOK:  Objection to the form, asked and

11          answered.

12                    THE WITNESS:  Yeah, as a -- as a physician,

13          yes.  Not as a -- not any legal context.

14     BY MR. WISEBERG:

15     Q    You -- just going back to the ligature in your report

16          on the middle of Page 2, you say, "The ligature was

17          placed about his neck in order to give the misleading

18          appearance that this was a suicidal attempt"; what can

19          you point to factually that you believe that the

20          ligature was placed there as a misleading appearance

21          that Mr. Cox had committed suicide or was attempting to

22          commit suicide?

23     A    Well, I didn't see any other purpose for the ligature

24          to be around his neck, and also, if it had -- being a

25          soft -- a soft cloth material, I think it was a shirt,

```
 1        although, someone else at some point thought it was a

 2        piece of the sheet, but it actually would have

 3        cushioned some of the impacts on his neck and would not

 4        -- it would -- the -- the injuries on the skin from the

 5        blunt force trauma would have been absent or much, much

 6        different.  And -- so it -- in the context of the

 7        injuries, the presence of this ligature that was --

 8        apparently was, well, tied in the front, but it was

 9        very easily undone, just made no sense to me.

10    Q   It is possible, though, that Mr. Cox could have done

11        that in an attempt -- a poor attempt to commit

12        suicide?

13    A   Oh, that possibility exists, but it doesn't -- again,

14        in the context of everything else, it doesn't -- it

15        doesn't make sense to me.

16    Q   And it doesn't factor into your determination either

17        one way or another?

18    A   Correct, I think it was irrelevant as far as anything

19        that contributed to his death.

20    Q   All right.  Has Mr. Cook asked you to create any

21        exhibits for trial other than your report?

22    A   No, we've not had any discussions at all about anything

23        like that.

24    Q   Has there been any discussion about you drafting any

25        additional or supplemental reports?
```

```
 1   A     No, not to this point.

 2   Q     Let me just look at here -- just going back to one

 3         other finding that you have here, it's Point No. 5,

 4         just so I can clarify, that, "Cox may have been alive

 5         when he was first found"; again, that goes back to we

 6         don't know whether he was alive or not alive, and you

 7         can't say one way or another within a resonable degree

 8         of medical certainty, is that correct?

 9   A     Correct, and that's fair.  I can't say --

10   Q     Okay.

11   A     -- whether he was alive or dead at that point.

12   Q     Okay.

13               MR. WISEBERG:  I think that's all the

14         questions I have.

15               THE WITNESS:  All right, good.  Thank you.

16               MR. WISEBERG:  Sheri, do you have any

17         questions?

18               MS. COREY-FORTE:  No, we don't have any

19         questions.

20               MR. WISEBERG:  Mr. Cook, any questions?

21               MR. COOK:  Yeah, just a couple.

22                     E X A M I N A T I O N

23   BY MR. COOK:

24   Q     Dr. Sperry, you said that it would take about 15 to 30

25         minutes to create swelling to the extent that a medical
```

```
 1        examiner could notice it, was -- was that your

 2        testimony?

 3    A     Yes.

 4              MR. WISEBERG:  Object to form.

 5              THE REPORTER:  Who objected to form?

 6              THE WITNESS:  Oh, who --

 7    BY MR. COOK:

 8    Q     That level of swelling --

 9              THE WITNESS:  -- who objected to the form?

10              MR. WISEBERG:  Sorry, Phil Wiseberg.

11              THE WITNESS:  Thank you.  Okay.  For the

12        court reporter --

13              THE REPORTER:  Thank you.

14              THE WITNESS:  She thanks you.  Go ahead,

15        Mr. Cook.

16    BY MR. COOK:

17    Q     Given the extent of swelling to the brain that you

18        actually observed or that you, I guess, extrapolated

19        from the medical examiner's description, which end of

20        that continuum would you say was most probable?

21    A     The longer end, and --

22              MR. WISEBERG:  Form.

23              THE WITNESS:  -- and even longer than that.

24              MR. COOK:  Okay.

25              MS. HURLEY:  Object to form.
```

```
 1                    THE REPORTER:  Who -- so that was Phil --

 2                    THE WITNESS:  Wiseberg.

 3                    MR. WISEBERG:  Correct.

 4                    THE REPORTER:  -- and the other --

 5                    THE WITNESS:  And who was the lady that

 6         objected?

 7                    MS. HURLEY:  Claire.

 8                    THE WITNESS:  Claire.  Okay, good.  Your

 9         court reporter is a very patient lady.  Go ahead.

10    BY MR. COOK:

11    Q    At least -- at least 30 minutes, and possibly more?

12    A    Yes, the -- the entity of rapidly evolving or malignant

13         cerebral edema really is only seen in small infants and

14         children, this does not occur in adults, and -- so the

15         longer end of the time frame, you know, 30 minutes or

16         longer is really what would be required to -- to

17         develop this extremely severe cerebral edema that would

18         cause complete flattening of the gyri of the brain.

19    Q    Okay.

20                    MR. COOK:  I think that's all I'm going to

21         have.  Thanks.  Anyone else?

22                    MR. WISEBERG:  Nope.

23                    MR. COOK:  Okay.  Dr. Sperry, you know the

24         drill about read and waive?

25                    THE WITNESS:  Yes.  I'll -- since we're doing
```

```
 1          it like this, I think I'm going to read it -- and I'll

 2          give the court reporter all my information, so either

 3          -- do you want her to send it to you, Mr. Cook, or to

 4          send it to me directly?

 5                    MR. COOK:  Either way, her pleasure.

 6                    THE WITNESS:  Okay.

 7                    MR. COOK:  I'll make sure it gets done if she

 8          sends it to me.

 9                    THE WITNESS:  Okay, good.

10                    MR. COOK:  And if anybody orders, we'll take

11          a copy.

12                    MS. HURLEY:  I'll order it.

13                    (Discussion held off record.)

14                    MR. WISEBERG:  This is Phil Wiseberg, the law

15          firm is Williams, Leininger & Crosby.  Yes to expedite,

16          and we'll have a PDF of it.

17                    MS. HURLEY:  And for Claire, I'll take the

18          e-tran or e-mail copy.

19                    THE REPORTER:  And you would like the

20          expedite as well?

21                    MS. HURLEY:  Yes.

22                    MS. COREY-FORTE:  Sheri-Lynn Corey, the firm

23          is Whitelock & Associates.  We're not going to order a

24          transcript copy at this time.

25                    MR. COOK:  This is James Cook.  I would like
```

```
 1            to get a copy, I don't need it expedited.  James Cook,

 2        Law Office of James Cook, attorney for the plaintiff.

 3                    (Discussion held off record.)

 4                    MR. COOK:  Okay.  Very good then.  That's all

 5        I have.

 6                    MS. HURLEY:  Okay.  Thank you for your time,

 7        court reporter and Dr. Sperry.  We appreciate it.

 8                    THE WITNESS:  Glad to.

 9                    MR. WISEBERG:  Thanks so much.

10            (The deposition concluded at 9:09 p.m.)

11      (Whereupon, the original exhibits were attached to the
                original transcript, copies to copies.)
12                              *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1       STATE OF WISCONSIN )
                            ) SS:
 2       MILWAUKEE COUNTY   )

 3

 4              I, ALEXANDRIA KLIER, Notary Public in and for

 5       the State of Wisconsin, do hereby certify that the

 6       preceding deposition was recorded by me and reduced to

 7       writing under my personal direction.

 8              I further certify that said deposition was

 9       taken before me at Gramann Reporting, 740 North

10       Plankinton Avenue, Suite 400, Milwaukee, Wisconsin

11       53203, on the 2nd day of March, 2018, commencing at

12       7:44 p.m. and concluding at 9:09 p.m.

13              I further certify that I am not a relative or

14       employee or attorney or counsel of any of the parties,

15       or a relative or employee of such attorney or counsel,

16       or financially interested directly or indirectly in

17       this action.

18              In witness whereof, I have hereunto set my

19       hand and affixed my seal of office at Milwaukee,

20       Wisconsin, on this 6th day of March, 2018.

21

22                       _____
                         ALEXANDRIA KLIER - Notary Public
23                       In and for the State of Wisconsin

24

25              My commission expires June 8, 2020.
```

```
 1    STATE OF WISCONSIN )
                         ) SS:
 2    MILWAUKEE COUNTY   )

 3

 4              I, KRIS SPERRY, M.D., do hereby certify that

 5    I have read the foregoing transcript of proceedings taken on

 6    the 2nd day of March, 2018, at Gramann Reporting, 740 North

 7    Plankinton Avenue, Suite 400, Milwaukee, Wisconsin, and the

 8    same is true and correct except for the list of corrections,

 9    if any, noted on the annexed errata sheet.

10

11                   Dated at _____, _____,
                                   (city)           (state)
12

13    this _____ day of _____, 2018.

14

15                              _____

16                              DR. KRIS SPERRY, M.D.

17

18

19

20

21

22

23

24

25
```

**WORD INDEX**

**< $ >**
**$500** 11:10
**$7,500** 11:16
**$750** 11:14

**< 1 >**
**1,490** 52:18
**100** 5:23  6:4
**11300** 2:24
**120** 2:16
**134** 45:10, 12
**15** 30:25  31:13, 14
35:14  60:24
**15th** 14:13  45:24
**174** 44:10  45:10
**18** 5:17  36:23
**1825** 15:10
**1850** 15:25
**19** 12:22  17:4
**1900** 15:25
**1928** 17:5
**1935** 17:13
**1941** 17:17
**1979** 41:23
**1981** 41:23
**1983** 40:9
**1st** 5:19  39:23

**< 2 >**
**2** 1:9  58:16
**2:17-CV-14177** 1:2
**20** 39:5, 5
**2015** 5:19, 23  7:1  8:5
14:13  39:23  45:24
**2015,** 45:18
**2018** 1:9  2:7  4:23
11:25  12:4  65:11, 20
66:6, 13
**2020** 65:25
**21st** 39:6
**222** 2:16
**25** 10:3
**2nd** 2:7  65:11  66:6

**< 3 >**
**3** 45:18
**30** 10:3  16:10, 10  20:8,
15  30:25  31:13, 14
34:23  35:14, 24  60:24
62:11, 15
**300** 2:20, 24
**30-some** 36:25
**314** 2:12
**31st** 12:4
**32301** 2:13
**33316** 2:20
**33401** 2:17
**33408** 2:24
**38** 3:4

**< 4 >**
**4** 3:3
**40** 17:8, 8  20:8, 15
35:24
**400** 1:18  2:6  65:10
66:7

**< 5 >**
**5** 52:17  60:3
**50** 6:18, 19, 21, 21
**53203** 1:19  65:11

**< 6 >**
**6,600** 11:3
**6:50** 16:1, 17
**60** 3:5  44:1
**62** 12:21  42:10
**6th** 65:20

**< 7 >**
**7** 15:17  45:18
**7:00** 16:1, 18
**7:28** 17:5
**7:44** 1:9  2:7  65:12
**740** 1:18  2:5  65:9  66:6

**< 8 >**
**8** 65:25
**804** 2:3
**88** 11:5

**< 9 >**
**9:09** 2:8  64:10  65:12
**90,000** 11:5

**< A >**
**ability** 32:23, 24
**able** 6:3  9:15, 19  11:24
14:2  15:21  16:3  18:5,
22  20:12  21:24  22:12
24:3  34:17  35:9  49:19
52:7
**above-entitled** 2:2
**absence** 29:13
**absent** 59:5
**absolutely** 41:18  47:7
52:6
**abuse** 40:18
**accompanied** 20:24
**account** 4:16
**accurate** 14:14  34:7
44:24  45:7
**achieve** 33:12  35:17
**act** 12:1
**acted** 37:9
**acting** 40:8
**action** 2:2  65:17
**active** 41:17, 25
**actual** 16:2, 5, 22
**acute** 54:13, 14
**additional** 17:16  38:15
42:6  59:25

**additions** 29:18
**address** 18:3
**adequately** 32:24
**adults** 62:14
**affixed** 65:19
**afternoon** 13:25
**agency** 36:23
**Agent** 13:7  14:22
15:22  16:3  18:12  43:20
**ago** 7:14  31:11  39:6
40:17
**agree** 26:23, 23  42:22
43:5  44:9  46:20  47:19
48:14, 24  51:4  52:2
57:10
**agreed** 18:4  25:11
**ahead** 57:1  61:14  62:9
**airway** 21:25  34:17
**Alexandria** 1:22  2:4
65:4, 22
**alive** 30:4, 24  35:7, 10
36:4, 11  49:13  55:7
56:6, 14  60:4, 6, 6, 11
**alleged** 9:11  16:11
**allow** 4:16
**allowed** 43:13
**altercation** 46:15
**amended** 12:9
**amount** 26:5  29:6  32:4,
23  44:15  49:14  51:15
**angry** 18:18
**annexed** 66:9
**answered** 56:2  58:11
**answers** 4:15
**anticonvulsive** 53:11
**anybody** 20:8, 15  38:7
63:10
**anymore** 40:21
**apologize** 34:20
**apparently** 59:8
**Appearance** 2:11, 13, 17,
21  58:18, 20
**Appeared** 2:13, 17, 21, 25
**applicable** 11:16
**applied** 28:19  47:17
**appreciate** 4:11  64:7
**appreciatively** 31:1
**approximation** 16:9
**approximations** 16:6
**areas** 26:3  28:20
**arm** 19:16
**arose** 50:22
**array** 5:21
**arrived** 16:12  17:16, 20
36:3  50:25  55:6
**arriving** 20:8  35:25
**ascribed** 42:21
**asked** 4:22, 25  7:9, 20
19:5  34:19  37:23  50:4
58:10  59:20
**asking** 11:22  36:22
48:19

**asleep** 18:14
**aspect** 20:19
**asphyxia** 26:16  33:4
42:24
**asphyxial** 32:19  33:2
**asphyxiate** 33:4
**asphyxiation** 43:3  51:4,
6, 14
**assault** 14:13  15:20, 25
16:11, 18, 24  17:9  18:6,
9  20:19  21:23  30:5
35:8, 10, 24  46:22
49:14, 20, 24  50:4, 10,
24, 25
**assessment** 55:3
**assessments** 49:5
**assist** 7:12
**associated** 39:7
**ASSOCIATES** 2:19
63:23
**assuming** 44:18
**atrophy** 54:11
**attach** 18:16
**attached** 64:11
**attempt** 58:3, 18  59:11,
11
**attempting** 58:21
**attention** 10:1  19:6
**attorney** 7:16, 24  38:12
40:20  64:2  65:14, 15
**attorneys** 40:15, 25
**authored** 13:1, 8
**autopsies** 10:1  11:3
**autopsy** 12:9, 11, 23
13:19, 22  14:9  23:16
25:9  31:2  35:18  42:12,
14  43:15  44:14  52:17
54:20  55:1
**available** 4:11
**Avenue** 1:18  2:6, 16
65:10  66:7
**aware** 43:23

**< B >**
**back** 6:2  8:24  10:3
18:19, 21  26:2  28:21
41:24  52:7  53:15
58:15  60:2, 5
**background** 57:17
**BAILES** 1:8  2:21
**bang** 19:5
**banging** 33:25
**bare** 18:24
**barred** 41:11
**barring** 12:1
**base** 27:6
**based** 20:13  34:21
35:23  36:9  43:19
44:13  48:8  49:6  51:23
55:21
**basic** 9:21
**basically** 16:14  19:8, 10
20:4, 6  50:6

**basis** 15:9 19:24 29:1 39:15
**Beach** 2:17, 24
**beaten** 27:16 34:15
**began** 18:20, 20, 21
**behalf** 1:4 2:13, 17, 21, 25 6:11, 15 7:15 8:2 9:4, 4
**belief** 20:13 47:21 50:8 51:14 53:21
**believe** 4:21 11:23 20:23, 23 24:17 25:5, 24 27:18 28:9 29:1 34:20 44:10 48:2, 5 52:15 55:16 58:19
**believed** 15:24 49:23
**best** 15:21 18:11 21:13 23:11 40:10
**better** 45:6
**beyond** 52:8 53:13 57:21
**bipolar** 53:12
**bit** 4:14 15:7 31:11 47:15 55:5
**bleeding** 28:20
**blockage** 32:20
**blocked** 23:23, 24 24:3, 6, 7
**blocking** 23:21
**blood** 30:14 53:10
**blow** 47:1, 9
**blunt** 25:6, 12 26:10, 13 29:3 42:21 46:5, 25 51:19 52:3 59:5
**bodies** 44:22
**body** 44:6, 20
**bookkeeper** 39:10
**bounced** 18:25
**bouncing** 20:2
**brain** 22:6, 21, 23 23:2, 7, 15, 16 24:13, 24 25:21, 23, 25 26:2 27:21 29:8, 11, 13, 15, 15, 16 30:3, 13, 14, 16, 22 31:1, 5, 10, 14, 16 33:9, 12, 17 34:10 35:9, 16 36:10 48:15, 22 49:7, 10 50:22 51:15, 22 52:8, 11, 16, 18, 20, 20, 25 53:2, 6, 16, 21, 24, 25 54:1, 5, 10, 14, 15, 21, 25 61:17 62:18
**brains** 54:14
**break** 5:14
**breathe** 24:3 32:24
**bring** 12:5
**broadest** 48:19
**Brown** 12:14 17:24, 24, 25 18:9, 12, 13, 14, 17, 18, 18, 19, 20, 20, 21 19:1, 2, 3, 5, 10, 13 20:17, 21 21:11, 22 27:25 28:3, 7, 14 35:5 43:25 44:4, 14

**basis** 45:25 46:6, 9, 16, 21 47:25 48:11 50:5, 21, 21
**Brown's** 19:16 45:1 50:2, 8
**bruises** 25:21
**bugged** 19:18
**Building** 2:16
**bunk** 18:15

**< C >**
**calendar** 11:19
**call** 40:3, 20 52:15
**called** 4:2 11:25 29:14 54:3
**capacity** 1:9
**carbamazepine** 53:10
**career** 41:20
**carnival** 45:9
**CAROLYN** 1:8 2:17 4:9
**Case** 1:2 4:20, 22 6:15 8:4, 5, 6 9:19 10:8, 23 11:2, 18 12:17 13:5, 20 14:24 15:16 33:21 37:9 38:20, 25 43:21
**cases** 5:22 6:10, 14, 18 7:6, 11 8:15, 21, 25 9:10, 11, 16 10:2 11:9, 11 39:16 41:14
**CAT** 49:6
**cause** 5:2 8:20 25:11 29:14 33:9 42:17 47:22 48:4 50:18 53:24 54:5, 16 62:18
**caused** 26:18 27:18, 25 28:11, 15, 24 29:24 32:19 40:18 48:9, 10, 17, 23 51:25
**causes** 53:23
**cell** 14:12, 17 15:11, 11 16:12 17:2, 4, 13, 22 19:16 20:9, 16, 25 23:5 24:9 36:3 46:11 49:25 51:1 55:7
**cells** 29:16 31:7
**cerebral** 25:20 29:2, 6 30:3 31:9 35:9 48:13, 25 49:13 50:14, 17, 19 52:23 53:3 54:15, 17 62:13, 17
**certain** 32:4 41:1
**certainly** 14:25 20:17 26:14 34:24 43:16
**certainty** 22:13 35:11 55:9, 11, 25 56:6 57:3 60:8
**certified** 37:3
**certify** 65:5, 8, 13 66:4
**chance** 14:8 55:20 56:16
**change** 15:16
**changed** 18:1

**Chapter** 2:3
**charge** 11:8, 10, 14
**CHARLES** 1:7
**check** 15:11
**checked** 56:11
**checks** 15:11
**chicken-and-egg** 50:16
**chief** 5:16
**child** 40:18
**children** 62:14
**choke** 28:13
**choked** 19:25 27:25 28:4
**choke-hold** 28:5, 8, 14, 15, 18, 22 31:18 32:1, 7, 15 33:7, 10, 23 34:14
**choking** 19:13
**CHRISTOPHER** 1:4, 7 2:21 8:17 10:10 12:24 17:22 25:5 36:3
**circumferential** 32:16
**circumferential,** 32:17
**circumstance** 31:17
**City** 7:18 8:4 9:2 66:11
**civil** 5:22 6:17, 20, 20
**Claire** 2:15 4:9 62:7, 8 63:17
**clarified** 41:5
**clarify** 5:8 7:23 60:4
**classify** 48:25
**clear** 10:21 45:11 51:17, 19
**clearly** 21:6 30:3
**clock** 33:15
**closed** 25:8
**cloth** 48:2, 3 58:25
**cold** 41:24
**COLE** 2:15
**colloquially** 25:21
**come** 9:25 31:24 50:7 52:13
**comes** 22:18 34:18
**coming** 20:16
**commencing** 2:7 65:11
**commission** 65:25
**commit** 48:1 58:22 59:11
**committed** 58:21
**common** 9:24 10:12 44:19
**company** 39:2, 3, 8
**compared** 46:23
**complaint** 12:9
**complete** 12:22 62:18
**completed** 23:24
**completely** 22:20 23:23 24:6, 7
**complicated** 31:21
**complications** 25:5
**compressive** 54:11
**conceal** 27:15

**concerned** 56:14
**concluded** 64:10
**concluding** 2:8 65:12
**conclusion** 14:18 37:12 55:17 57:20 58:1
**conclusions** 57:18
**concrete** 18:25 46:11
**conditions** 33:5
**conducted** 15:23
**confirms** 45:21
**conflicting** 51:9
**CONRAD** 1:8 2:17 4:9 5:6 17:2, 4, 13 20:25 23:5 55:6 56:7
**consequence** 56:14
**consider** 32:7 53:3 57:8
**considers** 35:24
**consistent** 26:20 46:19 47:16 48:9
**constant** 33:12
**constantly** 36:25
**consultant** 10:5 37:5 40:8
**Consultants** 39:3
**consulting** 5:20 6:6
**contact** 49:24 51:10
**contacted** 4:21 40:9
**contacts** 38:22, 24
**contained** 15:5
**context** 58:7, 13 59:6, 14
**continue** 29:18
**continued** 22:6 32:5
**continuous** 30:20
**continuum** 61:20
**contractor** 39:14
**contributed** 22:10 43:3 48:3 59:19
**contributing** 47:22 51:7
**contusions** 25:21 26:4 29:6
**convolutions** 53:2
**COOK** 2:11, 12 3:5 4:21 7:5, 16, 19, 24 8:6, 12 12:20 13:24 38:19, 25 48:6 49:17 58:10 59:20 60:20, 21, 23 61:7, 15, 16, 24 62:10, 20, 23 63:3, 5, 7, 10, 25, 25 64:1, 2, 4
**Cook's** 7:4
**copies** 64:11, 11
**copy** 63:11, 18, 24 64:1
**Corey** 63:22
**Corey-Forte** 2:19 60:18 63:22
**correct** 8:7 13:20, 21 15:5 17:11 23:19 27:20, 23 28:9 34:4 35:12 36:6, 20 39:4, 17, 18, 20, 23 42:8, 14 43:21 44:7, 11 45:15 46:1, 7, 11, 17 47:13, 18 48:5, 18, 23, 24 49:15

---

51:*1, 2, 8* 53:*18, 19*
54:*24* 55:*7, 8, 14* 57:*12,*
*18* 58:*8* 59:*18* 60:*8, 9*
62:*3* 66:*8*
**Corrections** 1:*9* 2:*25*
14:*23* 19:*6* 20:*24* 21:*3*
23:*5* 49:*24* 66:*8*
**correctly** 23:*13*
**counsel** 65:*14, 15*
**county** 9:*2* 12:*12* 65:*2*
66:*2*
**couple** 7:*8* 36:*18* 60:*21*
**course** 6:*7* 10:*14* 23:*4*
31:*22* 50:*2* 52:*4* 54:*6*
**COURT** 1:*1* 7:*17, 17*
32:*17* 40:*11, 15, 24*
41:*1* 61:*12* 62:*9* 63:*2*
64:*7*
**courtroom** 11:*15*
**court's** 11:*19*
**cover** 38:*15*
**covered** 37:*21*
**COX** 1:*4* 5:*3, 5, 9* 8:*17*
10:*10* 17:*22* 18:*14, 14,*
*17, 18, 19, 22, 23* 19:*1, 2,*
*4, 14, 17, 25* 20:*19, 23*
21:*4, 12, 18, 21, 25*
22:*25* 25:*5* 27:*16* 28:*7*
31:*18* 33:*22* 35:*7* 36:*3*
43:*4, 9, 25* 44:*4* 45:*6,*
*14, 15, 23* 46:*10, 16*
47:*1, 25* 50:*5, 9, 13, 20*
51:*11, 19* 53:*5* 55:*7, 12*
58:*3, 21* 59:*10* 60:*4*
**Cox's** 12:*24* 14:*12*
18:*17, 24, 24* 19:*7, 17*
20:*14, 21* 21:*8, 12, 18*
35:*6* 42:*17* 44:*10, 13*
47:*16* 48:*3* 56:*1*
**create** 59:*20* 60:*25*
**created** 22:*1, 8*
**criminal** 5:*22* 6:*14, 17,*
*19*
**CROSBY** 2:*23* 63:*15*
**crux** 57:*4*
**culminated** 22:*3*
**current** 45:*18*
**currently** 40:*2* 41:*16, 17*
**curriculum** 6:*23*
**cushioned** 59:*3*
**cut** 30:*14*

**< D >**
**damage** 33:*9, 17*
**date** 11:*23* 44:*17* 45:*23*
**dated** 12:*4* 66:*11*
**DAVID** 1:*8* 2:*21*
**day** 2:*7* 11:*16* 65:*11,*
*20* 66:*6, 13*
**De** 1:*2*
**dead** 5:*5* 23:*4* 36:*4*
57:*3* 60:*11*
**deal** 44:*21*

**death** 5:*3* 8:*20, 21* 9:*12*
12:*24* 22:*3, 11* 24:*19*
25:*11* 26:*18, 24* 27:*8,*
*19* 28:*11* 41:*2, 4* 42:*18*
43:*3* 45:*23* 48:*4* 51:*7,*
*21, 25* 59:*19*
**decades** 8:*24* 44:*21*
**December** 8:*4*
**decide** 40:*16, 25, 25*
**decided** 40:*20*
**decision** 58:*3*
**decrease** 32:*22, 23*
**defendant** 6:*11, 15*
**Defendants** 1:*9* 2:*3* 9:*5*
37:*9*
**defense** 6:*22* 7:*15* 8:*11*
40:*19*
**define** 37:*14*
**definition** 27:*2*
**degree** 22:*13* 23:*17*
35:*11* 36:*1* 55:*8, 10, 25*
56:*5* 57:*3* 60:*7*
**delayed** 55:*20*
**delaying** 55:*23*
**deliberate** 37:*9, 18*
**Department** 1:*9* 2:*25*
12:*10*
**depending** 28:*18* 47:*3*
**depends** 31:*5* 33:*6*
36:*22* 47:*4*
**deposed** 4:*12*
**Deposition** 1:*9* 2:*1*
6:*25* 8:*2, 15* 11:*13*
38:*18* 64:*10* 65:*6, 8*
**depositions** 11:*14*
**derived** 6:*4*
**described** 19:*1* 21:*1, 4*
28:*23* 46:*23*
**describes** 19:*11* 46:*9*
**describing** 21:*8*
**description** 49:*10* 61:*19*
**descriptions** 24:*12* 43:*12*
**detail** 43:*2*
**determination** 31:*4*
52:*14* 54:*21* 59:*16*
**determine** 53:*6*
**determines** 39:*15*
**develop** 22:*24* 30:*23*
43:*14* 54:*8* 62:*17*
**development** 50:*18*
54:*14*
**develops** 54:*6*
**devoted** 5:*24*
**died** 9:*1, 10, 25* 23:*3, 22,*
*24* 25:*5*
**dies** 30:*21*
**difference** 45:*10, 25*
**differences** 21:*6*
**different** 21:*7* 49:*4*
51:*10* 59:*6*
**differently** 37:*16*
**dilated** 54:*11*

**diminished** 30:*15*
**direct** 10:*23*
**direction** 65:*7*
**directly** 34:*1* 63:*4*
65:*16*
**disagreement** 42:*16*
43:*7, 16*
**disagreements** 42:*20*
**discipline** 42:*2*
**discuss** 42:*23*
**discussed** 13:*24*
**discussing** 11:*11*
**discussion** 59:*24* 63:*13*
64:*3*
**discussions** 38:*24* 59:*22*
**disorder** 53:*6, 12*
**disorders** 53:*11*
**DISTRICT** 1:*1, 1* 12:*22*
**doctor** 5:*12* 12:*5*
**document** 12:*20*
**documentation** 43:*18*
44:*4*
**documented** 15:*9* 16:*3*
**documents** 14:*16* 42:*11*
**doing** 40:*1, 2, 6* 43:*18*
62:*25*
**doors** 19:*6*
**Dr** 4:*7, 17* 13:*14* 25:*9*
26:*23* 36:*19* 37:*22*
38:*12* 49:*9* 52:*18*
60:*24* 62:*23* 64:*7* 66:*16*
**drafting** 59:*24*
**drill** 62:*24*
**due** 35:*8* 51:*15* 55:*19*
**duly** 4:*3*
**duration** 33:*7*
**dying** 9:*22* 31:*8*

**< E >**
**earlier** 12:*19* 13:*25*
34:*10* 35:*13, 22* 40:*24*
43:*11* 57:*15*
**easily** 6:*17* 59:*9*
**edema** 29:*2* 30:*3* 31:*10*
35:*9* 48:*13, 25* 49:*13*
50:*14, 17, 19* 52:*23*
53:*4* 54:*15, 18* 62:*13, 17*
**eerily** 50:*16*
**efficacy** 27:*10*
**effort** 27:*15*
**either** 14:*2* 32:*1, 1*
42:*24* 50:*10* 51:*21, 21*
59:*16* 63:*2, 5*
**element** 22:*10, 17* 24:*14*
26:*16, 17* 34:*18* 35:*14*
**elements** 37:*15* 42:*24*
**e-mail** 63:*18*
**e-mails** 12:*12*
**employ** 39:*14*
**employee** 65:*14, 15*
**ended** 7:*17* 50:*25*
**ends** 52:*19*

**enforcement** 36:*19, 21,*
*23, 24* 37:*3*
**engaged** 5:*20* 6:*13*
**enjoyed** 38:*5*
**entered** 17:*2, 4*
**entire** 29:*15* 53:*25*
**entity** 62:*12*
**environment** 22:*9*
**episode** 32:*14*
**episodes** 33:*2*
**errata** 66:*9*
**Esperante** 2:*16*
**essentially** 5:*7* 22:*2*
**establishes** 15:*1*
**ESTATE** 1:*4*
**estimating** 6:*18*
**estimation** 16:*1*
**estimations** 16:*15*
**e-tran** 63:*18*
**evening** 4:*7, 8*
**event** 30:*18* 32:*3, 19*
35:*5*
**events** 15:*8* 19:*10*
32:*10* 48:*18, 23*
**evidence** 15:*15* 28:*24*
**evolving** 62:*12*
**exact** 11:*23* 21:*8* 45:*8*
**exactitude** 46:*2*
**exactly** 16:*23* 24:*9*
**EXAMINATION** 3:*2*
14:*9*
**examined** 4:*4* 5:*6* 56:*7*
**examiner** 5:*16* 12:*10,*
*22* 13:*13* 39:*19* 40:*1*
42:*7, 13, 17* 44:*5, 9, 19*
48:*22* 61:*1*
**Examiner's** 12:*23* 43:*8*
51:*5* 61:*19*
**excuse** 5:*5*
**Executor** 1:*2*
**exhibits** 3:*8* 59:*21*
64:*11*
**exists** 14:*18* 59:*13*
**expect** 51:*24*
**expected** 23:*6* 51:*20*
**expedite** 63:*15, 20*
**expedited** 64:*1*
**expenses** 11:*17*
**experience** 57:*21*
**expert** 8:*11* 37:*6* 58:*8*
**expires** 65:*25*
**exposed** 22:*4*
**express** 40:*16*
**expressed** 37:*24*
**extent** 23:*21* 24:*4*
32:*22* 35:*13, 17, 17*
60:*25* 61:*17*
**extrapolated** 61:*18*
**extremely** 62:*17*
**eyes** 19:*18*

**< F >**

**face** 20:*3, 14, 20* 21:*1,*
*10, 18, 25* 22:*7, 7, 14, 14,*
*16, 25* 23:*18, 20* 24:*23*
*32:18* 34:*1, 22* 35:*1*
50:*5* 51:*11, 12*
**facilities** 9:*3*
**fact** 4:*13* 9:*21* 27:*15*
48:*8* 49:*12* 50:*13*
53:*15, 20* 56:*11*
**factor** 59:*16*
**facts** 9:*12*
**factually** 58:*19*
**fair** 52:*1* 60:*9*
**fairly** 9:*23* 45:*11*
**far** 5:*2* 21:*7* 24:*8*
37:*18* 45:*19* 50:*1*
55:*15* 56:*13* 59:*18*
**farther** 8:*25*
**fatal** 25:*17*
**FDLE** 12:*11* 13:*8*
14:*15* 18:*13* 43:*20* 44:*2*
**federal** 7:*17* 9:*1*
**feel** 37:*24, 25*
**feet** 18:*24*
**FEIPEL** 1:*7* 2:*25*
17:*14* 55:*6*
**fellow** 49:*23*
**fight** 18:*21* 19:*2*
**fighting** 19:*3*
**figure** 52:*13* 55:*22*
**file** 12:*22* 42:*9*
**final** 26:*17, 17*
**financially** 65:*16*
**find** 38:*18*
**finding** 53:*22* 60:*3*
**findings** 42:*16* 43:*8, 17*
49:*6* 51:*6*
**fine** 41:*4* 58:*2*
**finish** 30:*18*
**finished** 21:*23*
**firm** 63:*15, 22*
**first** 4:*3* 7:*13, 19* 12:*8*
25:*4* 30:*11* 32:*14* 40:*8*
41:*21* 57:*7* 60:*5*
**flat** 49:*8* 52:*23, 24*
53:*20, 24* 54:*22*
**flattening** 62:*18*
**floor** 18:*22, 25* 20:*2*
34:*1* 46:*11*
**FLORIDA** 1:*1, 8, 9*
2:*13, 17, 20, 24* 11:*20,*
*25* 12:*9*
**flow** 30:*14*
**follow** 38:*16*
**followed** 17:*14* 31:*18*
32:*7* 33:*24*
**following** 17:*11* 49:*14*
**follows** 4:*4*
**foot** 46:*9, 10*
**footage** 15:*4, 10*
**force** 25:*6* 26:*10, 14*
46:*5, 25* 47:*4, 7, 12, 17*

51:*19* 52:*3* 59:*5*
**foregoing** 66:*5*
**forensic** 4:*19* 5:*14, 21,*
*24* 6:*5, 6, 7* 9:*24* 10:*4*
27:*1* 37:*2, 13* 39:*3*
40:*4, 7*
**forgot** 29:*20*
**form** 45:*17* 48:*6* 49:*17*
58:*10* 61:*4, 5, 9, 22, 25*
**formulating** 12:*16*
14:*19* 16:*16* 19:*23*
21:*16, 17*
**fought** 19:*2*
**found** 20:*23* 23:*17*
25:*23* 30:*3* 35:*9, 17*
43:*12* 47:*21* 53:*9, 9*
57:*7* 60:*5*
**four** 7:*14* 30:*19* 33:*11*
49:*5, 6*
**fracture** 28:*21*
**frame** 16:*7* 20:*11* 62:*15*
**frankly** 10:*12* 22:*20*
32:*1* 46:*23* 56:*2, 11*
**Friday** 1:*9*
**front** 26:*2* 28:*20* 59:*8*
**frontal** 25:*24*
**Ft** 2:*20*
**full** 42:*13*
**fully** 41:*11*
**further** 9:*9* 31:*21* 65:*8,*
*13*

**< G >**
**gagging** 19:*4*
**Gallagher** 15:*24, 24*
17:*9* 49:*22*
**Gallagher's** 16:*17*
**general** 5:*20* 16:*6, 9*
20:*10* 30:*11, 23*
**generalized** 29:*10*
**generated** 13:*5*
**generation** 11:*12*
**Georgia** 5:*17, 18* 6:*8*
39:*20* 40:*1* 42:*1*
**getting** 23:*12* 29:*13*
**give** 5:*2* 31:*3* 37:*19*
45:*6* 58:*17* 63:*2*
**given** 4:*13* 16:*15* 61:*17*
**gives** 53:*20*
**Glad** 64:*8*
**glean** 15:*21*
**gleaned** 49:*9*
**global** 29:*14* 54:*17*
**go** 6:*2* 18:*19* 41:*5, 24*
56:*25* 61:*14* 62:*9*
**goal** 38:*16*
**God** 12:*1*
**goes** 60:*5*
**going** 7:*17* 8:*24* 10:*2*
31:*10* 40:*16* 52:*7*
53:*15* 57:*25* 58:*15*
60:*2* 62:*20* 63:*1, 23*

**Good** 4:*7, 8* 32:*12* 33:*2*
37:*23* 38:*15* 43:*5, 15*
60:*15* 62:*8* 63:*9* 64:*4*
**gradations** 49:*4*
**grade** 57:*22*
**GRAMANN** 1:*9* 2:*5*
65:*9* 66:*6*
**grams,** 52:*19*
**great** 29:*5* 38:*14*
**greater** 29:*8, 9*
**gross** 55:*19* 56:*13, 25*
57:*9, 10, 20* 58:*1, 6*
**guess** 6:*3* 17:*8* 20:*12*
23:*11* 36:*22* 42:*7* 61:*18*
**gyri** 52:*23, 24* 53:*20, 24*
54:*22* 62:*18*

**< H >**
**half** 5:*17* 16:*25* 17:*7, 8*
21:*19, 20* 36:*24*
**hand** 65:*19*
**handling** 4:*11*
**happened** 14:*17* 15:*20,*
*25* 17:*22, 25* 18:*5, 9*
20:*7* 24:*18* 34:*14*
**happens** 33:*22*
**happy** 33:*19*
**head** 9:*13* 10:*11* 18:*21,*
*24, 25* 19:*7* 20:*1, 1, 21*
21:*5, 8, 12, 19* 22:*4*
25:*6, 8, 12* 26:*11* 28:*16*
29:*3, 10* 31:*19* 33:*25,*
*25* 34:*9* 35:*3, 5, 6*
46:*10* 47:*1, 12*
**health** 41:*23*
**held** 63:*13* 64:*3*
**Hello** 38:*9*
**help** 25:*16*
**hemorrhage** 25:*25* 26:*1,*
*5* 29:*7*
**hemorrhages** 25:*22*
**HENDRY** 1:*7* 2:*25*
**hereunto** 65:*18*
**Highway** 2:*24*
**history** 53:*14*
**hitting** 18:*20*
**homicidal** 10:*19*
**homicide** 26:*24* 27:*2*
41:*4*
**honestly** 11:*2*
**hour** 11:*10, 14* 16:*25*
17:*7, 8* 21:*19, 20*
**hours** 15:*25* 54:*7*
**hung** 19:*21*
**Hurley** 2:*15* 3:*3* 4:*6, 9*
12:*14* 17:*24* 18:*9, 12*
19:*13* 27:*24, 25* 28:*3, 7,*
*14* 38:*3, 7, 16* 43:*25*
55:*4* 57:*15* 61:*25* 62:*7*
63:*12, 17, 21* 64:*6*
**Hurley's** 57:*24*
**hydrocephalus** 54:*4, 4*
**hypoxia** 29:*12*

**hypoxic** 31:*8, 15* 33:*4,*
*23*

**< I >**
**idea** 45:*6*
**identified** 7:*24* 12:*7*
**ignored** 22:*18*
**immediately** 24:*19*
**impact** 29:*9*
**impacts** 59:*3*
**important** 39:*9*
**inadequate** 29:*13*
**incarcerated** 9:*23*
**incarceration** 9:*2* 44:*4*
45:*3*
**incident** 12:*12* 31:*15*
44:*17* 45:*2* 52:*9* 53:*7*
**included** 25:*8*
**including** 42:*14*
**income** 6:*4*
**incompletely** 24:*3*
**incorporated** 39:*5*
**independent** 39:*14* 55:*2*
**independently** 45:*20*
**indeterminate** 49:*14*
**indicated** 26:*19* 30:*1*
43:*17*
**indicates** 30:*4* 46:*13*
**indicator** 52:*21*
**indifference** 37:*10, 19*
**indirectly** 65:*16*
**individuals** 7:*22* 21:*7*
**infants** 62:*13*
**inflicted** 26:*25*
**information** 9:*16* 42:*10*
44:*2* 45:*18* 50:*1* 55:*14*
63:*2*
**initially** 48:*1*
**initiated** 22:*10*
**initiating** 57:*6*
**injured** 9:*21*
**injuries** 5:*8, 9* 9:*12, 13,*
*22* 10:*11, 11, 13* 18:*2*
25:*6, 12* 26:*4, 9, 10, 14,*
*19, 25* 27:*21* 28:*1, 15,*
*18* 30:*17* 31:*24* 34:*9*
36:*10* 46:*16, 24* 51:*19,*
*23* 59:*4, 7*
**injury** 10:*9* 25:*8* 28:*25*
29:*9, 9* 33:*13* 43:*8*
47:*22*
**inmate** 8:*21* 9:*13* 10:*9*
12:*14* 15:*23* 17:*24*
28:*6, 23* 45:*13* 49:*23*
**inmates** 8:*25* 9:*10, 21*
13:*10* 14:*23* 15:*12*
19:*5, 13, 25*
**in-person** 38:*24*
**inside** 14:*17*
**instance** 2:*2* 40:*17* 41:*2*
**insult** 31:*9* 33:*4, 23*
**interested** 65:*16*

**interesting** 37:*11*
**interference** 4:*16*
**internal** 28:*20, 24*
**interview** 12:*13* 15:*23*
 16:*21* 18:*12*
**interviews** 14:*21* 15:*1*
 16:*4, 24* 43:*20*
**investigation** 12:*24*
**investigative** 12:*11* 13:*8*
**involuntary** 32:*23*
**involved** 4:*20* 36:*24*
 37:*15* 51:*14*
**involving** 10:*8* 51:*21*
 53:*25*
**irrelevant** 59:*18*
**irreversible** 33:*9, 17*
**issue** 14:*4* 50:*16* 57:*4*
**issues** 5:*3* 36:*25*
**item** 18:*16*

**< J >**
**jail** 37:*5*
**jails** 37:*6*
**JAMES** 2:*11, 12* 7:*4, 24*
 63:*25* 64:*1, 2*
**January** 4:*21, 23* 6:*25*
 12:*4*
**Jefferson** 2:*12*
**Jester** 13:*7* 14:*21, 22*
 15:*9* 16:*3* 17:*13*
**Jester's** 15:*22* 18:*12*
**job** 10:*3*
**JONES** 1:*8*
**judge** 40:*20*
**JULIE** 1:*8*
**jumped** 18:*20*
**June** 65:*25*

**< K >**
**Kansas** 42:*1*
**keep** 11:*1*
**keeps** 39:*11*
**kicked** 18:*23* 34:*15*
**kicking** 26:*20* 31:*24*
 33:*24, 25* 46:*9*
**kill** 26:*10* 34:*12*
**killed** 26:*9* 52:*2, 5*
**kind** 4:*16* 11:*6* 16:*6*
 31:*20* 35:*21* 50:*16*
**kinds** 5:*22*
**KISSANE** 2:*15*
**Klier** 1:*22* 2:*4* 65:*4, 22*
**knot** 27:*13*
**know** 4:*12, 15* 5:*10*
 6:*12* 7:*8, 9, 19* 9:*1, 2, 4,*
 *5, 18, 20, 24* 10:*2, 16*
 11:*3* 14:*3, 4, 10* 16:*25*
 18:*1* 21:*2, 5, 11, 22*
 22:*2, 6, 17, 19* 23:*7, 10*
 24:*2, 5, 8, 8, 10, 11*
 25:*22* 26:*13* 27:*13, 15*
 28:*7* 29:*12* 30:*12* 31:*2,*
 *6, 7, 25, 25* 32:*9* 33:*12,*

*15, 19* 34:*8, 12, 14, 22*
 35:*14, 20* 36:*7, 8, 11, 25*
 37:*1, 2, 19, 23, 24* 40:*3,*
 *16, 19, 24* 41:*5* 42:*9, 22*
 43:*13* 44:*3, 6, 13, 23*
 45:*1, 2, 2, 3, 7, 8, 14, 16,*
 *16, 20* 46:*21* 47:*7, 8*
 49:*4, 9, 10* 50:*3, 20, 23*
 53:*8, 13* 54:*7, 8, 24*
 56:*8, 9, 18* 57:*5, 8, 13,*
 *13, 19, 23* 60:*6* 62:*15, 23*
**knowledge** 40:*11* 50:*23*
**knows** 24:*10*
**KRIS** 1:*9* 2:*1* 4:*2*
 66:*4, 16*

**< L >**
**lack** 29:*16* 31:*5*
**lady** 62:*5, 9*
**Lakeview** 2:*16*
**lapse** 41:*22*
**larger** 43:*25*
**larynx** 28:*22*
**lasted** 49:*20* 50:*24*
**Lauderdale** 2:*20*
**LAW** 2:*11* 36:*19, 21, 23,*
 *24* 37:*3* 41:*11* 63:*14*
 64:*2*
**laying** 21:*5*
**leave** 17:*13*
**left** 53:*2*
**legal** 5:*14, 24* 6:*4*
 37:*12* 40:*4, 7* 57:*11, 14,*
 *16, 16, 17, 18, 20* 58:*1, 6,*
 *13*
**LEININGER** 2:*23* 63:*15*
**lethal** 10:*13, 13* 26:*6*
**level** 53:*9* 61:*8*
**license** 41:*19, 21*
**licenses** 41:*16, 17, 25, 25*
 42:*3*
**life** 55:*13* 56:*1*
**life-threatening** 25:*18*
**ligature** 27:*4, 7* 28:*3, 10*
 47:*15, 21* 48:*9* 58:*15,*
 *16, 20, 23* 59:*7*
**limit** 40:*11*
**line** 15:*4, 8* 17:*12*
 35:*22, 23* 43:*19*
**lines** 15:*1*
**list** 6:*25* 7:*24* 9:*19*
 11:*2* 66:*8*
**listed** 42:*5*
**lists** 12:*8* 39:*2*
**little** 4:*14* 10:*16* 13:*25*
 15:*7* 47:*15* 55:*5*
**live** 11:*15, 24*
**local** 9:*2*
**localized** 26:*1, 4*
**location** 47:*7*
**lodging** 11:*17*
**long** 30:*7* 31:*6* 35:*16*
 40:*6* 49:*20* 50:*4, 23, 24*

**longer** 46:*17* 61:*21, 23*
 62:*15, 16*
**look** 5:*3* 6:*19* 7:*20*
 18:*5* 49:*22* 54:*20* 55:*2*
 60:*2*
**looked** 7:*8* 10:*2, 20*
**looking** 6:*13* 30:*8*
 42:*19* 45:*8, 17*
**looks** 6:*24*
**lost** 11:*6* 28:*2* 55:*21*
 56:*16*
**low** 53:*9*

**< M >**
**M.D** 1:*9* 2:*1* 4:*2* 66:*4,*
 *16*
**ma'am** 8:*8* 10:*24* 13:*3,*
 *9* 25:*10* 29:*19* 37:*6*
 38:*5*
**majority** 30:*16*
**making** 4:*10* 19:*4*
 24:*25*
**malignant** 62:*12*
**maneuvers** 57:*6*
**manner** 26:*24* 41:*2*
**March** 1:*9* 2:*7* 14:*13*
 45:*24* 65:*11, 20* 66:*6*
**marked** 3:*8*
**marks** 47:*16* 48:*8, 10*
**MARTEEN** 1:*7*
**Martin** 12:*12*
**material** 43:*22* 58:*25*
**materials** 5:*1* 11:*10*
 12:*16* 15:*15* 42:*6*
**matter** 4:*10* 7:*15* 8:*12,*
 *17* 21:*17* 54:*12*
**matters** 6:*20* 21:*21*
**mean** 7:*7* 8:*23, 24, 25*
 9:*6* 10:*2, 11* 11:*1*
 16:*19* 17:*1, 23, 25* 18:*2,*
 *13* 20:*17* 22:*17, 24*
 26:*12* 27:*10* 28:*2* 29:*5*
 36:*14, 23* 37:*14* 40:*13,*
 *15, 23* 42:*20* 43:*10*
 44:*18, 20, 25* 47:*3*
 48:*19* 49:*2, 3, 3* 54:*2, 15*
**meaning** 5:*13* 24:*16*
**means** 49:*13*
**measured** 45:*4*
**measures** 55:*12*
**medical** 5:*16* 12:*10, 22,*
 *23* 13:*13* 22:*13* 23:*18*
 35:*11* 36:*1* 39:*19, 25*
 42:*3, 7, 13, 17* 43:*7*
 44:*5, 9, 19* 48:*22* 51:*5*
 53:*5, 8, 14* 55:*9, 11, 25*
 56:*5* 57:*3, 8* 58:*8* 60:*8,*
 *25* 61:*19*
**medicine** 5:*21* 6:*6*
 41:*17, 20*
**mentioned** 33:*7*
**ME's** 53:*15*

**met** 7:*13, 19* 8:*10*
**Mexico** 42:*1*
**middle** 58:*16*
**Milwaukee** 1:*19* 2:*6*
 65:*2, 10, 19* 66:*2, 7*
**minimum** 11:*15*
**Minnesota** 41:*22*
**minutes** 16:*10, 10* 17:*8*
 20:*8, 15* 22:*24* 30:*4, 7,*
 *19, 25* 31:*13, 14* 32:*4, 9*
 33:*11, 16* 34:*23* 35:*8,*
 *10, 15, 24* 36:*10* 54:*7*
 60:*25* 62:*11, 15*
**misleading** 58:*17, 20*
**mistake** 44:*19*
**mistrial** 40:*18, 21*
**MONICA** 1:*2*
**more-complete** 42:*7*
**mouth** 22:*4, 20* 23:*21,*
 *23* 32:*20*
**muscles** 28:*20*

**< N >**
**name** 4:*9* 7:*4* 9:*15*
 10:*22* 15:*24* 21:*3, 4*
**named** 7:*24*
**naps** 38:*8*
**narrow** 52:*22*
**nature** 5:*8*
**necessary** 11:*11* 32:*22*
**neck** 10:*11* 18:*17*
 19:*17* 20:*1* 25:*6, 13*
 26:*11, 14, 19, 21* 27:*5, 9,*
 *12, 18, 21* 28:*10, 16, 17,*
 *21* 30:*20* 32:*5, 8, 16*
 33:*11, 16, 24* 47:*16*
 48:*2* 51:*22* 58:*17, 24*
 59:*3*
**neck-type** 9:*13*
**need** 4:*17* 25:*15* 64:*1*
**needed** 29:*24*
**negligence** 55:*19* 56:*13,*
 *25* 57:*9, 10, 20* 58:*1*
**negligence,** 58:*6*
**nerve** 31:*7*
**never** 41:*23*
**New** 42:*1*
**noise** 19:*4*
**nontraumatic** 48:*17, 23*
**Nope** 62:*22*
**normal** 52:*19* 54:*3*
**normally** 52:*8, 10* 54:*13*
**North** 1:*18* 2:*6, 24*
 65:*9* 66:*6*
**nose** 22:*4, 19* 23:*21, 22*
 32:*20*
**Notary** 2:*5* 65:*4, 22*
**note** 43:*24* 47:*11* 55:*17*
**noted** 34:*8* 66:*9*
**notes** 13:*2*
**notice** 2:*4* 61:*1*
**noticeably** 31:*14*

noticed 7:3, 3
November 5:19 39:23
number 9:5
Nurse 5:5, 6 17:2, 4
20:25 23:5 35:25 36:2
55:6 56:7
nurses 14:23 17:18
nursing 17:16

< O >
object 4:17 61:4, 25
objected 40:20 61:5, 9
62:6
Objection 58:10
objective 50:1
observed 61:18
obstructive 54:4
obtained 44:2
obvious 36:15 50:2
Obviously 13:19 17:1
44:6 47:6 50:2
occasion 40:24
occasional 9:19 10:15,
19
occasionally 10:4
occipital 25:24
occluded 22:20
occur 62:14
occurred 17:9 35:24
45:2
occurring 33:5
o'clock 15:17
odd 40:14
oddly 46:21
offering 37:8
OFFICE 2:11 12:12, 23
13:17 64:2 65:19
officer 17:2, 3, 14 20:24
21:3 23:5 35:25 36:2,
21 37:3
officers 14:23 15:17
19:6
offices 44:20
official 1:9
oh 7:14 8:23 13:12
24:21 26:25 28:5, 5
29:4 30:19 39:1 40:5
41:18 46:21 47:3, 7
56:2 57:2 59:13 61:6
Okay 5:12, 23 6:9 7:23
8:9 9:9, 15 10:6, 18, 21,
25 11:18, 22 12:3, 7
13:2 14:5, 19 16:16
17:3, 11, 16, 21, 23
18:11 19:12, 20 20:7,
12 21:16 22:16 23:10,
20 24:1 25:2, 4 26:7,
10 27:22 28:5, 5, 17, 17
31:12, 17 32:13, 21
34:19 35:2, 19 36:18
37:4, 21 38:2 39:2
40:10, 22 41:10, 16
43:7 44:16 46:3 47:15

48:13 51:3 52:16
60:10, 12 61:11, 24
62:8, 19, 23 63:6, 9
64:4, 6
once 24:22 34:8, 16
40:17 45:5 50:3, 5
O'Neil 13:14 26:23
52:18
O'Neil's 49:9
ones 9:20 34:10
O'Niel 25:9
open 28:23
opinion 5:2 14:19
16:16 19:23 20:13, 13
27:3 29:2 37:8, 20
41:1 47:11 58:7
opinions 7:10 8:16
12:17 15:3 21:16, 18
25:3 30:2 35:23 37:21,
25 38:17, 20 39:15
40:11 41:13
order 18:16 30:24 33:9
58:17 63:12, 23
orders 63:10
original 64:11, 11
outside 7:6 8:21 56:8
outweighed 44:14, 15
outweighing 44:1
overhand 27:13
oxygen 29:13, 16 30:15
31:5

< P >
P.A 2:15, 19, 23
p.m 1:9 2:7, 8 16:1, 18
64:10 65:12, 12
p.m. 17:5
PAGE 3:2 52:17 55:18
58:16
pages 12:21 42:10
Palm 2:17, 24
Panama 7:18 8:4
paragraph 12:8 43:24
55:18
paraphrasing 17:1
parenthesis 25:16
part 10:3 14:9, 20
21:23 42:12 44:25
partial 23:8
particular 20:18
particularly 9:7
parties 65:14
parts 46:22
pass 38:4
pathologist 4:19 9:24
10:4 31:15 37:2, 13
pathologists 27:2 39:12
pathology 5:21 6:7
39:3 54:17
patient 62:9
pay 57:22
PDF 63:16

penitentiaries 9:1
pension 6:8
people 4:17 9:25 33:18
37:17
percent 5:23 6:4, 18, 19
percentage 6:10
perfect 12:7 46:24
perform 13:19
performed 15:11
performing 10:1
person 30:21, 24 39:15
52:2, 5
personal 65:7
person's 32:8
Phil 38:12 61:10 62:1
63:14
Philip 2:3
phone 4:13 38:22
photographs 13:22 14:1,
5 43:10 45:5 54:19, 25
phrase 58:5
phrasing 36:13
physical 21:23 43:8
46:15 47:22
physician 58:2, 12
piece 59:2
pillow 19:7 20:3, 15, 21
21:2, 6, 9, 12, 19, 20
22:1, 8, 15, 16 23:1, 19,
21 24:23 31:19 32:8,
18 34:2, 16, 22 50:6
51:11
pin 16:7
place 14:12 50:5 52:20
placed 20:3 22:25 27:4
34:16, 22 58:17, 20
placement 31:19 32:8
34:1
plaintiff 6:11, 22 8:2, 13
64:2
Plaintiffs 1:5 2:13 9:4
plaintiff's 7:16
Plankinton 1:18 2:6
65:10 66:7
play 31:25 34:18
plays 39:9
pleasure 63:5
plus 11:16
point 9:19 14:16 30:2
33:13 46:4 50:10
56:16, 24 57:4, 7 58:19
59:1 60:1, 3, 11
poor 59:17
poorly 36:13
position 21:8 39:23
56:15
positioned 24:9, 22 35:3
possibility 56:9 59:13
possible 34:21 59:10
possibly 21:10 62:11
potential 5:4
potentially 10:13 47:3, 9

pounds 44:1, 10 45:11,
12
practice 41:17, 19
preceding 65:6
precipitated 50:20
precise 31:3 35:20
36:14, 17 43:13
presence 59:7
present 11:24 52:23
pressure 30:20 32:5, 16
33:10, 12, 13, 16, 18 54:3
pretty 21:9
prevented 41:12
primarily 10:14
primary 29:9
prior 6:12 8:10 16:10
17:1 20:8, 15 24:19
35:25 38:18 39:25
52:9 53:5, 7
prison 8:21 9:10 10:9
37:4 50:25
prisons 37:6
private-party 40:4, 6
probability 23:18 36:2
probable 61:20
probably 6:17, 18, 21, 21
22:9 27:4 32:2 34:12
38:21 46:21 50:15
56:19, 22, 23
problem 22:18
procedures 55:20, 23
56:1
proceedings 66:5
professional 5:13, 15, 24
progress 22:25
progressed 24:22
progressive 31:9 50:17
properly 44:23
protect 21:24 34:17
provide 9:15
provided 5:2 6:24, 24
8:16, 20 10:8 13:23
14:1 24:12 42:6 54:19
providing 8:1
Public 2:5 41:22 65:4,
22
pulling 27:14
pulse 56:12
punched 18:23
purpose 58:23
purposes 16:16
pursuant 2:3, 4
pushing 46:10
put 16:24 19:7, 7 21:12
27:9 28:5, 14 43:5 50:5
putting 27:12 47:19
48:1

< Q >
question 11:22 28:13
29:20 30:8 34:20
40:14 44:25 47:19 56:3

**questions** 4:15 37:24
57:24 60:14, 17, 19, 20
**quite** 9:5 10:12 11:2
22:24 43:13
**quote** 19:4 45:18

**< R >**
**radial** 56:11
**range** 52:19
**rapid** 24:15
**rapidly** 23:22, 25 24:17,
22, 23 30:13 62:12
**rare** 9:3, 7
**reach** 55:15
**read** 46:6 62:24 63:1
66:5
**readily** 26:8 50:18
**reading** 7:25 14:14
50:11
**really** 5:7 8:23, 24 9:6
15:22 16:5, 7 23:3
26:17 27:7, 11, 11, 16
30:13 32:14 37:16, 17
42:20, 21, 23 44:25
46:24 49:5 62:13, 16
**realm** 56:8
**reason** 11:1
**reasonable** 20:11 22:12
**reasons** 16:20 36:15
**recall** 16:2, 14, 21 19:15
40:13 49:5 50:11
**recalled** 19:17
**received** 12:18, 25
**record** 45:13, 14 63:13
64:3
**recorded** 12:13 45:22
46:6 65:6
**recording** 14:16
**records** 5:1 45:3 53:5,
8
**reduced** 65:6
**reference** 14:15
**referenced** 13:11
**referring** 45:12
**reflection** 34:7
**regarding** 5:3 9:12
12:23 38:25 41:13
**regards** 38:20 45:13
**regions** 25:24
**related** 43:8
**relates** 50:14
**relative** 65:13, 15
**relatively** 26:1, 3
**released** 33:14, 18
**reliable** 52:21
**rely** 14:20 15:3
**remember** 11:23
**render** 47:9
**rendered** 27:5 34:13, 15
47:1
**repeat** 38:17
**report** 11:11, 12 12:4, 7,
9, 11, 11, 13 13:1, 4, 11

14:15 15:5, 22 18:13
25:4, 9 27:4 29:18
34:9 39:2 42:5, 7, 14
43:1, 15, 19, 20, 24 44:2,
9 47:11 48:21 49:3, 12
51:5, 18 52:17 53:16
55:16 58:15 59:21
**Reported** 1:22
**reporter** 32:17 56:20
61:5, 12, 13 62:1, 4, 9
63:2, 19 64:7
**REPORTING** 1:9 2:5
65:9 66:6
**reports** 51:9 59:25
**represent** 4:9
**representing** 7:21 8:12
**requests** 3:11
**required** 62:16
**resets** 33:14
**resigned** 39:22
**resonable** 23:17 35:11
36:1 55:8, 10, 24 56:5
57:2 60:7
**respect** 8:20 9:9
**responders** 16:12
**responding** 46:17, 19
57:24
**result** 29:7, 10 50:19
51:21
**resulted** 28:19 29:3
33:22
**results** 54:17
**resuscitatable** 56:23
**resuscitated** 56:16
**resuscitation** 58:3
**resuscitative** 55:11, 20,
23, 25 57:6
**retained** 8:6 10:5 39:16
**retired** 5:18, 20 6:16
39:22, 25
**retirement** 6:13
**review** 4:22 5:1 7:9
13:22 14:6, 8 15:4, 14,
15 53:5 58:8
**reviewed** 12:8, 16 15:16
25:8 42:13 49:19
**reviewing** 6:10, 14, 14
7:11 11:10
**reweigh** 44:22
**right** 5:12 6:21 7:3
8:1, 14 12:3 13:4, 7, 13,
16, 19, 22 14:24 15:3, 7,
14, 19 17:7, 19 19:9, 23
20:7 21:4, 14 22:12
24:16 25:11, 15 26:19
27:3 29:1, 17, 22 30:1
33:8, 20, 21 34:6, 25
35:7, 21 37:4, 21 38:2
45:17 46:13 47:2, 6, 23
48:15 50:10 55:4, 16
56:18, 25 59:20 60:15
**ROBERT** 1:7, 7 2:25, 25

**role** 37:13 39:9
**ROSE** 1:7 2:21 21:3

**< S >**
**SA** 14:21 15:9 17:13
**sadly** 44:18
**sands** 11:6
**saved** 55:13 56:1
**saw** 6:23 7:4 16:13
17:13 19:13 27:21
28:6 43:9 50:21 51:24
**saying** 10:7 23:15, 17
24:20 27:17 43:1
**says** 17:9, 25 18:13, 18
21:11 28:4 45:17
46:16 52:18 55:19
**scales** 44:24
**scan** 49:6
**scenario** 9:21
**SCOTT** 2:15
**seal** 65:19
**second** 12:9 25:15
32:18 43:24 44:25
**secondly** 16:22
**Secretary** 1:9
**section** 55:17
**sectioning** 54:10
**see** 14:10 16:8 19:15,
16, 22 21:3 30:17 31:2,
16 43:11 45:5 56:10
57:4 58:23
**seeing** 24:9 28:23
43:15 54:10
**seen** 11:4 28:16 29:24
43:10 48:21 51:16
53:2, 8 54:10 62:13
**seizure** 19:5 50:9, 14,
20, 22 53:11
**seizures** 50:18, 19 53:13
**send** 63:3, 4
**sends** 63:8
**sense** 21:21 24:25
40:14 41:10 46:24
50:17 59:9, 15
**sent** 12:20
**sentence** 25:15 52:22
**sequence** 19:10 20:19
**Sergeant** 52:6
**service** 5:18 41:23
**set** 9:21 16:22 65:18
**setting** 54:13
**severe** 29:7, 10 31:8, 9
33:3, 22 47:12 49:7
52:3, 14, 24 53:3, 17, 21
62:17
**severely** 24:25 27:16
49:11
**severity** 29:4 51:23
**shanks** 10:15
**sheet** 18:15 59:2 66:9
**Sheri** 60:16
**Sheriff's** 12:12

**Sheri-Lynn** 2:19 63:22
**shift** 15:16
**shirt** 19:21 27:17 58:25
**shortly** 17:14 19:18
**show** 18:2
**shows** 15:10 16:9 45:13
**side** 10:5 20:22 21:5,
11, 13, 20 51:12
**significance** 54:22
**significant** 24:14 26:15
52:12, 14
**significantly** 25:18
**similar** 8:15, 18, 18, 19
9:11 10:9
**Simultaneous** 41:9
**single** 27:13
**sir** 39:13
**sit** 10:22 24:5
**sitting** 9:18
**situation** 22:1 53:25
56:15
**skin** 59:4
**sleep** 18:19
**slices** 54:20
**small** 25:22 26:3, 4, 4
29:6, 6 62:13
**soft** 58:25, 25
**sole** 39:15
**solely** 43:19 57:20
**somebody** 31:2 45:9
46:20
**somewhat** 18:1
**Son** 1:2
**sorry** 12:10 14:21
36:14 55:17 56:20, 21
57:13 61:10
**sort** 33:14 37:15 40:3
51:3 54:22
**source** 17:23 43:22
**south** 11:19, 25
**Southeast** 2:20
**SOUTHERN** 1:1
**spaces** 53:1
**speaking** 41:9 55:22
**speaks** 51:6
**Special** 13:7 14:22
43:20
**specialty** 4:18
**specific** 16:2, 7, 24 26:9
53:14
**specifically** 24:11 25:20
**spend** 5:13
**SPERRY** 1:9 2:1 4:2,
7, 17 36:19 37:22
38:12 39:2 60:24
62:23 64:7 66:4, 16
**split** 6:12, 16, 20
**spoke** 57:15, 15
**spoken** 13:7, 10, 14, 16
38:19 44:11
**SS** 65:1 66:1
**stab** 10:15
**staff** 49:25 50:25

**start** 8:19 30:18 31:1,
7 35:16
**started** 49:24
**starts** 29:15
**STATE** 1:8 2:5 5:17,
18 6:8 9:1 23:16
39:20 40:1 55:8, 10
65:1, 5, 23 66:1, 11
**stated** 19:2
**statement** 16:17 20:22
46:6 47:25 50:8
**statements** 50:2
**STATES** 1:1 41:19
45:21
**Statutes** 2:4
**step** 9:9
**stomach** 19:1
**stomped** 18:24 20:1
34:15
**stomping** 26:20 31:24
**STONE** 1:2
**stopped** 19:3 46:16
**story** 18:1
**strangle** 27:11
**strangulation** 30:16, 18
32:3, 9, 15 33:10 42:24
52:5
**strangulations** 10:19, 20
**Street** 2:12, 20
**studies** 53:9
**stupid** 58:4
**stupidity** 37:15 57:23
**subarachnoid** 25:25
26:5 29:7
**subjected** 31:6
**subsequent** 5:6
**substance** 25:23
**substantially** 43:25
**suffering** 50:9, 13
**sufficient** 34:11
**suffocate** 24:23
**suffocated** 22:5, 14
24:18
**suffocating** 23:1
**suffocation** 22:2, 10, 17
23:8, 10 24:15, 18, 21
26:16 32:19 34:18
42:25 51:4, 6
**suicidal** 58:18
**suicide** 48:1 58:21, 22
59:12
**Suite** 1:18 2:6, 16, 24
65:10 66:7
**sulci** 52:22
**summaries** 14:20
**summary** 13:8 18:11
**superior** 39:10
**supervised** 11:5
**supplement** 29:25
**supplemental** 59:25
**supplements** 29:7
**Sure** 5:16 10:6 16:9
18:4 23:12, 12, 14

27:17 33:21 37:12, 14
41:7 45:23 51:17 58:5
63:7
**surface** 26:2
**surfaces** 49:8
**survivability** 5:4 8:21
**survivable** 26:8 36:12
**survival** 31:15
**survived** 36:4, 13
**surviving** 55:21
**sustained** 5:9 9:13, 22
10:10, 14 51:20
**swell** 22:7 23:3 29:15
30:13, 16 52:25 54:5
**swelled** 48:15
**swelling** 22:23 24:13
29:8, 10 30:21 31:1, 10,
16 35:16, 17 36:10
48:22 50:22 51:15
52:7, 10, 12, 15, 21, 25
53:17, 21, 23 54:1, 15
60:25 61:8, 17
**swollen** 22:22 23:7
24:16, 25 31:14 48:14
49:8, 11 52:8 54:9, 13
**swore** 41:23
**sworn** 4:3

< T >

**take** 4:16 32:4 35:16
54:20 60:24 63:10, 17
**taken** 2:2 13:2 45:15,
17, 19 54:25 65:9 66:5
**takes** 22:24 29:8 30:13,
15, 19, 23 31:7, 11
33:11, 15 54:8
**talk** 15:7 47:15 51:3
**talked** 13:24 16:20
36:9 46:5 48:13 50:8
**talking** 8:9 25:18, 20
28:6 34:10 56:21
**Tallahassee** 2:13 7:25
**technical** 48:14
**telephone** 4:12
**Telephonic** 2:11, 13, 17,
21
**tell** 5:12 6:3, 10 8:23
9:6, 15 10:22 35:6, 10
36:1, 8 40:23 44:23
45:5, 8 49:19 52:7
53:17 56:5, 17, 22 57:2,
25
**telling** 20:18 41:10
46:22 57:19
**ten** 32:9
**term** 48:14 57:11, 14, 23
**terminology** 57:16
**terms** 5:14 57:16
**testified** 4:4 8:14 9:4,
11, 17
**testify** 40:12, 17
**testifying** 7:15 8:5
40:19 41:12, 12

**testimony** 6:25 7:23
8:1, 20 10:8 11:13, 15
61:2
**Thank** 4:10 6:9, 23 7:3
8:14 10:21 30:1, 10
38:3, 4, 5 60:15 61:11,
13 64:6
**thanks** 61:14 62:21
64:9
**that'd** 48:14
**thereabouts** 16:25
**thing** 12:18, 25 22:3
41:1 54:1 56:10
**things** 7:21 10:16 12:8
30:11 36:18 37:7, 16
38:15, 16, 17 40:15
44:5 54:3, 12 55:1
**think** 7:7 12:19, 20, 21
15:23 18:11, 14 19:8,
17, 21 21:2, 21 22:17,
21 23:2 26:13, 15, 15
27:7, 10, 14 31:19, 20
32:2 34:7, 12, 19 37:14,
23 38:1 42:9, 10, 22
43:17 44:3 46:21
47:11 50:4, 15, 19 55:4
56:2, 2, 12 57:5, 22
58:25 59:18 60:13
62:20 63:1
**thinking** 7:18
**third** 27:3 55:18
**Thirteenth** 2:20
**thorough** 43:12, 18
**thought** 18:14 19:3
50:4 51:18 59:1
**thoughts** 34:8
**three** 6:2, 9 7:5, 14
30:19 33:11, 16 38:21
44:21 49:4
**tie** 18:15
**tied** 28:3, 10 59:8
**time** 5:5, 7, 13, 19, 24
6:16 7:4, 13, 20 8:10
11:7, 8 14:13 15:1, 4, 8,
19 16:7, 10, 11, 18 17:1,
8, 12 20:11 21:22 23:2,
4, 6 30:15, 22 31:25
32:9 33:13, 18 35:14,
22, 23 36:2 38:3 39:25
40:9 43:19 44:13 45:1
46:25 49:14, 23 50:24
55:13 56:6 62:15
63:24 64:6
**times** 9:5 16:2, 5, 22
18:23, 25 30:12 38:19
46:13
**today** 10:22 12:5, 19
24:5 37:22 38:19
**told** 7:11 11:18 13:25
34:20 35:13 40:22
55:21, 24 56:3
**tonight** 4:11

**Tort** 1:2
**totality** 26:12 30:9
**touched** 55:4
**toxicology** 53:9
**track** 39:11
**trained** 36:21 37:3, 18,
18
**training** 36:20 57:8, 21
**transcript** 12:13 63:24
64:11 66:5
**trauma** 25:12 29:3, 5, 9
42:22 46:5, 25 48:17
50:20 52:3 59:5
**travel** 11:16
**treat** 53:11, 12
**tremendously** 22:21
49:7
**trial** 6:25 8:15 11:19,
24 59:21
**tried** 18:18 51:18
**true** 66:8
**truth** 20:18 46:22
**try** 4:14 36:18
**trying** 18:15 48:1
52:13 55:22
**turned** 20:22 21:13, 20
22:5 35:5, 6
**two** 8:24 16:19 17:18
32:9, 11, 25 33:2, 4, 15
38:21 49:4
**two-hour** 11:14
**type** 8:1 10:9 47:17
50:9 53:6 57:6
**types** 9:12 10:12, 16
39:16
**typical** 53:22

< U >

**ultimately** 26:12
**unconscious** 21:22, 24
27:5 34:13, 16 46:20
47:2, 9
**underlying** 54:17
**underscore** 30:12
**understand** 15:14 17:12
32:11 36:7 43:14 44:18
**understanding** 10:7
14:11 15:8, 12, 19, 21
17:3, 21 18:8 19:12
20:14 25:16 35:22
**undone** 59:9
**unforeseen** 12:1
**uniformly** 21:10
**UNITED** 1:1
**unremitting** 33:16
**unusual** 10:16
**upper** 52:19
**use** 40:21 58:5
**usually** 10:12 30:18
**utilized** 16:17

< V >

**variability** 35:*15*
**variables** 47:*8*
**variety** 47:*8*
**various** 14:*22* 15:*1*
**ventricles** 54:*11*
**versus** 6:*11, 22* 18:*1*
 21:*19*
**video** 14:*11, 16, 18* 15:*4,*
*10* 18:*4*
**virtually** 42:*21*
**vitae** 6:*23*
**vitally** 39:*9*
**vs** 1:*6*

**< W >**
**wait** 4:*14*
**waited** 50:*6*
**waive** 62:*24*
**wake** 33:*19*
**want** 14:*6* 18:*2, 17*
 23:*12* 38:*15, 18* 41:*3*
 58:*5* 63:*3*
**wanted** 15:*7*
**way** 8:*18* 23:*11* 31:*3*
 36:*16* 37:*20* 42:*19, 23*
 43:*5, 15* 45:*24* 48:*19*
 55:*5* 59:*17* 60:*7* 63:*5*
**weigh** 44:*6*
**weighs** 24:*14* 52:*18*
**weight** 44:*10, 13, 20*
 45:*1, 4, 8, 14, 16, 19, 21,*
*25* 52:*20, 21* 53:*16*
**weights** 45:*7*
**Well** 5:*1, 16* 6:*2, 3, 6,*
*12, 16* 7:*7, 10* 8:*19*
 9:*23* 12:*1, 18* 14:*14*
 15:*2* 16:*5, 19, 19* 17:*7,*
*23* 18:*11, 16* 20:*12, 17,*
*20* 21:*11, 21* 22:*6, 16*
 23:*9* 24:*21* 26:*12, 14,*
*17* 27:*7, 14* 28:*4* 29:*4*
 30:*8, 11* 31:*22* 32:*11,*
*14* 33:*6* 35:*3* 36:*12, 15,*
*21* 37:*13, 15, 23* 38:*3*
 40:*17* 41:*21* 43:*10*
 49:*7* 52:*4, 5, 10, 16*
 53:*25* 54:*9, 13, 16, 24*
 56:*2, 10* 57:*5, 19* 58:*23*
 59:*8* 63:*20*
**went** 35:*21*
**we're** 4:*13, 14* 56:*21*
 62:*25* 63:*23*
**West** 2:*12, 17*
**we've** 6:*23* 59:*22*
**whereof** 65:*18*
**white** 54:*12*
**WHITELOCK** 2:*19*
 63:*23*
**wide** 5:*21*
**widely** 54:*11*
**wife** 39:*9*
**WILLIAMS** 2:*23* 63:*15*
**window** 19:*16, 21* 28:*23*

**Wisconsin** 1:*19* 2:*3, 5, 6*
 42:*1* 65:*1, 5, 10, 20, 23*
 66:*1, 7*
**Wiseberg** 2:*23* 3:*4*
 38:*9, 11, 12* 48:*7* 49:*18*
 58:*14* 60:*13, 16, 20*
 61:*4, 10, 10, 22* 62:*2, 3,*
*22* 63:*14, 14* 64:*9*
**witness** 2:*1* 4:*2* 38:*4, 5,*
*8* 56:*21* 58:*12* 60:*15*
 61:*6, 9, 11, 14, 23* 62:*2,*
*5, 8, 25* 63:*6, 9* 64:*8*
 65:*18*
**witnessed** 11:*4* 35:*4*
**witnesses** 51:*10*
**wonderful** 30:*8*
**woo-hoo** 39:*6*
**words** 31:*8* 34:*21*
 40:*18, 21* 49:*22* 56:*25*
 57:*10*
**work** 5:*14, 15, 25* 6:*5, 6,*
*17* 24:*12* 38:*25* 39:*11*
 40:*2, 4, 7* 41:*14*
**worked** 7:*5* 36:*23*
**working** 45:*9*
**wounds** 10:*15*
**wrap** 36:*18*
**writing** 65:*7*
**written** 44:*12*
**wrong** 44:*20*
**wrote** 31:*21* 35:*7*

**< Y >**
**yeah** 7:*7* 16:*14* 17:*18,*
*24* 19:*15* 20:*6* 29:*21*
 30:*6* 32:*11* 35:*1* 36:*5,*
*21* 45:*16* 47:*5* 50:*1*
 57:*2* 58:*12* 60:*21*
**year** 4:*22* 39:*6, 6*
**years** 5:*17* 6:*3, 9* 7:*5,*
*14* 10:*3* 36:*24, 25* 39:*6*
 40:*5, 17* 54:*8*
**Yep** 25:*1*
**yesterday** 12:*19*