```
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF FLORIDA




MONICA STONE,

     Plaintiff,

vs.                               CASE NO. 2:17-cv-14177-
                                            ROSENBERG/MAYNARD
ROBERT HENDRY, et al.,

     Defendants.
_____/




DEPOSITION OF:              ROBERT HENDRY

AT THE INSTANCE OF:         Plaintiff

DATE:                       February 19, 2018

TIME:                       Commenced: 10:00 a.m.

LOCATION:                   114 West Fifth Avenue
                            Tallahassee, Florida

REPORTED BY:                ANDREA KOMARIDIS
                            Court Reporter and
                            Notary Public in and for the
                            State of Florida at Large




                       PREMIER REPORTING
                       114 W. 5TH AVENUE
                     TALLAHASSEE, FLORIDA
                         (850) 894-0828
```

Case 2:17-cv-14177-RLR   Document 290-8   Entered on FLSD Docket 09/07/2018   Page 2 of 20

| 2/19/2018 | Monica Stone vs Robert Hendry | |
|---|---|---|
| Deposition of Robert Hendry | 2:17-CV-14177-ROSENBERG/MAYNARD | 2 (2 - 5) |

**Page 2**

APPEARANCES:

    REPRESENTING THE PLAINTIFF:

    JAMES V. COOK
    314 West Jefferson Street
    Tallahassee, FL 32301

    REPRESENTING DEFENDANTS HENDRY, FEIPEL, AND DOC:

    PHILIP B. WISEBERG
    Williams, Leininger & Cosby, P.A.
    11300 US Highway One, Suite 300
    North Palm Beach, FL 33408

    REPRESENTING DEFENDANT CAROLYN CONRAD:

    CLAIRE R. HURLEY
    Cole, Scott & Kissane
    222 Lakeview Avenue, Suite 120
    West Palm Beach, FL 33401

    REPRESENTING DEFENDANTS ROSE AND BAILES:

    SHERI-LYNN COREY
    Whitelock & Associates, P.A.
    300 Southeast Thirteenth Street
    Fort Lauderdale, FL 33316

**Page 3**

INDEX TO WITNESS

| ROBERT HENDRY | PAGE |
|---|---|
| Examination by Mr. Cook | 4 |
| Examination by Mr. Wiseberg | 63 |
| Examination by Ms. Hurley | 69 |
| Examination by Ms. Corey | 69 |
| Further Examination by Mr. Cook | 70 |

INDEX TO EXHIBITS

| NO. | DESCRIPTION | MARKED |
|---|---|---|
| 1 | Fact sheet on inmate mortality | 35 |

*Huh-uh is a negative response
*Uh-huh is a positive response

**Page 4**

DEPOSITION

Whereupon,

    ROBERT HENDRY

was called as a witness, having been first duly sworn to speak the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

    EXAMINATION

BY MR. COOK:

    Q  Please state your name for the record, sir.

    A  Robert Christopher Hendry.

    Q  And how are you employed, sir?

    A  I am employed with the Florida Department of Corrections as the bureau chief of Professional Development and Training.

    Q  And what was your prior job?

    A  I was the warden at Martin Correctional Institution.

    Q  And when did you move from one job to the other?

    A  In March of 2016.

    Q  And what was the reason for the move?

    A  I was offered a promotion to become the bureau chief of training in central office, which I accepted.

    Q  Okay. So, that's more income?

    A  Yes, sir.

**Page 5**

    (Brief interruption.)

    (Discussion off the record.)

BY MR. COOK:

    Q  Is there a -- kind of a job-level number that you attain at different stages of your career?

    A  No, sir. It's -- the position is equal to a warden, but based on being offered to move up here, it was a different pay class. So, I accepted it.

    Q  Does the level of warden or bureau chief -- does that have a number or some kind of designation?

    A  No, sir.

    Q  In terms of state employment, is that -- gosh, they used to call it Select Exempt?

    A  Yes, sir, it's -- SES is Select Exempt Service.

    Q  And does that usually mean that you make more money, but have less job security?

    A  Yes, sir.

    Q  Thanks. As opposed to Career Service?

    A  Yes, sir.

    Q  Can you give me a little idea of your work history prior to becoming warden at Martin?

    A  Yes, sir. I began my career in the Department of Corrections in -- March 30th of 1990. I progressed through the ranks, from correctional officer up to

Case 2:17-cv-14177-RLR Document 290-8 Entered on FLSD Docket 09/07/2018 Page 3 of 20

| 2/19/2018 | Monica Stone vs Robert Hendry | |
|---|---|---|
| Deposition of Robert Hendry | 2:17-CV-14177-ROSENBERG/MAYNARD | 3 (6 - 9) |

**Page 6**

1  captain. I took a position in central office as a
2  correctional program administrator. I was the assistant
3  bureau chief of Professional Development and Training.
4      And then I relocated back into the field as
5  assistant warden and warden. And then I was asked to
6  come back as the bureau chief of training.
7    Q  So, you had been in Tallahassee before.
8    A  Yes, sir.
9    Q  What was your -- well, let me ask you this
10 first: When did you make captain?
11   A  I made captain in 2014.
12   Q  And where were you at that time?
13   A  I apologize, sir. I made captain in 2004. I
14 apologize. I was --
15   Q  That's okay.
16   A  I was at Gulf Correctional Institution.
17   Q  And from Gulf CI, you went to work as
18 assistant bureau chief of training?
19   A  No, sir. From -- from Gulf, I went over to
20 Franklin Correctional Institution as a captain, to help
21 open the institution. And then, in July of 2006, I
22 became a correctional program administrator over the
23 special teams in the Office of Institutions.
24   Q  What are special teams?
25   A  There are rapid-response teams, our

**Page 7**

1  correctional emergency-response teams, and our
2  negotiation teams, and our K-9 tracking teams.
3    Q  Is that what they call tactical training?
4    A  Yes, sir.
5    Q  What led you to that area of corrections?
6    A  I -- while I was a correctional officer
7  sergeant, during the younger days of my career, I was a
8  member of the rapid-response team and had gained
9  significant experience and was able to promote into that
10 position, based on my experience in security.
11   Q  Is the rapid-response team essentially the
12 same thing as a cell-extraction team?
13   A  No, sir. The rapid-response team is a more-
14 advanced tactical unit trained to respond to riots,
15 major disturbances or incidences like that to quell
16 large-scale incidents.
17   Q  Did you ever work in a cell-extraction team?
18   A  Yes, sir, I have been on cell extractions in
19 my career.
20   Q  Frequently?
21   A  No, probably about -- less than ten, I would
22 say.
23   Q  About how long did these gigs last?
24   A  Well, you -- once you receive the training at
25 an institution -- and it depends on which institution

**Page 8**

1  you're at. So, if you received the training and you're
2  certified to conduct a cell extraction, you could be on
3  that your entire career, as long as you maintained your
4  training.
5      It all depends on the deployment and if you're
6  utilized. So, if I was at a lower-level institution
7  where we didn't have them, I may only do one cell
8  extraction every two years, but if I was at a higher-
9  level facility, and I was on a cell extraction team, I
10 could be utilized weekly.
11   Q  What kind of training do you get as a cell-
12 extraction officer?
13   A  You -- you go to the cell-extraction training
14 and you learn the components of going in and safely
15 restraining the inmate and gaining control over them,
16 using four other men or four other women, based on what
17 institution you're at. And you go in and you gain
18 control.
19     So, if it -- it goes into more-advanced use-
20 of-force technology and techniques and how to gain
21 compliance and extract the inmate with as least amount
22 of force necessary and without -- and reducing the
23 amount of injury to yourself and the inmate.
24   Q  Would you say that most of the people on the
25 cell-extraction teams are big guys like you?

**Page 9**

1    A  Traditionally, in the past, they were, but
2  with the new equipment that we have and the electronic
3  immobilization shields and things like that, we're able
4  to train specifically on specific body parts. But
5  traditionally, you would get the larger men or women
6  that you could find to perform the cell extraction.
7    Q  And I guess one reason for a cell extraction
8  might be if there is one inmate attacking another in a
9  cell?
10   A  Yes, sir.
11   Q  And not responding to chemical agents?
12   A  Yes, sir.
13   Q  If somebody is in a cell and they won't come
14 out and they won't submit to cuffs, then, cell
15 extraction is oftentimes the next thing, isn't it?
16   A  Yes, sir.
17   Q  And of course, not responding to chemical
18 agents, which would be the interim -- interim measure,
19 right?
20   A  Yes.
21   Q  How many cell extractions would you say you've
22 performed?
23   A  Without reviewing the -- my personnel file --
24 because once you do, you complete a use-of-force -- I
25 may have performed less than ten in my entire career.

Case 2:17-cv-14177-RLR   Document 290-8   Entered on FLSD Docket 09/07/2018   Page 4 of 20

| 2/19/2018 | Monica Stone vs Robert Hendry | |
|---|---|---|
| Deposition of Robert Hendry | 2:17-CV-14177-ROSENBERG/MAYNARD | 4 (10 - 13) |

**Page 10**

1  Q  And that would be something that you could see
2  in your -- in your personnel file?
3  A  Yes, sir. The use-of-force reports from those
4  are placed in your personnel file.
5  Q  So, that's how you would find out; you would
6  look at these use-of-force reports?
7  A  Yes, sir.
8  Q  And they would designate, this was a cell
9  extraction?
10  A  Yes, sir.
11  Q  Have you had a chance to look at the video
12  recording of the -- from the fixed video cameras around
13  the time of the incident that we're here on?
14     MR. WISEBERG: Form.
15     You can answer.
16  A  Not yet. To -- not recently, but I did review
17  the night of the incident.
18  Q  Okay. What time frame did you review?
19  A  I reviewed approximately an hour before and an
20  hour after the incident, and the incident.
21  Q  Did anything stand out to you about that
22  video, as you watched it?
23     MR. WISEBERG: Form.
24     MS. HURLEY: Join.
25     MR. WISEBERG: You can answer.

**Page 11**

1  A  The one thing that I noted was that the nurse
2  and Feipel exited the cell. I didn't see what went on
3  inside the cell, but that they had secured the cell door
4  and continued to make their medication rounds. And then
5  the emergency medical-response unit responded later.
6  Q  How often are officers required to do cell
7  checks?
8  A  Every 30 minutes.
9  Q  Okay. Did you see someone do cell checks
10  around 6:30?
11  A  Yes, sir. We did observe the previous shift,
12  the shift that was on duty at the time, make their final
13  round, which was around the 6:00 -- between the 6:20 to
14  6:30 mark.
15  Q  And you say "they." Was there -- in this
16  particular wing, was there one -- more than one officer
17  doing a cell check?
18  A  No, sir, I don't -- I don't recall. I
19  don't -- I don't know. I use "they" as in the
20  correctional officers on duty make the rounds; not in
21  multiple form, but "they" as in the officers that are
22  assigned to the unit.
23  Q  And then they write it in the log when they've
24  done it, right?
25  A  Yes, sir.

**Page 12**

1  Q  So, if there was somebody making cell checks
2  around 6:30, then the log would show that, right?
3  A  Yes, sir.
4     MR. WISEBERG: Form.
5  Q  Who maintains the log?
6  A  The correctional officer in the officer
7  station.
8  Q  Does the dorm sergeant sign off on the log?
9  A  The dorm sergeant is required to sign off on
10  the log.
11  Q  And the person who actually makes the entry --
12  could that be either the dorm sergeant or the dorm
13  officer?
14  A  Yes, sir.
15  Q  In this particular dorm, how many dorm
16  officers were there?
17  A  I can't answer that without review. It's
18  been -- it's been a while. Without reviewing the
19  staffing level for that current facility in the
20  confinement unit, I could only make a guess at this
21  time.
22  Q  Sergeant Feipel was the dorm sergeant, right?
23  A  Yes, sir.
24  Q  Do you know if Officer Rose was assigned to
25  that dorm?

**Page 13**

1  A  I don't -- I don't recall. I couldn't
2  honestly answer that without reviewing the -- the shift
3  roster for that night.
4  Q  How about Officer Bailes?
5  A  I believe Officer Bailes was assigned to the
6  previous shift, the first shift that was on, but without
7  reviewing, I don't know.
8  Q  As you sit here, can you remember whether the
9  person who made those last -- the last rounds in the
10  previous shift was Officer Bailes?
11  A  No, sir.
12  Q  Did you ever become aware of the name of the
13  officer or officers who placed Mr. Cox into that cell?
14  A  No, sir.
15  Q  Is that something that would be of concern to
16  you, as warden?
17  A  No, sir.
18  Q  Why not?
19  A  That they were placed in the cell together?
20  Q  No. Would you be interested in talking to the
21  officer who placed them there?
22  A  Oh, well, yes, sir, but it was under
23  investigation by FDLE and the Office of the Inspector
24  General. And we are instructed not to interfere in any
25  way. So, I let the -- I let the Office of the Inspector

Case 2:17-cv-14177-RLR   Document 290-8   Entered on FLSD Docket 09/07/2018   Page 5 of 20

| 2/19/2018 | Monica Stone vs Robert Hendry | |
|---|---|---|
| Deposition of Robert Hendry | 2:17-CV-14177-ROSENBERG/MAYNARD | 5 (14 - 17) |

Page 14

1  General handle finding all those things out, as not to
2  interfere with the investigation.
3     Q   Okay. Until after the investigation was
4  concluded?
5     A   Yes, sir.
6     Q   And then you made your inquiry?
7     A   Well, the investigation I was aware of was
8  concluded in March of 2017, after I had already been
9  reassigned from the facility.
10    Q   Did your reassignment have anything to do with
11 this death?
12    A   No, sir.
13    Q   So, this investigation was really concluded
14 two years after the incident?
15    A   Yes, sir.
16    Q   And that was concluded by FDLE or concluded by
17 OIG?
18    A   I believe the Office of the Inspector General,
19 the OIG.
20    Q   Did the FDLE investigation conclude sooner?
21    A   I don't know, sir, without looking at the
22 documents.
23    Q   Did you read the FDLE report?
24    A   No, sir, I did not.
25    Q   Never?

Page 15

1     A   I -- I haven't had an opportunity to -- to
2  review or look at it.
3     Q   After this incident happened, you remained at
4  Martin for another year?
5     A   Yes, sir.
6     Q   Did anything about this incident haunt you, as
7  warden?
8        MR. WISEBERG: Form.
9        MS. HURLEY: Join.
10       MR. WISEBERG: You can answer.
11    Q   They're just making --
12       MR. WISEBERG: You can answer.
13    Q   -- a record.
14    A   Oh, I --
15    Q   They're not talking to you.
16    A   -- apologize.
17    Q   That's okay.
18    A   I wouldn't say haunt. It was a tragic -- it
19 was a tragic event. And any time anybody loses their
20 life, it is tragic. And it happened while I was the
21 warden there. But as far as haunting, no, but it did
22 concern me that a human being lost their life.
23    Q   Did you read the -- or discuss the interviews
24 that were undertaken with the inmates in the surrounding
25 cells?

Page 16

1        MR. WISEBERG: Form.
2     A   No, sir.
3     Q   Has anyone -- well, let me back up and -- and
4  touch back on a previous thing we were talking about.
5        When you watched the video, an hour prior to
6  and an hour after the incident that we're here on, did
7  you do that with FDLE Special Agent Eric Jester?
8     A   No, sir. I had pulled the video for them, to
9  give it to the inspector and had just looked at the --
10 just reviewed the initial camera because I had to report
11 to my supervisor, the regional director.
12       And I just wanted to be able to give him as
13 much information as I could about, you know, were the
14 rounds completed as they there supposed to be scheduled;
15 did people respond on the wing; you know, anything that
16 I saw extremely out of the ordinary that I could go
17 ahead and report to them or pass on to Inspector Jester,
18 which I did.
19       As far as me and the inspector sitting down
20 and reviewing the video together, I don't recall doing
21 that with him.
22    Q   Do you recall watching the video more than
23 once?
24    A   No, sir.
25    Q   And the thing that stood out for you, I think

Page 17

1  you said, was the fact that Sergeant Feipel and Nurse
2  Conrad left the cell and went on about the business of
3  distributing medication?
4     A   Yes, sir.
5     Q   Do you remember what time -- within that time
6  frame, what time they did count?
7     A   No, sir, not without reviewing the control-
8  room logs or the dormitory logs.
9     Q   Wouldn't that be the same for every dormitory
10 in --
11    A   Yes, sir.
12    Q   Okay. So, that would be -- for the time that
13 you were at Martin, that would be a normal thing; the
14 count would be at a certain time, right?
15    A   Yes, sir. Sometimes they're delayed based on
16 feeding or if there is something going on. It may be
17 delayed at certain times, but it's procedurally driven
18 that counts have to happen within specific time frames
19 throughout the day, and you have a 15-to-30-minute
20 window. So, they -- they do occur normally around the
21 same time.
22    Q   And when count is done, then count is entered
23 on the log, right?
24    A   Yes, sir.
25    Q   And it's entered on the log for the time that

Page 18

1  it's supposed to have taken place, correct?
2    A   Yes, sir.
3    Q   And the actual count, the number of prisoners
4  counted -- that's entered on the log at the same time,
5  correct?
6    A   Yes, sir.
7    Q   Okay. So, as you watched the video, the
8  fixed-wing video, did you notice anything that was
9  concerning about the way the officer was conducting the
10 cell checks?
11       MR. WISEBERG: Form.
12   A   No, sir. I kind of just went -- breezed
13 through that, just to see him on the wing making his
14 rounds. And then I went to look at the incident. And
15 then I went to see the -- the follow-up after the
16 incident.
17       I didn't take the time to watch him
18 specifically go to each cell or note that. I don't
19 recall it being an issue at the time I looked at it
20 because I didn't see anything on that one wing at that
21 time, other than him making his rounds.
22       And then I just kind of fast-forwarded through
23 that and went to the next section because I was getting
24 it ready to prepare to turn over to the IG's -- or the
25 FDLE agent that was coming on scene because we have to

Page 19

1  pull the video from the system. And then we have to
2  transform it to a disc. And then we have to do a chain-
3  of-custody and turn it over to them.
4        So, I didn't really have a lot of time to sit
5  down and take a management review of -- of that because
6  I was turning all of it over to the Office of the
7  Inspector General and FDLE.
8        And I usually depend on them to report back to
9  me if there was any severe statutory, criminal, or rule
10 violations that was going on so I could take the action
11 on that.
12   Q   Okay. Rule violation -- you mean if somebody
13 needed to be disciplined.
14   A   Yes, sir.
15   Q   And when somebody does cell checks, they look
16 into the cells, right?
17   A   Yes, sir.
18   Q   Okay. So, as a former assistant bureau chief
19 of training, as a warden, and as a person who has
20 special experience in -- in officer training, your eyes
21 would be drawn like a shot to someone who walks by the
22 cells without looking into them, wouldn't they?
23   A   Yes, sir.
24       MR. WISEBERG: Form.
25   Q   Now, when -- shift changes at 7:00, right?

Page 20

1    A   Yes, sir.
2    Q   And we know, by looking at the log, don't we,
3  that the count was -- was done at 7:00?
4    A   I don't have access to the log.
5    Q   Okay. Fortunately, Mr. -- fortunately,
6  Mr. Jester made a notation -- let's see. I think I
7  have -- I just have one copy of the -- Special Agent
8  Jester made some notations from the log.
9        There at the top of the page, can you tell me
10 when it is recorded that count took place?
11       MR. WISEBERG: Form.
12   A   At 7:00 p.m.
13   Q   Okay. Did you ever look at the log to see if
14 that was, in fact, what it says?
15   A   No, sir. We -- we pulled all of the records
16 and files and then turned them all over.
17   Q   Okay. As you -- I'll take that back. I'm not
18 going to enter that as an exhibit right now.
19       As you looked at the video, did you see
20 anybody conducting count at 7:00?
21   A   I don't recall, sir.
22   Q   After you saw the person -- I think you said
23 between 6:20 and 6:30 -- conducting the cell checks --
24 as you sit here today, what is your memory of the next
25 officer that you saw on the wing?

Page 21

1    A   I -- I don't recall.
2    Q   Was it Sergeant Feipel at around 6:25?
3    A   I believe it was Sergeant Feipel and Nurse
4  Conrad.
5    Q   Okay. Did that concern you that -- that it
6  goes from around 6:30 to 7:25, without anybody doing
7  cell checks?
8    A   The off-going shift made their last check, and
9  then the oncoming shift is required, by policy, to do
10 theirs within 30 minutes of being assigned to the
11 institution -- or being assigned to their posts. So,
12 they had begun their rounds within the 30-minute time
13 frame.
14   Q   But doesn't that mean that there's actually an
15 hour without any cell checks?
16   A   It -- it can. It's -- it depends on how they
17 go in. The way that they change shifts, it does not
18 give them the ability to go in and immediately, without
19 being briefed and beginning all the required paperwork
20 that they're supposed to start, getting their equipment
21 and then hitting the floor -- usually takes a little bit
22 of the time during that process.
23       So, if it were an extremely-long period of
24 time, there would be a -- there would be a concern that
25 we would want to address with the staff and make sure it

Case 2:17-cv-14177-RLR   Document 290-8   Entered on FLSD Docket 09/07/2018   Page 7 of 20

| 2/19/2018 | Monica Stone vs Robert Hendry | |
|---|---|---|
| Deposition of Robert Hendry | 2:17-CV-14177-ROSENBERG/MAYNARD | 7 (22 - 25) |

**Page 22**

1  was corrected.
2  Q  Now, the officers actually come to work a
3  little bit early for briefing, don't they?
4  A  There is no shift briefing. They usually
5  report and go straight to their work post by the -- at
6  least five minutes before. If not, then they're paid
7  overtime.
8  Q  So, who does the briefing?
9  A  They brief the current sergeant and super- --
10 or current sergeant and officers that are in the dorm.
11 They --
12 Q  Now, who is "they"?
13 A  The officers coming on duty brief with the
14 officers that are on duty in that post. They give them
15 the count. They tell them if there's any issues going
16 on, transfer and relay information with each other, turn
17 in their equipment.
18    The other officers, in turn, take the
19 equipment, make sure everything is there, everything is
20 good, and then the previous shift will depart. And then
21 the oncoming shift will be on duty.
22 Q  Okay. And you've always got two people in
23 a -- in a dormitory, right?
24    MR. WISEBERG: Form.
25    You can answer.

**Page 23**

1  A  Yes, sir.
2  Q  So, one officer can be checking the -- the
3  keys and the various -- the restraints and all of those
4  inventory-type items while the other one is doing cell
5  checks?
6  A  Yes, sir.
7  Q  When did you say you came to Martin?
8  A  I was officially assigned there November of
9  2014. And between the move and getting fully there, my
10 first full workday was after Thanksgiving, around the
11 beginning of December.
12 Q  You had a homicide at that institution just
13 before you came, didn't you?
14    MR. WISEBERG: Form.
15 A  I believe so, yes, sir.
16 Q  Okay. When something like that happens, a
17 homicide, is there generally a review process to
18 determine if there's something that could have been done
19 differently or better?
20 A  Yes, sir.
21 Q  Was that going on when you arrived?
22 A  I don't believe so. I don't re- -- I don't
23 know when that the homicide occurred, that you're
24 speaking of, versus the time that I arrived.
25 Q  September 10th, 2014?

**Page 24**

1  A  No, sir, that would have already -- the after-
2  action and everything would have already been done with
3  the previous warden. And I wasn't briefed or anything
4  by anyone, as- -- when assuming my position, that there
5  was any discrepancies or anything found that would need
6  to be corrected on that one.
7  Q  Who was the previous warden?
8  A  Oh, I could have told you if you hadn't asked
9  me. Oh. It was Trivino, Alexis Trivino.
10 Q  And was there any overlap?
11 A  No, sir. She retired and went to the house
12 and was actually -- the institution was without a warden
13 for a couple of months before my assignment.
14 Q  Was the retirement unexpected?
15 A  I -- I couldn't answer that, sir. I
16 wouldn't -- I don't know.
17 Q  Didn't you think it was kind of funny that
18 somebody would retire and -- and just leave the
19 institution without a warden for two months?
20    MR. WISEBERG: Form.
21    You can answer.
22 A  I don't know the specifics about it, but it
23 did seem odd that she retired.
24 Q  Any kind of -- any -- any factors hasten her
25 retirement, to your knowledge?

**Page 25**

1  A  No, sir, not that I know -- without knowing
2  and talking to her personally, which I never had an
3  opportunity to, I wouldn't -- I wouldn't know.
4  Q  And apparently she left about the time of
5  this -- sometime in September, right?
6  A  Yes, sir.
7  Q  She had another homicide the year before that,
8  didn't she?
9     MR. WISEBERG: Form.
10 A  I -- I don't know that.
11 Q  The one that I'm talking about that occurred
12 on September 10th, 2014 -- that was a Hispanic inmate
13 named Luis Colón. Do you remember that name?
14 A  No, sir, I don't.
15 Q  Do you know if Mr. Colón was killed by his
16 cellmate?
17 A  No, sir, not without reviewing the case. I
18 don't know.
19 Q  The guy who was killed the year before, Brian
20 Rechter -- did you ever hear his name?
21 A  No, sir.
22 Q  How about his cellmate, Jacob Spears? Did you
23 ever hear that name?
24 A  No, sir.
25 Q  Does the Department of Corrections currently

Case 2:17-cv-14177-RLR Document 290-8 Entered on FLSD Docket 09/07/2018 Page 8 of 20

| 2/19/2018 | Monica Stone vs Robert Hendry | |
|---|---|---|
| Deposition of Robert Hendry | 2:17-CV-14177-ROSENBERG/MAYNARD | 8 (26 - 29) |

**Page 26**

1  have something called a compatibility standard?
2  A  Yes, sir.
3  Q  Do you know when that came into effect?
4  A  That was in effect when we -- I believe that
5  was in effect sometime in 2014.
6  Q  I'm sorry. Would you say that again?
7  A  I believe it was in effect sometime in 2014 or
8  2013.
9  Q  So, there were compatibility standards at the
10 time of Mr. Cox's death, right?
11 A  Yes, sir.
12 Q  Is there anything that you know about the
13 particulars of Mr. Cox and Mr. Brown, his cellmate, that
14 appeared to you to be questionable in terms of the
15 compatibility standards?
16 A  No, sir.
17 Q  Did you review that?
18 A  Yes, sir.
19 Q  Can you give me kind of a rundown of -- of
20 what the compatibility standards require?
21 A  It's called the IBAS system -- and if you ask
22 me the acronym for it, I apologize, I can't -- I can't
23 remember exactly what it stands for.
24 Q  Is it I-B-I-S?
25 A  I-B-A-S. It's the Inmate -- I can't remember

**Page 27**

1  what the "B" stands for -- Assessment System.
2  Q  Okay.
3  A  But what it does is, you take two inmates and
4  you take their DC numbers and you enter them into the
5  computer database. And it is programmed to determine
6  their sent- -- it looks at their sentence, their
7  violence, their -- their height, their weight -- it
8  takes all of these things into consideration and it
9  gives out a point system of these two, so -- whether or
10 not they can be housed together because we don't want to
11 put a -- what we call predator or prey in a cell with
12 each other. We don't want to put somebody that's
13 written a bad check in the same cell with an inmate that
14 has a -- three life sentences for murder.
15     We want to make sure that we're doing
16 everything we can to -- to prevent those type of inmates
17 being housed with each other. That's why classification
18 came up with the system that we could use that would be
19 able to assist in determining that. And it just
20 basically takes all the data from their file and their
21 history and gives us a click -- click -- quick glance at
22 it.
23     And then we, of course, have to use the human
24 element into it as well in making those determinations
25 whether inmates can be housed with each other or not.

**Page 28**

1  Q  What other demographics do they put in there?
2  A  They put whether they have any gang
3  affiliation, their sentence, whether there were -- they
4  have committed a murder in prison. If their history --
5  their disciplinary history is extreme violence.
6  Q  How about mental health?
7  A  That's all taken into consideration as well,
8  too. I just don't know the -- the exact details without
9  reviewing the current policy and procedure on it.
10 Q  What did you understand about Mr. Brown's
11 mental-health situation?
12 A  I didn't know or have any idea about his
13 mental-health situation at the time.
14 Q  If he had been writing a lot of grievances
15 about needing mental-health care, would that have been
16 something that would have attracted your attention, as
17 warden?
18     MR. WISEBERG: Form.
19     You can answer.
20 A  Yes, sir. We review the grievances -- the
21 assistant warden of programs and our grievance
22 coordinator would have brought those to our attention
23 and they would have been looked at.
24 Q  Is there something called a critical-incident
25 review?

**Page 29**

1  A  Yes, sir.
2  Q  How does that process work?
3  A  That's managed by the Bureau of Security
4  Operations. If there's a critical incident, the Bureau
5  of Security Operations determines if it's significant to
6  send a group of experienced professionals down to review
7  the incident, review policy and procedure, and make a
8  determination if there was anything that could have been
9  avoided -- do policies and procedures needed to be
10 changed. Do we have the proper equipment -- and make
11 recommendations on moving forward.
12 Q  Was that done in this case?
13 A  No, sir.
14 Q  Was there a mortality review done?
15 A  I couldn't answer that. I don't know who
16 would do a mortality review.
17 Q  Is that not something that you participate in,
18 as warden?
19 A  No, sir.
20 Q  I don't know if I already asked you this --
21 and I apologize if I already did -- but did Mr. Jester
22 or anybody else tell you that Brown and Cox and the
23 inmates in the surrounding cells all reported saying
24 they didn't want to be housed together?
25     MR. WISEBERG: Form.

Page 30

1　　You can answer.
2　A　No, sir. I believe I reported that to him.
3　When I responded, I was notified of the incident,
4　several inmates had -- were telling me that. And I told
5　them just to -- just to hang tight; that the inspector
6　general and the FDLE was going to be there, and to give
7　them their honest -- honest observation of what
8　happened, and let them know anything that did happen.
9　That way we would be able to address it and take care of
10　it.
11　Q　And you have already said that you have not
12　read the FDLE report on this?
13　A　No, sir. I believe it was concluded upon my
14　departure. And it may have been sent to the
15　institution. I knew it was completed. I just hadn't
16　had the opportunity to have it sent to me where I could
17　review or look at it.
18　　It may have been sent to the -- my
19　predecessors. There's been two other wardens assigned
20　to Martin since my departure.
21　Q　Oh, who are they?
22　A　Beth Mallard was my immediate replacement in
23　2016; and then Robert Bryner, B-r-y-n-e-r, is now the
24　current warden who replaced her.
25　Q　Is Martin CI a tough institution to run?

Page 31

1　　MR. WISEBERG: Form.
2　A　Yes, sir.
3　Q　What would you say would be the -- the average
4　term of a warden's service at a particular institution?
5　A　It -- it varies. I've seen wardens -- have
6　been -- remained at institutions for sometimes three to
7　five years. Usually, about three years, they -- they --
8　they rotate them and move them around. But I don't
9　know -- it's above my pay grade on how those decisions
10　are based; who stays and how they're moved around and
11　things of that nature.
12　　But typically, around three years to -- three
13　to five years is about the typical -- at normal
14　institutions where there's not a lot of high turnover.
15　Q　Had you been a warden at any other
16　institution, except for Martin?
17　A　No, sir.
18　Q　Were you copied on any of the inmates [sic]
19　that went back and forth between -- I mean, copied on
20　any of the e-mails that went back and forth between
21　Mr. Jester and the state attorney?
22　A　I -- I honestly don't recall, sir.
23　Q　Would you say that's the primary mode of
24　communication between people at the central and the
25　institutional level?

Page 32

1　A　Utilizing e-mail?
2　Q　Yes.
3　A　Pretty much, yes, sir.
4　Q　Do all corrections employees have e-mail?
5　A　No, sir.
6　Q　At what level does it usually start that they
7　have e-mail?
8　A　The lieutenant and captain level.
9　Q　Apparently, Sergeant Feipel would have gotten
10　there around -- I don't know -- maybe 7:30 or so. Does
11　that sound right?
12　　MR. WISEBERG: Form.
13　　You can answer.
14　A　I -- I don't know.
15　Q　Do you remember when he came on the wing,
16　prior to discovering what happened?
17　A　No, sir.
18　Q　When did you get there?
19　A　I was called by Captain Martins. I don't
20　remember the specific time. I did live on the
21　institutional grounds at that time, so I was able to
22　respond pretty quickly.
23　　The initial call that I received from Captain
24　Martins was that it was an inmate suicide.
25　Q　Did you go to the cell?

Page 33

1　A　I went into the wing, yes, sir.
2　Q　Did you go to the cell?
3　A　I don't recall if I went up to the cell or
4　not.
5　Q　Did you see Mr. Cox?
6　A　No, sir. I don't believe I -- I don't -- I
7　just don't remember. I know EMS was -- I believe EMS
8　was departing when I got there, and that's about --
9　without looking it at it, I just don't recall.
10　Q　When -- when EMS departed, they took Mr. Cox
11　with them, didn't they?
12　A　I don't believe so, no, sir.
13　Q　Oh, okay.
14　　Do you know when he left the institution?
15　A　Not without reviewing the records. I don't
16　know what time that the body was transported out.
17　Q　So, EMS basically just declared him dead.
18　A　Yes, sir.
19　Q　And left.
20　A　Yes, sir.
21　Q　Do you remember when you left?
22　A　Oh, I probably left about 2:00 or 3:00 in the
23　morning.
24　Q　Do you remember who you talked to while you
25　were there?

Page 34

1 A I talked to the regional director. I talked
2 to Captain Martins. I talked to Jester when he arrived.
3 I talked to the Office of the Inspector General when
4 they arrived.
5     In between then and that, I don't recall
6 everybody that I talked to.
7 Q Did these conversations happen at your office?
8 A No, sir. Usually, I was meeting them in the
9 parking lot or mak- -- or greeting them at the gate and
10 getting them down to the scene or in and out of my
11 office.
12 Q Who was the regional director at the time?
13 A That was Randy Tifft, T-i-f-f-t.
14 Q And who was from the OIG?
15 A I do not recall.
16 Q Did you see any handheld video from the cell?
17 A No, sir.
18 Q How about photographs?
19 A No, sir.
20 Q Did you understand that those things existed?
21 A No, sir.
22 Q Do you have any idea why the number of inmate
23 deaths is rising so quickly at the Department of
24 Corrections -- Florida Department of Corrections?
25     MR. WISEBERG: Form.

Page 35

1 You can answer, if you know.
2 A No, sir, I -- I don't.
3     MR. COOK: (Handing to attorneys.)
4     MS. HURLEY: Thank you.
5     MR. COOK: Uh-huh. I'm going to give this to
6 you first.
7     MR. WISEBERG: There you go.
8     (Exhibit No. 1 marked for identification.)
9 BY MR. COOK:
10 Q Have you ever looked at that -- at that web
11 page?
12 A Yes, sir.
13 Q And you were at the Department of Corrections
14 from -- did you say 1990 on?
15 A Yes, sir.
16 Q So, you saw some pretty dramatic changes in
17 the number of inmate deaths, didn't you?
18 A Yes, sir.
19 Q Have you ever had a meeting with anyone or
20 exchanged information with anyone with the intention of
21 trying to figure out what the problem was?
22 A No, sir.
23 Q Is that not an issue that is discussed much in
24 the area of training?
25     MR. WISEBERG: Form.

Page 36

1 A Prevention, security, and safety -- all of
2 those are -- are mentioned in there. And without
3 knowing the specifics of each case -- but we look at how
4 can we prevent these tragedies from happening.
5     And just without knowing the specifics of each
6 one of -- of -- if there was a -- if there was one that
7 was so outgoing of if an inmate walked into a wall and
8 was immediately killed, then you know, we would
9 definitely train on how to prevent people from walking
10 into a wall.
11     But there's -- we don't get a lot of these --
12 information because of these pending cases. And we
13 don't get to review a lot of these things. So, what
14 we -- what we have to do is give the -- take the
15 information that is given to us, and we do work to
16 develop anything that we can to -- to help prevent these
17 tragedies from happening and work with officers on
18 making sure that they're alert and aware of their
19 surroundings and trying to -- for anything that could
20 happen on this.
21     But to answer your question, I haven't been
22 given specific details on these and find a way that we
23 could develop some training that would prevent this from
24 happening.
25 Q Well, it sounds like you're saying that it is

Page 37

1 an important issue; that the infant [sic] mortality is
2 an important issue in training; is that -- am -- is my
3 understanding correct on that?
4     MR. WISEBERG: Form.
5     MS. HURLEY: Join.
6     MR. WISEBERG: Answer.
7 A Yes, sir.
8     MR. COOK: What's wrong with that question?
9     MR. WISEBERG: You said infant mortality. I
10 want to make sure you're talking inmate mortality.
11     MR. COOK: Oh, please help me out when I do
12 that. Okay.
13     MR. WISEBERG: Inmate mortality.
14     MR. COOK: Yeah.
15     MR. WISEBERG: I thought that was just a slip,
16 but I just wanted to make sure that --
17     MR. COOK: Yeah, the --
18     MR. WISEBERG: -- that they didn't have
19 inmates at Martin -- infants at Martin CI.
20     MR. COOK: Okay. Well, then let's do that
21 over again. I appreciate your letting me know
22 because it's not the first time.
23 BY MR. COOK:
24 Q Okay. So, what I intended on saying is that
25 it sounds like inmate mortality is an important issue in

Page 38

**the training area; is that fair?**
A Yes, sir.
**Q And just aside from the general issue of not wanting anybody to lose their life in a corrections setting, would you still say that there have been no discussions in the training area about the trend toward more and more inmates dying every year?**
A The discussion that we've had in the training department is what can we do to maintain life and safety of the inmates because, like I said, to be honest with you, we want everybody to live, officers and inmates. So, we train to make sure that they can preserve life.
The trends -- what you're -- what I want you to understand is, while they're important for what you're talking about, what is the specific trend of the uptick of the inmate mortality rate? Is it due to the contraband and the drugs that are coming in that are -- when they smoke K2 or something that they're -- go into respiratory arrest and they immediately, you know, die from that? Is it inmate safety where we're being diligent and observant in our daily life and security checks to make sure that the human beings that have to live together that don't know each other are coming together and being able to live together peacefully, with all the gangs and everything else -- all of those

Page 39

things are addressed in training and we're doing everything we can.
But like I said, you -- you throw the number out there, and I can't sit here and honestly say that, oh, yes, we've examined that number and we do see a trend in this, so we're developing training on that, no, sir.
What I say is that life is important and our -- we train our correctional officers every day to make sure that we provide a safe environment that the officers can go home; that the inmates can get out -- serve their sentence and go back to their families. That's what we do. And that is the discussion in topics.
As far as that, though, I can't sit here and say that this document was brought into a meeting and we sat around a table and discussed how to develop training to stop the statistics from happening.
**Q Well, isn't that infant [sic] mortality review that you have in front of you --**
MR. WISEBERG: Same problem.
MR. COOK: I'm sorry, inmate.
MR. WISEBERG: Stopped you before you got to whole question.
MR. COOK: Yeah. You know what? I probably

Page 40

should take a marker and write it on the back of my hand. That's another case.
BY MR. COOK:
**Q Inmate mortality. Okay.**
A Yes, sir.
**Q The inmate-mortality document that you have there -- that's just a small part of a rather-large project in the Department of Corrections, isn't it?**
A Yes, sir. And I don't -- I don't sit on anything or have a seat at the table of anything for these discussions. Like I said, we manage training. We gear our training towards life and safety for the inmate as well as the officers and for everybody that comes into the institution.
**Q And so, you've never had any discussions about what kind of trends are being discovered through this inmate-by-inmate, death-by-death analysis?**
A No, sir. That has not been -- been brought to me.
**Q Now, as a warden, cell checks would be a fairly important part of keeping inmates safe, right?**
A Yes, sir.
**Q And so, when you have an hour pass without any cell checks, that's kind of a big deal, isn't it?**
A Yes, sir.

Page 41

**Q What would be the discipline, normally, for skipping a cell check?**
A Well, with the career service, the union, and the disciplinary process, it would depend on if it was their first offense or their third offense or if it was a continual problem. So, it would all be based on the individual employee and their disciplinary record.
**Q Is that what they call progressive discipline?**
A Yes, sir.
**Q If somebody wrote on a log that a count took place and the count did not take place as logged, what would be the disciplinary response to that?**
MR. WISEBERG: Form.
You can answer.
A It would be the same as before. That would be falsifying a state document. The penalty for that is more severe than other things. So, you would take into consideration their disciplinary history. You would review it. And you would issue discipline, based upon that.
**Q I understand that there is some kind of document that basically gives a presumed type of discipline for each type of violation; is that right?**
A There's Florida Administrative Code 33-208, which deals with employee discipline. And it lists out

## Page 42

1  specific infractions from -- from first offense to the
2  severity that you would take and -- and they grow as the
3  severity of the processes expand.
4      So, if it's something worse, you can -- you
5  know, like for sleeping on duty, you can receive up to
6  dismissal for the first offense of that. And for -- and
7  I just don't know without looking at the policy, but I
8  believe falsifying state records or documents or
9  providing false testimony is up to dismissal for the
10 first offense, if it's substantiated through an OIG
11 investigation and proven that it was done with the
12 intent of malice.
13     As far as a typo or writing something on a
14 piece of paper that was a human error, those things are
15 looked at a little bit differently, as well, too.
16     Q   Well, malice aside, what if it was just a
17 matter of laziness?
18     A   In my opinion, you would --
19         MR. WISEBERG: Form.
20     A   In my opinion, that would be a severe penalty.
21     Q   What if it were the result of understaffing?
22         MR. WISEBERG: Form.
23         You can answer.
24     A   If it were the result of understaffing, still
25 there is an integrity of putting the truth down because

## Page 43

1  if you're not putting the truth down, you can't fix the
2  staffing levels because it appears that we're doing
3  everything we're supposed to do.
4      So, if you're not being transparent and honest
5  in your paperwork, how do we ever support and give
6  evidence that we do need more help; that we can't do
7  what we're supposed to do.
8      Q   So, as warden, you depend on the truthful
9  reporting of your officers and your supervisors, right?
10     A   Yes, sir.
11     Q   And so, then, if it turns out that there is a
12 staffing problem, then, obviously there is something
13 organizational that might be done to address that
14 glitch; might there not?
15         MR. WISEBERG: Form.
16     A   Yes, sir.
17         MR. WISEBERG: That's okay. Any time I say
18     form, you can still answer. It's okay. It's just
19     for purposes of the record.
20         THE WITNESS: Can I go ahead and take one of
21     those breaks?
22         (Brief recess.)
23 BY MR. COOK:
24     Q   Okay. We're back on the record. And I don't
25 have a whole lot more stuff.

## Page 44

1      Would you give me what the chain of command
2  would be, from yourself to the individual corrections
3  officer in the dormitory where this took place?
4      A   Yes, sir. At each specific institution, it is
5  me, the assistant warden of operations, the correctional
6  officer chief of security, which is the colonel at
7  Martin CI.
8      Q   Who was that, by the way?
9      A   David Colón.
10     Q   Okay.
11     A   The individual captains -- there was five.
12     Q   Is the captain what they call the OIC?
13     A   Yes, sir, the -- we -- shift supervisor,
14 officer in charge -- yes, sir, that's the captain.
15     Q   And was that Martins, in this case?
16     A   Yes, sir.
17     Q   Okay.
18     A   Sergeant.
19     Q   No lieutenant?
20     A   N- -- there's an lieutenant at the main unit,
21 but it's an admin lieutenant. And they don't have the
22 direct chain down to the correctional officer. It goes
23 to the captains.
24     Q   And they're just there during the day shift,
25 right?

## Page 45

1      A   Yes, sir, they're just there during the admin
2  hours.
3      Q   Okay. So, sergeant in this case -- it is
4  Feipel, right?
5      A   Yes, sir.
6      Q   And then the corrections officers in the dorm?
7      A   Yes, sir.
8      Q   What is -- what -- what would be full staffing
9  for -- I think this is D-dorm, isn't it?
10     A   Yes, sir.
11     Q   Yeah, D-dorm. What would be full staffing for
12 D-dorm?
13     A   Full staffing with D- -- for D-dorm would
14 be -- we had two confinement wings, one open-population
15 wing. So, you would have a confinement sergeant, an
16 open-population sergeant, which would be two.
17         I don't recall in the post chart if it allowed
18 for that or if it was just one sergeant. So, let's just
19 go with the assumption, at that time, it was one
20 sergeant, one correctional officer for each wing. So,
21 it would be four people total, including the sergeant.
22     Q   Okay. So, there are three wings?
23     A   Yes, sir.
24     Q   And one -- an officer for each wing.
25     A   Yes, sir.

Case 2:17-cv-14177-RLR   Document 290-8   Entered on FLSD Docket 09/07/2018   Page 13 of 20

| 2/19/2018 | Monica Stone vs Robert Hendry | |
|---|---|---|
| Deposition of Robert Hendry | 2:17-CV-14177-ROSENBERG/MAYNARD | 13 (46 - 49) |

Page 46

Q  Do you know if you were running short on officers at that time?

A  Yes, sir, at that time, we were heavily recruiting officers. We lose them to the counties. There are specific time frames in the county -- surrounding counties' budgetary year. So, we would always lose them in the spring and in the fall, probably up to five or six at a time sometimes, or through retirements or attrition of people just leaving.

But we did have a lot of new people on duty at that time. And we were trying to resolve the recruiting issue at Martin at that time.

Q  Did you happen to know whether D-dorm was short-staffed at that time?

A  Not without looking at the -- at the current post chart at that time and reviewing the documents. I couldn't honestly answer that for you.

Q  This was -- I know that Cox and Brown were both -- well, let me just not say I know.

Were Cox and Brown both protective-management inmates?

A  No, sir.

Q  Who -- were -- were either of them protective-management inmates?

A  No, sir.

Page 47

Q  Were they pending protective-management decision?

A  Yes, sir. They were -- they should have both -- from my recollection, they should have both been administrative confinement, pending protection review.

Q  How long does protection review usually take?

A  With the process and everything, it can take up to three to four weeks for the investigation to be complete; ICT recommendations, sending it to the state classification officer for review, getting approval. Up and down, back and forth through the chain of command, it can take up to sometimes a month or a month and a half.

Q  When someone is pending protective management, are there any kinds of restrictions on who they can be celled with?

A  Well, they're in administrative confinement -- what we try to do is -- the inmates that are requesting protection -- they present a written statement for the need for protection. So, those inmates we tries to -- we try to house those alike.

So, if there's two inmates in there that are requesting for protection, we put them in the same cells. And we try to keep those cells isolated or in spec- -- you can't keep them isolated because of the

Page 48

design of the dormitory, but say, if there was five cells on the first top tier, we would make those designated where we'd place inmates that are pending protection versus the other administrative-confinement inmates that are in there.

Q  Are inmates pending PM sometimes for the protection of other inmates?

A  Yes, sir.

Q  Is that what Mr. Brown was?

A  Without reviewing the specifics, I couldn't -- I couldn't honestly answer that.

Q  He had been in a stabbing incident; is that right?

A  I don't recall.

Q  So, when you've got people in administrative confinement pending a decision on protective management, who makes the decision on how -- on -- on how inmates are celled together?

A  The institutional classification team and then the housing officers in the dormitory, the sergeant -- so, if you -- if you're gained into confinement, you utilize the system that we discussed earlier. You find out, if you're going to house these two inmates together, if there are any flags that would come up.

And then the process is there is no specific

Page 49

written procedure or process for housing inmates together other than the institutional classification team and classification components of that.

Q  Okay. And the institutional classification team -- who -- who makes up that team?

A  That's consisted of the classification supervisor, the assistant warden of programs, and a chief of security.

Q  That's the colonel, right?

A  Or major. We have a -- we utilize the major from the work camp a lot to help out with ICT because we had -- we had a lot of stuff going on with ICT there. So, we would utilize either the major or the colonel.

Q  And ICT decision -- that requires a meeting, right?

A  Yes, sir, with the inmate and the -- and the three individuals mentioned there.

Q  And can the housing officer make the decision on his own?

A  Well, the housing officer, when they're initially confined -- which is why we have the computer database system that we talked about. So, if it's after hours and we have to place two inmates in confinement and we don't have -- and we only have one cell, so we're going to have to double bunk them -- which is

Page 50

1 commonplace practice, based on the housing that we have
2 in the secure cells -- we do the initial IBAS system,
3 check, make sure there's nothing wrong, and then we go
4 ahead and house those two inmates together.
5  Q   But my question was: Can the housing officer
6 make that decision?
7  A   The housing officer is --
8  Q   I'm sorry. The housing sergeant?
9  A   Yes, sir.
10  Q   Is that what happened here?
11  A   Well, without reviewing the date and time that
12 they went in and they were placed in the cell together,
13 I -- I couldn't honestly answer that on -- on who
14 that -- but typically, they would do the computer check
15 and then house those two together.
16  Q   Meaning that the -- the housing sergeant would
17 do the computer check or have it done?
18  A   Yes, sir.
19  Q   And then make the decision based on that?
20  A   Yes, sir.
21  Q   Would there be anything printed out?
22  A   I believe they -- I believe they do do a --
23 yes, as a matter of fact, I do believe they -- we were
24 requiring a printout to be placed on the confinement
25 package when they were placing them into confinement.

Page 51

1 So, there would be a sheet that had both
2 inmates' name and DC number on them and would show that.
3 And we usually -- they were supposed to attach that to
4 the -- to the 233, which is the report of administrative
5 confinement.
6 And that would go on with the DC6229, which is
7 the daily record of segregation for confinement where
8 they utilize to log their meals, their weight, cell
9 checks, and other things like that.
10  Q   Is that a DC6233?
11  A   Yes, sir.
12  Q   Yeah. Now, I'm familiar with the DC6229. And
13 I think there's a 229B, isn't there?
14  A   Yes, sir.
15  Q   But the DC6233 -- is there one for each
16 inmate?
17  A   Yes, sir. There has to be a report -- and
18 I -- and again, I apologize. I've been out of the
19 warden business for two years, now. So, I'm geared and
20 focused on a bunch of other policies and procedures.
21 But it's the report of administrative
22 confinement. And that's the report that we do when
23 you're placed in confinement. And that's when we do the
24 housing checks and things of that nature to place you in
25 there. And I do believe it is the DC6233.

Page 52

1  Q   Okay. How big are the cells?
2  A   I want to say six- -- 8-feet-by-12-feet,
3 6-feet-by-ten-feet. I'm not -- I'm not specifically
4 sure -- I can't remember.
5  Q   About the size of an average parking lot
6 space?
7  MR. WISEBERG: Form.
8  You can answer.
9  A   Maybe the size of a handicap parking lot
10 space.
11  Q   Okay.
12  A   Yeah, I -- I see what you're saying because
13 the bunks, the toilet area, the cell door, how it would
14 go in -- there's probably about four feet. So, three
15 feet, seven, ten, six, eight -- yeah, I -- I just
16 don't -- I just don't remember the specific size of the
17 cells that we had there.
18  Q   But you think it was either 6-by-10 or
19 8-by-12?
20  A   Yes, sir.
21  Q   Do you remember if you reviewed the housing
22 documents that you just described in this case?
23  A   I don't recall, sir. I would have -- I just
24 don't recall. I remember there's an evidentiary process
25 where we're gathering all these documents. The Office

Page 53

1 of the Inspector General is taking them. FDLE is there
2 taking them. And I just can't honestly answer if I did
3 review those or not that night.
4  Q   Now, when documents are turned over to the
5 investigators, you don't give them your only copy, do
6 you?
7  A   It -- it depends on what it is, but they are
8 copied and scanned and done. And then there's a file
9 maintained at the institution.
10  Q   Is there anything that you observed about the
11 incident that we're here on that leads you to feel that
12 something needed to be done differently?
13  MR. WISEBERG: Form.
14  You can answer.
15  A   No, sir.
16  Q   How about the -- the thing that you mentioned
17 about Sergeant Feipel and Nurse Conrad walking out of
18 the cell and continuing the medication pass-out?
19  A   That was the one thing that I did have concern
20 with that I mentioned to the inspector general and the
21 FDLE agent that I was concerned about. And I didn't
22 have time for -- to remain in that position to take the
23 action that would be through the sustained review of the
24 case of any wrongdoing on the part of Sergeant Feipel at
25 the time of why the -- why that specifically occurred

## Page 54

1  that way.
2  Q  Would you have had -- as warden, would you
3  have had any say on the -- on any -- I meant to give
4  this to you and ask you to give me that one back.
5      Would you have had any say on the -- on any
6  discipline of Nurse Conrad?
7  A  Oh, no, sir.
8  Q  That's all handled in medical?
9  A  That would have been handled through Wexford,
10 yes, sir.
11 Q  As warden, do you not have the ability to make
12 sure that medical staff is disciplined for wrongdoing?
13 A  As far as the personnel issues of those
14 things, I can report and prevent them from entering my
15 institution, if it's something extremely egregious that
16 would pose a safety risk or -- as an example, if there
17 was a nurse that was bringing in contraband, I can't
18 fire her, but I can prevent her or him from entering my
19 institution.
20     I can -- they call it cutting the gate on
21 them. I can restrict their access to the point that
22 they can't enter that institution anymore, which means
23 they can't work at that facility until Wexford can take
24 the appropriate personnel actions that they need to.
25 Q  Is that what happened with Nurse Conrad?

## Page 55

1  A  No, sir. I believe -- I don't know what
2  happened with Nurse Conrad, with Wexford after that. I
3  know that she -- she no longer worked for Wexford
4  anymore --
5  Q  Okay.
6  A  -- after the incident.
7  Q  But that was nothing that you initiated.
8  A  No, sir. I just reported what I observed on
9  the video to the Wexford personnel manager or the -- we
10 call them the health services administrator, at the
11 time.
12 Q  Cutting the gate -- is that what it's called?
13 A  Yes, sir.
14 Q  Did you have any discussions with Captain
15 Martins about this incident?
16 A  The only thing I recall discussing with
17 Captain Martins was that it was initially relayed to me
18 as a suicide.
19     Captain Scarpatti was in the wing when I
20 arrived. And he gave me conflicting information that
21 Inmate Brown had stated to him that he had -- was in an
22 altercation with him, not -- versus a suicide.
23     I asked Captain Martins about that. He
24 confirmed that Captain Scarpatti had told him that. At
25 that point there, I told them not to ask the inmate any

## Page 56

1  more questions and referred everything over to the FDLE
2  and the Office of the Inspector General.
3  Q  So, Captain Martins and Captain Scarpatti had
4  been talking to Brown?
5  A  Well, initially, you go in there, hey, what
6  happened; you know, your initial response. And then
7  Captain Scarpatti had walked by the cell that Brown had
8  been secured in, and I believe he had said something to
9  him. I just don't know the exact conversation, which is
10 why I instructed them not to ask him any more questions
11 and to make sure they gave all of that information to
12 the FDLE and the Office of the Inspector General, that
13 they obtained.
14 Q  Now, at Martin CI, you had audio on the wing
15 as well as video, right?
16 A  I honestly -- I do believe so, but I don't --
17 I -- I just can't remember if there was audio with the
18 video. I know that there was fixed-wing cameras and
19 there was video, but I just don't recall if there was
20 audio on the wing or not.
21 Q  Do you have any training materials that relate
22 to celling inmates together?
23 A  No, sir.
24 Q  Do you think there's a need for that?
25 A  Yes, sir.

## Page 57

1  Q  Have you ever heard of what some people are
2  calling "fight clubs"?
3  A  No, sir.
4  Q  How about "gladiator schools"? Have you ever
5  heard that term?
6  A  Only in the media.
7  Q  Have you ever heard of an incident where
8  officers have encouraged inmates to fight each other?
9  A  No, sir.
10 Q  So, that would be over a career of nearly 30
11 years, right?
12 A  Yes, sir.
13 Q  Have you ever heard of officers paying inmates
14 to harm another inmate?
15 A  Have I heard of that? No, sir. I've not
16 heard of any officers paying inmates to hurt other
17 inmates.
18 Q  Have you ever heard of officers bringing in
19 contraband?
20 A  Yes, sir.
21 Q  When officers bring in contraband, is it usual
22 for inmates to do the distribution?
23     MR. WISEBERG: Form.
24     You can answer.
25 A  Yes, sir.

Page 58

1  Q  Is this oftentimes a gang thing?
2  A  Yes, sir.
3  Q  Have you ever become aware of a situation
4  where someone received contraband from an inmate who
5  didn't pay for it?
6  A  Yes, sir.
7  Q  What happens then, usually --
8      MR. WISEBERG:  Form.
9      You can answer.
10 Q  -- if gangs are involved?
11 A  If gangs are involved, there's usually a hit
12 or a threat put out on the inmate.
13 Q  So, contraband distribution can result in
14 inmate violence sometimes, right?
15 A  Yes, sir.
16 Q  Have you ever heard of a situation which an
17 officer lets someone into a wing where they're not
18 authorized to be in order to carry out hits or
19 extortion?
20     MR. WISEBERG:  Form.
21     You can answer.
22 A  I've heard of allegations of it, but I've
23 never -- I've never heard or seen, firsthand, any
24 evidence of that, but I have heard of -- heard of that.
25 Q  So, it has been an allegation, but as far as,

Page 59

1  you know, it hasn't proved out?
2  A  No, it's never been sustained, that I know of.
3  Q  Do you know how many inmates died in the
4  Department of Corrections in 2015?
5  A  350 plus.
6  Q  I've got 354; so, that's very close.
7      Do you know how many of those deaths have been
8  classified as natural?
9  A  250 plus.
10 Q  286.  You're pretty close to the money.
11 A  Well, you gave me the document right here.
12    (Laughter.)
13 Q  Oh, okay.  Well, then, you have a good memory.
14    I don't think that's on that page, is it?
15 A  I'm not sure, but you had -- you had mentioned
16 it --
17 Q  Okay.  Yeah.
18 A  -- in a question earlier.  So, I was just --
19 Q  Okay.  Well, that's impressive.  You have a
20 good memory.
21    Close to being finished.
22    I understand that the inmates, Brown and Cox,
23 were locked down.  Do you know what that means in this
24 case?
25 A  Cox and Brown, being in administrative

Page 60

1  confinement, would mean that they are normally locked
2  down 24 hours a day, seven days a week.  And after they
3  have been in confinement for a certain period of time,
4  they're eligible to come out for six hours of rec a
5  week.
6      But not knowing the specifics of how long each
7  one of them were locked down -- that's why they were,
8  the term, "locked down" because they were in
9  administrative confinement.
10 Q  Okay.  So, that wouldn't be a -- a special
11 thing; that would just be a normal thing --
12 A  That would be the norm for administrative
13 confinement, yes, sir.
14 Q  Initially.
15 A  Initially.
16 Q  Right.
17    How long does it take before they start
18 getting their six hours of rec a week?
19 A  30 days.
20 Q  So, the first 30 days of admin confinement can
21 be more harsh than disciplinary confinement, can't it?
22 A  Well, you're brought out for showering three
23 times a week.  So, you're -- you're able to come out of
24 your cell to shower three times a week.
25 Q  Right, but in disciplinary confinement, you

Page 61

1  get shower plus rec, don't you?
2  A  Yeah.  Typically, if you're in disciplinary
3  confinement, you've been in confinement long enough.
4  And -- and don't quote me on those.  I'm not sure if the
5  rule -- like I said, I've been out of the warden
6  business for two years, now, so -- but from what I
7  remember, at the time, the rule was, after you've been
8  in confinement a certain period of time, whether it be
9  30 days or 20 days, you were eligible for six hours of
10 rec a week.
11 Q  Okay.  Every corrections officer is a first
12 responder, right?
13 A  Yes, sir.
14    MR. WISEBERG:  Form.
15 Q  And first responders are trained to do CPR,
16 right?
17 A  Yes, sir.
18 Q  And -- and you were trained to do CPR, right?
19 A  Yes, sir.
20 Q  And you're currently certified to do CPR?
21 A  No, sir.  My certification has lapsed.  Based
22 on the position I'm in, I'm not required to maintain
23 that.
24 Q  But when you did do the CPR training, is it
25 true that you are not supposed to have someone

Case 2:17-cv-14177-RLR  Document 290-8  Entered on FLSD Docket 09/07/2018  Page 17 of 20

| 2/19/2018 | Monica Stone vs Robert Hendry | |
|---|---|---|
| Deposition of Robert Hendry | 2:17-CV-14177-ROSENBERG/MAYNARD | 17 (62 - 65) |

### Page 62

1  handcuffed when they receive CPR?
2     A   Yes, sir.
3     Q   Have you heard anything about the death of
4  Ricky Martin at Santa Rosa CI?
5     A   No --
6        MR. WISEBERG:  Form.
7     A   No, sir; just through the media only.
8     Q   Okay.  You're roughly aware of what happened
9  to him, aren't you?
10    A   Yes, sir.
11    Q   Was there anything -- and I think that may
12 have happened in 2012.  Was there anything that was done
13 as a result of that incident that changed the way the
14 Department operated, to your knowledge?
15       MR. WISEBERG:  Form.
16    A   No, sir.
17    Q   Are you aware of the specific injuries that
18 caused Mr. Cox's death?
19    A   No, sir.  I have not read the report.
20    Q   Did you read anything about the death of
21 Matthew Walker in Charlotte CI?
22       MR. WISEBERG:  Form.
23    A   Not the specifics, just -- other than the
24 press coverage that was on it.
25    Q   Do you recall -- and I may have asked you this

### Page 63

1  before, and if I did, I apologize.  But do you recall
2  Hurley Brown trying to get medical-health [sic]
3  treatment?
4     A   Medical-health treatment?
5     Q   Mental-health treatment, I'm sorry, is what I
6  meant to say.
7     A   No, sir.
8        MR. COOK:  Okay.  I think that is all I've
9  got.  Do you have anything?
10       MR. WISEBERG:  Just a couple.
11          EXAMINATION
12 BY MR. WISEBERG:
13    Q   Mr. Hendry, you were asked about cell checks
14 being skipped and the discipline for that.  From your
15 review of the incident, knowing that there was a cell
16 check, I think you said, at about 6:30 and then another
17 one after the 7:00 shift came on -- from your review,
18 did it appear to you that a cell check was skipped in
19 that time period?
20    A   No, sir.  By policy, based on the shift
21 change, both sides were in compliance.
22    Q   And when you say, both sides in compliance,
23 the cell check was done 30 minutes before the initial
24 shift was over at 7:00?
25    A   Yes, sir.

### Page 64

1     Q   And within 30 minutes of the shift that came
2  on, at 7:00.
3     A   Yes, sir.
4     Q   Okay.  At the time that you were the warden at
5  Martin CI and this event occurred, were you aware of any
6  policies that were in force at the Department of
7  Corrections related to protecting the life and safety of
8  inmates that you had not implemented or enforced?
9     A   No, sir.
10    Q   Did you ever speak to or train the corrections
11 officers at Martin CI to show a callous disregard for
12 the life and safety of their -- of the inmates there?
13    A   No, sir.
14       MR. COOK:  I'll stipulate to that.
15       MR. WISEBERG:  Okay.
16 BY MR. WISEBERG:
17    Q   Are you aware of any policy that the
18 Department of Corrections had not accurately reported
19 inmate deaths in the past?
20    A   No, sir.
21    Q   Are you aware of any policy where the
22 Department of Corrections has sabotaged investigations
23 to hide the true extent of any problems within the
24 Department of Corrections?
25    A   No, sir.

### Page 65

1     Q   Did you have any personal knowledge that the
2  environment within Martin Correctional was that
3  corrections officers knew they could engage in conduct
4  that violated a prisoner's civil rights, with impunity?
5     A   No, sir.
6     Q   Did you ever see that go on throughout the
7  time that you were the warden at Martin Correctional?
8     A   No, sir.
9     Q   Did you see that go on, as it relates to this
10 incident, regarding the death of Inmate Cox?
11    A   No, sir -- can we go back on that one
12 question?
13    Q   Sure.
14    A   Because I answered it too quickly.
15    Q   Sure.
16    A   I have terminated and disciplined staff for
17 using excessive force or for using unnecessary force
18 which would, by constitutional right, be a violation of
19 an inmate's civil right.  So, actions that were of that
20 nature, I took immediate and swift action upon.
21    Q   And as it relates to this incident, did you
22 take any immediate action to terminate the employment of
23 any Department of Corrections officer at Martin CI
24 related to this incident?
25    A   No, sir.

### Page 66

1  Q   Was there any -- was -- related to this
2  incidence, with regards to Mr. Cox and Mr. Hendry [sic],
3  was any form of use-of-force documentation filled out
4  that identified this as an excessive-use-of-force issue?
5  A   No, sir.
6  Q   From the records, it appears that Mr. Brown
7  was restrained prior to officers entering the cell that
8  evening --
9       MR. COOK: Form.
10 Q   -- is that correct?
11 A   Yes, sir.
12 Q   And in your discussions with the officers that
13 were present -- specifically Sergeant Feipel -- did he
14 make you aware that he restrained Mr. Brown before
15 entering that cell?
16      MR. COOK: Form.
17 A   I don't recall without reading -- honestly, I
18 don't recall if he had specifically told me that or not.
19 Q   But were you aware that Mr. Brown was
20 restrained prior to officers entering the cell, before
21 contact was made with Mr. Cox?
22 A   Yes, sir.
23      MR. COOK: Form.
24 Q   And did that cause any concern to you that
25 Mr. Brown was restrained prior to the cell being opened?

### Page 67

1  A   No, sir.
2  Q   Why not?
3  A   Because it's policy and procedure that the
4  inmates are restrained beforehand.
5  Q   And -- before -- before what?
6  A   Before entering a cell.
7  Q   And was -- did you become aware that Inmate
8  Cox was also restrained once Sergeant Feipel entered the
9  cell that evening?
10      MR. COOK: Form.
11 A   Yes, sir.
12 Q   Did that cause you any concern that Inmate
13 Cox, himself, was restrained once Sergeant Feipel first
14 entered the cell?
15 A   No, sir.
16 Q   Why not?
17 A   Because they don't -- until he determines
18 what's going on, it could be a staged incident for an
19 attack or, for safety reasons, for the -- for the nurse
20 that was there and for Sergeant Feipel, restraints were
21 probably applied until he could make a determination and
22 do an assessment with the nurse.
23 Q   Were you contacted after this incident by
24 anyone questioning as to why Inmate Cox was restrained
25 in the cell, despite his condition?

### Page 68

1  A   The HSA.
2  Q   What is the HSA?
3  A   The Health Service Administrator -- I can't
4  remember what his name was -- had sent me an email
5  the -- that following morning because the people that
6  were concerned with the nurses that responded after the
7  other nurses were responded -- they responded to a
8  medical emergency that they were dispatched to where the
9  cell door was secured and the inmate was handcuffed on
10 the floor.
11      So, they brought it to the attention because
12 they didn't realize the actions of Sergeant Feipel and
13 the nurse previously to the door being secured.
14 Q   Now, at the time that those nurses arrived and
15 the cell door was closed, why was Inmate Cox still
16 restrained?
17 A   From what I understand, that he was pronounced
18 dead by the nurse on the scene and that Sergeant Feipel
19 immediately started the crime-scene protocol, which was
20 to secure the cell door.
21 Q   When you arrived on scene and were in the
22 D-dorm, was the -- that cell where Mr. Cox was located
23 being treated as a crime scene?
24 A   Yes, sir.
25      MR. WISEBERG: That's all the questions I

### Page 69

1  have.
2       MS. HURLEY: One question.
3           EXAMINATION
4  BY MS. HURLEY:
5  Q   You just said that it was your understanding
6  that he was pronounced by the nurse on the scene. Where
7  does that understanding come from?
8  A   From Sergeant Feipel's statement.
9       MS. HURLEY: Okay. That's it. Thank you.
10      THE COURT REPORTER: Do you want to see if
11 Ms. Corey, on the phone, has any questions?
12      MR. COOK: Do you have any questions,
13 Ms. Corey?
14      MS. COREY: I just have one quick question.
15          EXAMINATION
16 BY MS. COREY:
17 Q   Mr. Hendry, you noted that every corrections
18 officer is a first responder and trained to do CPR.
19 Would it be the case if there was a correctional officer
20 that was present, but the -- as you noted the nurse
21 pronounced him dead. Would it be unreasonable for the
22 correctional officer not to attempt CPR at that point?
23      MS. HURLEY: Objection to form.
24      You can answer, sir.
25 A   No, ma'am.

Page 70

1 Q So, it would -- it would be -- that would be a
2 standard practice; that would be acceptable?
3 A I --
4     MS. HURLEY: Same objection.
5 A -- wouldn't consider it a standard practice,
6 but what I would say is that it's a gray area and that
7 correctional officers are -- receive significant
8 training in security, use-of-force, equipment training;
9 only eight hours of training, initially, in CPR; and
10 that if there was a healthcare professional that's a
11 full-time job and received certifications and training
12 in healthcare made a call -- that in that gray area, the
13 determination could be made by the officer.
14     But I can't -- there is no standard policy or
15 procedure for that specific thing. If a nurse makes the
16 call, the correctional officer doesn't have to act.
17 It's kind of like a -- a judgment call that you make
18 while you're on the scene.
19     MS. COREY: Okay. Thank you very much.
20     No further questions.
21     MR. COOK: Yeah, I've got something based on
22 that.
23         FURTHER EXAMINATION
24 BY MR. COOK:
25 Q Was Nurse Conrad an RN or an LPN?

Page 71

1 A That, sir, I do not know.
2 Q Okay. If -- if she was an LPN, do you know if
3 she has the ability to declare somebody dead?
4     MR. WISEBERG: Form.
5 A That, sir, I would believe she did not, but I
6 don't know the specific policies and procedures for the
7 company that was employed at the time to handle that --
8 what their protocol for that was. But no, sir, I don't
9 believe so.
10 Q Well, that wouldn't be up to the company,
11 would it? That's -- that's -- that's up to the
12 certification of the nurse, right?
13     MR. WISEBERG: Form.
14     You can answer.
15 A Yes, sir, but I'm just -- I'm not familiar
16 with that, so I can't honestly answer that if an LPN
17 versus an RN -- like the question that you asked me, if
18 one could make the call versus the other one. I don't
19 know the specifics on that.
20 Q But if -- as -- as the -- the chief of the
21 Bureau of Training, if -- if a nurse, even an LPN, tells
22 an officer that somebody is dead, then the officer is
23 supposed to treat them as dead?
24     MR. WISEBERG: Form.
25 A Well, there, again -- like I said, I wasn't

Page 72

1 there. And it would have several factors if that call
2 were made on that determination whether or not you acted
3 or didn't act. And I guess it would be based on the
4 unresponsiveness.
5     But like, I wasn't there. So, how do you want
6 me to answer that? Because I can give you my opinion
7 of -- of a different scenario. But you know, that
8 scenario -- I wasn't there. I don't know what was going
9 on in Feipel's head. I -- I don't know the specifics of
10 the conversation. I didn't see -- because you can't see
11 in the cell, from the fixed-wing camera, exactly what
12 was done with Inmate Cox.
13     So, without interviewing them or reading the
14 documents, I -- I just can't answer that question
15 honestly. You know what I'm saying?
16 Q Well, Feipel can't declare him dead, can he?
17 A No, sir.
18 Q Do you -- were you told that the officers
19 refused to allow the nurses to take -- and I'm talking
20 about the second group of nurses that came there --
21 would not allow them to take Cox to medical?
22 A I didn't -- I didn't -- that never came up
23 during my -- during my initial assessment of the
24 situation. That wasn't brought up to me.
25 Q They said it was a crime scene?

Page 73

1 A Yes, sir.
2 Q And wouldn't let them take Mr. Cox to medical?
3 A I hope that's not the case, but I don't -- I
4 don't know.
5 Q You're aware that Mr. Cox was warm when they
6 found him, right?
7 A No, sir, I don't -- I don't know any of those
8 specifics.
9 Q Okay. Do you recall what the autopsy said the
10 cause of death was, the direct cause of death?
11 A I haven't reviewed -- reviewed the autopsy,
12 sir.
13     MR. COOK: Okay. I have no other questions.
14     Anybody else?
15     MR. WISEBERG: No questions.
16     MS. HURLEY: No, thank you.
17     (Whereupon, the deposition was concluded at
18 1:25 p.m., and the witness did waive reading and
19 signing.)

Page 74

CERTIFICATE OF OATH

STATE OF FLORIDA   )
COUNTY OF LEON    )

I, the undersigned authority, certify that the above-named witness personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 5th day of March, 2018.

ANDREA KOMARIDIS
NOTARY PUBLIC
COMMISSION #GG060963
EXPIRES FEBRUARY 09, 2021

Page 75

CERTIFICATE OF REPORTER

STATE OF FLORIDA   )
COUNTY OF LEON    )

I, ANDREA KOMARIDIS, Court Reporter, certify that the foregoing proceedings were taken before me at the time and place therein designated; that my shorthand notes were thereafter translated under my supervision; and the foregoing pages, numbered 1 through 73, are a true and correct record of the aforesaid proceedings.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 5th day of March, 2018.

ANDREA KOMARIDIS
NOTARY PUBLIC
COMMISSION #GG060963
EXPIRES FEBRUARY 09, 2021