UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-14177-CIV-ROSENBERG/MAYNARD

MONICA STONE, as the Personal Representative
of the Estate of Christopher Cox, and on
behalf of Survivors Monica Stone and Ronald Doyle,

     Plaintiff,

v.

ROBERT HENDRY,
ROBERT FEIPEL,
CHRISTOPHER ROSE,
DAVID BAILES, AND
CAROLYN CONRAD,

     Defendants.

_____/

```
FILED by _____ D.C.

OCT 1 2 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE
```

## SECOND REPORT AND RECOMMENDATION ON PENDING MOTIONS (DE 130, 142, 144, 150 & 177)

**THIS CAUSE** comes before this Court upon an Order of Reference (DE 309) and the above Motions. Having reviewed the above Motions and the relevant record including the revised Responses (DE 281, 285, 287, 288 & 290) and Replies (DE 291, 294, 295 & 298), this Court recommends as follows:

### BACKGROUND

1.    On March 13, 2015, inmate Christopher Cox was moved into a cell with Hurley Brown. Other inmates in the wing were concerned about Cox's safety in Brown's cell. Their concern proved well-founded. Two days later Brown killed Cox. Around 7:30 PM he was found in his cell unresponsive, and by 8:00 PM

paramedics pronounced him dead. Monica Stone---who is Mr. Cox's mother and the personal representative of his estate---sued the Florida Department of Corrections ("FDOC")[1], the Warden of the Martin Correctional Institution ("MCI"), various MCI Correctional Officers, and an MCI nurse for his death. The Plaintiff argues that Cox should not have been paired with Brown; that the Defendants were deliberately indifferent to the substantial risk of harm that Brown posed to Cox; that that risk of harm bore out when Brown killed Cox; and that the Defendants were then deliberately indifferent to Cox's medical distress during and after the attack. The Plaintiff seeks to hold the Defendants liable under 42 U.S.C. § 1983 for the constitutional violations that resulted in Cox's death. The operative pleading is the Plaintiff's Third Amended Complaint (DE 173).

Procedural Posture

2.     The primary subject of this ruling are the Defendants' summary judgment motions. Moving for summary judgment are the two Correctional Officers Christopher Rose and David Bailes (found at DE 130); Robert Hendry, MCI's then Warden (found at DE 142); Sergeant Robert Feipel (found at DE 144); and Carolyn Conrad, a nurse at MCI at the time (found at DE 150). They claim

---

[1] The Plaintiff's claim against FDOC no longer is at issue in this federal lawsuit. At DE 261 the District Court remanded the Plaintiff's negligence claim against it back to state court. Consequently this Court excludes FDOC as a named Defendant from the case style.

qualified immunity, and they argue that the Plaintiff's deliberate indifference claims fail as a matter of law. Also at issue is the Motion to Dismiss/Strike (DE 177) where Defendants Warden Hendry and Sgt. Feipel ask the Court to strike the Plaintiff's claim for punitive damages.

3.    All of the above Motions are fully ripe. This includes the revised Responses and Replies that the District Court instructed the parties to file after this Court's first Report and Recommendation (DE 226) on the summary judgment motions. As they did in the first round of briefing, the Defendants continue to raise a variety of procedural-type objections to the Plaintiff's presentation of his arguments and his evidentiary proffer. For the same reasons this Court explains in its first Report and Recommendation, this Court overrules them here. The Defendants are in no position to complain or criticize. For example the Defendants now complain that the Plaintiff abused the "privilege" of being able to revise his Responses. What the Defendants omit from that criticism is how FDOC's delayed compliance with this Court's discovery Orders created the need for the re-briefing.

4.    As for the scope of the evidentiary record, this Court takes into consideration the full record that has been proffered both during the initial briefing and now in the revised briefing

of the summary judgment motions. This Court considers the entire available record: the Third Amended Complaint (to the extent the Plaintiff pleads specific facts), other pleadings, discovery, and proffered evidence. See Castleberry v. Goldome Credit Corp., 408 F.3d 773, 785—86 (11th Cir. 2005). (For ease of reference this Court provides a pinpoint docket citation for each item of record evidence.) This Court gives each item of evidence the weight that is appropriate for summary judgment review taking into consideration any admissibility objections. This Court excludes from consideration the affidavit found at DE 288-2 and DE 306 that the District Court struck from the record in its Order at DE 308. As for what the videos that the Plaintiff submits under seal as Exhibit B to DE 307 show, this Court will cite to the description that Special Agent Jester provides in his FDLE report found at DE 288—1. His description provides the equivalent to a citable transcript of what was filmed.

## Fact Background

5.   This Court fashions from the parties' respective proffers one general narrative of the underlying facts and sequence of events. This Court stresses that its recitation is drawn from the available record and with inferences drawn in the Plaintiff's favor under the Rule 56 standard of review. This

Court does not offer this recitation as the ultimate findings of fact.

6.    This Court begins with inmate Hurley Brown. The information in his "face sheet" on the FDOC's website (DE 191—8) shows that Brown has a criminal history that goes back to 1983. His current incarceration began in January 1998 for a robbery conviction. He was sentenced to 35 years. At the time of Cox's death in 2015 (and still today as Exhibit N to DE 288 shows), he has a release date in 2029. FDOC records (DE 191—4 & 191—9 and Exhibit K to DE 288) show a history of threats, violence, racist comments, and lewd and lascivious acts. On February 6, 2015 FDOC transferred Brown to MCI. The specific reason for the transfer is unclear.

7.    Those same disciplinary records show that in addition to being a threat to others, Brown sought protection for himself. At various times he has sought protection claiming to be a gang member in fear of reprisal. He made his most recent such request soon after his arrival at MCI. He complained that upon his arrival, he "was chased by two Blood members with knives." MCI's Institutional Classification Team ("ICT") denied his Protective Management ("PM") request, and on February 25, 2015 Brown administratively appealed that denial. He complained that the ICT laughed at his story. He accused the ICT of being

unprofessional, unsympathetic, and racist against him. He accused the panel of being indifferent to violence between black inmates. He speculated that the team would care more if blacks started killing "white boys".

8.   The Plaintiff pleads at Paragraph 83 of his Third Amended Complaint that "Brown had told MCI he was not right and needed help." The existing record contains no direct medical evidence about Brown's mental health (despite the HIPAA Qualified Protective Order authorizing its disclosure). Instead there is indirect indication of mental health issues. At DE 212 the Plaintiff references the mental health call-outs notated in the housing records. They suggest that Brown was receiving mental health care of some sort. The Plaintiff also points to other inmates' description of Brown's reputation as crazy and dangerous. His prison nickname is "Bug". This Court construes the inference in the Plaintiff's favor and assumes for present purposes that Brown posed mental health and violence concerns.

9.   As with Brown, the only information of record about Cox's criminal background is the FDOC website (DE 191—7 and Exhibit N to DE 288). It shows that in February 2012 Cox was sentenced to 25 years for second degree murder. This Court notes that at DE 174 the two Correctional Officer Defendants----CO Rose and CO Bailes---describe Cox as "a reputed gang member or

associated with gangs, who was in prison for ordering the execution murder of a gang member." Both the nature of the conviction and his gang affiliation reasonably could be construed to lessen the characterization of Cox as "prey" in the inmate-against-inmate violence sense of the term. However the Defendants leave the nature of Cox's conviction and criminal history undeveloped both factually (they proffer no supporting evidence) and in terms of their legal arguments.

10.   Records at DE 146—2 show that on several occasions before his transfer to MCI, Cox had sought PM status. Exhibit P to DE 288 contains FDOC records about the violence that Cox had suffered leading up to his transfer to MCI and his requests for PM status. They suggest stabbing and rape incidents.

11.   Cox was transferred to MCI on January 14, 2015 after a PM request that Cox had submitted on December 18, 2014. (The exact reason for the transfer is unknown.) His fears for his safety continued at MCI. He reported that a gang was threatening his life and requested to be transferred away from MCI. His family members had not visited him at MCI because they could not afford to travel that far, his mother explained at her deposition (DE 146—1), but she says that Cox had written two letters expressing concern for his personal safety. Cox's initial concerns at MCI do not relate to the present deliberate

indifference issues. As for his concerns about Brown, this Court notes the very brief period of time between Cox's move into Brown's cell and his death. Moreover contact with the outside would have been restricted during his time in administrative confinement. It is also important to note that Cox is unable to tell his side of the story about what happened and what requests for help or intervention he sought during those two days.

12.   Cox may have been receiving mental health care. Cox's prison records contain reference to "psych-evals" and to an incident of taking a handful of pills in front of a nurse on March 5th. The only other evidence that implies mental health treatment is the autopsy which found a low level of a medication in his blood that is commonly prescribed for seizure disorders or bipolar disorder.

13.   MCI's Institutional Classification Team ("ICT") had granted Cox's PM request. The State Classification Office ("SCO"), that reviews ICT's recommendations, then overruled ICT's decision, and it denied Cox's request. Consequently Cox did not have PM status at the time of his death although he was appealing the denial. Brown's situation was the same presumably. Consequently they both remained in administrative confinement pending their appeals. Both were in Dormitory D where MCI houses those with special confinement status.

14.    The Plaintiff says MCI is a prison that specializes in protective management. Ironically, according to the inmates who provided statements in conjunction with the investigation of Cox's death, MCI also has a reputation of being unusually violent and permissive toward (and even encouraging of) inmate-against-inmate violence and "hits". At his deposition Defendant Warden Hendry denied knowing about two inmate murders at MCI during the two years before he started there in November 2014.

15.    At this juncture this Court reviews what the ICT does and what the PM/administrative confinement means as it relates to the legal issues raised in this litigation. At DE 288-5 the Plaintiff proffers Rule 33—602.220 of the Florida Administrative Code. That rule sets forth the standards for administrative confinement.

16.    Section (1)(h) thereof explains that the "ICT is responsible for making work, program, housing and inmate status decisions at a facility". As Defendant Warden Hendry described it, MCI's ICT consisted of the classification supervisor, the assistant warden of programs, and the chief of security. The dormitory's housing officers and the sergeant also participate in the decision, he added. However he denied his own personal involvement. The Plaintiff counters that Defendant Warden Hendry was an "ex officio" member of the ICT by which this Court

presumes to mean he can participate by virtue of being in charge of the whole prison. This Court adds that section (1)(h) of Rule 33—602.220 defines the ICT as "consisting of the Warden or Assistant Warden, Classification Supervisor, a correctional officer chief, and other members as necessary when appointed by the warden or designated by rule."

17.   Administrative confinement is temporary and meant to keep an inmate secure while other proceedings or decisions are made. Placement in administrative confinement is decided by the ICT and overseen by the SCO or other supervisory officer. Those decisions are required to be well-documented. Inmates placed in administrative confinement are kept in their cells under "lock-down" close confinement conditions. At first they are not allowed to leave their cells at all. Then after some period of time they are permitted very short recreational breaks only. They may not leave their cells without restraints. Guards are required to check on administratively confined inmates every half hour at irregular intervals. Guards also are required to document information about administratively confined inmates that is relevant to the ICT and SCO's decision-making process. Such relevant information includes changes in housing location. The Plaintiff highlights the documentation responsibility placed on guards: guards are the "eyes and ears" on the ground.

18.   One reason for placing an inmate in administrative confinement is if he is applying for PM status. Rule 33—602.221 of the Florida Administrative Code sets out the standard for protective management. Its requirements are the same as and generally track those for administrative confinement. That includes the need to document relevant information in the appropriate logs. It also identifies the housing sergeant as the guard in charge of those inmates with PM status. At DE 307—1 the Plaintiff proffers Post Order No. 10 which is in effect a housing sergeant's job description. It restates the need to log information, such as cell changes, relevant for the ICT's decision-making.

19.   At DE 191—10 is MCI's Accreditation Report. Because it is dated March 2017---two years after the incident---it is not directly relevant. However it repeats the same emphasis on close supervision of special management inmates that the earlier documents do. The Accreditation Report stresses how, pursuant to Standard #4—4257, all special management inmates should be observed personally twice an hour and no more than 40 minutes apart, on an irregular schedule. It stresses the need for more frequent observation of inmates who are violent, mentally disordered, or who demonstrate unusual or bizarre behavior.

20.   The next point of inquiry relevant to this case
relates to  the standards or policies that govern cell
assignments. At Exhibit O to DE 288 and at DE 191—6 the
Plaintiff proffers an FDOC memorandum entitled "Potential
Predator Identification List". That memorandum addresses one
particular subject of concern when it comes to cell assignments:
the need to avoid placing a "prey" inmate in the same cell with
a "predator" inmate. The memorandum places the responsibility on
all prison staff including the warden to avoid creating such
situations. "Any [potential] inmate on inmate violence occurring
in the cell", the memo stresses, "will be closely scrutinized as
to the appropriateness of their housing in conjunction with this
memo". "It may be appropriate, to the extent possible," the memo
adds reflecting the seriousness of the matter, "for some inmates
to be housed alone." The Plaintiff says that that memorandum
predates Cox's assignment to Brown's cell and thus governed that
decision.

21.   The evidence is inconsistent whether the Inmate
Behavioral Assessment Scale/Sexual Risk Indicator ("iBAS")
compatibility software was in place yet. As Defendant Warden
Hendry explained at his deposition, the iBAS computer software
program aids the determination of whether two inmates should be
placed in the same cell together. The iBAS program compares such

factors as physicality (height and weight), gang affiliation, sentence length, and disciplinary history for violence or murder. He furthered that the assistant warden of programs and the grievance coordinator bring grievance-related concerns to the cell assignment decision, too. He does not know whether the program accounted for mental health, however. The reason for checking compatibility is to avoid creating a "predator and prey" situation inside a cell. Even if the iBAS software program were in place at the time, the memorandum stresses the continued need for staff's discretion and judgment. The memorandum does not leave it to the computer software program alone. "Security staff should be mindful of these issues when making cell assignments", the memorandum advises, and "[w]ardens should make this determination on a case-by-case basis and in the best interest of inmate and staff safety." "As always, database reports do not replace the sound correctional judgment of our staff." At his deposition Defendant Warden Hendry echoed the need to bring the "human element" to the decision to supplement the computer's calculation.

22.   There is very little evidence about why Cox was moved into Brown's cell. First there is very little evidence about what standards or policies guided that particular decision, and what evidence does exist about it is inconsistent. Part of the

decision to place two inmates together in the same cell entails consideration of their safety. Defendant Warden Hendry explained at his deposition that during the relevant time period, FDOC did have formal compatibility standards in place in the form of the "iBAS" computer software. Later in his deposition Defendant Warden Hendry then denied the existence of formal compatibility standards at the time. Defendant Sgt. Feipel (to whom the regulatory standards give cell-assignment decision-making responsibility) also denied that iBAS or other formal compatibility standard was in place when Cox was moved into Brown's cell. At his deposition (DE 145–3) Sgt. Feipel explained that at that time there was just one safe compatibility measurement: the respective inmates' disciplinary reports as rated on a scale of A–4 to A–8. Inmates with equivalent disciplinary situations were housed together. Sgt. Feipel explains that Cox and Brown both had an A–5 rating (which means seeking protection) and thus were housed together because they shared the same rating. He said that inmates who are seeking protection may be housed together---unless there is something in the housing records[2] that says otherwise.

23.    This Court notes that PM status does not necessarily mean an inmate is in need of protection. Defendant Warden Hendry

---

[2] At his deposition (DE 158–11) Defendant CO Rose explained that the "DC-229" is a housing record in which guards sometimes make entries.

explained at his deposition that both those seeking protection and those who pose a danger to others may have PM status. The Plaintiff argues that Brown was being held for both reasons, both for his own safety and for the safety of other inmates. This Court assumes that Cox was seeking PM status solely for his own safety, by contrast. This Court presumes that inmates who have PM status or who are awaiting PM status determination receive the same administrative confinement classification. Defendant Warden Hendry furthered that MCI tries to house administrative confinement status inmates together. Whether MCI separates those PM inmates who seek protection from those PM inmates who pose a risk to others (rather than put both types in the same cell under lock-down together), he did not address. This distinction presumably was not taken into consideration when Cox was moved into Brown's cell.

24.   Second there is little evidence about who at MCI generally decides how to house inmates in administrative confinement pending PM determination. Defendant Warden Hendry says the ICT is primarily responsible. Alternatively, when there is need for a quicker decision, the housing sergeant makes that decision alone but with the aid of the "iBAS" computer program. The overall consistent theme in the evidence seems to be that

the housing sergeant is a decision-maker if not the primary decision-maker.

25.   There is no direct information about who specifically decided to place Cox in Brown's cell (and that person's reason for doing so). Defendant Warden Hendry denies any knowledge. The other Correctional Officer Defendants deny any knowledge. Defendant Sgt. Feipel was the housing sergeant for the area where Cox was killed. However he was not directly asked whether nor did he specifically volunteer that he was the one who decided to placed Cox in Brown's cell. The relevant portion of his deposition is limited to the exchange in which Sgt. Feipel was asked, "Do you happen to know why Mr. Cox and Mr. Brown were put in the same cell together?", to which he answered, "They were both A-5 [status]". This particular exchange might support the inference that Sgt. Feipel was the decision-maker.

26.   This Court stresses how the cell assignment was not documented---even though both the governing regulations and Defendant Warden Hendry himself say that such a decision should have been documented. SA Jester noted this omission, too. At page 8 of his report at DE 288-1, SA Jester stated that he "did not observe any record on Cox being moved to cell 2210. Furthermore, on March 13, 2015, when Cox was allegedly moved to cell 2210 the record only reflected satisfactory for appearance

and attitude." Indeed, as the Plaintiff stresses, MCI's records
showed Cox still assigned to his prior cell number even after
his death. The Plaintiff highlights the very meager information
available about Cox's assignment to Brown's cell at pages 13—14
of her Revised Omnibus Response at DE 281. The Plaintiff argues
that the lack of documentation and the failure to update his
cell assignment imply that the cell re-assignment decision was
made unofficially or informally.

27.  As noted above the reason for the move is unknown.
Plaintiff contends that it could not have been motivated by bed
space needs. Citing to the records proffered at Exhibit G of DE
288, the Plaintiff argues that the wing was not at full
occupancy. It may have been simply to keep together two inmates
in administrative confinement who were appealing the denials of
their respective PM requests, as Sgt. Feipel says. A third
theoretical possibility is that Cox was moved into Brown's cell
for the purpose of causing Cox harm out of some sort of
retaliatory motive, for example. Inmate Powell says that "it is
not unusual for officers to place inmates in cells with tougher,
heavier, more aggressive inmates for whatever reasons", adding
that he has "had other friends die that way." In any event, for
whatever reason, Cox was moved into Brown's cell.

28.   The Plaintiff provides the history of Cox's cell assignments at MCI at Exhibit L to DE 288. That history begins on February 3, 2015 when MCI's ICT granted Cox PM status and moved him into cell no. D2214 in Dormitory D. He shared that cell with an inmate by name of Denis McAuliffe. On March 1st inmate Willie Davis became his new cellmate. (SA Jester took no statements from either McAuliffe or Davis, this Court notes.) Davis left on March 12th, leaving Cox alone in the cell for the rest of that day. On March 13th Cox was removed from cell no. D2214 and moved to cell no. D2210 with Brown. This is the cell assignment at issue.

29.   Brown had been in cell no. D2210 since his arrival at MCI on February 6th. Unlike with Cox, SA Jester did interview Brown's previous cellmate, Shernerd Richardson. Richardson had attempted suicide several times (and again after he was moved to a new cell) motivated by the desire to leave MCI. Richardson was moved to another cell on March 9, 2015. Richardson reported no problems with Brown, however, and it is unknown why he was moved out of Brown's cell. This Court emphasizes a few points from Richardson's statement (which starts at page 11 of DE 148—5). First is Richardson's complaint about the guards' response when he cut himself. (This is similar to Brown's own perception of an unsympathetic ICT.) Second, when the guards did intervene, they

sprayed a chemical agent into the cell before entering it, after which both Richardson and Brown had to be treated for the exposure. (Brown told SA Jester that he told Cox to commit suicide elsewhere to avoid being pepper-sprayed.) Third is the fact that Richardson's last suicide attempt while in Brown's cell involved making a noose from a bed sheet and hanging himself from the top bunk. (Brown said that Cox attempted suicide in the same way.) After only two days in his cell, Brown's next cellmate, Cox, committed suicide in that way, as Brown told investigators.

30.   Cox feared the move into Brown's cell. Neighboring inmates were concerned for his safety, too, as they later recalled when SA Jester interviewed them. Inmate Ernest Powell told SA Jester at his interview that "Cox seemed very uncomfortable about moving into [Brown's cell and] that he did not know if it was a set up." Powell also recalled those concerns in his Declaration (Exhibit S at DE 288). The neighboring inmates were concerned that the pairing would create a "predator/prey" situation. Cox was smaller and younger. FDOC's website states Cox's weight as 134 lbs. (which is the same weight that SA Jester gave in his report)[3]. He was 28 years old

---

[3] The coroner reported Cox's weight as 174 lbs. Dr. Sperry said that it is common for coroners to report an incorrect weight. Because the Defendants did

at the time. Powell describes Cox's personality as friendly and even-tempered. Brown was heavier. (FDOC's website states his weight as 198 lbs., but SA Jester estimated it to be 165 lbs.) Powell described Brown's reputation as being dangerous and sexually predatory. The Plaintiff pleads at Paragraph 85 of his Third Amended Complaint that "Brown had indicated . . . that he was going to rape Cox." The Plaintiff pleads that the neighboring inmates voiced their concern to MCI.

31.   This Court considers next the events of Cox's attack and death. Another main issue raised in this litigation is the span of time during which the cell went unchecked and the time it took for guards to respond to Cox's distress, both of which the Plaintiff argues permitted Cox's death.

32.   There is no dispute that MCI guards were required to check the Dormitory D cells every thirty minutes and also as part of every change of guard. The record contains videos of the relevant dormitory wing during the relevant time period. The Plaintiff files those DVD's under seal as his Exhibit B at DE 307. SA Jester includes in his FDLE report a descriptive narration, a transcript of sorts, of what those video recordings show. As he describes it, the video shows that at 6:25 PM, a guard conducted a cursory cell check, not looking into every

---

not produce the coroners' photographs, he is unable to confirm the weight that the coroner reported.

cell and not looking into Brown and Cox's cell either. The whole wing was checked in three minutes.

33.  Next, according to the Housing Log filed under seal as Exhibit G at DE 307—3, Defendant CO Rose conducted an inmate count at the shift's start at 7:00 PM. Defendant Sgt. Feipel signed off on that log entry. However SA Jester found the video to contradict their report. The videos of the wing from that time show no guards in the wing. It was not until 7:25 PM when prison staff---Sgt. Feipel and Nurse Conrad---entered the wing. Defendant Warden Hendry permits some delay in conducting shift change inmate counts given the variety of tasks that incoming staff must do at the shift's start. Sgt. Feipel explained at his deposition that the Housing Log entry was intended to reflect the previous shift's concluding inmate count.

34.  Having considered the full proffer on the matter and all of the parties' arguments, it suffices to say for present purposes that cell no. D2210 went unchecked for a 90 minute span of time and in a way that may have violated written policies (although the shift change inmate count was consistent with what Warden Hendry allowed). Moreover there is evidence that reasonably could support the finding that Brown anticipated the incoming shift's delay in conducting its starting inmate count. For present purposes this Court construes this evidence in the

Plaintiff's favor and assumes that the 6:25 PM check did not include a visual check into Cox's cell; that no inmate check at all was done at 7:00 PM; and that Defendants Sgt. Feipel and CO Rose inaccurately reported conducting a check at 7:00 PM.

35.   The record contains statements from the neighboring inmates about the events surrounding Cox's death. Warden Hendry said at his deposition that he had instructed them to cooperate with SA Jester and to report what they knew. Their statements enter the record through the FDLE Summary Report (DE 148-5)--- the complete version of which is found at DE 288-1---authored by SA Jester who interviewed them. The details differ between their respective recollections, and only one inmate had some sort of view into the cell. The rest recall what they heard. The common thread running through their respective reports is that starting between 6:50 and 7:00 PM, they began to sense a struggle happening inside the cell. Inmate Cedri says he heard Cox cry out for help, Brown's answer that everything was alright, and the sound of strangling. Inmate Gallagher says that he had a view into the cell and saw Brown choking Cox. Several inmates heard the struggle end with a thud sound. Inmate Cedri then heard the sound of running water and cleaning up. Around 7:15 PM (some inmates place the time a few minutes before and some place it a few minutes after) the neighboring inmates began yelling

"Man Down!" which is prison lingo for an inmate in distress and made other commotion to attract the guards' attention. No guard responded to their collective cries for help. In his Declaration Powell concedes that such din is common in the wing.

36.   The only evidence of a specific alert being communicated directly to a specific guard comes from inmate Cedri. As he told SA Jester (found at page 24 of DE 288–1), he saw Defendant CO Bailes checking the perimeter of Dormitory C and yelled to him that "a man was getting killed in the cell next to [his]."

37.   At around 7:25 PM Defendant Sgt. Feipel[4] entered Dormitory D to conduct a security, safety, and sanitation check. The videos show this to be the first entry of a guard into the wing since 6:25 PM. Defendant Nurse Conrad accompanied Sgt. Feipel to pass out medication. They both recall hearing the din, but they did not know what it concerned. Sgt. Feipel briefly left the dormitory to get his radio which he had forgotten. Soon after being in the wing, Sgt. Feipel got a better sense of what the inmates were trying to communicate, and he went directly to cell D2210 to check on Cox and Brown. He then summoned Nurse Conrad to assist him.

---

[4] Sgt. Feipel's statements of record consist of his interview as summarized by SA Jester (DE 148–5), affidavit (DE 144-1), and deposition (DE 145–3). Sgt. Feipel had worked at MCI since 2000 and for FDOC for 25 years. At the time of the incident he was the Sergeant of Confinement in Dormitory D handling intake. His shift had started at 7:00 PM.

38.    Through the cell door flap, Sgt. Feipel and Nurse
Conrad saw Cox unresponsive with a noose-like ligature around
his neck. Cox was lying face down into a pillow with his arms
along his side. Sgt. Feipel handcuffed Brown through the flap
before opening the cell. After entering the cell he placed
restraints on Cox (who remained unresponsive). That was in
accordance with lock-down close confinement procedure. Defendant
CO Rose responded to Sgt. Feipel's call for assistance and
escorted Brown out of the cell.

39.    Next Nurse Conrad entered the cell and examined Cox.
Sgt. Feipel flipped him over. She observed blood that had
drained from his mouth and nose as well as from an abrasion on
his forehead. Cox was warm but pale with some discoloration in
his nose and ears. There is a dispute in the record[5] over the
degree to which Nurse Conrad rendered medical care to Cox.
Construing the record in the light most favorable to the
Plaintiff, Nurse Conrad's actions were limited to checking his
wrist pulse. She found no pulse, and she observed no chest
movement. Nurse Conrad quickly formed the opinion that Cox
already was dead. She undertook no resuscitative measures and
resumed her medication round. Based on her opinion that Cox

---

[5] Nurse Conrad wrote an Incident Report on March 15, 2015. It is found at DE
204—13. SA Jester interviewed her, and the Plaintiff deposed her. Her
deposition is found at DE 158—6.

already was dead, neither Sgt. Feipel nor CO Rose undertook resuscitative measures either.

40.   Captain Martens[6] declared the cell a crime scene. This meant that the cell (including Cox) could not be disturbed, and the cell was locked to secure it. CO Rose was ordered to log all traffic in and out of the cell.

41.   Although Captain Martens declared a crime scene, it was not initially treated that way. When the guards first entered the cell, Brown said that Cox had had a seizure. This affected the medical staff's response to the situation. Although Nurse Conrad had requested medical staff, the responding medical staff did not know that the situation was of an unresponsive inmate. Had they known of the true situation, they would have responded differently. Another factor that affected the medical response was the fact that the cell door was locked. That caused a delay while the responding medical staff waited for the cell to be unlocked and re-opened.

42.   SA Jester came to the scene on March 15th to investigate Cox's death. SA Jester initially had been told it was a suicide. Upon his arrival Warden Hendry told SA Jester that Brown had spontaneously told a guard that he had "taken Cox

---

[6] Captain Martens was Sgt. Feipel's superior. The Plaintiff originally named him as a Defendant, but he passed away in February 2017. That was the subject of DE 51. Captain Martens' story of what happened is recorded in the Incident Report that he had written and which SA Jester summarizes in his FDLE Report at DE 148—5.

out" in self-defense after Cox had attacked him first. (The
guard who had heard that spontaneous utterance and who relayed
it to Warden Hendry is unidentified.) After Brown admitted to
killing Cox, the investigation shifted from one about suicide to
one about a possible crime.

43.   Also on, that same day, March 15th, SA Jester
interviewed Brown post-Miranda in the presence of the Chief
State Attorney for Martin County and an Assistant State
Attorney. Brown told them that he awoke to the sound of Cox
trying to hang himself. Brown told Cox not to try that in the
cell because he did not want to be pepper-sprayed when the
guards responded. Brown assumed that the matter was over and
fell back asleep. He awoke to Cox attacking him. He fought back,
punching and kicking Cox including stomping on his head. He
fought back hard not knowing if Cox had a weapon. Cox was lying
on the floor on his stomach. Cox became unresponsive and then
began making a gagging noise and was having a seizure. Thereupon
it was he who called out to the neighboring inmates to get the
guards' attention. Brown said he placed the pillow under Cox's
head but with Cox's face to the side. He denied trying to kill
Cox.

44.   The two nurses who responded to Sgt. Feipel's and/or
Nurse Conrad's call for medical assistance were Nurse Williams

and Nurse Darlington[7]. They thought they were responding to a seizure event and had assumed that they would be bringing the inmate back to the infirmary for care. Because they did not know he already was in an unresponsive state, they did not bring all of their first-aid medical equipment with them to the cell. En route they passed guards who said the inmate was dead. They also passed Nurse Conrad who said, "he looks dead to me".

45.   They arrived at the cell at 7:41 PM. (After an updated review of the evidence the Plaintiff calculates in her Revised Response that Nurse Williams and Nurse Darlington arrived at Cox's cell sixteen minutes after Nurse Conrad.) When Nurse Williams and Nurse Darlington arrived, no one was administering CPR. It took three to four minutes for the cell door to be unlocked and opened for them. The other prison officials were acting on the belief that Cox already was dead and beyond help. His cell already was being treated as a crime scene.

46.   Inside they found Cox in restraints and lying on his back. They saw blood coming from his nose and mouth and from a forehead bruise. They observed signs of strangulation and trauma. His ears and nail beds were cyanotic. They found no pulse or blood pressure. They found him still very warm to the

---

[7] Both Nurse Williams and Nurse Darlington wrote Incident Reports. Nurse Williams' is found at DE 204-14. In addition to reviewing their Incident Reports, SA Jester interviewed them. He includes their statements in his Summary Report at DE 148—5.

touch. They began CPR, requested an AED, and requested an EMS 9-1-1 call. Nurse Jones[8] arrived with the AED. She hooked it up to him, but the machine advised against administering an electric shock after detecting no sign of heart activity. EMS arrived at 8:05 PM, took over CPR, and then pronounced Cox dead.

47.  Dr. O'Neil performed the autopsy. Her Coroner's Report is dated May 19, 2015 and is found at DE 158–9. Dr. O'Neil observed brain contusion and hemorrhage, cerebral swelling, muscular hemorrhages around the neck, larynx fracture, tongue contusion, muscular hemorrhages in the right side of the back, and pulmonary edema and congestion. She declared the cause of death to be blunt trauma injuries to the head and neck, and she declared the manner of death to be homicide[9]. (It does not appear that Dr. O'Neil estimated the time of death.)

48.  The Plaintiff engaged Dr. Sperry, M.D., as her expert forensic pathologist expert. His deposition is found at DE 158–10. Dr. Sperry was the chief medical examiner for the State of Georgia for 18½ years, retiring in November 2015 (thus seven months after Cox's death). His career in public health service

---

[8] Nurse Jones wrote an Incident Report on March 16, 2015. It is found at DE 204–15. SA Jester interviewed her for his Summary Report, as well.

[9] Dr. O'Neil's autopsy report clarifies that suicide was not the cause of Cox's death. It is therefore accurate to say that Brown "killed" Cox. The determination of whether Brown unlawfully murdered Cox has not been made. Defendants CO Rose and CO Bailes highlight that difference at DE 175 where they refer to "the alleged 'killing' by inmate Brown" and at DE 207 where they refer to the alleged murder of Cox by Brown.

began in 1979. The Defendants argue that Dr. Sperry and his medical opinion in this case do not meet the Daubert standard. This Court finds his professional experience, the breadth of the records that he reviewed, and the detail of his deposition testimony to be sufficiently compelling to take it into consideration for present purposes. He did not have the benefit of Dr. O'Neil's autopsy photographs, but that was because the Defendants had not produced them.

49.   Moreover Dr. Sperry largely agreed with Dr. O'Neil's opinion. Dr. Sperry's opinion differed from her report in that he reached some additional findings based on what Dr. O'Neil had reported. From the degree of brain injuries and the amount of brain swelling that Dr. O'Neil reported, Dr. Sperry opines that some degree of slow suffocation contributed to his death. In other words the blunt force injuries to his head were the primary---but not sole---cause of death. Dr. Sperry attributes the partial and slow suffocating effect to lying face down in the pillow (and not to Brown's initial choke-hold on Cox). The fact that Cox was unable to turn his head out of the pillow to breathe implies that he already was unconscious.

50.   Moreover the degree of brain swelling that Dr. O'Neil reports suggests that Cox lived 15 to 30 minutes after Brown physically attacked him (with it more likely 30 minutes than 15

minutes). This raises the possibility that Nurse Conrad might have been able to revive him, although Dr. Sperry cannot make that assertion with medical certainty. Dr. Sperry cannot opine with a medical degree of certainty one way or the other whether Cox could have been revived when Nurse Conrad and Sgt. Feipel first encountered him.

51.   Secondly Dr. Sperry doubted that the noose-like ligature that was found around Cox's neck played any role at all, whether as the cause of death or even the cause of the neck injuries. Because the ligature could not have caused the injuries observed or been a contributing cause of death, Dr. Sperry deduces that it was placed around his neck after the attack. Otherwise Dr. Sperry regarded the observed injuries and trauma to be consistent with Brown's description of how he had attacked Cox. Dr. Sperry furthered that the brain swelling could have caused seizure-like manifestations.

52.   Dr. Sperry is not the only one to think Nurse Conrad should have begun CPR as soon as she arrived. Several others who responded to the scene, including the other nurses, were critical. The Director of Nursing at MCI at the time, Nurse Robert Silvis, complained. He was fired afterward on May 26, 2015. The medical services contractor at MCI, Wexford, said it fired him because "he was doing poor care". Nurse Silvis said

Wexford fired him in retaliation for raising "several issues concerning the nurses at [MCI]" with various administrative staff including Warden Hendry regarding documented incidents of concern. The foregoing is subject of a report by the Office of the Inspector General (DE 191—12).

53. Nurse Conrad no longer works at MCI or for Wexford. At her deposition she said that she retired from nursing after the incident. The OIG Report suggests that she was fired and is no longer permitted to work at an FDOC facility. At the time of his deposition (in February 2018) CO Rose was still working for FDOC but at a different facility. Captain Martens passed away. Warden Hendry left MCI in March 2016 to work as an FDOC trainer. He did not follow the Cox investigation and does not know what became of it. Warden Hendry denies administering any discipline as a consequence of this incident. He sees nothing about the incident that could have been done differently---other than the inaccurate initial report of a suicide and of the need for training materials on how to house inmates together.

54. As for the consequences to Brown, SA Jester testified at his deposition that he left the question of whether Brown had committed any crime to the State Attorney's Office to answer. SA Jester furthered that the State Attorney's Office decided not to pursue any criminal charges against Brown. Presumably the State

Attorney's Office did not believe it could overcome his claim of self-defense, he speculated. FDOC removed Brown from MCI the day after the incident. His disciplinary record (at page 11 of DE 191—4) shows only that he received a penalty of 90 days' lost gain-time for the administrative offense of lewd or lascivious exhibition on March 15, 2015 (the day of the incident)[10]. The FDOC "face sheet" for Brown that is found at Exhibit N to DE 288—1 and dated January 28, 2018 shows no significant change in his anticipated prison release date.

 55. Exhibit C at DE 288—1 is the 60-page comprehensive report that Special Agent Eric Jester wrote for the Florida Department of Law Enforcement. It is the product of all of the factual inquiries and interviews that he conducted. It is thorough and even touches upon the shortcomings that the Plaintiff stresses in her Response such as the inaccurate log entry about the 7:00 PM inmate check and the lack of documentation about Cox's move to Brown's cell. However it is solely a fact record. SA Jester offers no opinions of a legal nature and offers no opinions about regulatory or prison protocol compliance.

---

[10] The record contains no direct evidence of an act of a sexual nature by Brown on the day of the incident. The only possible evidence of such is Inmate Cedri's statement to SA Jester, found at page 9 of DE 148—5, of his belief that Brown had attacked Cox to rape him.

## SUMMARY JUDGMENT STANDARD OF REVIEW

56.   This Court applies the well-established standard for deciding a claim of relief summarily under Rule 56, Fed.R.Civ.P. See Essex Ins. Co. v. Barrett Moving & Storage, Inc., 2018 WL 1407067 (11th Cir. 2018) (providing a recent application of the Rule 56 standard of review). See also, Caldwell, supra (applying the summary judgment standard in the deliberate indifference context). That standard requires the moving Defendants to show the absence of a genuine issue of material fact and the ability of this Court to rule on the merits of the claim on the existing evidentiary record as a matter of law. That standard requires the Plaintiff as the opposing party to proffer sufficiently probative evidence by which a reasonable jury could find in her favor and the existence of a dispute over a material fact that warrants sending the claim to the jury to resolve. This standard of review requires this Court to draw all reasonable factual inferences in the Plaintiff's favor.

## DISCUSSION & ANALYSIS

57.   The Eighth Amendment of the U.S. Constitution protects inmates from cruel and unusual punishment. It sets the standard for the treatment of inmates and the conditions of their confinement. Prison officials must care for inmates' basic life necessities, and there are several different manifestations of

that obligation. One such manifestation is inmate safety. A prison official must take reasonable measures to ensure an inmate's safety and to protect inmates from harm. Gratuitous violence against an inmate serves no penological purpose. A prison official therefore violates an inmate's Eighth Amendment right if he is deliberately indifferent to a substantial risk of serious harm to the inmate. See Farmer v. Brennan, 511 U.S. 825 (1994). Another such manifestation is inmate health. A prison official violates an inmate's Eighth Amendment right if he is deliberately indifferent to the inmate's serious medical need. See Estelle v. Gamble, 429 U.S. 97 (1976). A third manifestation is when a prison official violates an inmate's Eighth Amendment right in a supervisory capacity. See Harper v. Lawrence County, 592 F.3d 1227 (11th Cir. 2010). Title 42 U.S.C. § 1983 provides an aggrieved inmate the cause of action to seek redress for an Eighth Amendment violation.

58.   The Plaintiff alleges three different kinds of deliberate indifference. Generally speaking, they all share the same basic elements. Therefore this Court's review of the elements in the failure to protect from risk of harm context applies generally to the other two contexts, too. This Court notes any material differences between them in the respective discussions below.

59.   As for the elements that the Plaintiff must prove to prevail on a deliberate indifference theory of relief, this Court reviews the case law of Williams v. Bennett, 689 F.2d 1370 (11th Cir. 1982), Farmer v. Brennan, 511 U.S. 825 (1994), Carter v. Galloway, 352 F.3d 1346 (11th Cir. 2003), McBride v. Rivers, 170 Fed.Appx. 648 (11th Cir. 2006), Rodriguez v. Sec'y, Dep't of Corrs., 508 F.3d 611 (11th Cir. 2007), Goodman v. Kimbrough, 718 F.3d 1325 (11th Cir. 2013), Caldwell v. Warden, 748 F.3d 1090 (11th Cir. 2014), Brooks v. Warden, 800 F.3d 1295 (11th Cir. 2015), Bowen v. Warden, 826 F.3d 1312 (11th Cir. 2016), Scott v. Miami Dade County, 657 Fed.Appx. 877 (11th Cir. 2016), and Woodyard v. Ala. Dep't of Corrs., 700 Fed.Appx. 927 (11th Cir. 2017). This Court adds that Reid v. Polk, 2018 WL 1426428 (M.D.Fla. 2018) provides a recent discussion of that case law.

60.   The three main elements are as follows: First, the aggrieved inmate must have faced a harm that is serious in nature. This Court notes that the above case law recognizes inmate-against-inmate violence as a serious harm. There also must be a substantial risk of that serious harm. That is, a strong likelihood of occurring (as opposed to a mere possibility), and the risk of harm must be relatively concrete, not abstract or general. However an inmate need not wait to actually suffer that harm before he may seek redress. See

Helling v. McKinney, 509 U.S. 25 (1993). Whether the inmate demonstrates this first "substantial risk of serious harm" element is determined objectively.

61.   The second element concerns the defendant's conduct, and it consists of three sub-parts. It entails showing (1) the defendant's subjective (actual) awareness of that risk of harm and (2) the defendant's failure to respond in an objectively reasonable manner despite that knowledge. It entails showing (3) that the defendant committed that wrongdoing with a heightened degree of culpability. That is, the inmate must prove that the defendant's wrongdoing is more blameworthy than mere negligence and possibly more than gross negligence[11].

62.   The third element is causation. It requires the plaintiff to link the defendant's wrongdoing causally to the harm suffered. One way to show causation is to show that a prison official failed in his "duties, discretion, or means" to reduce the risk of harm.

---

[11] This Court notes some discussion in the case law over whether the standard requires culpability greater than "gross negligence" or greater than just simple negligence. For the precise culpability standard this Court applies the holding from the seminal case of Farmer, supra, which requires a showing of culpability equivalent to conscious disregard. In any event the standard does not require the inmate to prove blameworthiness at the level of a purposeful or intentional act to inflict harm.

<u>Deliberate Indifference to Risk of Harm</u>
<u>(Assigning Cox to Brown's Cell)</u>

63.   At Count I of her Third Amended Complaint the
Plaintiff contends that Defendants Warden Hendry, CO Rose, and
CO Bailes failed to protect Cox from the substantial risk that
Brown might seriously harm him. The Plaintiff argues that they
were deliberately indifferent to the harm that would result from
placing Cox in the same cell with Brown. It is that cell
assignment decision that is the act that underlies the
Plaintiff's failure to protect theory of relief.

1. Objective Harm

64.   This Court begins by accepting as true for present
purposes that the cell assignment presented a substantial risk
of harm to Cox. This Court accepts as true that both Cox,
himself, and the neighboring inmates were concerned about Cox's
safety inside Brown's cell. This Court accepts as true that
certain criteria (Brown's disciplinary history and reputation,
the physical and sentence differences between the two, etc.)
were factors that could have called Cox's safety into question.
In addition to those standard compatibility factors, there was a
point of consideration specific to this situation: just a few
days before killing Cox, Brown expressed in his administrative
appeal to MCI what reasonably could be construed as motivation
to kill someone like Cox. This Court also accepts as true that

Brown could have anticipated the delayed cell check during the guards' shift change. This Court therefore assumes that Cox was facing a risk of harm that was potentially both violent and specific in nature and thus of sufficient magnitude to satisfy that first element of the cause of action. The Defendants had an obligation to prevent inmate-against-inmate violence.

2. Subjective Knowledge

65.    The deliberate indifference theory of relief (whether it be in the failure to protect, medical need, or supervisory contexts) turns on what the defendant subjectively (actually) knew. A prison official cannot deliberately fail to protect an inmate from a risk of harm of which the prison official personally knew nothing about. Through sworn affidavits and deposition testimony the Defendants deny any subjective knowledge of any reason why Cox should not be assigned to Brown's cell. There is at least some evidence that Defendant CO Rose had reason to anticipate Brown's sexual interest in someone like Cox. That evidence---inferred from inmate Powell's description of what Defendant CO Rose would have observed of Brown in the showers[12]---is too speculative, however, to show the

---

[12] Defendant CO Rose counters at page 5 of his Reply (DE 291) that MCI is "not mandated to be comfortable or provide services of a good hotel" and thus the Plaintiff has no justiciable complaint over Brown's sexually aggressive behavior in the showers. However Cox, as an incarcerated person in the State's custody, is MCI's ward for whom MCI is responsible for his safety and general well-being. See Helling, 509 U.S. at 32. That is the circumstance

risk of physical assault on Cox. There is no evidence that any of the Defendants actually knew of Brown's threat to kill whites (although it was available in Brown's grievance record). The Plaintiff therefore fails to establish this element with the existing record evidence, and for that reason summary judgment may be entered in the Defendants' favor. This Court's analysis of the causation element below also shows how the Plaintiff fails to establish the subjective knowledge element.

### 3. Causation

66.   The third element concerns whether there is any causal link between the cell assignment and Cox's death. As the Fourth Circuit noted in the analogous supervisory liability context, "liability ultimately is determined by pinpointing the persons in the decision-making chain whose deliberate indifference permitted the constitutional [violation to occur]." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal citation omitted). Not only do the Defendants deny subjective knowledge of the risk of harm, but they also deny any involvement with the cell assignment decision. At the time of the incident Sgt. Feipel was sergeant of confinement/housing sergeant in charge of intake in Dormitory D. In his affidavit (DE 144—1) he denies any

---

that underlies the deliberate indifference cause of action. Nevertheless, even if CO Rose knew of Brown's proclivities, there is no evidence that CO Rose moved Cox into Brown's cell despite that knowledge. CO Rose affirmatively denies involvement.

"involvement in the decision for these two inmates to be housed together" despite his post. In his affidavit (DE 148—2) CO Rose likewise denies any responsibility for cell assignments either generally or with respect to Cox specifically. CO Bailes expressly denies the same in his affidavit (DE 148—3). Someone other than them, the Defendants therefore represent to this Court, made the decision to move Cox into Brown's cell[13].

67.   The Defendants deny any involvement in the decision through sworn affidavits and sworn deposition testimony. There is nothing in the record that directly contradicts their denials of involvement or brings their denials into genuine dispute. If the Defendants named in Count I did not participate in the cell assignment decision, then it does not matter what they subjectively knew. The Plaintiff's failure-to-protect theory of relief is moot as to them. What the Plaintiff must do is "pinpoint" the decision-maker(s) and raise her failure to protect-based theory of relief against them.

---

[13] Frustratingly the Defendants deny any personal involvement in the cell assignment decision without identifying who the decision-maker(s) are (and without disclosing the actual decision-making process). This includes Defendant Hendry who despite being the warden and conceding in his Motion (DE 142) general responsibility for inmate housing, went to his deposition unprepared to explain who exactly made the cell assignment decision. (The primary portion of this area of inquiry is found at pages 48—52 of DE 191—5). Defendant Warden Hendry only goes so far to describe the different ways in which a cell assignment decision can be made and the different ranks and titles of officers who may participate in that decision. Defendant Warden Hendry offers nothing more specific than that, especially in regard to Cox's cell assignment. Earlier at page 13 of his deposition when he was asked, "Did you ever become aware of the name of the officer or officers who placed Mr. Cox into that cell?", he answered "No".

68.   Nor does the record contain information about how that decision was made. There are only two possibilities for how that decision could have been made. The cited regulations suggest that a cell assignment decision is the product of some formal process, but the lack of any documentation suggests that was not the case here. The other possibility is some informal, ad hoc decision. Presumably that is what happened here. It also is unknown why Cox was moved into Brown's cell. Their shared administrative confinement designations could have been one reason---or even the sole reason---for why they were placed in the same cell together. If the decision was made for a legitimate reason (and not to cause Cox harm), then that fact would run counter to the Plaintiff's theory of relief.

69.   Therefore this Court finds Defendants Warden Hendry, CO Rose, and CO Bailes entitled to summary judgment on Count I to the extent that the Plaintiff alleges that they personally assigned Cox to Brown's cell with deliberate indifference to the serious harm that that assignment posed. This Court finds them entitled to summary judgment on the basis of their sworn denials of any involvement in that assignment decision. If none of the named Defendants participated in the cell assignment decision, then they cannot be found liable. Without knowing who the responsible decision-maker(s) are and what the reason for the

cell assignment was, this Court cannot judge the merit of the
Plaintiff's failure-to-protect theory of relief.

### Deliberate Indifference to Risk of Harm
### (The Response to Cox's Attack)

70.   Count I alleges another instance of failure to protect
against Defendants Warden Hendry, CO Rose, and CO Bailes. That
is, for "failing to come to Cox's aid before it was too late to
protect him." This Court construes this theory of relief to
concern the span of time that starts when Brown attacked Cox and
afterwards when the neighboring inmates were trying to get the
guards' attention. This is not the focus of Count I (which
mainly concerns the cell assignment). Nevertheless this Court
will consider it here as its own free-standing theory of relief.

71.   The element of the deliberate indifference to risk of
harm standard that is dispositive to this particular inquiry is
the "subjective awareness" element. As the above cited case law
stresses, "deliberate indifference" means the failure to take
remedial action despite actual awareness of the harm or the risk
of harm. This Court discerns nothing in the record that suggests
or raises the possibility that Defendant Warden Hendry actually
knew that Cox had been attacked and was in distress. He was not
physically present in the vicinity to know Cox was in distress.
At page 32 of his deposition he recalls being at his residence
when Captain Martens called him to report the situation. On this

record evidence Warden Hendry cannot be held liable for not responding to Cox's need for help.

72. Defendant CO Rose was assigned to Dormitory D, and his shift had just started. CO Rose explained at his deposition (DE 158—11) that he began his shift by attending a briefing in the visitation area and then went to Dormitory D where he conducted preliminary tasks such as storing his lunch and conducting an equipment inventory. He first became aware of the situation when he responded to Sgt. Feipel's call for help, he said. Moreover the video recordings reportedly confirm that no prison guard or official entered the relevant dormitory wing after the 6:25 PM check. On this record evidence this Court cannot hold Defendant CO Rose liable for not responding to Cox's need for help. This holds true even though CO Rose entered an entry into the Housing Log that said he checked the intercom at 7:00 PM. It remains speculative whether that intercom check would have enabled him to make sense of the inmates' calls for help. It is possible moreover that that log entry is inaccurate just as the entry about conducting the inmate count was.

73. However there is some record evidence that could tie Defendant CO Bailes to the situation. This comes from inmate Cedri's statement to SA Jester that he saw CO Bailes checking the perimeter of Dormitory C and yelled to "him that a man was

43 of 59

getting killed in the cell next to [his]." Inmate Cedri said
that he had heard sounds of fighting through a vent and asked
them what was going on. Brown answered first, saying that
everything was alright. Cox answered next, yelling "Help, Ced,
everything is not alright!" (This is found at page 9 of DE 148–
5.) Inmate Cedri also believes that CO Bailes wrote a report of
the incident. After yelling to CO Bailes, Cedri then prompted
the other inmates to call out for help for Cox, he recalled.

    74.   Although Cedri's statement does constitute some
evidence of subjective awareness by a prison officer (CO
Bailes), this Court finds it to be insufficient evidence by
which to create a genuine dispute. CO Bailes explains in his
affidavit (DE 148–3) that his shift started at 7:00 PM and that
he was finishing pre-shift tasks too far away from either
Dormitory C or D to have known what was going on. He first
learned of the situation when Captain Martens, whom he was with
at the time, received the radio call. SA Jester's report
suggests that it was CO Huertas-Rodriguez---not CO Bailes---who
was doing that perimeter check of Dormitory C. However CO
Huertas-Rodriguez denied hearing anything like that coming from
Dormitory D. (In any event CO Huertas-Rodriguez is not a
defendant to this lawsuit.) Therefore, on the record evidence,
this Court finds that Defendant CO Bailes had no subjective

knowledge of Cox's distress, and for that reason he cannot be found liable under a deliberate indifference cause of action. This finding holds true even if, as the Plaintiff responds, SA Jester did not definitively ascertain who that Dormitory C guard was.

75.   To be clear, this Court sees no genuine dispute of fact over whether inmate Cedri had alerted some guard about the attack. This Court accepts that assertion as true. The relevant point here is that Plaintiff proffers insufficient evidence to show that CO Bailes was the one who was checking the Dormitory C parameter at the time when Cedri says he yelled at him (or someone whom he believed to be CO Bailes). The record evidence shows that CO Bailes still had not yet finished his pre-shift duties and was with Captain Martens when word began to spread.

76.   To the extent the Plaintiff includes in her deliberate indifference theory the predictable pause in cell checks at the shift's start, this Court finds insufficient evidence for that particular argument to survive summary judgment either. This Court sees no evidence of how the simple fact of that predictable pause created an actionable risk of harm. It is relevant to the Plaintiff's deliberate indifference theory only when coupled with the cell assignment theory. However, as this Court explains above, this Court sees insufficient evidence for

the Plaintiff's cell assignment claim against the named
Defendants to survive summary judgment.

### Deliberate Indifference (Supervisory Context)

77.  Next this Court considers the Plaintiff's claim that
Defendants Warden Hendry and Sgt. Feipel were deliberately
indifferent in their supervisory capacity. The Plaintiff raises
this cause of action at Count II. There the Plaintiff argues
that those two named "supervisory Defendants failed to implement
or follow a lawful inmate classification system that identified
predator and non-predator inmates, and those suffering from
mental health problems, which directly resulted in Brown and Cox
being housed together in a single cell."

78.  This Court draws the legal standard for what
constitutes liable supervisory conduct from Cottone v. Jenne,
326 F.3d 1352 (11th Cir. 2003), McDowell v. Brown, 392 F.3d 1283
(11th Cir. 2004), and Harper v. Lawrence County, Ala., 592 F.3d
1227 (11th Cir. 2010). The deliberate indifference standard in
the supervisory context places the same emphasis on subjective
knowledge and causation. It asks whether the supervisor
knowingly disregarded, condoned, promoted, or tacitly permitted
conduct that created a known or obvious risk of harm to an
inmate. In other words a supervisor is not vicariously liable
simply by virtue of being the supervisor. The supervisor must

have played some role in or had some direct responsibility for the constitutional deprivation that the inmate suffered. The denials of involvement in the cell assignment decision by Defendants Warden Hendry and Sgt. Feipel therefore mean neither can be found liable for taking some <u>affirmative</u> supervisory action in relation to Cox's cell assignment. The record evidence does not call their denials of any direct conduct into genuine doubt. Given the case law's strict requirements in the deliberate indifference context, this Court finds an insufficient basis to send the supervisory-based theory of relief to the jury.

79.   Starting at page 7 of her Revised Omnibus Response (DE 281) the Plaintiff frames the argument in terms of "subjective recklessness" to that risk of harm, citing Farmer, supra. The Plaintiff argues that lax security (inferred from how Brown and Cox had gone unchecked for 90 minutes) and an inadequate cell assignment system created the risk for the kind of harm that Cox unfortunately experienced. The Plaintiff argues that MCI's dangerous environment heightened the need for more careful oversight. However the Plaintiff does not develop that argument with sufficient specificity to show a constitutional deprivation. Without a supporting factual predicate showing how either Warden Hendry or Sgt. Feipel deliberately allowed

inadequate oversight or excessive permissiveness, the argument remains one of vicarious liability or negligence neither of which is actionable. The evidence of record already contains Warden Hendry's explanation for why the inmate count at the shift's start was delayed: to give the incoming staff time to complete all of their tasks. The cell assignment issue is wholly undeveloped. It is possible, as Sgt. Feipel attests, that Cox was moved into Brown's cell in compliance with then existing compatibility standards. If such were true, then the lack of documentation would not necessarily support the Plaintiff's position. If, by contrast, some prison staff member moved Cox into Brown's cell on an informal ad-hoc way, there is little evidence to show it. Even if it did happen that way, there is little evidence to show it as common practice and a common practice of which Warden Hendry or Sgt. Feipel directly or indirectly condoned.

80.    The same holds true for the cell assignment. Warden Hendry's broad denial of knowledge of or involvement in the cell assignment decision-making process may leave open the question of whether through <u>inaction</u> he was deliberately indifferent to the risk that the cell assignment process would pair a "predatory" inmate with a "prey" inmate. As warden he did have at least "ex officio" influence over the cell assignment

protocol and decision-making process. It is in effect the flip-side of Hendry's denial of any relevant knowledge about the cell assignment including of the decision-maker's identity. However without a supporting fact predicate this possibility remains theoretical speculation.

81.  As for Defendant Sgt. Feipel, the Plaintiff neither pleads nor does the proffered evidence show what action he took in a supervisory role that affected the cell assignment decision. Sgt. Feipel therefore is entitled to summary judgment in his favor on Count II.

82.  The regulatory evidence suggests that Sgt. Feipel, as the housing sergeant, instead exercised direct responsibility for cell assignment decisions. In this way he would have acted as the decision-maker and not as the supervisor of the decision-maker. However the Plaintiff does not include Sgt. Feipel under Count I of his Third Amended Complaint as a Defendant whom she alleges was deliberately indifferent as a direct actor (i.e., as someone who decided to move Cox into Brown's cell). Even if this Court were to construe the Third Amended Complaint very broadly and include him under the Count I theory of relief, this Court still would find him entitled to summary judgment. There is no direct evidence that affirmatively shows that Sgt. Feipel was the housing sergeant who decided to move Cox into Brown's cell.

49 of 59

Moreover Sgt. Feipel affirmatively denies being that person. At Paragraph 9 of his affidavit, found at DE 144—1, Sgt. Feipel attests: "I had no involvement in the decision for these two inmates to be housed together." Even if he were, he further denies any subjective knowledge of the risk. As he re-asserts at page 8 of his Reply (DE 295): "[Defendant Sgt. Feipel] states in his Motion, and through his affidavit as an exhibit to his motion, that he had no knowledge from any source, directly or indirectly, prior to the alleged incident that there was a 'substantial risk of serious harm' to Cox in being housed with Brown."

Deliberate Indifference (Medical Need)

83.    Count III raises the third theory of deliberate indifference. The Eighth Amendment right at issue here concerns an inmate's serious medical need. The failure to respond to an inmate's serious medical need violates the Eighth Amendment right against cruel and unusual punishment. Serious medical suffering serves no penological purpose. The deliberate indifference standard in the medical need context remains fundamentally the same as the two contexts discussed above. Ways in which a prison official can be deliberately indifferent in this context is either (1) by not responding or refusing to respond to an inmate's need for medical care or (2) by delaying

treatment unreasonably, without explanation, or for a non-medical reason. A violation also can be shown through grossly inadequate medical care, the administration of easier but less efficacious treatment, or the administration of medical care that is so cursory that it amounts to no treatment at all. See generally, Melton v. Abston, 841 F.3d 1207 (11th Cir. 2016) and Truschke v. Chaney, 2018 WL 814579 (S.D.Ga. 2018) (providing recent statements of the governing case law).

84.   The Plaintiff brings Count III against Defendants CO Rose, CO Bailes, and Nurse Conrad for their alleged failure to render aid after Brown had attacked Cox. The first aspect of the Plaintiff's theory of relief concerns the lack of response to the neighboring inmates' cries for help. However, as this Court explains above, there is no record evidence that either of these three named Defendants actually knew that Cox was in distress and in need of medical care. Just because inmates were trying to alert guards to Cox's need for help does not necessarily mean the guards were able to make sense of it. As inmate Powell concedes, the noise and din that the inmates were making is common in the wing. The record evidence shows that once staff realized what was going on, they did respond immediately. This Court sees no evidence that the guards knowingly delayed their reaction to the inmates' calls for help for the purpose of

causing harm to Cox. Therefore this Court finds the Defendants entitled to summary judgment on this particular point.

85.   The other aspect of the Plaintiff's theory of relief concerns their response when Cox was found. The first responders at the scene were Sgt. Feipel and Nurse Conrad, next joined by CO Rose (who answered Sgt. Feipel's call for assistance), and thirdly Captain Martens and CO Bailes (who also answered a radio call for assistance). None of them began resuscitative measures. As for the guards, Defendants CO Rose and CO Bailes, the medical need-based deliberate indifference standard applies to them differently because they are not medical personnel. See Truschke, 2018 WL 814579 at *5. Even if the standard were the same, Count III still fails against them. This is because neither of them were the first at the scene, and they were acting on instructions from their superiors to handle other needed matters related to the situation. Defendants CO Rose and CO Bailes therefore are entitled to summary judgment on the failure-to-resuscitate aspect of Count III.

86.   The proper focus is Nurse Conrad. Not only was she the first on the scene (along with Sgt. Feipel), but she was medical staff. For present purposes this Court construes the record evidence to show that Nurse Conrad's response was limited to a cursory check for life signs. She was quick to form the opinion

that Cox already was dead and beyond the need for first aid or resuscitative measures. That opinion in turn caused other prison guards and officials at the scene not to render first aid or attempt resuscitation.

87. Nevertheless the failure to render first aid and resuscitation aspect of Count III against Nurse Conrad fails and for several reasons. First if Cox indeed was dead and beyond resuscitation when Nurse Conrad first found him, then there was no serious medical need in a purely clinical sense. Next is the question of whether Nurse Conrad acted with the required degree of culpability when she decided not to respond with medical care (in the form of first aid and resuscitative measures). As to this point this Court construes the other responding nurses' statements and the supervising nurse's formal complaint to establish that Nurse Conrad was negligent---and even grossly negligent---in her conduct. Even if a matter of standard procedure or even a matter of simple conscientiousness, it reasonably could be said that Nurse Conrad should have evaluated Cox more thoroughly, should have attempted resuscitation, and should have solicited appropriate medical help. The dispositive point is that those "should have's" do not rise to the level of deliberate indifference. If Nurse Conrad genuinely perceived Cox to be dead and perceived no medical need, then she did not

withhold medical care with deliberate indifference. Even if Nurse Conrad's negligence constitutes medical malpractice, it is a degree of culpability insufficient to prove deliberate indifference.

88.   The third element is causation. If Cox already was dead and beyond resuscitation, then it stands to reason that Nurse Conrad's failure to respond did not cause or contribute to his death. This Court gives careful consideration to Dr. Sperry's opinion. It may have been within the realm of possibilities that immediate first aid and resuscitative measures might have brought Cox back, Dr. Sperry opines. This Court assumes for present purposes that Dr. Sperry's opinion is sound. However it is a moot point whether it suffices to create a genuine dispute of fact regarding causation because the Plaintiff still fails to prove all required elements.

### Qualified Immunity

89.   All of the individual Defendants claim the defense of qualified immunity. This Court assumes for present purposes that all of the individual Defendants, including Nurse Conrad, are the kind of government actors who may seek qualified immunity protection and that they all acted within the scope of their discretionary authority with respect to the incident involving Cox.

90.   Resolving those points in the Defendants' favor shifts the burden to the Plaintiff to refute their claims of qualified immunity. A Defendant is not entitled to qualified immunity if (1) the Defendant violated Cox's constitutional rights and (2) that constitutional right was clearly established at the time. The case law that this Court cites above discusses the qualified immunity standard in the deliberate indifference context. <u>See also</u>, <u>Dang v. Sheriff</u>, 871 F.3d 1272 (11th Cir. 2017).

91.   In a practical sense the qualified immunity claims are moot. The individual Defendants (with the exception of Nurse Conrad) were not the relevant actors who were involved in the cell assignment decision and none of them personally knew that Cox lay dying during the period of time between Brown's attack and Sgt. Feipel's check. The individual Defendants have no practical need for qualified immunity because they are not the proper defendant-parties to the causes of action. To the extent a legal ruling is required here, this Court finds the individual Defendants entitled to qualified immunity for the same reason the Plaintiff fails to show a violation of Cox's Eighth Amendment constitutional right on the merits. Because the Plaintiff fails to overcome qualified immunity's first element, this Court need not consider the second element of whether Cox's Eighth Amendment right was clearly established.

92.    The qualified immunity issue is not moot with respect to Nurse Conrad. In comparison to the other named Defendants, she was a participant. Nevertheless the Plaintiff still fails to overcome qualified immunity's first element. She proffers insufficient evidence to warrant sending the question of whether Nurse Conrad was deliberately indifferent to Cox's medical need to the jury. Because the Plaintiff fails to contradict Nurse Conrad's qualified immunity claim on the first element, there is no need for this Court to consider whether Cox's constitutional right was clearly established to put Nurse Conrad on fair notice.

## CONCLUSION

93.    The Plaintiff's allegation that deliberate indifference may have caused the death of her son, Christopher Cox, is reasonably made. The Plaintiff proffers evidence that could suggest an improper cell assignment and a predictable gap in inmate checks that together bears a relationship to Cox's death. The neighboring inmates regarded Cox's assignment to Brown's cell as too risky. Moreover Brown raised in an administrative appeal grievance what reasonably could be construed as a threat to kill someone like Cox. That grievance also reasonably could be construed as notice to MCI of the existence of a specific risk that Brown would harm someone like

Cox. At page 28 of his deposition (DE 191—5), Defendant Warden
Hendry said that he is in the loop for inmate grievances and
that inmate grievances factor into a cell assignment decision.
That suggests that the grievance did or should have played a
role in Cox's assignment decision.

94.    The record suggests that MCI had---or should have had-
--some sort of decision-making system or protocol for making
cell assignments whose purpose was to avoid creating
"prey/predator" cell assignments. That system may have failed
Cox. Brown killed him very soon after being moved into his cell.
If that system did fail him, it failed without any negative
consequences or repercussions to Brown or to those responsible
for Cox's safety and well-being. That is where the record stops,
however. The record does not identify who made the decision to
assign Cox to Brown's cell---other than to exclude the named
Defendants. On the basis of their sworn testimony and the lack
of sufficient evidence to refute their sworn testimony directly,
this Court finds them entitled to summary judgment in their
favor.

95.    As for Nurse Conrad, she was the first medical
personnel to find Cox after Brown had attacked him. Therefore,
unlike the other named MCI officials, she properly stands as a
Defendant against the Plaintiff's medical need-based deliberate

indifference claim for relief. However she still is entitled to summary judgment. The record evidence fails to show that Nurse Conrad deliberately failed to provide first aid or to initiate resuscitative measures. This is because the record does not suggest that she subjectively perceived him still to be alive. In addition, if Dr. Sperry's opinion that Cox still could have been revived when Nurse Conrad first found him is rejected, then neither can the Plaintiff prove the existence of a serious medical need or causation.

**ACCORDINGLY**, this Court recommends to the District Court that the Motions for Summary Judgment (DE 130, 142, 144 & 150) be **GRANTED**. This Court recommends that summary judgment be entered in favor of Defendants Warden Hendry, Sgt. Feipel, CO Rose, CO Bailes, and Nurse Conrad. Next this Court recommends that the Defendant's Motion to Dismiss/Strike Claims for Damages (DE 177) be **DENIED** as moot.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Robin L. Rosenberg, the United States District Judge assigned to this case. Failure to file timely objections shall bar the parties from a de novo determination by the District Court of the issues covered in this Report and Recommendation and bar the parties from attacking on appeal the

factual findings contained herein. LoConte v. Dugger, 847 F.2d 745, 749—50 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988).

   **DONE AND SUBMITTED** in Chambers at Fort Pierce, Florida, this ____12th____ day of October, 2018.


                                    _Shaniek Maynard_
                                    SHANIEK M. MAYNARD
                                    UNITED STATES MAGISTRATE JUDGE